**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISTOPHER R. OLSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff<br><br>v.<br><br>MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, LP; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, LP,<br><br>Defendants | Case No.<br><br><br>CLASS ACTION COMPLAINT<br>JURY TRIAL DEMANDED |

Plaintiff Kristopher R. Olson brings this action, individually and as a class action on behalf of all others similarly situated, to recover damages for defendants' wrongful promotion of fantasy baseball wagering competitions that they caused to be, and knew or should have known were, corrupt and dishonest.

## NATURE OF THE ACTION

1.      For decades in the Twentieth Century and into this Century, defendant Major League Baseball ("MLB") stridently opposed the legalization of sports gambling in this country and, in particular, legalization of gambling on baseball. MLB argued that the honesty and integrity of major league baseball would be jeopardized if gambling on baseball was permitted. MLB repeatedly assured its fans that it was protecting the integrity of the game; and to emphasize its commitment to the public of ensuring that baseball remained free of gambling-related taint or corruption, MLB imposed lifetime bans on star players who became involved with gambling – Shoeless Joe Jackson in 1921, Pete Rose in 1989. MLB reiterated this commitment after the United States Supreme Court invalidated federal prohibitions on state legalization of sports gambling in 2018, lobbying state legislatures considering whether to

legalize sports gambling for "integrity fees" to compensate it for the cost of maintaining the honesty of the game in the face of the dangers that legalized sports gambling posed to the integrity of baseball.

2.      Defendant MLB's attitude toward wagering on baseball changed – secretly in 2013 and then publicly in 2015 – as MLB recognized and sought to take advantage of the enormous popularity and lucrative financial opportunities presented by fantasy sports wagering competitions.  Investing in fantasy baseball was a win-win proposition for MLB.  Not only would it be able to benefit financially by sharing in the multi-million dollars of entry fees fantasy baseball contestants paid their fantasy sports operator, but fan interest in the game would be heightened by fan participation in fantasy baseball wagering, resulting in greater attendance, higher advertising and broadcasting revenues, and additional sales of MLB merchandise and paraphernalia.

3.      In 2013, MLB, through its affiliated entity, defendant MLB Advanced Media, L.P. ("MLBAM"), made a confidential investment in daily fantasy sport operator DraftKings Inc. ("DraftKings"). Two years later, MLB added to its original undisclosed investment with a greater, now-public, equity investment in DraftKings. As MLB stated at the time, its investment would enable it "to reap meaningful benefit from the rise of daily fantasy."[1]

4.      To that end, MLB did not simply become a passive investor in DraftKings. Rather, describing itself as DraftKings' "partner,"[2] and entering into a comprehensive league partnership agreement with DraftKings,[3] MLB has participated, from at least 2015 to date, in

---

[1] Eric Fisher, *A look into DraftKings' MLB Deal*, SPORTS BUSINESS JOURNAL (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Jan. 22, 2020).
[2] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Jan. 22, 2020).
[3] *Id.*

actively promoting DraftKings' fantasy baseball competitions – featuring DraftKings' fantasy baseball contests across MLB's media properties, granting DraftKings broad promotional and advertising rights, including use of MLB league and team logos, designating DraftKings as MLB's "Official Daily Fantasy Game," and affording DraftKings the exclusive right to sign sponsorship agreements with MLB individual member teams.[4]

5.      Defendant MLB is an unincorporated association of baseball's 30 major league teams, and – as anticipated in MLB's 2015 agreement with DraftKings – MLB's individual member teams have entered into lucrative individual promotional agreements with DraftKings. Concurrent with MLB's 2015 investment, DraftKings' signage immediately appeared in 27 of MLB's 30 stadiums, and MLB teams engaged in co-branding promotions with DraftKings. In particular, as relates to this lawsuit, two of MLB's constituent member teams – the Houston Astros LLC (the "Houston Astros" or the "Astros") and the Boston Red Sox LP (the "Boston Red Sox" or the "Red Sox") – entered into agreements with DraftKings and have, throughout the period relevant to the claims against them in this lawsuit, actively promoted and featured DraftKings' fantasy baseball competitions to their fanbases.

6.      Through their relationship with DraftKings, MLB and its constituent teams, including the Astros and Red Sox, have encouraged their fans to take a financial stake in DraftKings' fantasy baseball wagering competitions by engaging in what the fantasy sport world defines as a "game of skill" – wagering on the performance of MLB's players through

---

[4] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Jan. 22, 2020) ("DraftKings' existing partnership with Major League Baseball included a provision that it is the only DFS site that can sign deals with individual teams.").

DraftKings' fantasy baseball contests. MLB has enthusiastically embraced DraftKings' slogan that "Life is more fun with skin in the game."[5]

7.     And MLB's fans – believing the game to be honest – have engaged in DraftKings' games of skill to the tune of millions of dollars in daily fantasy sports baseball contest fees, to DraftKings', MLB's, and MLB's member teams' enormous financial benefit.

8.     What MLB's fans did not know was that MLB's and its member teams' commitment to ensuring the honesty and integrity of the game of baseball had also changed, substantially undermining and compromising the fairness not only of MLB team vs. team competitions, but DraftKings' fantasy baseball contests as well.  While actively inducing their fans to enter into fantasy baseball wagers based on the individual statistical performance of MLB players, MLB's member teams secretly engaged in corrupt and fraudulent conduct, in knowing and intentional violation of MLB's Official Rules and regulations, that produced player statistics distorted by cheating and deprived their fans of an honest fantasy baseball competition. The corrupt conduct of at least two of those teams – the Houston Astros and the Boston Red Sox – has now been publicly exposed, revealing that, at the very least, all of DraftKings' fantasy baseball contests from early in the 2017 baseball season through the end of the 2018 regular season and into the 2019 season, were tainted by cheating and compromised, at the expense of DraftKings' contestants.

9.     Throughout this period, MLB was well aware that its member teams were engaging in corrupt and fraudulent conduct that rendered player performance statistics dishonest

---

[5] *See, e.g. DraftKings Expands Partnership with Major League Baseball to Become an Authorized Gaming Operator*, DRAFTKINGS (July 25, 2019), https://about.draftkings.com/2019/07/25/draftkings-expands-partnership-with-major-league-baseball-to-become-an-authorized-gaming-operator/ (accessed Jan. 22, 2020)("DraftKings is a global sports technology and entertainment company *that believes life is more fun with skin in the game*.)(emphasis added).

and undermined the validity of its fan wagers on DraftKings' fantasy baseball contests. MLB wholly failed to properly investigate, deter, remedy or disclose its members' misconduct and purposefully continued to encourage fan participation in what it knew to be corrupted fantasy baseball competitions.

10.     Plaintiff Kristopher R. Olson – like millions of other similarly-situated DraftKings' contestants – was a victim of this wrongful conduct by MLB and its corrupt member teams.  Believing Major League Baseball games to be honestly conducted, Plaintiff Olson and his fellow DraftKings' contestants made wagers on DraftKings' fantasy baseball contests that they thought were based on the honest performance of MLB's players, when instead the contests were based on the cheating by MLB's teams and their players that MLB chose to turn a blind to and knowingly failed to prevent or disclose. Neither Plaintiff Olson, nor any other DraftKings' contestants would have wagered on daily fantasy baseball contests if they had known that the players' performance statistics on which their wagers were based were not honest.

11.     Plaintiff Olson now brings this action, on his own behalf and on behalf of his fellow DraftKings' contestants, to recover the amounts they wagered in these corrupt fantasy baseball competitions, including all fees paid to DraftKings, as well as for statutory and punitive damages, attorneys' fees and costs, and such other relief as warranted by applicable law.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members as defined below, and minimal diversity exists because a majority of putative class members are citizens of a state different than Defendants.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendants reside in and are subject to the court's personal jurisdiction in this District in that they either have their principal places of business in this District or transact substantial business in this District on an ongoing basis and are subject to the court's personal jurisdiction with respect to this action.

**PARTIES**

**A.     Plaintiff**

14.     Plaintiff Kristopher R. Olson is a citizen of the Commonwealth of Massachusetts.

**B.     Defendants**

15.     Defendant Major League Baseball ("MLB") is an unincorporated association whose members are the thirty Major League Baseball Clubs. MLB, on behalf of its members, and acting through its Office of the Commissioner, has responsibility for administrative and operational matters relating to Major League Baseball. MLB's headquarters are located at 1271 Avenue of the Americas, New York, New York.

16.     Defendant MLB Advanced Media, L.P. ("MLBAM") is a limited partnership comprised of the owners of MLB's member teams and has its principal place of business at 1271 Avenue of the Americas, New York, New York. Defendant MLBAM has responsibility for internet and interactive marketing for MLB, including MLB's relationship with DraftKings and promotion of DraftKings' fantasy baseball competitions.

17.     Defendants MLB and MLBAM are collectively referred to, herein, as the "MLB Defendants."

18.     Defendant Houston Astros, LLC (the "Houston Astros" or the "Astros") is a Texas limited liability corporation that owns and operates the Houston Astros professional major league baseball team and is a constituent member of MLB. At all times relevant to the events at issue in this lawsuit, defendant Houston Astros, LLC engaged in continuing substantial business in this District, individually and as a member of defendant MLB.

19.     Defendant Boston Red Sox Baseball Club LP (the "Boston Red Sox" or the "Red Sox") is a Massachusetts limited partnership that owns and operates the Boston Red Sox professional major league baseball team and is a constituent member of MLB. At all times relevant to the events at issue in this lawsuit, defendant Boston Red Sox Baseball Club LP engaged in continuing substantial business in this District, individually and as a member of defendant MLB.

## FACTUAL BACKGROUND

### I.     Fantasy Baseball

20.     Fantasy Baseball is a statistics-based wagering competition in which contestants assemble lineups (a "fantasy team") of real-life MLB players to compete against lineups of MLB players selected by other contestants.

21.     The performance of a contestant's fantasy lineup is directly tied to the real-life performance of the players that comprise the contestant's team. Points are awarded to each player on a contestant's fantasy baseball team based on the player's objectively measurable statistical baseball performance achievements (*e.g.*, home runs, hits, batting average, strike outs, earned run average). The contestant whose fantasy team earns the most points wins the contest and the contest's cash prize.

22.     Fantasy sports competitions, including fantasy baseball, are defined as a "game of skill" and are exempted from federal prohibitions on illegal gambling and are authorized forms of wagering in 43 states and the District of Columbia.

**II.     DraftKings' Fantasy Baseball Wagering Contests**

23.     DraftKings Inc. is a Delaware corporation with its principal place of business in Boston, MA. DraftKings was founded in 2012 and operates fantasy sports contests on daily and weekly bases through its website and mobile applications. DraftKings offers daily fantasy contests across multiple sports, including baseball.  In contrast to traditional fantasy sports contests, which typically last an entire season, DraftKings' contests start and end in a much shorter period (*i.e*, a single day or week).

24.     Daily fantasy sports ("DFS") baseball competitions ("MLB DFS") offered by DraftKings require contestants to select their lineups of MLB players pursuant to a "salary cap" draft. In this draft, each real-life MLB player is assigned an imaginary value, or "salary." The better a real-life MLB player has or is expected to perform, the higher his "salary." Contestants are required to draft a fantasy team with players whose aggregate salary is less than the salary cap allocated to the contestants in each given competition. The past statistical performance of the real-life MLB players available to be drafted by contestants is, thus, a material consideration for contestants, who rely on the accuracy of the past statistics in making decisions about whether to draft a player to their lineups and how much to "spend" on a player in the draft.

25.     DraftKings' MLB fantasy contests begin once the first real-life MLB game on which the contest is based commences. For example, in a weeklong MLB fantasy contest, the contest begins when the first MLB game of the week begins. Contestants accumulate fantasy points based on the real-life performances of the MLB players they have selected for their

lineups. The total points the contestant's line-up of real-life players generate during each specific competition determines the contestant's ranking in the contest. Because the points are tied directly to real-life performance metrics, a contestant's final ranking in the contest, and pecuniary gain or loss, is wholly dependent on player performance.

26.     DraftKings' MLB daily and weekly fantasy contests typically take one of two forms: head-to-head contests, which feature only two competing contestants and lineups, and tournaments, which can include tens of thousands of user lineups. Fantasy contestants pay an entry fee to join each competition. A portion of each entry fee is kept by DraftKings as payment for its DFS services, and the remainder is used to fund the prize money for each fantasy competition.

27.     From the outset, DraftKings' DFS contests have proved enormously popular and lucrative. In 2014, just two years after it was formed and the year preceding the formation of its league partnership agreement with MLB (discussed below), DraftKings reported over $300 million in DFS entry fees and over $30 million in revenue.[6] DraftKings further reported an eight-fold increase that year in participants in its fantasy baseball wagering contests.[7]

28.     In 2013, less than a year after DraftKings was founded, defendant MLB – through defendant MLBAM – invested in an equity stake in DraftKings.[8] At the request of MLB, the investment was not publicly disclosed by DraftKings (or MLB).[9] While the amount of the

---

[6] *See* Darren Heitner, *DraftKings Reports $304 Million of Entry Fees in 2014*, FORBES (Jan. 22, 2015), https://www.forbes.com/sites/darrenheitner/2015/01/22/draftkings-reports-304-million-of-entry-fees-in-2014/ (accessed Jan. 22, 2020)("Daily fantasy sports operator DraftKings has released its key annual fiscal year 2013 and 2014 financials for the first time, which shows entry fees of $45 million in 2013 and a rise to $304 million in 2014. Revenues were $4 million and $30 million, respectively.").

[7] *Id.*

[8] Albert Chen, *Billion Dollar Fantasy: The High-Stakes Game Between FanDuel and DraftKings That Upended Sports in America*, 174 (2019).

[9] *Id.*("[DraftKings'] 2013 marketing partnership with MLB was a watershed moment because it was the first daily fantasy partnership with a professional sports league, *but it also was a ghost deal— at MLB's behest, there was no*

investment has still never been disclosed, it was large enough to cause DraftKings employees who knew the details to be "taken aback by the size of it."[10]

29.     In April 2015, MLB and DraftKings publicly announced that MLB was taking a further equity stake in DraftKings. While the size of MLB's 2015 investment has remained undisclosed, MLB's investment was "described by league executives as *sizeable enough to reap meaningful benefit from the rise of daily fantasy*."[11] In conjunction with MLB's investment, DraftKings and MLB entered into what they described as "the most comprehensive league partnership in daily fantasy sports history."[12] The agreement provided for co-branding of DraftKings' DFS baseball contests, allowed DraftKings to offer market-specific in-ballpark experiences, and gave DraftKings promotional rights, use of MLB league and team logos, the exclusive right to sign sponsorship deals with individual MLB member clubs, and a designation as MLB's "Official Daily Fantasy Game."[13]

30.     Shortly thereafter, DraftKings also announced individual partnerships with 27 of MLB's member clubs, including the Astros and the Red Sox.[14] These partnerships enabled DraftKings to "create one-in-a-lifetime, market-specific in-ballpark experiences" and allowed DraftKings to place advertisements inside the stadiums of their partner MLB member clubs.

---

*press release at the time, simply DraftKings signage popping up in major league ballparks and DraftKings banners on MLB.com.*")(emphasis added).

[10] *Id.* ("[S]ome early employees who knew the details of the deal were taken aback by the size of it, but what it did accomplish was to give the industry legitimacy and also give DraftKings an inside track to a bigger deal, which was announced in the spring of 2015.").

[11] Eric Fisher, *A look into DraftKings' MLB Deal*, SPORTS BUSINESS JOURNAL (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Jan. 10, 2020)(emphasis added).

[12] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Jan. 22, 2020).

[13] *See* Fisher, *supra*, at note 11.

[14] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Jan. 22, 2020).

MLB, its member teams and DraftKings all benefitted financially from this aggressive marketing campaign.

31.     DraftKings' (and its competitor, FanDuel's) explosive growth drew regulatory scrutiny in a number of states. In 2015-16, then-New York Attorney General Eric Schneiderman sought a preliminary injunction to have DFS games declared illegal gambling and successfully prevented DraftKings from operating in New York until the New York State Assembly passed legislation declaring daily fantasy sports games to be "games of skill" and thus permitted under New York law. DraftKings (and FanDuel) successfully fought similar battles in a number of other states and currently operate in 43 states and the District of Columbia.

32.     DraftKings' and MLB's aggressive marketing of MLB DFS baseball contests as a legal and fair competition has resulted in hundreds of millions of dollars of contest fees being paid to DraftKings for MLB daily fantasy contests and tens, if not hundreds, of millions of dollars of annual revenue, all to the financial benefit of defendant MLB and its constituent teams including, in particular, the defendant Astros and the defendant Red Sox.

### III.     Major League Baseball's Official Rules and Regulations Expressly Prohibit the Use of Electronic Devices to Steal Signs.

33.     Defendant MLB, acting principally through its Office of the Commissioner, operates the professional sports organization known as Major League Baseball. Defendant MLB has 30 member baseball teams, including the defendant Astros and the defendant Red Sox.

34.     Defendant MLBAM, owned by defendant MLB's constituent member teams (including the defendant Astros and the defendant Red Sox), provides internet and interactive marketing services for MLB and its teams and, in particular, oversees and participates in promoting MLB's partnership with DraftKings.

35.     Defendant MLB, through its predecessors the National League and American League, has conducted baseball competition according to a written set of rules since the National League's inception in 1876. MLB's Official Rules covering on-the-field conduct were codified in 1949. In addition to MLB's Official Rules, MLB issues and enforces policies via regulations which are implemented via league-wide memoranda.

36.     Defendant MLB has long represented to the public, including members of the public that it has sought to induce to participate in DraftKings' MLB DFS contests, that it carefully enforces its Official Rules and regulations to ensure the honesty and integrity of the game.

37.     MLB's Official Rules and regulations have, throughout the period at issue in this lawsuit, expressly prohibited the use of electronic devices to monitor and decipher a catcher and pitcher's coded communications with each other about each upcoming pitch during MLB games. This prohibition on "stealing signs" with the aid of electronic devices applies to each of MLB teams and to MLB's team players.

38.     As MLB and its member teams were (and are) well aware, violation of MLB's prohibition on electronic sign stealing substantially affects the honesty and fairness of MLB competitions. A pitcher's ability to conceal from a hitter the type of pitch being thrown, and the intended speed, movement, and location of the pitch, is critical to a pitcher's success. A team that can successfully steal the catcher's signs and alert its hitter to information about a forthcoming pitch will have a substantial hitting advantage in that knowing what type of pitch is coming, and where, dramatically improves a professional major league hitter's ability to hit the pitched ball and to hit the pitched ball with substantial contact. As one MLB pitcher has recently tweeted, "I

would rather face a player that was taking steroids than face a player that knew every pitch that was coming."[15]

39.     The opportunity for impermissible electronic sign stealing was substantially increased by MLB's adoption in 2014 of the instant replay challenge process, which allows MLB member teams to challenge certain field decisions made by MLB umpires during the course of MLB games. In order to determine whether to challenge a call, MLB member teams were permitted to create rooms ("replay rooms") with television monitors and staffed with team employees tasked with immediately reviewing video footage of a play so teams could decide whether to challenge a call within the permitted period of time.

40.     Several of MLB's member teams, including the Astros and the Red Sox, realized that the replay rooms provided an opportunity for them to easily view and decipher an opposing team's pitcher and catcher signals and devised ways to relay the information from the replay room to the dugout and to team hitters as they were batting. In 2017, numerous MLB teams reported concerns to MLB's Office of the Commissioner that other clubs were impermissibly using electronic means to steal their signs in violation of MLB rules.[16]

41.     Because electronic sign stealing directly affects player performance statistics, teams and players that violate MLB's prohibition directly compromise the fairness and integrity of DraftKings' MLB DFS wagering contests. Since such contests are based on MLB player

---

[15]  Alex Wood (@Awood45), Twitter (Jan. 16, 2020, 1:37 PM), https://twitter.com/Awood45/status/1217923855156760577 (accessed Jan. 22, 2020). Similarly, Hank Greenberg, a Hall of Fame player for the Detroit Tigers from 1930 through 1945 "loved" knowing what pitch was coming and proclaimed that he "was the greatest hitter in the world when I knew what kind of pitch was coming up." *The Cambridge Companion to Baseball*, 185, (Leonard Cassuto and Stephen Partridge eds.).
[16] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, The Athletic (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020)("'Beginning in the 2017 season, numerous Clubs expressed general concerns that other Clubs were stealing their signs,' MLB said in a statement.").

performance statistics, a violation of the electronic sign stealing prohibition completely corrupts the fantasy baseball player selection process and the subsequent player performance results that determine the contest winner.

42.     Although MLB was well aware in 2017, 2018 and 2019 of its member teams' likely violations of its rule prohibiting electronic sign stealing and although MLB was well aware of the likely impact of any such violations on player performance, MLB did not take reasonable steps to investigate, deter, prevent, remedy or disclose to the wagering public the existence of such team and player misconduct.

## IV.     The Houston Astros Corrupted DraftKings MLB DFS Contests to the Detriment of the Class.

43.     What was unknown to the public until November 2019 was that the Houston Astros and Boston Red Sox (and most likely other MLB teams) had engaged in persistent and continuous violations of MLB rules regarding electronic sign stealing in 2017, 2018 and 2019.

44.      On November 12, 2019 Ken Rosenthal and Evan Drellich of *The Athletic* reported that "early in the 2017 season, at least two uniformed Astros got together to start the process" of putting together an electronic system for stealing signs which was forbidden by MLB rules and regulations. MLB later identified these two individuals as Carlos Beltran, a then-player for the Astros, and Alex Cora, a then-bench coach for the Astros.

45.     Beltran and Cora, with the assistance of the Astros' baseball operations staff set up a "[video] feed from a camera in center field, fixed on the opposing catcher's signs, hooked up to a television monitor that was placed on a wall steps from the team's home dugout at Minute Maid Park."[17] During games, "one or more" Astros players would watch the feed and

---

[17] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-

decode the opposing team's signs and would then "bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter."[18] This scheme is hereinafter referred to as the "Trash Can Scheme."

46.     Video evidence confirming the allegations in *The Athletic* article soon emerged. The trash can banging described in the article was plainly audible in video footage of Astros' players batting in their home stadium, and the footage further demonstrated that the players were aware of the nature of the pitch being signaled by the banging, to their significant hitting advantage.

47.     Six days after *The Athletic* first revealed the Trash Can Scheme to the public, evidence emerged that MLB had been aware of the scheme and yet remained silent.  On November 18, 2019, The Houston Chronicle reported that MLB told video monitors it placed in the Astros' Minute Maid Park during the 2019 season to "listen for banging sounds emanating from the Astros' dugout,"[19] indicating that MLB knew of the Astros' Trash Can Scheme far in advance of *The Athletic* article and had intentionally failed to disclose the scheme to the public.

48.     On January 13, 2020, MLB published the results of an investigation into the Astros' electronic sign stealing misconduct.  MLB's investigation resulted in the following relevant findings of conduct by the Astros in violation of MLB rules and regulations:

    a.     At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences (*i.e.*, which sign flashed by the catcher is the actual sign) for use when an Astros runner was on second base. Once the sign sequence was decoded, a player in the video replay review room would act as a "runner" to relay the

---

stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020).

[18] Rob Manfred, *Statement of the Commissioner*, MAJOR LEAGUE BASEBALL (Jan. 13, 2020), at 2, https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Jan. 22, 2020).

[19] Chandler Rome, *MLB told video monitors to listen for Astros' banging sounds in 2019*, THE HOUSTON CHRONICLE (Nov. 18, 2019), https://www.houstonchronicle.com/sports/astros/article/MLB-told-video-monitors-to-listen-for-Astros-14844792.php (accessed Jan. 16, 2020).

information to the dugout, and a person in the dugout would notify the players in the dugout or signal the sign sequence to the runner on second base, who in turn would decipher the catcher's sign and signal to the batter from second base.

b.      Approximately two months into the 2017 season, a group of players, including Beltrán, discussed that the team could improve on decoding opposing teams' signs and communicating the signs to the batter. Cora arranged for a video room technician to install a monitor displaying the center field camera feed immediately outside of the Astros' dugout [. . .] One or more players watched the live feed of the center field camera on the monitor, and after decoding the sign, a player would bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter; and

c.      [T]he Astros' replay review room staff continued, at least for part of the 2018 season, to decode signs using the live center field camera feed, and to transmit the signs to the dugout through in-person communication [hereinafter, the "Astros Replay Room Scheme"].

49.      The Astros Trash Can Scheme and Replay Room Scheme inflated the Astros' player performance statistics used by DraftKings' MLB DFS contestants to formulate their MLB DFS wagers and deflated the statistics of opposing pitchers, rendering the contests dishonest and unfair.

50.      Plaintiff and the Class of other similarly-situated Draftkings' MLB DFS contestants were induced by defendants' promotion of DraftKings' fantasy baseball contests to participate in wagering competitions that defendants knew were corrupted by the defendant Astros, to plaintiff's and the Class's financial detriment.

**V.      The Boston Red Sox Manipulated DraftKings MLB DFS Contests to the Detriment of the Class.**

51.      Rosenthal and Drellich wrote in their November 12, 2019 article that "electronic sign-stealing [was] not a single team issue"[20] and on January 2, 2020 published allegations

---

[20] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Reed Sox used video replay room illegally in 2018,* THE ATHLETIC (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign-

sourced to current and former Red Sox personnel that the Red Sox impermissibly implemented

their own replay room scheme (the "Red Sox Replay Room Scheme") throughout the 2018 MLB

regular season.

52.     The Boston Red Sox hired Alex Cora—the bench coach architect of the Houston

Astros Trash Can Scheme—as their field manager in advance of the 2018 MLB season.

According to Rosenthal and Drellich, Cora immediately set out to recreate one of the schemes he

implemented while on the Astros: the replay room scheme. According to Rosenthal and Drellich,

"[t]hree people who were with the Red Sox during their 108-win 2018 season" told them that "at

least some players visited the video replay room during games to learn the sign sequence

opponents were using."[21]

53.     Like the Astros' improper electronic sign stealing schemes described above, the

Red Sox's Replay Room Scheme harmed Plaintiff and the Class by improperly distorting the

performance statistics of Red Sox players and their opponents in 2018, rendering the resulting

fantasy baseball contest dishonest and unfair.

54.     Plaintiff and the Class of other similarly-situated Draftkings' MLB DFS

contestants were induced by defendants' promotion of DraftKings' fantasy baseball contests to

participate in wagering competitions that defendants knew were corrupted by the defendant Red

Sox, to plaintiff's and the Class's financial detriment.

---

stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Jan. 15, 2020).

[21] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Red Sox used video replay room illegally in 2018,* The Athletic (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign-stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Jan. 22, 2020).

## VI.    MLB Continued to Encourage the Class to Risk Hundreds of Millions on Player Performance While Failing to Enforce MLB Rules and Regulations Concerning Electronic Sign Stealing.

55.     Sports Illustrated's Tom Verducci has reported that in the course of its investigation of the Astros, MLB investigators were told by Astros personnel that they believed as many as eight other MLB member teams were electronically stealing signs.[22] Assuming one of those eight teams is the Red Sox, as many as seven yet-to-be identified teams remain.

56.     Plaintiff and the Class are not privy to the total number of complaints filed by MLB member teams prior to November 2019 against other MLB teams alleging use of electronic devices to steal signs in violation of MLB rules and regulations, but the following complaints have been publicly reported:

    a.    In 2017 the New York Yankees filed a complaint alleging that the Boston Red Sox were stealing signs using Apple Watches in contravention of MLB rules.

    b.    In August 2018 the Oakland Athletics filed a complaint alleging that the Houston Astros were stealing signs using electronic equipment in contravention of MLB rules.

    c.    In October 2018 the Cleveland Indians filed a complaint alleging that the Houston Astros were stealing signs using electronic equipment in contravention of MLB rules.

    d.    In October 2019 the New York Yankees filed a complaint alleging that the Houston Astros were stealing signs using electronic equipment in contravention of MLB rules.

---

[22] *See* Tom Verducci, *Why MLB Issued Historic Punishment to Astros for Sign Stealing*, SPORTS ILLUSTRATED (Jan. 13, 2020), https://www.si.com/mlb/2020/01/13/houston-astros-cheating-punishment (accessed Jan. 22, 2020).

**VII.** **The Conduct of MLB and its Member Clubs Resulted in Millions of Dollars in Losses to the Class that Would Not have Occurred But For the Wrongful and Deceptive Conduct.**

57.     The Astros' Trash Can Scheme and Replay Room Scheme and the Red Sox's Replay Room Scheme compromised the integrity of DraftKings' MLB DFS wagering contests in 2017, 2018 and 2019. Untold numbers of hits, walks, runs, and wins were dishonestly obtained and awarded to the Astros and Red Sox that would not have taken place but for the Astros' and the Red Sox's players' impermissibly-gained advanced knowledge of pitches. The Astros' and Red Sox's misconduct, combined with MLB's intentional failure to enforce its rules or disclose the wrongdoing, resulted in DraftKings' contestants taking part in dishonest and unfair wagering competitions.

58.     In particular, the performance statistics on which the DraftKings' MLB DFS contests were based were corrupted in in numerous ways, including but not limited to the following:

a.      DraftKings contestants who drafted pitchers for their MLB DFS lineup who were pitching against the Astros in Houston or the Red Sox in Boston were harmed when those pitchers performed poorly as a result of the Trash Can Scheme and/or Replay Room Schemes;

b.      DraftKings contestants who played MLB DFS contests against opponents who selected Astros players or Red Sox players playing at home were harmed when the opponents' Astros or Red Sox players statistics were corruptly enhanced by the Trash Can Scheme or Replay Room Schemes;

c.      DraftKings contestants were fraudulently induced to pick Astros or Red Sox players for their MLB DFS teams based on artificial statistics (and not to select pitchers who had fared poorly in games against the Astros and Red Sox at their home stadiums) and were harmed when the Astros or Red Sox players did not perform as well as expected in away games (or the unselected pitchers performed better) as a result of not having access to the Trash Can Scheme or Replay Room Scheme.

      d.      DraftKings contestants overpaid when they selected Astros or Red Sox players for their MLB DFS teams based on artificial statistics created by the Trash Can Scheme or Replay Room Scheme.

**VIII.**    **Defendants Have Profited Enormously from their Wrongful Conduct.**

59.    Defendant MLB and its member teams have profited enormously, at the expense of Plaintiff and the other Class Members, from their wrongful promotion of DraftKings' MLB DFS contests and participation in soliciting contestant wagers.

60.    The financial benefits to defendants from their misconduct include not only their share of DraftKings' enormous fantasy baseball fees. Equally important, MLB and its teams benefited substantially from the increased fan involvement in the game that participation in fantasy baseball wagering engenders – producing increased fan attendance, increased advertising and television revenues, and increased sales of MLB paraphernalia. [23]

**IX.**    **Plaintiff Kristopher R. Olson**

61.    Plaintiff Kristopher R. Olson was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit. Plaintiff Olson placed at least 226 entries into DraftKings' fantasy baseball contests during the Class Period.

62.    Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros were engaged in the Trash Can Scheme and Astros Replay Room Scheme.

---

[23] Indeed, a study conducted by FanDuel found that fans who played daily fantasy sports consumed 40% more sports content. Brent Schrotenboer, *Leagues see real benefits in daily fantasy sports*, USA TODAY (Jan. 1, 2015), https://www.usatoday.com/story/sports/2015/01/01/daily-fantasy-sports-gambling-fanduel-draftkings-nba-nfl-mlb-nhl/21165279/ (accessed Jan. 16, 2020) ("If there is a statistic that puts dollar signs in the heads of league commissioners, it's this one: Fans consume 40% more sports content — across all media — once they start playing FanDuel.").

63.     Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox were engaged in the Red Sox Replay Room Scheme.

64.     Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

65.     Plaintiff Olson would not have entered into DraftKings MLB DFS contests during the Class Period had he known that MLB was aware of, and failed to remedy or disclose, electronic sign stealing in violation of MLB Official Rules and regulations that compromised the honesty of the player performance statistics upon which his DraftKings MLB DFS wagering depended.

## X.     Class Allegations

66.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), as representatives of the class defined as follows (the "Class"):

> All individuals who participated in DraftKings' MLB DFS contests that took place from April 2, 2017 through October 30, 2019 and paid an entry fee for, and entered a lineup into, a DraftKings MLB DFS contest..

67.     Plaintiff Olson also seeks certification of a claim for violation of the MASS. GEN. LAW, Ch. 93A, § 11 and the substantially similar of the following states:

> Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South

Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

68.     Plaintiff reserves the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to accommodate any of the Court's manageability concerns.

69.     All Defendants concealed the existence of their conduct.  Plaintiff and the members of the Class were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that would otherwise apply should be tolled to the earliest date of Defendants' wrongful conduct.  In addition, Defendants are estopped from relying on any applicable statute of limitation.

70.     ***Numerosity***. Members of the Class are so numerous (consisting of millions of DraftKings users) and geographically dispersed that individual joinder is impracticable. Beginning no later than 2017, DraftKings operated in 43 states as well as the District of Columbia and collected entry fees for millions of entries purchased in states other than New York.

71.     The members of the Class are readily identifiable from information and records in the possession or control of MLB.

72.     ***Commonality and Predominance***. Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting only individual members of the Class, including, but not limited to:

      a.      Whether the MLB Defendants engaged in false, misleading, deceptive and/or unfair acts or practices;

      b.      Whether the MLB Defendants violated state consumer protection statutes;

22

c.      Whether the MLB Defendants are liable to Plaintiff and the Class for compromising the fairness of DraftKings MLB DFS contests;

d.      Whether the MLB Defendants' conduct constituted negligence;

e.      Whether the Houston Astros are liable to Plaintiff and the Class for compromising the fairness of DraftKings MLB DFS contests;

f.      Whether the Houston Astros engaged in false, misleading, deceptive and/or unfair acts or practices;

g.      Whether the Houston Astros violated the Texas Deceptive Trade Practices Act;

h.      Whether the Boston Red Sox are liable to Plaintiff and the Class for compromising the fairness of DraftKings MLB DFS contests;

i.      Whether the Boston Red Sox engaged in false, misleading, deceptive and/or unfair acts or practices;

j.      Whether the Boston Red Sox violated the Massachusetts Consumer Protection Act;

k.      Whether the MLB Defendants, the Houston Astros and the Boston Red Sox have been unjustly enriched by their conduct;

l.      Whether Plaintiff and the Class are entitled to actual damages, statutory damages and/or punitive damages;

m.      The measure of damages suffered by Plaintiff and the Class;

n.      Whether Plaintiff and the Class are entitled to restitution, disgorgement and/or other equitable relief or injunctive relief.

73.     ***Typicality***. The Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and the members of the Class were injured through the same conduct described herein and they assert the same (or similar) claims for relief.

74.     ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the Class. The interests of Plaintiff are consistent with and not antagonistic to the interests of the other members of the Class. Plaintiff has lost significant amounts individually

and has agreed to act for the benefit of all of the victims similarly situated and not to put his individual interest ahead of any member of the Class. Plaintiff has retained competent counsel that is highly experienced in prosecuting complex fraud, consumer, and class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Class.

75.     *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of the claims of Plaintiff and the members of the Class. The damages suffered by individual members of the Class are relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would be extremely difficult for members of the Class, on an individual basis, to obtain effective redress for the wrongs committed against them. Further, even if members of the Class could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court.

76.     This proposed class action is manageable. Plaintiff knows of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

77.     Class certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

78.     Class certification is also appropriate under FED. R. CIV. P. 23(b)(1), because the prosecution of separate actions by numerous individual members of the Class may create a risk that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Class, and may substantially impair or impede the interests of other members of the Classes to protect their interests.

79.     Class certification is also appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES
### (Against the MLB Defendants)

80.     Plaintiff repeats and incorporates herein by reference the above allegations.

81.     Plaintiff Olson resides in Massachusetts. Massachusetts prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce ...." M.G.L. c. 93A § 2 *et seq.* (the "Massachusetts Act").

82.     At all material times, the MLB Defendants have engaged in unfair and deceptive acts that violated the Massachusetts Act and, as described below, other state consumer protection acts.

83.     Any person who has suffered a loss as a result of a violation of the Massachusetts Act (and the other state consumer protection acts below) may bring an action based on the MLB Defendants' unfair and/or deceptiver acts and practices.

84.     The MLB Defendants have been and are engaged in trade and commerce as defined by the Massachusetts Act and the other state consumer protection acts described below. Major League Baseball is broadcast, advertised and promoted, and sales of merchandise take place, throughout the United States; and professional baseball games are held in states throughout the United States.  In addition, daily fantasy sports participants reside throughout the United States.  Defendant MLB is engaged in business on behalf of its constituent members teams and Major League Baseball in every State including Massachusetts, and defendant MLBAM's internet and interactive services are likewise provided throughout the country, including in Massachusetts.  Moreover, defendant MLBAM is responsible for coordinating the partnership between DraftKings and Major League Baseball and its team, and does so throughout the country, including in Massachusetts where DraftKings has its principal place of business.

85.     At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have promoted their partnership with DraftKings and participated in soliciting participants in DraftKings' daily and weekly fantasy baseball contests.

86.     In addition, at all material times, the MLB Defendants have realized substantial financial gain through their partnership with DraftKings, based on the MLB Defendants' equity interest in, sponsorship, advertising and promotion with and through DraftKings.

87.     Fan participation in fantasy baseball contests directly resulted in increased financial benefit to the MLB Defendants. Not only did the MLB Defendants have a financial interest in the fees paid by DraftKings baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball,

26

resulting in greater revenue for the MLB Defendants from broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

88.     Thus, it was and is in the MLB Defendants' interest to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the MLB Defendants, which the MLB Defendants did at all material times, even while knowing that DraftKings' fantasy baseball contests were compromised and unfair as a result of MLB's member teams' misconduct.

89.     At the same time the MLB Defendants were promoting DraftKings and DraftKings' fantasy baseball contests, the MLB Defendants knew of and failed to stop the electronic sign stealing schemes described above, which resulted compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiff and the Class participated corrupt and tainted.  In particular, the MLB Defendants knew of and failed to stop the Houston Astros Trash Can Scheme and Replay Room Scheme and the Boston Red Sox's Replay Room Scheme, all of which were in violation of the rules, regulations and directives of Major League Baseball.

90.     Further, the MLB Defendants affirmatively concealed and failed to disclose the electronic sign stealing misconduct of the Houston Astros and Boston Red Sox even though the MLB Defendants knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests they were separately promoting.

91.     At all material times, the MLB Defendants knew or recklessly disregarded the fact that the Major League Baseball games involving the Houston Astros and the Boston Red Sox resulted in compromised and dishonest player performance statistics.

92.     The MLB Defendants' conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that its member teams are compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its member teams' misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair and deceptive practices, conduct which violates M.G.L. c. 93A and the state consumer protection acts described below.

93.     As a result of their conduct, the MLB Defendants have engaged in unfair, deceptive, misleading and/or false acts or practices in violation of M.G.L. c. 93A *et seq*. and the state consumer protection acts listed below.

94.     Like M.G.L. c. 93A *et seq*., a significant number of states' consumer protection statutes closely track the language of the Federal Trade Commission Act ("FTCA"), proscribing "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). The following states have consumer protection statutes that prohibit unfair and/or deceptive acts or practices:

**Alaska: ALASKA STAT. § 45.50.471,** *et seq*. provides that "unfair methods of competition and unfair or deceptive acts or practices in trade or commerce are declared to be unlawful."

**California: CAL. BUS. & PROF. CODE § 17200,** *et seq*. prohibits any "unlawful, unfair or fraudulent business act or practices."

**California: CAL. CIV. CODE § 1750,** *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"

**Colorado: COLO. REV. STAT. § 6-1-101,** *et seq*. prohibits a broad range of "deceptive trade practices," including knowingly making various false representations concerning goods, services, or property.

**Connecticut: CONN. GEN. STAT. § 42-110b,** *et seq*. provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

**Florida:** FLA. STAT. § 501.204, *et seq*. provides that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Georgia:** OFFICIAL CODE OF GA. § 10-1-390, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce are declared unlawful."

**Hawaii:** HAW. REV. STAT. § 480, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Illinois:** ILL. COMP. STAT. § 505/1, *et seq*. **and** § 510/1, *et seq*. provides "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful."

**Iowa:** IOWA CODE § 714.16, *et seq*. prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…"

**Kentucky:** KY. REV. STAT. ANN. § 367.110, *et seq*. prohibits "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce"

**Louisiana:** LA. REV. STAT. ANN. § 51.1405, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Maine:** ME. REV. STAT. TIT. 5, § 205-A, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**Maryland:** MD. CODE ANN., MD COM. LAW § 13-101, *et seq*. provides that [a] person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale . . . of any consumer goods."

**Michigan:** MICH. COMP. LAWS § 445.901, *et seq*. prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce…"

**Mississippi:** MISS. CODE. ANN. § 75-24-1, *et seq*. prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

**Missouri:** MO REV. STAT. § 407.010, *et seq*. makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation,

unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…"

**Montana:** MONT. CODE ANN. § 30-14-101, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Nebraska:** NEB. REV. STAT. § 59-1601, et seq., § 87-301, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

**New Hampshire:** N.H. REV. STAT. ANN. § 358-A:1, *et seq*. provides that "[i]t shall be unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

**New Mexico:** N.M. STAT. ANN. § 57-12-1, *et seq*. prohibits the "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

**North Carolina:** NC GEN. STAT. § 75-1.1, *et seq*. provides that "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

**Ohio:** OHIO REV. CODE ANN. § 1345.01, *et seq*. provides that [n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

**Oklahoma:** OKLA. STAT. TIT. 15, § 751, *et seq.* provides that [a] person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act. . . when, in the course of the person's business, the person: . . . (20) Commits an unfair or deceptive trade practice…"

**Pennsylvania:** 73 PA. STAT ANN. § 201-1, *et seq*. prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…"

**Rhode Island:** R.I. GEN LAWS § 6-13.1-1, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**South Carolina:** S.C. CODE § 39-5-10, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful."

**Tennessee:** TENN. CODE ANN. § 47-18-104, *et seq*. prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

**Texas:** TEX. BUS. & COM. CODE ANN. § 17.41, *et seq*. prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," and an

unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

**Vermont: VT. STAT. ANN. TIT. 9, § 2451,** *et seq*. provides that "unfair or deceptive acts or practices in commerce, are hereby declared unlawful."

**Washington: REV. CODE WA. § 19.86.010,** *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**West Virginia: W. VA. CODE § 46A-6-104,** *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Wisconsin: WIS. STAT. § 100.20,** *et seq*. prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

**Wyoming: WYO. STAT. ANN. § 40-12-101,** *et seq*. provides that "[a] person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly: . . . (xv) Engages in unfair or deceptive acts or practices.

95.     The statutes identified in the preceding paragraph (like M.G.L. c. 93A *et seq.*) provide consumers with a private right of action for the MLB Defendants' unfair and deceptive acts or practices as alleged above, and such acts or practices are unlawful under these substantially similar or identical consumer protection and consumer fraud statutes set forth immediately above.

96.     Plaintiff has asserted claims under the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 ("GFBPA"), and the Massachusetts Consumer Protection Law, M.G.L. c. 93A *et seq*. ("MCPL") against MLB Defendants. Upon information and belief, MLB Defendants do not maintain a place of business in Georgia, or Massachusetts, nor do MLB Defendants maintain property or asserts in Georgia, or Massachusetts. Plaintiff is thus not required to provide MLB Defendants with pre-suit written demand for relief pursuant to O.C.G.A § 10-1-399(b), and M.G.L 93A § 9(3).

97.     Plaintiff intends to assert a claim under the Maine Unfair Trade Practices Act ("MeUTPA") against MLB Defendants. Plaintiff has provided a written demand for relief describing the particular violations of MeUTPA to MLB Defendants pursuant to ME. REV. STAT. § 212 TIT. 5 § 213(1-A). Subject to the response, if any, of MLB Defendants within 30 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include a Claim for Relief pursuant to ME. REV. STAT. § 212 TIT. 5 § 205-A, *et seq.* and demand all appropriate relief under the MeUTPA.

98.     Plaintiff intends to assert a claim under the Mississippi Consumer Protection Act ("MCPA") against MLB Defendants. Plaintiff intends, pursuant to MISS. CODE. ANN. § 75-24-15, to attempt to resolve his and the Class' MCPA claims through an informal dispute resolution program approved by the Attorney General. Subject to the outcome of the informal dispute resolution undertaking, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include a Claim for Relief pursuant to MISS. CODE. ANN. § 75-24-1 *et seq.* and demand all appropriate relief under the MCPA.

99.     Plaintiff intends to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA") against MLB Defendants. Plaintiff has provided written notice of the specific complaint and damages to MLB Defendants in accordance with TEX. BUS. & COM. CODE § 17.505. This Claim for Relief provides notice to MLB Defendants of the prospective claim against it by Plaintiff and the Class. Subject to the response, if any, of MLB Defendants within 60 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include this Fourth Claim for Relief and demand all appropriate relief under the TDTPA.

100.    Plaintiff intends to assert a claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") against MLB Defendants. Plaintiff has provided MLB Defendants

notice, in writing by certified mail, return receipt requested, of the alleged violation pursuant to W. VA. CODE § 46A-6-106(c). Subject to the response, if any, MLB Defendants within 20 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include a Claim for Relief pursuant to W. VA. CODE § 46A-6-104, *et seq.*

101.    Plaintiff intends to assert a claim under the Wyoming Consumer Protection Act ("WCPA") against MLB Defendants. Plaintiff has provided notice in writing to MLB Defendants of the nature of the violations of MCPA pursuant to WYO. STAT. ANN. § 40-12-109. Plaintiff's Claim for Relief under WYO. STAT. ANN. § 40-12-101, *et seq.* found below provides notice to MLB Defendants of the prospective claim against it by Plaintiff and the Class. Subject to the response, if any, of MLB Defendants within 15 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include a Claim for Relief pursuant to WYO. STAT. ANN. § 40-12-101, *et seq.* and demand all appropriate relief under the WCPA.

102.    As a result of their conduct, the MLB Defendants have engaged in unfair and deceptive acts or practices in violation of the foregoing state consumer protection statutes.

103.    In addition, a number of states' consumer protection statutes (like M.G.L. c. 93A *et seq.*) broadly prohibit false, misleading or deceptive acts or practices, but do not prohibit "unfair" practices. The following states have consumer protection statutes that prohibit deceptive acts or practices but do not prohibit "unfair" practices:

**Alabama: ALA. CODE § 8-19-1, *et seq.* sets forth a list of twenty-six unlawful trade practices and a catch-all provision that makes it unlawful to "engag[e] in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

**Arkansas: ARK. CODE ANN. § 4-88-107, *et seq.* prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade [.]"

**Colorado: COLO. REV. STAT. § 6-1-101,** *et seq*. prohibits a broad range of "deceptive trade practices," including knowingly making various false representations concerning goods, services, or property.

**Delaware: DEL. CODE ANN. TITLE 6, § 2511,** *et seq*. prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."

**District of Columbia: D.C. CODE § 28-3901,** *et seq*. provides that "[i]t shall be a violation of this chapter…for any person to: . . . (e) misrepresent as to a material fact which has a tendency to mislead" and "(t) use deceptive representations…in connection with goods or services."

**Idaho: IDAHO CODE § 48-601,** *et seq*. provides that "[t]he following … unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is … [e]gaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer."[24]

**Indiana: IND. CODE § 24-5-0.5-1,** *et seq*. provides protection to "consumers from suppliers who commit deceptive and unconscionable sales acts…"

**Kansas: KAN. STAT. § 50-623,** *et seq*. provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction[;]"

**Minnesota: MINN. STAT. § 325F.68,** *et seq*. prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, damaged thereby …"

**Nevada: NEV. REV. STAT. § 598.0903,** *et seq*. provides that "[a] person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he: . . . (13) Makes false or misleading statements of fact concerning the price of goods . . . for sale. (15) Knowingly makes any other false representation in a transaction."

**New Jersey: N.J. STAT. ANN. § 56:8-1,** *et seq*. provides that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud,

---

[24] While Idaho's consumer protection statute refers to "unfair or deceptive acts or practices[,]", the court *in In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 110 (D. Mass. 2008) excluded it from the list of statutes that more closely track the FTC Act because the statute's "general prohibition refers to an enumerated list of prohibited practices, instead of simply prohibiting all unfair or deceptive practices."

false pretense, false promise, misrepresentation . . . in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice."

**New York: N.Y. GEN. BUS. § 349,** *et seq.*, prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

**North Dakota: N.D. CENT. CODE § 51-15-01,** *et seq.*, prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale . . . of any merchandise . . ."

**Oregon: OR REV. STAT. § 646.605,** *et seq*. provides that: "[a] person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods."

**South Dakota: S.D. CODIFIED LAWS § 37-24-1,** *et seq*. prohibits "deceptive acts or practices", which are defined to include: [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

**Utah: UTAH CODE ANN. § 13-11-1,** *et seq*. prohibits "deceptive acts and practices by a supplier in connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Act."

**Virginia: VA. CODE Ann. § 59.1-196,** *et seq*. makes unlawful certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction," including "[m]isrepresenting that goods or services are of a particular standard, quality, grade style or model."

104.    The statutes identified in the preceding paragraph provide consumers with a private right of action for the MLB Defendant's deceptive acts and practices, which are made unlawful under those statutes. As a result of their conduct described above, the MLB Defendants have violated these consumer statutes.

105.    Plaintiff has asserted claims under the Alabama Deceptive Trade Practices Act, ALA. CODE § 8-19-1, *et seq.* ("ADTPA") against MLB Defendants. Upon information and belief,

MLB Defendants do not maintain a place of business in Alabama, nor do MLB Defendants maintain property or asserts in Alabama. Plaintiff is thus not required to provide MLB Defendants with pre-suit written demand for relief pursuant to ALA. CODE § 8-19-10.

106.    Plaintiff intends to assert a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA") against MLB Defendants. Plaintiff has provided notice of the nature of the alleged violation and damages suffered within six months of the initial discovery of the deceptive act pursuant to IND. CODE § 24-5-0.5-5(a). Plaintiff's Claim for Relief under IND. CODE § 24-5-0.5-1, *et seq.* provides notice to MLB Defendants of the prospective claim against it by Plaintiff and the Class. Subject to the response, if any, of MLB Defendants within 30 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include a Claim for Relief pursuant to IND. CODE § 24-5-0.5-1, *et seq.* and demand all appropriate relief under the IDCSA.

107.    As a direct, foreseeable and proximate result of the MLB Defendants' unfair, deceptive, misleading and/or false acts or practices, in violation of M.G.L. c. 93A *et seq.* and the foregoing consumer protection statutes, Plaintiff and the Class were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

108.    The MLB Defendants' wrongful conduct was wanton, willful or in reckless disregard of the rights of Plaintiff and the Class.By reason of the foregoing, Plaintiff and the Class are entitled to all available damages and remedies available under the consumer protections statutes identified above, including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees.  Further, because the MLB Defendants acted willfully or knowingly, Plaintiff and the Class are entitled to

recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the consumer protection statutes set forth above.

## SECOND CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### (Against the MLB Defendants)

109.    Plaintiff repeats and incorporates herein by reference the above allegations.

110.    At all material times, the MLB Defendants have realized substantial financial gain from their partnership with DraftKings and promotion of and participation in DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

111.    Fan participation in fantasy baseball contests directly resulted in increased financial benefit to the MLB Defendants based not only on the foregoing revenue streams, but also through increased revenue from broadcasting, attendance, advertising, and the sale of merchandise and paraphernalia.

112.    At all material times, the MLB Defendants promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

113.    At all material times, the MLB Defendants knew and did not disclose that the Houston Astros and Boston Red Sox were engaged in electronic sign stealing in violation of MLB's rules and regulations, that resulted in compromised and dishonest player performance statistics that rendered DraftKings' fantasy baseball contests corrupt and tainted.

114.    Plaintiff and the Class conferred substantial monetary benefits on the MLB Defendants in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise.

115.     The MLB Defendants' wrongful conduct was knowing and intentional, and the MLB Defendants appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiff and the Class as a result of such wrongful conduct.

116.     Under principles of equity and good conscience, the MLB Defendants should not be permitted to retain the foregoing monetary benefits they wrongfully obtained at the expense of Plaintiff and the Class.

117.     As a direct and proximate result of the MLB Defendants' wrongful conduct, the MLB Defendants are liable to Plaintiff and the Class for the amount of the monetary benefits conferred upon the MLB Defendants, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

118.     The MLB Defendants should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the Class all unlawful, inequitable and unjust proceeds received and/or realized as a result of their wrongful conduct.

### THIRD CLAIM FOR RELIEF

### NEGLIGENCE
**(Against the MLB Defendants)**

119.     Plaintiff repeats and incorporates herein by reference the above allegations.

120.     At all material times, the MLB Defendants owned an interest in and were partners with DraftKings and solicited contestants to participate in and otherwise promoted DraftKings' MLB DFS contests.

121.     At all material times, the MLB Defendants realized substantial financial gain through their partnership with DraftKings and promotion of DraftKings' MLB DFS contests.

38

122.    At all material times, the MLB Defendants knew or should have known that contestants in DraftKings' MLB DFS contests relied on the honesty and accuracy of MLB's player performance statistics in deciding to participate in DraftKings' fantasy baseball contests.

123.    At all material times, the MLB Defendants knew or should have known that contestants in DraftKings' MLB DFS contests were unaware that defendant MLB's member teams, including the Astros and the Red Sox, were engaging in impermissible electronic sign stealing, in violation of MLB's rules and regulations, that compromised the honesty and integrity of DraftKings' fantasy baseball contests.

124.    By virtue of the MLB Defendants' ownership in and partnership with DraftKings and promotion of DraftKings' MLB DFS contests, all undertaken by the MLB Defendants for financial benefit, and in light of the MLB Defendants' knowledge that the honesty and accuracy of MLB's player performance statistics were critical to the fairness of DraftKings' MLB DFS contests, and in light of all of the above, the MLB Defendants had a duty (a) to take reasonable steps to ensure that MLB's player performance statistics were, in fact, honest and accurate and not compromised by team or player misconduct; (b) to investigate team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics; (c) to take reasonable steps to prevent and deter any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics; and (d) to disclose to potential DraftKings' MLB DFS contestants any information that the MLB Defendants knew or should have known about any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics.

125.    Although the MLB Defendants knew or should have known of MLB's member team or player misconduct that compromised the honesty and fairness of MLB's player

performance statistics, they breached their obligations to Plaintiff and the Class, in one or more

of the following ways:

      a.     in that the MLB Defendants failed to take reasonable steps to ensure that MLB's player performance statistics were honest and accurate and not compromised by team or player misconduct;

      b.     in that the MLB Defendants failed to investigate reported team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics;

      c.     in that the MLB Defendants failed to take reasonable steps to prevent and deter any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics; and

      d.     in that the MLB Defendants failed to disclose to potential DraftKings' MLB DFS contestants information that the MLB Defendants knew or should have known about any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics.

126.     As a direct and proximate result of the MLB Defendants' negligent conduct,

Plaintiff and the Class have suffered injury and are entitled to damages in an amount to be

proven at trial.

**FOURTH CLAIM FOR RELIEF**

**VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**(TEX. BUS. & COM. CODE § 17.41 *ET SEQ.*)**
**(Against Defendant Houston Astros, LLC)**

127.     Plaintiff repeats and incorporates herein by reference the above allegations.

128.     Plaintiff intends to assert a claim under the Texas Deceptive Trade Practices Act

("TDTPA") against defendant Houston Astros, LLC.  Plaintiff has provided written notice of the

specific complaint and damages to MLB Defendants in accordance with TEX. BUS. & COM.

CODE § 17.505.  This Claim for Relief provides notice to defendant Houston Astros of the

prospective claim against it by Plaintiff and the Class.  Subject to the response, if any, defendant

40

Houston Astros within 60 days, Plaintiff, on behalf of himself and the Class, shall amend the Complaint to include this Fourth Claim for Relief and demand all appropriate relief under the TDTPA.

129.    The TDTPA makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.

130.    At all material times,  defendant Houston Astros, LLC has engaged in misleading, false, deceptive and/or unfair acts that violated the TDTPA.

131.    Any person who has suffered a loss as a result of a violation of the TDTPA may bring an action based on defendant Houston Astros, LLC 's deceptive and/or unfair acts and/or practices.

132.    Defendant Houston Astros, LLC has been and isare engaged in trade and commerce under the TDTPA.  Houston Astros baseball is broadcast, advertised and promoted, and sales of merchandise take place in Texas and throughout the United States; and professional baseball games in which the Houston Astros are involved are held in Texas and in states throughout the United States.  In addition, daily fantasy sports participants who wager on contests that are and have been impacted by the performance and statistics of players in games involving the Houston Astros reside in Texas and throughout the U.S.

133.    At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have operated and promoted their partnership with DraftKings and DraftKings' MLB DFS contests.  In addition, defendant Houston Astros, LLC has a partnership with DraftKings, and has promoted its partnership with DraftKings and has participated in soliciting participants in DraftKings' daily and weekly MLB DFS contests.

134. At all material times, defendant Houston Astros, LLC has realized substantial financial gain through MLB's and its partnerships with DraftKings, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

135. Further, fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant Houston Astros, LLC . Not only did defendant Houston Astros, LLC have a financial interest in the fees paid to DraftKings by baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball, including the Houston Astros, resulting in greater revenue for defendant Houston Astros, LLC from increased broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

136. Thus, it was and is in defendant Houston Astros, LLC 's interest to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the Houston Astros, which defendant Houston Astros, LLC did at all material times, even while knowing that DraftKings' fantasy baseball contests were compromised and unfair as a result of the Houston Astros' misconduct.

137. At the same time defendant Houston Astros, LLC was DraftKings and DraftKings' fantasy baseball contests, the Houston Astros were engaged in the electronic sign stealing schemes described above (*i.e.*, Houston Astros Trash Can Scheme and Replay Room Scheme), which were in violation of the rules, regulations and directives of Major League Baseball, and which resulted in compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiff and the Class participated corrupt and tainted.

42

138.    At all material times, defendant Houston Astros, LLC knew or recklessly disregarded the fact that their secret electronic sign stealing misconduct resulted in compromised and dishonest player performance statistics.

139.    Further, defendant Houston Astros, LLC affirmatively concealed and failed to disclose its electronic sign stealing misconduct even though the defendant Houston Astros, LLC knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests it was separately promoting.

140.    Defendant Houston Astros, LLC's conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that the Astros' electronic sign stealing misconduct was compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair, deceptive, misleading and/or false practices, all conduct which violates TEX. BUS. & COM. CODE § 17.41 *et seq*.

141.    As a result of its conduct, defendant Houston Astros, LLC has engaged in false, misleading and deceptive acts and practices in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*.

142.    Plaintiff and the Class are consumers within the meaning of the TDTPA who paid for the fantasy baseball services provided by DraftKings that were compromised and rendered dishonest by defendant Houston Astros, LLC's unfair, deceptive, misleading and/or false acts or practices in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*.

143.    As a direct, foreseeable and proximate result of defendant Houston Astros, LLC's unfair, deceptive, misleading and/or false acts or practices, in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*., Plaintiff and the Class were injured – and continue to be injured – and

have suffered ascertainable loss and damages, including, without limitation, the money

wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

144.     Defendant Houston Astros, LLC's wrongful conduct was wanton, willful or in

reckless disregard of the rights of Plaintiff and the Class.

145.     By reason of the foregoing, Plaintiff and the Class are entitled to all available

damages and remedies available under TEX. BUS. & COM. CODE § 17.41 *et seq*., including,

without limitation, actual damages, statutory damages, injunctive or other equitable relief,

costs and reasonable attorneys' fees.  Further, because defendant Houston Astros, LLC acted

willfully or knowingly, Plaintiff and the Class are entitled to recover up to three times their

actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable

under the TDTPA.

### FIFTH CLAIM FOR RELIEF

**UNJUST ENRICHMENT**
**(Against Defendant Houston Astros, LLC)**

146.     Plaintiff repeats and incorporates herein by reference the above allegations.

147.     At all material times, defendant Houston Astros, LLC has realized substantial

financial gain from its agreement with DraftKings and promotion of and participation in

DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry

fees, sponsorship, advertising and promotion.

148.     Fan participation in fantasy baseball contests directly resulted in increased

financial benefit to defendant Houston Astros, LLC based not only on the foregoing revenue

streams, but also through increased revenue from broadcasting, attendance, advertising, and the

sale of merchandise and paraphernalia.

149.     At all material times, defendant Houston Astros, LLC promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

150.     Further, at all material times, defendant Houston Astros, LLC knew and did not disclose that it was engaged in electronic sign stealing in violation of MLB's rules and regulations (and directives), that resulted in compromised and dishonest player performance statistics that rendered  DraftKings' fantasy baseball contests corrupt and tainted.

151.     Plaintiff and the Class conferred substantial monetary benefits on defendant Houston Astros , LLC in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise revenue.

152.     Defendant Houston Astros, LLC's conduct was knowing and intentional, and defendant Houston Astros, LLC appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiff and the Class.

153.     Under principles of equity and good conscience, defendant Houston Astros, LLC should not be permitted to retain the foregoing monetary benefits it wrongfully obtained at the expense of Plaintiff and the Class.

154.     As a direct and proximate result of defendant Houston Astros, LLC's wrongful conduct, defendant Houston Astros, LLC is liable to Plaintiff and the Class for the amount of the monetary benefits conferred upon defendant Houston Astros, LLC, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

155.     Defendant Houston Astros, LLC should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the Class all unlawful, inequitable and unjust proceeds received and/or realized as a result of its wrongful conduct.

## SIXTH CLAIM FOR RELIEF

## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### (M.G.L. CHAPTER 93A)
### (Against Defendant Boston Red Sox Baseball Club, LP)

156.    Plaintiff repeats and incorporates by reference the above allegations herein.

157.    Plaintiff intends to assert a claim under the Massachusetts Consumer Protection

Act (the "Massachusetts Act") against defendant Boston Red Sox Baseball Club, LP.  Plaintiff

has provided a written demand for relief in accordance with M.G.L. c. 93A § 9(3).  This Count

provides notice to defendant Boston Red Sox of the prospective claim by Plaintiff and the Class.

Subject to the response, if any, by the Boston Red Sox within 30 days, Plaintiff, on behalf of

himself and the Class, shall amend the Complaint to include this Sixth Claim for Relief and

demand all appropriate relief under the Massachusetts Act.

158.    The Massachusetts Act prohibits "unfair or deceptive acts or practices in the

conduct of any trade or commerce …." M.G.L. c. 93A § 2.

159.    At all material times, defendant Boston Red Sox Baseball Club, LP has engaged

in unfair and deceptive conduct that violated the Massachusetts Act.

160.    Any person who has suffered a loss as a result of a violation of the Massachusetts

Act may bring an action based on defendant Boston Red Sox Baseball Club, LP's unfair and/or

deceptive acts or practices.

161.    Defendant Boston Red Sox Baseball Club, LP has been and is engaged in trade

and commerce under the Massachusetts Act.  Boston Red Sox baseball is broadcast, advertised

and promoted, and sales of merchandise take place in Massachusetts and throughout the United

States; and professional baseball games in which the Boston Red Sox are involved are held in

Massachusetts and in states throughout the United States.  In addition, daily fantasy sports

participants who wager on contests that are and have been impacted by the performance and statistics of players in games involving the Boston Red Sox reside in Massachusetts and throughout the U.S.

162.    At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have operated and promoted their partnership with DraftKings and DraftKings' MLB DFS contests.  In addition, defendant Boston Red Sox Baseball Club, LP has a partnership with DraftKings, and has promoted its partnership with DraftKings and has participated in soliciting participants in DraftKings' MLB DFS contests.

163.    At all material times, defendant Boston Red Sox Baseball Club, LP has realized substantial financial gain through the partnerships between MLB and DraftKings and between the Boston Red Sox and DraftKings, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

164.    Further, fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant Boston Red Sox Baseball Club, LP. Not only did defendant Boston Red Sox Baseball Club, LP have a financial interest in the fees paid to DraftKings by baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball, including the Boston Red Sox, resulting in greater revenue for defendant Boston Red Sox Baseball Club, LP from broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

165.    Thus, it was and is in the interest of defendant Boston Red Sox Baseball Club, LP to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the Boston Red Sox, which defendant Boston Red Sox Baseball

Club, LP did at all material times, even while knowing that DraftKings' fantasy baseball contests were compromised and unfair as a result of the Boston Red Sox's misconduct.

166.    At the same time defendant Boston Red Sox Baseball Club, LP was promoting DraftKings and DraftKings' fantasy baseball contests, the Boston Red Sox were engaged in the electronic sign stealing in violation of the rules, regulations and directives of Major League Baseball, and which resulted in compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiff and the Class participated corrupt and tainted.

167.    At all material times, defendant Boston Red Sox Baseball Club, LP knew or recklessly disregarded the fact that their electronic sign stealing misconduct resulted in compromised and dishonest player performance statistics.

168.    Further, defendant Boston Red Sox Baseball Club, LP affirmatively concealed and failed to disclose its electronic sign stealing misconduct even though defendant Boston Red Sox Baseball Club, LP knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests they were separately promoting.

169.    Defendant Boston Red Sox Baseball Club, LP's conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that their electronic sign stealing misconduct is compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair, deceptive, misleading and/or false practices, all conduct which violates M.G.L. c. 93A *et seq*.

170.    As a result of their conduct, defendant Boston Red Sox Baseball Club, LP hashave engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A *et seq*.

171.    Plaintiff and the Class are consumers who paid for the fantasy baseball services provided by DraftKings that were compromised and rendered dishonest by defendant Boston Red Sox Baseball Club, LP's unfair and deceptive acts or practices in violation of M.G.L. c. 93A *et seq.*

172.    As a direct, foreseeable and proximate result of the unfair and deceptive acts or practices by defendant Boston Red Sox Baseball Club, LP in violation of M.G.L. c. 93A *et seq.*, Plaintiff and the Class were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

173.    The wrongful conduct by defendant Boston Red Sox Baseball Club, LP was wanton, willful or in reckless disregard of the rights of Plaintiff and the Class.

174.    By reason of the foregoing, Plaintiff and the Class are entitled to all available damages and remedies available under M.G.L. c. 93A *et seq.*, including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees.  Further, because defendant Boston Red Sox Baseball Club, LP acted willfully or knowingly, Plaintiff and the Class are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the Massachusetts Act.

## SEVENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(Against Defendant Boston Red Sox Baseball Club, L.P.)**

175.     Plaintiff repeats and incorporates herein by reference the above allegations.

176.     At all material times, defendant Boston Red Sox Baseball Club, LP has realized substantial financial gain from its agreement with DraftKings and promotion of and participation in DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

177.     Fan participation in fantasy baseball contests directly resulted in increased financial benefit to  defendant Boston Red Sox Baseball Club, LP based not only on the foregoing revenue streams, but also through increased revenue from broadcasting, attendance, advertising, and the sale of merchandise and paraphernalia.

178.     At all material times, defendant Boston Red Sox Baseball Club, LP promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

179.     Further, at all material times, defendant Boston Red Sox Baseball Club, LP  knew and did not disclose that it was engaged in electronic sign stealing in violation of MLB's rules and regulations (and directives), that resulted in compromised and dishonest player performance statistics that rendered DraftKings' fantasy baseball contests corrupt and tainted.

180.     Plaintiff and the Class conferred substantial monetary benefits on defendant Boston Red Sox Baseball Club, LP in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise revenue.

181.    Defendant Boston Red Sox Baseball Club, LP's conduct was knowing and intentional, and defendant Boston Red Sox Baseball Club, LP appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiff and the Class.

182.    Under principles of equity and good conscience, defendant Boston Red Sox Baseball Club, LP should not be permitted to retain the foregoing monetary benefits it wrongfully obtained at the expense of Plaintiff and the Class.

183.    As a direct and proximate result of defendant Boston Red Sox Baseball Club, LP's wrongful conduct, defendant Boston Red Sox Baseball Club, LP is are liable to Plaintiff and the Class for the amount of the monetary benefits conferred upon the defendant Boston Red Sox Baseball Club, LP, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

184.    Defendant Boston Red Sox Baseball Club, LP should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiff and the Class all unlawful, inequitable and unjust proceeds received and/or realized as a result of its wrongful conduct.

## PRAYER FOR RELIEF

A.    Certify this action and the Classes as requested herein, appoint Plaintiff as Class Representative, and appoint Plaintiff's attorneys as Class Counsel.

B.    Enter judgment against Defendants and in favor of Plaintiff and the Class on the claims for relief asserted herein.

C.    Award to Plaintiff and each member of the Class actual, compensatory, general and/or statutory damages in an amount to be determined at trial.

D.      Award Plaintiff and the Class disgorgement and restitution of all ill-gotten gains, together with all proceeds, interest, income, profits, and accessions thereto as a result of Defendants' unlawful conduct.

E.      Award Plaintiff and the Class exemplary and/or punitive damages, as allowed by law, in an amount to be determined at trial.

F.      Award Plaintiff and the Class injunctive and/or other appropriate equitable relief pursuant to the state consumer protection acts cited herein.

G.      Award Plaintiff and the Class attorneys' fees and costs, as allowed by law.

H.      Award Plaintiff and the Class prejudgment and post-judgment interest, as allowed by law.

I.      Award such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Pursuant to FED. R. CIV. P. 38, Plaintiffs and the Classes demand trial by a jury on all issues so triable.

DATED: January 23, 2020                    **SILVER GOLUB & TEITELL LLP**


                                           By:    /s/ David S. Golub
                                                  DAVID S. GOLUB
                                                  dgolub@sgtlaw.com
                                                  STEVEN L. BLOCH
                                                  sbloch@sgtlaw.com
                                                  IAN W. SLOSS
                                                  isloss@sgtlaw.com
                                                  184 Atlantic Street
                                                  Stamford, CT 06901
                                                  Tel. (203) 325-4491