# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD, and ERIK LIPTAK, individually and on behalf of all others similarly situated, <br><br> Plaintiff <br><br> v. <br><br> MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, L.P., <br><br> Defendants | Case No. 1:20-CV-00632-JSR <br><br> AMENDED CLASS ACTION COMPLAINT |

Plaintiffs Kristopher R. Olson, Christopher Lopez, Warren Barber, Christopher Clifford, and Erik Liptak bring this action, individually and as a class action on behalf of all others similarly situated, to recover damages for defendants' wrongful promotion of fantasy baseball wagering competitions that they caused to be, and knew or should have known were, corrupt and dishonest.

## NATURE OF THE ACTION

1.      For decades in the Twentieth Century and into this Century, defendant Major League Baseball ("MLB") stridently opposed the legalization of sports gambling in this country and, in particular, legalization of gambling on baseball. MLB argued that the honesty and integrity of major league baseball would be jeopardized if gambling on baseball was permitted. MLB repeatedly assured its fans that it was protecting the integrity of the game; and to emphasize its commitment to the public of ensuring that baseball remained free of gambling-related taint or corruption, MLB imposed lifetime bans on star players who became involved

with gambling – Shoeless Joe Jackson in 1921, Pete Rose in 1989.  As MLB Commissioner Robert D. Manfred, Jr. stated in January 2016 when he refused to lift the lifetime ban against Rose, "[T]here's a need to never lose sight that your foremost responsibility is to protect the integrity of the play of the game on the field."[1]

2.      MLB reiterated this commitment after the United States Supreme Court invalidated federal prohibitions on state legalization of sports gambling in 2018, lobbying state legislatures considering whether to legalize sports gambling for "integrity fees" to compensate it for the cost of maintaining the honesty of the game in the face of the dangers that legalized sports gambling posed to the integrity of baseball.  As Manfred has repeatedly stated, "Our most important priority is protecting the integrity of our games."[2]

3.      Defendant MLB's attitude toward wagering on baseball changed – secretly in 2013 and then publicly in 2015 – as MLB recognized and sought to take advantage of the enormous popularity and lucrative financial opportunities presented by fantasy sports wagering competitions.  Investing in fantasy baseball was a win-win proposition for MLB.  Not only would it be able to benefit financially by sharing in the multi-million dollars of entry fees fantasy baseball contestants paid their fantasy sports operator, but fan interest in the game would be heightened by fan participation in fantasy baseball wagering, resulting in greater attendance, higher advertising and broadcasting revenues, and additional sales of MLB merchandise and

[1] Jerry Crasnick, *Q&A: Rob Manfred reflects on his 1-year anniversary as MLB commissioner*, ESPN (Jan. 25, 2016), https://www.espn.com/mlb/story/_/id/14636894/qa-rob-manfred-one-year-mlb-commissioner (accessed Feb. 13, 2020).
[2] Chandler Rome, *Major League Baseball re-examining its stance on gambling,* HOUSTON CHRONICLE (May 14, 2018), https://www.chron.com/sports/astros/article/Major-League-Baseball-reexamining-stance-gambling-12913043.php (accessed Feb. 13, 2020).

paraphernalia.  As Manfred stated on behalf of MLB in October 2015, "[F]antasy [baseball] is an important source of fan engagement and has been for a long time."[3]

4.     In 2013, MLB, through its affiliated entity, defendant MLB Advanced Media, L.P. ("MLBAM"), made a confidential investment in daily fantasy sport operator DraftKings Inc. ("DraftKings"). Two years later, MLB added to its original undisclosed investment with a greater, now-public, equity investment in DraftKings. As MLB stated at the time, its investment would enable it "to reap meaningful benefit from the rise of daily fantasy."[4]

5.     To that end, MLB did not simply become a passive investor in DraftKings. Rather, it entered into a comprehensive league partnership agreement with DraftKings,[5] and, acting as DraftKings' "partner,"[6] MLB has participated, from at least 2015 to date, in actively promoting and marketing DraftKings' fantasy baseball competitions – featuring DraftKings' fantasy baseball contests across MLB's media properties, granting DraftKings broad promotional and advertising rights, including use of MLB league and team logos, designating DraftKings as MLB's "Official Daily Fantasy Game," and affording DraftKings the exclusive right to sign sponsorship agreements with MLB individual member Clubs.[7]  And, in return as DraftKings' partner, MLB (directly and through MLBAM) has received a share of the multi-million dollar

---

[3] Mark Feinsand, *MLB commissioner Rob Manfred defendants DraftKings partnership, says fantasy sprots 'not gambling'*, N.Y. DAILY NEWS (Oct. 26, 2015), https://www.nydailynews.com/sports/baseball/fantasy-sports-not-gambling-mlb-commissioner-manfred-article-1.2412347 (accessed Feb. 13, 2020).

[4] Eric Fisher, *A look into DraftKings' MLB Deal*, SPORTS BUSINESS JOURNAL (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Jan. 22, 2020).

[5] *Id.*

[6] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Jan. 22, 2020).

[7] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Jan. 22, 2020) ("DraftKings' existing partnership with Major League Baseball included a provision that it is the only DFS site that can sign deals with individual teams.").

fees earned from fantasy baseball contestants, an increase in the value of its equity investment in DraftKings (which MLB redeemed in 2019), as well as substantial other financial benefits.

6. Defendant MLB is comprised of baseball's 30 Major League Clubs, led by MLB's Office of the Commissioner. As anticipated in MLB's 2015 partnership agreement with DraftKings, MLB's individual member Clubs have entered into lucrative individual agreements with DraftKings to promote DraftKings' fantasy baseball contests. In 2015, pursuant to MLB's league partnership agreement with DraftKings and MLB individual member team agreements with DraftKings, DraftKings' signage began being featured in 27 of MLB's 30 stadiums, and MLB Clubs engaged in co-branding promotions with DraftKings, including "in-stadium experiences" for DraftKings' contestants. In particular, as relates to this lawsuit, two of MLB's constituent member Clubs – the Houston Astros, LLC (the "Houston Astros" or the "Astros") and the Boston Red Sox Baseball Club, L.P. (the "Boston Red Sox" or the "Red Sox") – entered into agreements with DraftKings and have, throughout the period relevant to the claims against them in this lawsuit, actively promoted, marketed and featured DraftKings' fantasy baseball competitions to their fanbases. The Astros and the Red Sox have financially benefited from their relationship with DraftKings, both through MLB's agreements and through their individual agreements with DraftKings.

7. Through their relationship with DraftKings, MLB and its constituent Clubs, including the Astros and Red Sox, have, in the course of promoting and helping to market DraftKings' fantasy offerings, encouraged their fans to take a financial stake in DraftKings' fantasy baseball wagering competitions by engaging in what the fantasy sport world defines as a "game of skill" – wagering on the performance of MLB's players through DraftKings' fantasy

baseball contests. MLB has enthusiastically embraced DraftKings' slogan that "Life is more fun with skin in the game."[8]

8. Concurrent with its support and partnership with DraftKings, MLB recognized – and publicly addressed – the importance of safeguarding the honesty and fairness of DraftKings' fantasy baseball competitions it was promoting to its fans. Manfred – acting on behalf of MLB and its constituent Clubs, and as the duly authorized agent and spokesperson for MLB's Major League Clubs, including the Astros and Red Sox, stated in October 2015 in a radio interview, "I think the biggest concern is the one that attracted the most publicity. You want to make sure that the fantasy organizations have appropriate safeguards in place to ensure that things are fair, that there's not an inappropriate use of information and that fans who engage on these platforms have an opportunity to win."[9]

9. And MLB's fans – believing the fantasy contests to be honest – have engaged in DraftKings' games of skill to the tune of millions of dollars in daily fantasy sports baseball contest fees, to DraftKings', MLB's, and MLB's member Clubs' enormous financial benefit.

10. What MLB's fans did not know was that MLB's and its member Clubs' commitment to ensuring the honesty and integrity of the game of baseball had also changed, substantially undermining and compromising the fairness not only of MLB team vs. team competitions, but DraftKings' fantasy baseball contests as well. While Manfred, speaking on behalf of MLB and its constituent Clubs, repeatedly represented that MLB was affirmatively acting to maintain the integrity of the game of baseball, and while MLB and its member Clubs,

---

[8] *See, e.g. DraftKings Expands Partnership with Major League Baseball to Become an Authorized Gaming Operator*, DRAFTKINGS (July 25, 2019), https://about.draftkings.com/2019/07/25/draftkings-expands-partnership-with-major-league-baseball-to-become-an-authorized-gaming-operator/ (accessed Jan. 22, 2020)("DraftKings is a global sports technology and entertainment company *that believes life is more fun with skin in the game.*)(emphasis added).

[9] Darren Rovell, *Commissioners say daily fantasy not akin to gambling, but needs regulation*, ABC NEWS (Oct. 27, 2015), https://abcnews.go.com/Sports/commissioners-daily-fantasy-akin-gambling-regulation/story?id=34764018 (accessed Feb. 13, 2020).

including the Astros and the Red Sox, were actively inducing their fans to enter into fantasy baseball wagers based on the individual statistical performance of MLB players, MLB's member Clubs secretly engaged in corrupt and fraudulent conduct, in knowing and intentional violation of MLB's Official Rules and regulations, that produced player statistics distorted by cheating and deprived their fans of an honest fantasy baseball competition. The corrupt conduct of at least two of those Clubs – the Astros and the Red Sox – has now been publicly exposed, revealing that, at the very least, DraftKings' fantasy baseball contests from the beginning of the 2017 baseball season through the 2019 season were tainted by cheating and compromised, at the expense of DraftKings' contestants.

11.　　Throughout this period, Manfred and all of MLB's member Clubs were well aware that MLB member Clubs were engaging in corrupt and fraudulent conduct that rendered player performance statistics dishonest and undermined the validity of wagers on DraftKings' fantasy baseball contests. In particular, the fraudulent conduct of the Astros was an "open secret" among MLB league executives, scouts and players.[10] Despite its members' (and the Office of the Commissioner's) knowledge of such misconduct, MLB intentionally failed to take appropriate action to prevent the Astros' misconduct. MLB failed to properly investigate, deter, remedy or disclose its members' misconduct and purposefully continued to encourage fan participation in what it knew to be corrupted fantasy baseball competitions. And, even after the misconduct by the Astros and the Red Sox was exposed, Manfred – acting on behalf of MLB and its member Clubs – intentionally minimized and misrepresented the extent of the fraudulent

---

[10] *See* Barry Svrluga and Dave Shienin, *The world just learned of the Astros' cheating. Inside baseball, it was an open secret.*, The Washington Post (Feb. 11, 2020), https://www.washingtonpost.com/sports/mlb/astros-cheating-open-secret/2020/02/11/1830154c-4c41-11ea-9b5c-eac5b16dafaa_story.html (accessed Feb. 13, 2020)("According to people at all levels through [baseball] – players, clubhouse staff, scouts and executives – the idea that the Astros employed nefarious methods was an open secret. 'The whole industry knows they've been cheating their asses off for three or four years,' said an executive from a team that faced the Astros in the playoffs during that span. 'Everybody knew it.'").

conduct, falsely asserting the Astros' violation of MLB's rules was "player-driven," when he knew that the misconduct had been perpetrated by and with the approval of Astros' management.

12.     And MLB's member Clubs – specifically, the Astros and Red Sox – were well aware of their cheating, which was perpetrated with the direct knowledge (or, at best, willful blindness) of team officials.  MLB's Clubs ratified and approved Manfred's knowing failure to take action to stop, deter and disclose the member team misconduct described in this Complaint. And Manfred and MLB's Clubs knew that Manfred's continuing statements to the public and to state governments promising to maintain the integrity and honesty of the game of baseball were false – because MLB did not want to suffer the public relations disaster that disclosing  and remedying MLB team and player fraudulent conduct would engender.

13.     Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak – like the hundreds of thousands and likely millions of other similarly-situated DraftKings' contestants – were victims of this wrongful conduct by MLB and its corrupt member Clubs.  Believing Major League Baseball games to be honestly conducted, plaintiffs and their fellow DraftKings' contestants made wagers on DraftKings' fantasy baseball contests that they thought were based on the honest performance of MLB's players, when instead the contests were based on the cheating by MLB's teams and their players that MLB chose to turn a blind to and knowingly failed to prevent or disclose. Neither plaintiffs, nor any other DraftKings' contestants would have wagered on daily fantasy baseball contests if they had known that the players' performance statistics on which their wagers were based were not honest.

14. Plaintiffs now bring this action, on their own behalf and on behalf of their fellow DraftKings' contestants, to recover the amounts they wagered in these corrupt fantasy baseball competitions, including all fees paid to DraftKings, as well as for statutory and punitive damages, attorneys' fees and costs, and such other relief as warranted by applicable law.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members as defined below, and minimal diversity exists because a majority of putative class members are citizens of a state different than Defendants.

16. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendants reside in and are subject to the court's personal jurisdiction in this District in that they either have their principal places of business in this District or transact substantial business in this District on an ongoing basis and are subject to the court's personal jurisdiction with respect to this action.

## PARTIES

**A.      Plaintiff**

17. Plaintiff Kristopher R. Olson is a citizen of the Commonwealth of Massachusetts.

18. Plaintiff Christopher Lopez is a citizen of the State of California.

19. Plaintiff Warren Barber is a citizen of the State of Texas.

20. Plaintiff Christopher Clifford is a citizen of the State of Florida.

21. Plaintiff Erik Liptak is a citizen of the State of Colorado.

**B.     Defendants**

22.     Defendant Major League Baseball ("MLB") is comprised of the thirty Major League Baseball Clubs, which have formed a partnership governed by a written agreement (the Major League Constitution).  Pursuant to the member Clubs' agreement, MLB's Office of the Commissioner d/b/a Major League Baseball, is vested with responsibility for administrative and operational matters relating to Major League Baseball, and acts on behalf of and serves as spokesperson for all of the Clubs.  At all times relevant to plaintiffs' claims herein, Robert Manfred has served as defendant MLB's Commissioner,  and his statements and actions, as described herein, were duly-authorized, approved and ratified by all of MLB's member Clubs. MLB's headquarters are located at 1271 Avenue of the Americas, New York, New York.

23.     Defendant MLB Advanced Media, L.P. ("MLBAM") is a limited partnership comprised of MLB's member Clubs (or their affiliates) and has its principal place of business at 1271 Avenue of the Americas, New York, New York.  Defendant MLBAM has responsibility for internet and interactive marketing for MLB, including MLB's relationship with DraftKings and promotion and marketing of DraftKings' fantasy baseball competitions on a nationwide basis.  At all times mentioned herein, defendant MLBAM acted in concert with, as partner or joint venture with, defendant MLB in furthering MLB's and MLBAM's business relationship with DraftKings.

24.     Defendants MLB and MLBAM were, at all times mentioned herein, actively collectively to further their joint interests in promoting, marketing and receiving the financial benefits of their agreements and relationships with DraftKings, and authorized, approved and ratified each other's conduct, statements and representations in such regards, including the

statements and representations by Manfred cited in this Complaint. Defendants MLB and MLBAM are referred to, collectively, herein, with respect to such conduct, statements and representations as the "MLB Defendants."

25. Defendant Houston Astros, LLC (the "Houston Astros" or the "Astros") is a Texas limited liability corporation that owns and operates the Houston Astros professional major league baseball team and is a constituent member of MLB. At all times relevant to the events at issue in this lawsuit, defendant Houston Astros, LLC engaged in continuing substantial business in this District, individually and as a member of defendant MLB.

26. Defendant Boston Red Sox Baseball Club, L.P. (the "Boston Red Sox" or the "Red Sox") is a Massachusetts limited partnership that owns and operates the Boston Red Sox professional major league baseball team and is a constituent member of MLB. At all times relevant to the events at issue in this lawsuit, defendant Boston Red Sox Baseball Club LP engaged in continuing substantial business in this District, individually and as a member of defendant MLB.

## FACTUAL BACKGROUND

### I. Fantasy Baseball

27. Fantasy Baseball is a statistics-based wagering competition in which contestants assemble lineups (a "fantasy team") of real-life MLB players to compete against lineups of MLB players selected by other contestants.

28. The performance of a contestant's fantasy lineup is directly tied to the real-life performance of the players that comprise the contestant's team. Points are awarded to each player on a contestant's fantasy baseball team based on the player's objectively measurable statistical baseball performance achievements (*e.g.*, home runs, hits, batting average, strike outs,

earned run average). The contestant whose fantasy team earns the most points wins the contest and the contest's cash prize.

29.     Fantasy sports competitions, including fantasy baseball, are defined as a "game of skill" and are exempted from federal prohibitions on illegal gambling and, during the 2017, 2018 and 2019 baseball seasons at issue in this action, were authorized forms of wagering in 43 states and the District of Columbia.

## II.     **DraftKings' Fantasy Baseball Wagering Contests**

30.     DraftKings Inc. is a Delaware corporation with its principal place of business in Boston, MA. DraftKings was founded in 2012 and operates fantasy sports contests on daily and weekly bases through its website and mobile applications. DraftKings offers daily fantasy contests across multiple sports, including baseball.  In contrast to traditional fantasy sports contests, which typically last an entire season, DraftKings' contests start and end in a much shorter period (*i.e*, a single day or week).

31.     Daily fantasy sports ("DFS") baseball competitions ("MLB DFS") offered by DraftKings require contestants to select a lineup of MLB players pursuant to a "salary cap" draft. In this draft, each real-life MLB player is assigned an imaginary value, or "salary." The better a real-life MLB player has or is expected to perform, the higher his "salary." Contestants are required to draft a fantasy team with players whose aggregate salary is less than the salary cap allocated to the contestants in each given competition. The past statistical performance of the real-life MLB players available to be drafted by contestants is, thus, a material consideration for contestants, who rely on the accuracy of the past statistics in making decisions about whether to draft a player to their lineups and how much to "spend" on a player in the draft.

32.     DraftKings' MLB fantasy contests begin once the first real-life MLB game on which the contest is based commences. For example, in a weeklong MLB fantasy contest, the contest begins when the first MLB game of the week begins. Contestants accumulate fantasy points based on the real-life performances of the MLB players they have selected for their lineups over the length of the contest. The total points the contestant's line-up of real-life players generate during each specific competition determines the contestant's ranking in the contest. Because the points are tied directly to real-life performance metrics, a contestant's final ranking in the contest, and pecuniary gain or loss, is wholly dependent on player performance (and not affected by the actual outcome of any MLB game).[11]

33.     DraftKings' MLB daily and weekly fantasy contests typically take one of two forms: head-to-head contests, which feature only two competing contestants and lineups, and tournaments, which can include tens of thousands of user lineups. Fantasy contestants pay an entry fee to join each competition. A portion of each entry fee is kept by DraftKings as payment for its DFS services, and the remainder is used to fund the prize money for each fantasy competition.

34.     From the outset, DraftKings' DFS contests proved enormously popular and lucrative. In 2014, just two years after it was formed and the year preceding the formation of its league partnership agreement with MLB (discussed below), DraftKings reported over $300

---

[11] Defendant MLB has disingenuously stated that it is unable to determine whether the outcome of any MLB games was affected by the impermissible electronic sign stealing described in this Complaint. *See* Robert D. Manfred, Jr., *Statement of the Commissioner*, OFFICE OF THE COMMISSIONER OF BASEBALL (Jan. 13, 2020) at 8, https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Feb. 13, 2020). Even assuming that to be true, that is irrelevant to plaintiffs' claims.

million in DFS entry fees and over $30 million in revenue.[12] DraftKings further reported an

eight-fold increase that year in participants in its fantasy baseball wagering contests.[13]

35.     In 2013, less than a year after DraftKings was founded, defendant MLB – acting

through and in a partnership or joint venture with defendant MLBAM – invested in an equity

stake in DraftKings.[14] At the request of MLB, the investment was not publicly disclosed by

DraftKings (or MLB).[15] While the amount of the investment has still never been disclosed, it was

large enough to cause DraftKings employees who knew the details to be "taken aback by the size

of it."[16]

36.     In April 2015, MLB and DraftKings publicly announced that MLB was taking a

further equity stake in DraftKings. While the size of MLB's 2015 investment has remained

undisclosed, MLB's investment was "described by league executives as *sizeable enough to reap*

*meaningful benefit from the rise of daily fantasy*."[17] In conjunction with MLB's investment,

DraftKings and MLB entered into what they described as "the most comprehensive league

partnership in daily fantasy sports history."[18] The agreement provided for co-branding of

---

[12] *See* Darren Heitner, *DraftKings Reports $304 Million of Entry Fees in 2014*, Forbes (Jan. 22, 2015), https://www.forbes.com/sites/darrenheitner/2015/01/22/draftkings-reports-304-million-of-entry-fees-in-2014/ (accessed Jan. 22, 2020)("Daily fantasy sports operator DraftKings has released its key annual fiscal year 2013 and 2014 financials for the first time, which shows entry fees of $45 million in 2013 and a rise to $304 million in 2014. Revenues were $4 million and $30 million, respectively.").

[13] *Id.*

[14] Albert Chen, *Billion Dollar Fantasy: The High-Stakes Game Between FanDuel and DraftKings That Upended Sports in America*, 174 (2019).

[15] *Id.*("[DraftKings'] 2013 marketing partnership with MLB was a watershed moment because it was the first daily fantasy partnership with a professional sports league, *but it also was a ghost deal— at MLB's behest, there was no press release at the time, simply DraftKings signage popping up in major league ballparks and DraftKings banners on MLB.com.*")(emphasis added).

[16] *Id.* ("[S]ome early employees who knew the details of the deal were taken aback by the size of it, but what it did accomplish was to give the industry legitimacy and also give DraftKings an inside track to a bigger deal, which was announced in the spring of 2015.").

[17] Eric Fisher, *A look into DraftKings' MLB Deal*, Sports Business Journal (Apr. 20, 2015), https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx (accessed Jan. 10, 2020)(emphasis added).

[18] Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BusinessWire (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Jan. 22, 2020).

DraftKings' DFS baseball contests, allowed DraftKings to offer market-specific in-ballpark

experiences, and gave DraftKings promotional rights, use of MLB league and team logos, the

exclusive right to sign sponsorship deals with individual MLB member clubs, and a designation

as MLB's "Official Daily Fantasy Game."[19]

37.     Shortly thereafter, DraftKings announced individual partnerships with 27 of

MLB's member Clubs, including the Astros and the Red Sox.[20] These partnerships enabled

DraftKings to "create one-in-a-lifetime, market-specific in-ballpark experiences" and allowed

DraftKings to place advertisements inside the stadiums of their partner MLB member clubs.

MLB, its member teams and DraftKings all benefitted financially from this aggressive marketing

campaign.

38.     In July 2015, MLB Commissioner  Manfred, speaking on behalf of MLB, its

member Clubs, and MLBAM, publicly explained the importance of DraftKings fantasy baseball

to MLB, and defended its legality, stating:

>    I think fantasy baseball is an important source of fan engagement and has been for
>    a long time.  We did thoroughly investigate the games that were available on the
>    [DraftKings] site, and we were completely comfortable with the idea that those
>    games were consistent with the existing federal law.[21]

39.     And Manfred, again speaking on behalf of MLB, its member Clubs, and

MLBAM, further emphasized in October, 2015 that MLB understood the need to safeguard the

fairness of fantasy baseball contests to insure that wagering contestants have a fair opportunity to

win, publicly stating:

---

[19] *See* Fisher, *supra*, at note 11.

[20] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL
SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Jan.
22, 2020).

[21] *See* Rome, *supra*, at note 2.

I think the biggest concern is the one that attracted the most publicity. You want to make sure that the fantasy organizations have appropriate safeguards in place to insure that things are fair, that there's not an inappropriate use of information and that fans who engage on these platforms have an opportunity to win.[22]

Consistent with Manfred's representation, when questions arose in 2015 concerning DraftKings' failure to protect the fairness of its fantasy baseball contests, MLB issued a statement indicating it had "reached out and discussed this matter with [DraftKings].[23]

40. Manfred, on behalf of MLB, publicly reiterated the importance MLB placed on establishing and following policies that maintained the integrity of the game of baseball in an era of increase sports gambling, stating on November 27, 2018:

It's more than just making a business deal [with a sports gambling operator]. It's having in place a set of policies for the industry that give us comfort on what is always our most important issue – that is integrity.[24]

41. And Manfred further reassured the public that, with the advent of laws legalizing sports gambling, MLB would exercise care to maintain the integrity of the baseball:

The challenge for us is to make sure … those [sports gambling] laws develop in a way where can protect the integrity of the sport. We want to be careful our product retains a pristine quality.[25]

42. DraftKings' and the MLB Defendants' aggressive marketing of MLB DFS baseball contests has resulted in hundreds of millions of dollars of contest fees being paid to DraftKings for MLB daily fantasy contests and tens, if not hundreds, of millions of dollars of annual revenue, all to the financial benefit of defendant MLB and its constituent teams including, the defendant Astros and the defendant Red Sox.

---

[22] *See* Rovell, *supra*, at note 10.

[23] ESPN News Services, *DraftKings says employee didn't have unfair advantage on FanDuel*, ESPN (Oct. 6, 2015), https://www.espn.com/chalk/story/_/id/13821770/draftkings-defends-integrity-says-employee-had-no-unfair-fanduel-advantage (accessed Fe. 13, 2020).

[24] Billy Witz, M.L.B., *Once Averse to Gambling, Strikes a Deal With MGM Resorts*, N.Y. TIMES (Nov. 27, 2018), https://www.nytimes.com/2018/11/27/sports/mlb-gambling-mgm-resorts.html (accessed Feb. 13, 2020).

[25] Adam Candee, MLB Commish On Sports Betting: *'We Will Never Delegate Responsibility For Those Integrity Issues To State Regulators'*, LEGAL SPORTS REPORT (July 18, 2018), https://www.legalsportsreport.com/22146/mlb-commissioner-integrity-fees/ (accessed Feb. 13, 2020).

### III. **Major League Baseball's Official Rules and Regulations Expressly Prohibit the Use of Electronic Devices to Steal Signs.**

43.     Defendant MLB, acting principally through its Office of the Commissioner, operates the professional sports organization known as Major League Baseball.  Defendant MLB has 30 member baseball Clubs, including the defendant Astros and the defendant Red Sox.

44.     All of MLB's member Clubs have entered into an operating agreement, the Major League Constitution, pursuant to which all teams agree, *inter alia*, to be bound by all rules and regulations relating to games, ballparks … and other matters," including bulletins and directives "relating to the Commissioner's functions and the administration of the game of baseball."

45.     Defendant MLB's member Clubs have all ratified and approved the conduct of MLB Commissioner Manfred and the Office of the Commissioner set forth herein.

46.     Defendant MLB's members Clubs have all authorized MLB Commissioner Manfred and the Office of the Commissioner to issue public statements on their behalf and have ratified and approved the statements by Manfred and the Office of the Commissioner set forth herein.

47.     As an aspect of their business relationship, MLB's member Clubs have agreed that the Commissioner will act as their spokesman on matters involving the honesty and integrity of the game of baseball and, further, have accepted the Commissioner's instruction that they not comment publicly on matters involving accusations of electronic sign stealing misconduct by other Clubs.

48.     MLB Commissioner Manfred and the Office of the Commissioner have acted as the duly authorized agents of all of MLB's member Clubs with respect to the statements and conduct set forth herein.  In particular, Manfred and the Office of the Commissioner were acting as the duly-authorized agents of all of MLB's Clubs, including the Astros and the Red Sox, when

16

they made the public statements described herein concerning the need to protect the integrity of the game of baseball and MLB's continuing efforts to do so and made statements and engaged in the conduct described herein concerning MLB member Club electronic sign stealing.

49.     Defendant MLBAM, owned by defendant MLB's constituent Clubs (including the defendant Astros and the defendant Red Sox) or their affiliates, provides internet and interactive marketing services for MLB and its teams and, in particular, oversees and participates in promoting MLB's partnership with DraftKings and helping to promote and market, in combination with MLB, DraftKings' fantasy baseball wagering competitions on a nationwide basis.

50.     Defendant MLB, through its predecessors the National League and American League, has conducted baseball competition according to a written set of rules and regulations since the National League's inception in 1876.  MLB's Official Rules covering on-the-field conduct were codified in 1949. In addition to MLB's Official Rules, MLB issues and enforces policies via regulations which are implemented via league-wide memoranda.

51.     Defendant MLB has long represented to the public (including members of the public that it has sought to induce to participate in DraftKings' MLB DFS contests) that it carefully enforces its Official Rules and regulations to ensure the honesty and integrity of the game, MLB's "most important priority."[26]

52.     Manfred has further repeatedly stated publicly that MLB itself, not state regulatory authorities, will protect Major League Baseball from problems associated with gambling.  He has stated on behalf of MLB and all of its member teams, "We will never delegate responsibility for those integrity issues … We have our own expertise and no one is more motivated than the commissioner's office of baseball to make sure there is no threat to the

---

[26] *See* Chandler, *supra*, at note 2.

integrity of our sport."[27]  In this regard, MLB has, through Manfred and other MLB

representatives, asserted to state legislatures considering sports gambling legislation, that MLB is

entitled to an "integrity fee" to be assessed on any gambling transactions in the given state to

compensate MLB for its ongoing commitment to self-policing Major League baseball and

insuring the integrity of the game of baseball as only MLB is best motivated and best able to

do.[28]

      53.    MLB has sought legislation entitling it to an "integrity fee" on this basis in

numerous states (at least 18) considering the legalization of sports gambling.  Bryan Seeley, a

Senior Vice President for MLB explained why it was so important for MLB to maintain the

integrity of the game in testimony on March 3, 2018 before the Connecticut legislature:

> My sense is that fans watch our games … because they are spontaneous, they're
> unpredictable, they're not scripted, they're some of the best athletes in the world
> striving to do their best in every play.  And so anything that changes that,
> anything that makes fans lose confidence in the spontaneity … could affect our
> [leagues] in a major way.[29]

      54.    MLB's Official Rules and regulations have, throughout the period at issue in this

lawsuit, expressly prohibited the use of electronic equipment or devices during MLB games to

monitor, decipher or communicate information about a catcher and pitcher's coded

communications with each other about each upcoming pitch.

      a.    As of the start of the 2017 season, Major League Baseball regulations
           expressly prohibited the use of electronic equipment or devices during
           games, providing that no such equipment "may be used for the purpose of
           stealing signs or conveying information designed to give a Club an
           advantage."

---

[27] *See* Candee, *supra,* at note 27.

[28] *Id.* ("That's our job. We're not going to delegate it to some regulator in New Jersey or whatever, with all due
respect. We care more about it. It's what we're about.").

[29] CT Mirror Contributor, *NBA and MLB officials call for fee from legal sports betting*, CT MIRROR (Mar. 1, 2018),
https://ctmirror.org/2018/03/01/nba-mlb-officials-call-fee-legal-sports-betting/ (accessed Feb. 13, 2020).

b.  On September 15, 2017, after learning of an intentional violation by the Boston Red Sox of what he described as the above "clear Regulation," Manfred issued a memorandum reiterating the rules prohibiting the use of electronic equipment or devices to steal signs and making clear that the General Manager and Field Manager of all Major League Clubs were responsible for ensuring compliance with the rules.

c.  During the 2017-18 baseball offseason, the prohibition on electronic sign stealing was expressly discussed and re-stressed at MLB's General Managers Meetings, including the need for monitoring of team behavior because of team violations of the prohibition.

d.  Thereafter, in March 2018, immediately prior to the start of the 2018 baseball season, the Office of the Commissioner issued a memorandum to all Clubs stating, in relevant part:

> Major League Baseball Regulation 1-1 prohibits all uniformed personnel, clubhouse staff and equipment staff from using or possessing telephones or similar electronic devices, including any type of walkie-talkies, mobile phones, 'smart watches' (e.g., Apple watches), laptop computers, tablets or other communication devices, in or near the dugout, in the bullpens or on the playing field once batting practice has begun. MLBR 1-1 also prohibits the use of such devices in the clubhouse within 30 minutes of the start of a game. The prohibition includes the use of any electronic equipment that has the capability to receive electronic messages by any person occupying the bench or in the bullpen.
> ….
> Electronic equipment, including game feeds in the Club replay room and/or video room, may never be used during a game for the purpose of stealing the opposing team's signs. In this respect, MLBR 1-1 expressly provides that "under no circumstances may electronic equipment or devices be used for the purpose of stealing signs or conveying other information designed to give a Club a competitive advantage." **To be clear, the use of any equipment in the clubhouse of in a Club's replay or video rooms to decode an opposing Club's signs during the game violates this Regulation.** [Emphasis in original.] Clubs (and Club employees) who are found to have utilized equipment in the replay or video rooms for such purposes during a game will be subject to discipline by the Commissioner's Office.

55.     At all times, MLB's prohibition on "stealing signs" with the aid of electronic equipment or devices applied to each of MLB's Clubs and to all of MLB's team players and employees.

56.     All of MLB's Club ratified and expressly agreed to comply with MLB's prohibition on electronic sign stealing and represented, in writing, that they were doing so.

57.     As MLB and its member Clubs were (and are) well aware, violation of MLB's prohibition on electronic sign stealing substantially affects the honesty and fairness of MLB competitions. A pitcher's ability to conceal from a hitter the type of pitch being thrown, and the intended speed, movement, and location of the pitch, is critical to a pitcher's success. A team that can successfully steal the catcher's signs and alert its hitters to information about forthcoming pitches will have a substantial hitting advantage in that knowing what type of pitch is coming, and where, dramatically improves a professional major league hitter's ability to hit the pitched ball and to hit the pitched ball with substantial contact. As one MLB pitcher has recently tweeted, "I would rather face a player that was taking steroids than face a player that knew every pitch that was coming."[30]

58.     The opportunity for impermissible electronic sign stealing was substantially increased by MLB's adoption in 2014 of the instant replay challenge process, which allows MLB teams to challenge certain field decisions made by MLB umpires during the course of MLB games. In order to determine whether to challenge a call, MLB teams are permitted to create rooms ("replay rooms") with television monitors and staffed with team employees tasked with

---

[30] Alex Wood (@Awood45), TWITTER (Jan. 16, 2020, 1:37 PM), https://twitter.com/Awood45/status/1217923855156760577 (accessed Jan. 22, 2020). Similarly, Hank Greenberg, a Hall of Fame player for the Detroit Tigers from 1930 through 1945 "loved" knowing what pitch was coming and proclaimed that he "was the greatest hitter in the world when I knew what kind of pitch was coming up." *The Cambridge Companion to Baseball*, 185, (Leonard Cassuto and Stephen Partridge eds.).

immediately reviewing video footage of a play so teams can decide whether to challenge a call within the permitted period of time.

59.     Several of MLB's Clubs, including the Astros and the Red Sox, realized that the live video feeds in their replay rooms provided an opportunity for them to easily view and decipher an opposing team's pitcher and catcher signals and devised ways to relay the information from the replay room to the dugout and to team hitters as they were batting. Beginning in 2017, numerous MLB Clubs and the Office of the Commissioner were aware that the Astros were impermissibly using electronic means to steal their signs in violation of MLB rules but acquiesced and ratified the Commissioner's determination not to act to stop or publicly disclose such misconduct.[31]

60.     Because electronic sign stealing directly affects player performance statistics, teams and players that violate MLB's prohibition directly compromise the fairness and integrity of DraftKings' MLB DFS wagering contests.  Since such contests are based on MLB player performance statistics (rather than on which team wins or loses), a violation of the electronic sign stealing prohibition completely corrupts the fantasy baseball player selection process and the subsequent player performance results that determine the contest winner.

61.     Although MLB was well aware in 2017, 2018 and 2019 of its member Clubs' violations of its rule prohibiting electronic sign stealing and although MLB was well aware of the likely impact of any such violations on player performance, MLB did not take reasonable steps to properly investigate, deter, prevent, remedy or disclose to the wagering public the existence of such team and player misconduct.

---

[31] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020)("'Beginning in the 2017 season, numerous Clubs expressed general concerns that other Clubs were stealing their signs,' MLB said in a statement.").

62. MLB's member Clubs acquiesced and ratified the Commissioner's determination to, in effect, turn a blind eye to the ongoing electronic sign stealing misconduct.

63. Indeed, MLB's Office of the Commissioner was alerted by a number of teams to concerns that the Astros were engaged in impermissible electronic sign-stealing activities in violation of MLB rules.

64. In particular, in October 2018, during the 2018 post-season playoffs, MLB's Office of the Commissioner received reports that the Astros had utilized technological devices to steal signs during the Astros' successful series against the Cleveland Indians and that in connection with the Astros' ensuing playoff series against the Red Sox, the Astros had sent an employee to Fenway Park to try to take photographs of the Red Sox dugout to enable the Astros to steal signs.

65. At that time, defendant Astros' President of Baseball Operations and General Manager Jeffrey Luhnow falsely denied that the Astros had or were violating MLB rules against electronic sign stealing, falsely stating that the Astros' suspected efforts to place an individual with a camera in a position to view into the opposing team's dugout was solely to make sure that the opposing team was not cheating. Luhnow falsely stated on October 17, 2018:

> We do it every stadium we go into. We dispatch someone from the travel party to go out to center field, look at a particular area that might be suspicious or a certain monitor. I'm sure other clubs do this as well, but we're just trying to protect ourselves the best we can.[32]

66. In fact, the Astros had sent the individual to Fenway Park to engage in electronic sign stealing. MLB, through the Office of the Commissioner, purported to investigate the Astros' conduct at that time and issued a public statement on or about October 17, 2018 asserting that it

---

[32] Bob Nightengale, *MLB clears Astros of cheating, Houston GM Jeff Luhnow says team was 'playing defense'*, USA TODAY (Oct. 17, 2018), https://www.usatoday.com/story/sports/mlb/2018/10/17/astros-cleared-cheating-sign-stealing-jeff-luhnow-mlb-playoffs/1675379002/ (accessed Feb. 13, 2020).

had conducted a "thorough investigation" and that the "Astros employee was monitoring the field to ensure the opposing club was not violating any rules."

67.     MLB's public assertion that it had conducted a "thorough investigation" of the Astros' conduct was false, as was its assertion that the Astros had not violated MLB's prohibition on electronic sign stealing.  Had the Office of the Commissioner conducted a proper investigation (as it falsely represented it had done), it would have determined that Luhnow's statement was false and that the Astros' employee involved was, in fact, attempting to engage in electronic sign stealing in violation of MLB rules.

68.     MLB's Office of the Commissioner also received a complaint about the Astros' electronic sign stealing misconduct from the Oakland Athletics, an MLB member Club, but did not properly investigate the complaint or take action to prevent the Astros' continuing electronic sign stealing.

69.     MLB's Clubs acquiesced to and ratified the Commissioner's failure to take action against the Astros because they, like the Commissioner, determined that the adverse public relations and adverse financial effects on fan, advertising and broadcast support from taking action against the Astros outweighed maintaining the honesty and integrity of baseball.

i.      **The Houston Astros' Impermissible Electronic Sign Stealing Corrupted DraftKings MLB DFS Contests to the Financial Detriment of the Class.**

70.     What was unknown to the public until November 2019 was that the Houston Astros and Boston Red Sox (and most likely other MLB teams) had engaged in persistent and continuous violations of MLB rules regarding electronic sign stealing during the 2017, 2018 and 2019 seasons.

71.     Prior to the start of the 2017 baseball season, employees of the Houston Astros devised a scheme to use the Astros' replay room video equipment to engage in electronic sign stealing.

72.     To that end, defendant Astros' non-uniformed employees developed an algorithm that enabled the team to decode opposing catcher's coded signals to opposing pitchers viewed on the Astros' replay room video equipment.  The Astros called this algorithm "Codebreaker" and referred to the scheme to steal signs electronically as the "dark arts," including in written communications to Luhnow.

73.     Pursuant to the Astros' impermissible electronic sign stealing scheme, once the opposing teams' signals were decoded, Astros players reaching second base were able to determine what pitches Astros hitters would receive and to signal that information to the hitters in advance of the pitch.  As discussed above, this information provided Astros hitters with a significant, impermissible, hitting advantage.

74.     Shortly after the season began, the Astros' electronic sign stealing scheme was enhanced during Astros' home games.  Two uniformed Astros – Alex Cora, then a bench coach for the Astros, and Carlos Beltran, then an Astros player, with the assistance of the Astros' baseball operations staff, set up a "[video] feed from a camera in center field, fixed on the opposing catcher's signs, hooked up to a television monitor that was placed on a wall steps from the team's home dugout at Minute Maid Park."[33]  During home games, one or more Astros

---

[33] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020).

players would watch the feed and decode the opposing team's signs and would then "bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter."[34]

75.     The Astros perpetrated these electronic sign stealing schemes for Astros' home and away games for the entire 2017 season, including the 2017 post-season playoffs and World Series.

76.     The Astros' impermissible electronic sign stealing, although unknown to the public (including fantasy baseball contestants), was "an open secret" among MLB executives, scouts and players and made known to the Office of the Commissioner by numerous MLB teams.[35]

77.     The Office of the Commissioner, with the ratification and approval of MLB's Clubs, determined not to investigate the Astros' conduct, not to stop the Astros' impermissible electronic sign stealing, and not to disclose the Astros' conduct.

78.     The Astros won the World Series in 2017, utilizing the impermissible electronic sign stealing misconduct described above.

79.     After the 2017 season, the Astros continued to perpetrate electronic sign stealing in violation of MLB's rules and regulations throughout the 2018 and 2019 seasons.

80.     As noted above, MLB was made aware of – and falsely purported to conduct a "thorough investigation" of the Astros and cleared the Astros of any electronic sign stealing misconduct during the 2018 playoffs.

---

[34] Rob Manfred, *Statement of the Commissioner*, MAJOR LEAGUE BASEBALL (Jan. 13, 2020), at 2, https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Jan. 22, 2020).
[35] *See The Washington Post*, Feb 11, 2020, Barry Svrluga and Dave Shienin, washingtonpost.com/sports/mlb/astros-cheating-open-secret/2020/02/11/1830154c-4c41-11eac5b16dafaa_story.html ["'It was a big open secret, really big,' said a veteran scount from another teaqm whose coverage included the Astros.  'Throughout baseball, throughout the scouting community, for several years, not just starting in 2017.  I would say probably 2016, may earlier, through [2019], things were going on [with the Astros] that were blatantly against the rules  [bracketed material in original].'"]

81.     Earlier in the 2018 season, during a game between the Astros and MLB member Club the Oakland Athletics, Oakland players determined that the Astros players were clapping in the dugout before pitches and believed they were relaying electronically stolen signs to Astros' hitters (in what would be a modified version of the Astros' 2017 use of trash can banging).

82.     Although the incident was reported to the Office of the Commissioner, because MLB and its member Clubs did not want to alert the public that the integrity of baseball games was being undermined by the Astros' cheating, the Commissioner did not seek to investigate the Astros' conduct, nor was any action taken against the Astros on account of the incident, nor was the matter ever disclosed publicly.  All of MLB's member Clubs ratified and approved the Commissioner's determination to take no action and keep the Astros' conduct secret.

83.     The Astros' electronic sign stealing misconduct remained secret until November 2019, when it was reported by Ken Rosenthal and Evan Drellich in a November 12, 2019 article in *The Athletic* that described the Astros' use at home games of a centerfield video feed linked to a monitor adjacent to the Astros' home dugout and the Astros' use of trash can banging to alert Astros' hitters to upcoming pitches.[36]

84.      Video evidence confirming the allegations in *The Athletic* article soon emerged. The trash can banging described in the article was plainly audible in video footage of Astros' players batting in their home stadium, and the footage further demonstrated that the players were aware of the nature of the pitch being signaled by the banging, to their significant hitting advantage.

---

[36] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020).

85.     Six days after *The Athletic* first revealed the trash can banging scheme to the public, evidence emerged that MLB had long been aware of the scheme and yet remained silent. On November 18, 2019, *The Houston Chronicle* reported that MLB told video monitors it placed in the Astros' Minute Maid Park during the 2019 season to "listen for banging sounds emanating from the Astros' dugout,"[37] indicating that MLB knew of the Astros' trash can scheme far in advance of *The Athletic* article and had intentionally failed to disclose the scheme to the public.

86.     Manfred has acknowledged that MLB had prior awareness of the Astros' misconduct, admitting in an interview with *The Houston Chronicle* on November 19, 2019, "We have over time monitored various rumors that you hear throughout the industry, made preliminary investigations and tried to satisfy ourselves that we know exactly what is going on. But certainly not with the depth and detail."

87.     In the face of the public disclosure of the Astros' electronic sign stealing misconduct, Manfred announced on November 19, 2019 that MLB would conduct a "very active" and "really, really thorough investigation."[38] Manfred stated that the investigation would not be limited to the 2017 season.[39]

88.     On January 13, 2020, Manfred issued a public statement purporting to contain the results of MLB's investigation of the Astros' electronic sign stealing conduct. In the statement, Manfred stated that "transparency with our fans and our Clubs regarding what occurred is extremely important, and this report is my attempt to achieve that objective."[40]

---

[37] Chandler Rome, *MLB told video monitors to listen for Astros' banging sounds in 2019*, THE HOUSTON CHRONICLE (Nov. 18, 2019), https://www houstonchronicle.com/sports/astros/article/MLB-told-video-monitors-to-listen-for-Astros-14844792.php (accessed Jan. 16, 2020).
[38] T.R. Sullivan, *Manfred: Astros investigation will be thorough*, MLB.COM (Nov. 19, 2019), https://www.mlb.com/news/rob-manfred-addresses-astros-sign-stealing (accessed Feb. 13, 2020).
[39] *Id.*
[40] Robert D. Manfred, Jr., *Statement of the Commissioner*, OFFICE OF THE COMMISSIONER OF BASEBALL (Jan. 13, 2020), https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Feb. 13, 2020).

89.     Manfred's representation that his public statement would contain a "transparent" description of the Astros' misconduct was false.  Although, as set forth below, Manfred disclosed that Astros' team players had engaged in electronic sign stealing during the 2017 and "part" of the 2018 seasons, in violation of MLB rules, Manfred disingenuously characterized the misconduct as "player-driven," even though MLB's investigators had determined that Astros' non-uniformed employees had developed and implemented use of the "Codebreaker" algorithm and even though MLB investigators had obtained substantial documentary information – including emails to and from Luhnow in 2017 from the Astros' director of advance information, referencing "the system" and "our dark arts, sign-stealing department"[41] – establishing that the scheme had been undertaken with the knowledge of Luhnow, the Astros' President of Baseball Operations and General Manager, as well as Astros' Field Manager A.J. Hinch.  Manfred's "transparent" report further failed to mention the Astros' development and use of the "Codebreaker" algorithm or explain the extent to which the Astros' impermissible electronic sign stealing had continued throughout the 2018 season (including into the 2018 playoffs) and 2019 seasons.

90.     After Manfred's statement mischaracterizing the Astros' scheme as "player driven" and omitting discussion of the extent of non-uniformed Astros' employees' (including management's) involvement in the scheme was issued, Luhnow – who received and sent emails about the scheme – issued a public statement acknowledging that the Astros had engaged in impermissible electronic sign stealing, but falsely denying that he had any knowledge of it:

---

[41] *See* Jared Diamond, '*Dark Arts' and 'Codebreaker': The Origins of the Houston Astros Cheating Scheme*, WALL STREET JOURNAL (Feb. 7, 2020), https://www.wsj.com/articles/houston-astros-cheating-scheme-dark-arts-codebreaker-11581112994  (accessed Feb. 13, 2020). Although Manfred sent Luhnow a letter 11 days before Manfred's statement was release stating that Luhnow was aware of Codebreaker, the team's sign-stealing algorithm, the January 13, 2020 statement makes no reference to that fact.

I did not know rules were being broken. ….  The [Astros'] sign-stealing initiative was not planned or directed by baseball management; the trash-can banging was driven and executed by players, and the video decoding of signs originated and was executed by lower-level employees working with the bench coach.  I am deeply upset that I wasn't informed of any misconduct because I would have stopped it. [42]

91.     Notwithstanding the patent shortcomings of Manfred's January 13, 2020 report, it nonetheless contained the following relevant findings of electronic sign stealing misconduct by the Astros in violation of MLB rules and regulations:

a.      At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences (*i.e.*, which sign flashed by the catcher is the actual sign) for use when an Astros runner was on second base. Once the sign sequence was decoded, a player in the video replay review room would act as a "runner" to relay the information to the dugout, and a person in the dugout would notify the players in the dugout or signal the sign sequence to the runner on second base, who in turn would decipher the catcher's sign and signal to the batter from second base.

b.      Approximately two months into the 2017 season, a group of players, including Beltrán, discussed that the team could improve on decoding opposing teams' signs and communicating the signs to the batter. Cora arranged for a video room technician to install a monitor displaying the center field camera feed immediately outside of the Astros' dugout [. . .] One or more players watched the live feed of the center field camera on the monitor, and after decoding the sign, a player would bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter; and

c.      [T]he Astros' replay review room staff continued, at least for part of the 2018 season, to decode signs using the live center field camera feed, and to transmit the signs to the dugout through in-person communication.[43]

---

[42] Jeff Luhnow, *Statement by Jeff Luhnow*, Associated Press (Jan. 13, 2020), https://apnews.com/PR%20Newswire/92872c1fc2ac64279d395da6241ed72f (accessed Feb. 13, 2020).
[43] *See* Manfred, *supra*, at note 45.

29

92.     And, significantly, Manfred's report makes clear that the Astros' team players participated in the wrongful scheme with knowledge that it was wrong:

> Most of the position players on the 2017 team either received sign information from the banging scheme or participated in the scheme by helping to decode signs or bang on the trash can. Many of the players who were interviewed admitted that they knew the scheme was wrong because it crossed the line from what the player believed was fair competition and/or violated MLB rules.[44]

93.     The Astros' electronic sign stealing inflated the Astros' player performance statistics used by DraftKings' MLB DFS contestants to formulate their MLB DFS wagers and deflated the statistics of opposing pitchers, compromising and corrupting the fairness of the fantasy baseball contests.

94.     Analyses have shown that the Houston Astros' sign stealing schemes were effective and allowed the Astros players to improve their performance "at a level unparalleled in the last 100 years."[45] Jayson Stark and Eno Sarris of *The Athletic* have examined the Astros' performance data and determined that the Astros as a team went from striking out the fourth-most in baseball and the eighth-most in the *history of the game* in 2016 to striking out less than any team in the league in 2017.[46]  This statistical analysis of the Astros' strikeout rates "found essentially no parallel between the 2017 Astros *and any other team in the live-ball era,* in the ability to appreciably cut down on strikeouts everywhere—but by a much larger margin at home,"[47] where the Astros utilized the trash can banging scheme.

95.     The Astros' ability to know what pitch was coming unsurprisingly further led to significant improvement in their ability to hit those pitches. For example, Stark and Sarris observed that the Astros improved their slugging percentage on strikes by 70 percentage points

---

[44] *Id.*

[45] Jayson Stark & Eno Sarris, *Does electronic sign stealing work? The Astros' numbers are eye-popping*, THE ATHLETIC (Jan. 31, 2020).

[46] *Id.*

[47] *Id.* (emphasis in original).

in 2017 as compared to 2016.[48] No other team in the history of baseball has improved so dramatically at hitting strikes.[49] The various advantages conferred on Astros players as a result of electronic sign stealing were worth, by some estimates, as much as five additional wins over the course of the regular season in 2017.[50]

96.    The Astros not only engaged in impermissible electronic sign stealing that corrupted fantasy baseball statistics, but further issued numerous fraudulent statements that concealed from the public (including the fantasy baseball wagering public) the Astros' misconduct and falsely attributed the Astros' hitting success to player ability, team hard work and modern analytics.  These false statements – including false statements by Lunhow, Hinch, team players and fraudulent promotions by the team itself – included the following:

    a.    "Hard to get specific, I had to revamp everything and that's what I did this whole offseason and that's what spring training for me was for was getting used to this new swing and its starting to come out right now and it feels good." **Astros player Jake Marisnick on May 28, 2017 commenting on his offensive success.**[51] **Analysis has shown that the Astros banged on trash cans during over 22% of pitches thrown to Marisnick during home games in 2017.**[52]

    b.    "He's a middle of the order bat whose leading off the game and once it rolls back around you can see how productive he can be getting the most at-bats of the night . . . . its incredible to watch him grow as a hitter and do some things behind the scenes that he is maturing with pretty quickly." **Astros Manager A.J. Hinch on June 28, 2017 discussing Astros player George Springer's hitting ability after defeating the Oakland Athletics 11-8.**[53] **Game footage reveals that the Astros banged on the trash can**

---

[48] *Id.*

[49] *Id.*

[50] Jake Mailhot, *Which Players Might Have Benefited from the Astros' Sign-Stealing?*, FANGRAPHS (Nov. 27, 2019), https://blogs.fangraphs.com/which-players-might-have-benefited-from-the-astros-sign-stealing/ (accessed Feb. 12, 2020).

[51] Adam Wexler, *Catching up with Astros outfielder Jake Marisnick*, CLICK2HOUSTON.COM, https://www.click2houston.com/sports/2017/05/29/catching-up-with-astros-outfielder-jake-marisnick/  (accessed Feb. 13, 2020).

[52] Tony Adams, *Astros Bangs: Team Total*, SIGN STEALING SCANDAL, http://signstealingscandal.com/ (accessed Feb 13, 2020).

[53] A.J. Hinch, *Hinch on Offensive outburst*, MLB.COM (June 28, 2017), https://www.mlb.com/video/hinch-on-offensive-outburst-c1551448283 (accessed Feb. 13,2020).

**26 times** and **10 times** during George Springer's at-bats during that game.[54]

c.    "That inning just continued to go. It's one of the proudest moments that I have about our team or one of the things I love the most about our team is that we just keep coming at you. At bat after At-bat continues to be good and we can put some big innings on some really good pitchers. **Astros Manager A.J. Hinch on July 14, 2017, after defeating the Minnesota Twins 10-5.[55] Game footage reveals that the Astros banged on the trash can *48 times* during that game.[56]**

d.    "It's not unusual for us to have big nights when we put good at-bats together." **Astros Manager A.J. Hinch on Aug. 4, 2017, after defeating the Toronto Blue Jays 16-7.[57] Game footage reveals that the Astros banged on the trash can *54 times* during that game.[58]**

e.    "We've got guys that have been putting up pretty good at bats. It was nice to break out and get a couple of runs. Throughout the day I think our at bats were pretty good." **Astros Manager A.J. Hinch on Aug. 23, 2017, after defeating the Washington National 6-1.[59] Game footage reveals that the Astros banged on the trash can *47 times* during that game.[60]**

f.    "They threw him a couple breaking balls in a row and he hung in there…his hard hit rate is off the chart he's really good at making contact on the barrel with some length and the ball carries pretty far out there so he's what they call a professional hitter and it doesn't matter what country or what level, this guy can really hit." **Astros Manager A.J. Hinch on Sept. 23, 2017 discussing Astros player Carlos Correa hitting ability after defeating the Chicago White Sox 4-3.[61] Analysis has concluded the Astros can be heard banging on the trash can *31 times* and *10 times* during Carlos Correa's at-bats.[62]**

g.    "We talk internally about being on the 'bleeding edge.' We know we're going to have some cuts, some nicks, some bruises because if we're not,

[54] *See* Adams, *supra*, at note 57.

[55] A.J. Hinch, *Hinch on 10-5 wins over Twins*, MLB.com (July 14, 2017), https://www.mlb.com/mets/video/hinch-on-10-5-win-over-twins-c1606863683 (accessed Feb. 13, 2020).

[56] *See* Adams, *supra*, at note 57.

[57] *See* Associated Press, *Ex-Dodgers Pitcher Mike Bolsinger Sues Astros, Says Their Sign Stealing Ended His MLB Career* (Feb. 10, 2020), KTLA4, https://ktla.com/2020/02/10/ex-dodgers-pitcher-mike-bolsinger-sues-astros-says-their-sign-stealing-ended-his-mlb-career/ (accessed Feb. 13, 2020).

[58] *See* Adams, *supra*, at note 57.

[59] A.J. Hinch, *Hinch of Fiers' performance*, MLB.COM (Aug. 23, 2017), https://www.mlb.com/video/hinch-on-fiers-performance-c1764557383 (accessed Feb. 13, 2020).

[60] *See* Adams, *supra*, at note 57.

[61] A.J. Hinch, *Hinch on Peacock's Performance*, MLB.com (Sept. 20, 2017), https://www.mlb.com/astros/video/hinch-on-peacock-s-performance-c1842902783 (accessed Feb. 13, 2020).

[62] *See* Adams, *supra*, note 57.

it's similar to base running. If you have a player on first, and he never gets thrown out at third on a single to right field, he's not being aggressive enough. If you don't ever get thrown out at third, you're leaving runs on the table. I consider it the same way in terms of how quickly we implement new technologies and try and squeeze out a competitive advantage. **Astros General Manager Jeff Luhnow in June 2018 to McKinsey Quarterly.**[63]

h.    "The old way of looking at a season's worth of performance data and using that to predict the future is kind of obsolete . . . . [w]e get tens of thousands of rows of data—about every swing, every pitch, every fielder movement—and we need to decide what to do with that information." **Brandon Taubman, Astros Assistant General Manager in Spring 2018.**[64]

i.    "I wish I knew [which pitch was coming]…every time we got hits now everyone thinks somebody's tipping . . . can you have [Alex Rodriguez] help us out and let us know?" **Astros player Alex Bregman on October 16, 2019 in response to Alex Rodriguez alleging the Astros knew the pitches in advance.**[65]

j.    "In reality, it's a joke. But Major League Baseball does a lot to ensure the fairness of the game. There's people everywhere. If you go through the dugouts and the clubhouses and the hallways, there's like so many people around." **A.J. Hinch on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[66]

k.    "It sucks for our players . . . because those guys are so talented. And I don't think anything should take away from what they're able to accomplish. And so in that aspect, it's disappointing. . . . But I think we know what's going on there. Look at what we're getting accused of. How many runs did we score in that first game? But I understand where the paranoia comes from. We have it. I have it.' **Astros Pitcher Justin**

---

[63] Aaron De Smet & Allen Web, *A view from the front lines of baseball's data-analytics revolution*, McKinsey Quarterly (June 2018), https://web.archive.org/web/20191030085219/https://www.mckinsey.com/business-functions/organization/our-insights/how-the-houston-astros-are-winning-through-advanced-analytics# (accessed Feb. 13, 2020).

[64] Brad Herzog, Houston, *We Solved a Problem – How baseball analytics guru Brandon Taubman '07 helped lead the Astros to their first-ever World Series win*, Cornell Alumni Magazine (Mar./Apr. 2018), http://cornellalumnimagazine.com/houston-solved-problem/ (accessed Feb. 13, 2020).

[65] Mark Berman (@MarkBermanFox26), Alex Rodriguez (@AROD) Tweeted Luis Severino was tipping his pitches..Astros knew what was coming. Alex Bregman (@ABREG_1) says not the case: "I wish I knew..Every time we get hits now everyone thinks somebody's tipping..(Jokingly said) "Can u have him help us out & let us know." Twitter (Oct. 16, 2019, 12:28 AM), https://twitter.com/markbermanfox26/status/1184325169206235136?lang=en (accessed Feb. 13, 2020).

[66] Associated Press, *Hinch blows whistle, calls sign stealing suspicions 'a joke'*, USA Today (Oct. 17, 2019), https://www.usatoday.com/story/sports/mlb/2019/10/17/hinch-blows-whistle-calls-signal-suspicions-a-joke/40335919/ (accessed Feb. 13, 2020).

**Verlander on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[67]

l.   "Not everything is about tipping . . . .[w]e can hit, too . . . . [b]ut I think it's disrespectful that every time we score a lot of runs, people talk about tipping. Nobody was tipping today and we scored, what, eight runs? We're great hitters. We've been doing it for a whole season." **Astros player Carlos Correa on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[68]

97.     As the above-mentioned quotes demonstrate, on a nearly daily basis the Astros disseminated statements to the public misrepresenting that their success was due to, *inter alia*, their embrace of analytics and their approach to batting rather than their implementation and execution of the Trash Can Scheme and Replay Room Scheme.

98.     Moreover, for the 2017 baseball season, the Houston Astros adopted a false public theme "Earn History" and placed the phrase on souvenir cups, t-shirts, rally towels, baseball caps, banners, social media outlets, and more. The Astros placed signs around Minute Maid Park explaining the theme. One sign was placed in the underground tunnel connecting clubhouses and offices and read:

> What does it really mean to make history? To do something that has never been done. To write your name in the books? There's only one way—you've got to earn it. We're talking about respect and creating a legacy. So who cares what everyone else says? History won't remember them. Stay relentless. Unleash greatness and create your own destiny. For Houston, for H-Town, for the H. It's time to show the world who we are. Earning our place in history together.[69]

99.     Defendant Astros' false theme: "Earn History," falsely represented that the team's success was "earned" based on player performance and other legitimate baseball factors, rather than impermissible cheating through electronic sign stealing.  Defendant Astros' use of this false

---

[67] Bob Nighten, *'It's a joke': Astros livid about cheating allegations in ALCS vs. Yankees*, USA TODAY (Oct. 17, 2019), https://www.usatoday.com/story/sports/mlb/columnist/bob-nightengale/2019/10/17/houston-astros-cheating-yankees-alcs/4013592002/ (accessed Feb. 13, 2020).
[68] *Id.*
[69] Kevin Schindler, *Final World Series Blog, 2017: Astros Earn History*, ARIZONA DAILY SUN (Nov. 1, 2017), https://azdailysun.com/news/local/final-world-series-blog-astros-earn-history/article_7f41ba28-9c8a-59d3-8e71-6bbd41c3c090 html (accessed Feb 14, 2017).

motto, in 2017 and in ensuing years, was ubiquitous. Defendant Astros displayed the motto on pennants and banners, posters, stadium signage, pole banners, programs, advertisements, on line screen shots, promotional videos about the team, team clothing (including hats, shirts, sweat shirts, and rally towels) and merchandise (such as souvenir cups).

100.    Plaintiff and the Class of other similarly-situated DraftKings' MLB DFS contestants were induced by defendants' promotion of DraftKings' fantasy baseball contests and fraudulent statements to participate in wagering competitions that defendants knew were corrupted by the defendant Astros, to plaintiff's and the Class's financial detriment.

**ii.       The Boston Red Sox's Impermissible Electronic Sign Stealing Corrupted DraftKings MLB DFS Contests to the Financial Detriment of the Class.**

101.    During the 2017 season, defendant Red Sox also engaged in electronic sign stealing, in knowing violation of MLB's rules and regulations prohibiting such conduct.

102.    Defendant Red Sox positioned one of its employees in the team replay room and had the employee review video replay from the center field cameras to decode the opposing team's catcher's signs to the opposing team's pitcher. The Red Sox employee(s) in the reply room then sent the decoding information to the Apple Watch of another Red Sox employee located in the Red Sox dugout. The employee in the dugout then relayed that information to one or more Red Sox players in the dugout. The Red Sox player(s) in the dugout then relayed the decoding information to Red Sox runners on second base, who could see the opposing catcher's signs and decode the signs based on the video room information. The Red Sox runner on second base then gave signals to the Red Sox batter providing the batter with information about the type and location of each pitch.

103.    The effect of the Red Sox's impermissible electronic sign stealing was to afford Red Sox batters a substantial competitive advantage.

104.     Defendant Red Sox's impermissible electronic sign stealing during the 2017 season could not have succeeded without the knowledge, participation and support of Red Sox players and Red Sox management, including the Red Sox Field Manager.

105.     The Red Sox electronic sign stealing in 2017 resulted in corrupted player performance statistics for Red Sox hitters and for opposing pitchers, that compromised and rendered unfair DraftKings' MLB DFS wagering contests in 2017.

106.     Defendant MLB has publicly acknowledged it received a complaint about the Red Sox electronic sign stealing scheme in September 2017 from the New York Yankees. At that time, Manfred fined defendant Red Sox an insignificant amount, but took no action against any of defendant Red Sox's players, employees or management involved in perpetrating or approving the impermissible electronic sign stealing scheme. Defendant MLB's member teams ratified and approved Manfred's disposition of the Red Sox's electronic sign stealing misconduct.

107.     Not surprisingly, defendant Red Sox resumed its impermissible electronic sign stealing misconduct during the 2018 baseball season. Rosenthal and Drellich wrote in their November 12, 2019 article that "electronic sign-stealing [was] not a single team issue"[70] and on January 2, 2020 published information sourced to current and former Red Sox personnel that the Red Sox impermissibly implemented a renewed replay room scheme throughout the 2018 MLB regular season.

108.     Defendant Red Sox hired Alex Cora – the Astros' bench coach who was one of the architects of the Astros' trash can banging scheme – as their Field Manager in advance of the

---

[70] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Reed Sox used video replay room illegally in 2018,* THE ATHLETIC (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign-stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Jan. 15, 2020).

2018 MLB season. According to Rosenthal and Drellich, Cora immediately set out to recreate one of the schemes he implemented while on the Astros: the use of the replay room to steal signs electronically. According to Rosenthal and Drellich, "[t]hree people who were with the Red Sox during their 108-win 2018 season" told them that "at least some players visited the video replay room during games to learn the sign sequence opponents were using."[71]

109. Like the Astros' improper electronic sign stealing schemes described above, the Red Sox's 2018 replay room scheme harmed Plaintiffs and the Class by improperly distorting the performance statistics of Red Sox players and their opponents in 2018, rendering the resulting fantasy baseball contest dishonest and unfair.

110. Analyses have shown that the Red Sox's electronic sign stealing, like the Astros', was effective and caused Red Sox players to hit substantially better with runners on second base in 2018 than they did in 2017. For example, analysis by Jake Mailhot of FanGraphs, a baseball statistics and analysis website, observed that Red Sox's Weighted On-Base Average[72] ("wOBA") with runners on second base jumped substantially in 2018 as compared to 2017 and far outperformed the MLB league average:[73] In particular, Mailhot observed that the Red Sox excelled at hitting off-speed pitches when they had a runner on second base:

> It's clear that the Red Sox hit much better when there was a runner on second base. They simply crushed offspeed pitches and saw smaller benefits when facing breaking balls and fastballs. The obvious implication

---

[71] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Red Sox used video replay room illegally in 2018,* The Athletic (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign-stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Jan. 22, 2020).

[72] Weighted On-Base Average is "a rate statistic which attempts to credit a hitter for the value of each outcome (single, double, etc.) rather than treating all hits or times on base equally. wOBA is on the same scale as On-Base Percentage (OBP) and is a better representation of offensive value than batting average." Steve Slowinski, *Sabermetrics Library – wOBA*, FANGRAPHS (Feb. 15, 2010), https://library.fangraphs.com/offense/woba/ (accessed Feb. 12, 2020).

[73] Jake Mailhot, *How Much Did the Red Sox Benefit from Their Sign-Stealing Scheme?*, FANGRAPHS (Jan. 23, 2020), https://blogs.fangraphs.com/how-much-did-the-red-sox-benefit-from-their-sign-stealing-scheme/ (accessed Feb. 12, 2020).

is that the team gained an advantage when a runner on second was able to relay the incoming pitch to the batter. When we compare their aggregate run values from 2017 to 2018, I estimate they gained a total cumulative value around five wins — the same estimated benefit the Astros saw with their sign-stealing scheme in 2017.[74]

111.    The Red Sox not only engaged in impermissible electronic sign stealing that corrupted fantasy baseball statistics, but further issued numerous fraudulent statements that concealed from the public (including the fantasy baseball wagering public) the Red Sox's misconduct and falsely attributed the Red Sox's hitting success to player ability and legitimate baseball factors.  These false statements – including false statements by Cora and Dave Dombrowski, team players and fraudulent promotions by the team itself – included the following:

a.    We're getting better. We're staying away from strikes on the edges. We're looking for pitches in the middle of the zone and putting good swings. If they're not there, we're taking their walks. . . .you know two big innings, one Sunday one today. . . .they found a way to grind out great at bats against a great pitchers." **Alex Cora on April 10, 2018 after defeating the New York Yankees 14-1**.[75]

b.    "Good at bats again. . . .its instant offense. Mookie works a walk, Benny hits the wall, we score one and then Hanley, you should've seen his BP today that was impressive so we felt  very good about him and he put a good swing on it and from there it was just good at-bat after good at-bat. They're doing a good job staying in the zone and not expanding and putting good swings on pitches that they can drive." **Alex Cora on April 14, 2018 after defeating the Baltimore Orioles 10-3.**[76]

c.    "He's staying on pitches you can see on his takes. The way he is taking pitches tells you at a lot. We've been talking a lot lately about him staying in the zone and not chasing pitches. He was able to get that pitch in the air the other way. He's feeling good about himself, putting good at-bats, not expanding so those are all good signs for hitters. . . .it was all around a

[74] *Id.*
[75] Alex Cora, *Cora on huge win over Yankees*, MLB.COM (Apr. 10, 2018), https://www.mlb.com/redsox/video/cora-on-huge-win-over-yankees-c1925599983 (accessed Feb. 14, 2020).
[76] Alex Cora, *Cora on Red Sox's 10-3 victory*, MLB.COM (Apr. 14, 2018),

good offensive game for us." **Alex Cora on May 28, 2018 after defeating the Toronto Blue Jays 8-3.**[77]

d.  "Lineup-wise everybody's doing an outstanding job . . .like I said. . . its getting fun…it's a pretty good lineup right now from top to bottom, everybody is putting good at-bats. . . . the line kept moving and that's what its all about, from top to bottom just be relentless and that's what they've been doing the last few weeks. **Alex Cora on July 10, 2018 after defeating the Texas Rangers 8-4.**[78]

e.  "Jackie [Bradley] has been one of our best hitters the last month and a half . . . he's driving in runs he's hitting the ball solid, he's staying in the middle of the ballpark, if you see his contact, the quality of his at-bats, driving the ball, then you see the hitter that we see. . . .he's doing an outstanding job." **Alex Cora on July 28, 2018 after defeating the Minnesota Twins 10-4.**[79]

f.  "It was good, put the ball in play, a little more aggressive. . . .if you stay away from the edges of the strike zone and you get pitches in the middle of the plate and you square them off you're going to have good results and we've been doing that the whole season. . . .it seems like today they were ready to hit, they were looking for pitches in the middle of the zone and they did a good job." **Alex Cora on August 22, 2018 after defeating the Cleveland Indians 10-4.**[80]

g.  "It's almost overwhelming . . . .because you just never think that you'll be associated with a club that can do that. [To go] 119-57? Those numbers are mind-boggling. It's winning more than two-thirds of your games over the year, so, no, I don't think you can really grasp it, and I think it's a tribute to all these guys. You don't get to that point unless you're talented and you grind, you really work through things, you bounce back, you're resilient and you're tough. And that's this group." **Dave Dombrowski, Red Sox President of Baseball Operations, on October 28, 2018 after the Red Sox won the World Series.**[81]

[77] Alex Cora, *Alex Cora on Jackie Bradley Jr.'s catch: 'Woah'*, YOUTUBE.COM (May 28, 2018), https://www.youtube.com/watch?v=JucOElDyUoQ (accessed Feb. 14, 2020).

[78] Alex Cora, *Cora on offense in win*, MLB.COM (July 10, 2018), https://www mlb.com/video/cora-on-offense-in-win-c2256697083 (accessed Feb. 14, 2020).

[79] Alex Cora, *Cora discusses win over Twins*, MLB.COM (July 28, 2018), https://www.mlb.com/video/cora-discusses-win-over-twins-c2322233983 (accessed Feb. 14, 2020).

[80] Alex Cora, *Cora on offense after 10-4 win*, MLB.COM (Aug. 22, 2018), https://www.mlb.com/video/cora-on-offense-after-10-4-win-c2417205683 (accessed Feb. 14, 2020).

[81] Anthony Castrovince, *Team of this century? Sox win 4th title since '04*, MLB.COM (Oct. 28, 2018), https://www.mlb.com/redsox/news/red-sox-win-2018-world-series-title-c299876586 (accessed Feb. 14, 2020).

112.    As the above-mentioned quotes demonstrate, on an almost daily basis the Red Sox represented to the world that their success was due to, *inter alia*, their hard work and approach to batting rather than their impermissible electronic sign stealing scheme.

113.    Plaintiff and the Class of other similarly-situated Draftkings' MLB DFS contestants were induced by defendants' promotion of DraftKings' fantasy baseball contests to participate in wagering competitions that defendants knew were corrupted by the defendant Red Sox, to plaintiff's and the Class's financial detriment.

114.    Plaintiff and the Class are not privy to the total number of complaints filed by MLB member teams prior to November 2019 against other MLB teams alleging use of electronic devices to steal signs in violation of MLB rules and regulations, but the following complaints have been publicly reported:

      a.      In 2017, the New York Yankees filed a complaint alleging that the Red Sox were stealing signs using Apple Watches in contravention of MLB rules.

      b.      In August 2018, the Oakland Athletics filed a complaint alleging that the Astros were stealing signs using electronic equipment in contravention of MLB rules.

      c.      In October 2018, the Cleveland Indians complained that the Astros were stealing signs using electronic equipment in contravention of MLB rules.

      d.      In October 2019, the New York Yankees complained that the Astros were stealing signs using electronic equipment in contravention of MLB rules.

115.    Sports Illustrated's Tom Verducci has reported that in the course of its investigation of the Astros, MLB investigators were told by Astros personnel that they believed as many as eight other MLB member teams were electronically stealing signs.[82] Defendant MLB

---

[82] *See* Tom Verducci, *Why MLB Issued Historic Punishment to Astros for Sign Stealing*, SPORTS ILLUSTRATED (Jan. 13, 2020), https://www.si.com/mlb/2020/01/13/houston-astros-cheating-punishment (accessed Jan. 22, 2020).

has not disputed Verducci's report, but has not identified any of the teams or publicly stated how it intends to address this accusation.

### iii. The Conduct of MLB and its Member Clubs Resulted in Millions of Dollars in Losses to the Class that Would Not have Occurred But For the Wrongful and Deceptive Conduct.

116. The Astros' and the Red Sox's electronic sign stealing schemes compromised the integrity of DraftKings' MLB DFS wagering contests in 2017, 2018 and 2019. Untold numbers of hits, walks, runs, and wins were dishonestly obtained and awarded to the Astros and Red Sox that would not have taken place but for the Astros' and the Red Sox's players' impermissibly-gained advanced knowledge of pitches. The Astros' and Red Sox's misconduct, combined with MLB's intentional failure to enforce its rules or disclose the wrongdoing, resulted in DraftKings' contestants taking part in dishonest and unfair wagering competitions.

117. In particular, the performance statistics on which the DraftKings' MLB DFS contests were based were corrupted in in numerous ways, including but not limited to the following:

    a.     DraftKings contestants who drafted pitchers for their MLB DFS lineup who were pitching against the Astros in Houston or the Red Sox in Boston were harmed when those pitchers performed poorly as a result of the Trash Can Scheme and/or Replay Room Schemes;

    b.     DraftKings contestants who played MLB DFS contests against opponents who selected Astros players or Red Sox players playing at home were harmed when the opponents' Astros or Red Sox players statistics were corruptly enhanced by the Trash Can Scheme or Replay Room Schemes;

    c.     DraftKings contestants were fraudulently induced to pick Astros or Red Sox players for their MLB DFS teams based on artificial statistics (and not to select pitchers who had fared poorly in games against the Astros and Red Sox at their home stadiums) and were harmed when the Astros or Red Sox players did not perform as well as expected in away games (or the unselected pitchers performed better) as a result of not having access to the Trash Can Scheme or Replay Room Scheme.

d.    DraftKings contestants overpaid when they selected Astros or Red Sox players for their MLB DFS teams based on artificial statistics created by the Trash Can Scheme or Replay Room Scheme.

### iv.    **Defendants Have Profited Enormously from their Wrongful Conduct.**

118.    Defendant MLB and its member teams have profited enormously, at the expense of Plaintiff and the other Class Members, from their wrongful promotion and marketing of DraftKings' MLB DFS contests and participation in soliciting contestant wagers.

119.    The financial benefits to defendants from their misconduct include not only their share of DraftKings' enormous fantasy baseball fees. Equally important, MLB and its teams benefited substantially from the increased fan involvement in the game that participation in fantasy baseball wagering engenders – producing increased fan attendance, increased advertising and television revenues, and increased sales of MLB paraphernalia. [83]

120.    And both the Astros and the Red Sox have profited enormously from winning the 2017 and 2018 World Series, with resulting increases in fan attendance and seat prices, advertising and broadcast revenue, merchandise sales, and team valuations.

---

[83] Indeed, a study conducted by FanDuel found that fans who played daily fantasy sports consumed 40% more sports content. Brent Schrotenboer, *Leagues see real benefits in daily fantasy sports*, USA TODAY (Jan. 1, 2015), https://www.usatoday.com/story/sports/2015/01/01/daily-fantasy-sports-gambling-fanduel-draftkings-nba-nfl-mlb-nhl/21165279/ (accessed Jan. 16, 2020) ("If there is a statistic that puts dollar signs in the heads of league commissioners, it's this one: Fans consume 40% more sports content — across all media — once they start playing FanDuel.").

### v. __Plaintiff Kristopher R. Olson__

121.    Plaintiff Kristopher R. Olson was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit. Plaintiff Olson placed at least 226 entries into DraftKings' fantasy baseball contests during the Class Period.

122.    Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

123.    Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

124.    Plaintiff Olson would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

### vi. __Plaintiff Christopher Lopez__

125.    Plaintiff Christopher Lopez was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit. Plaintiff Lopez placed hundreds of entries into DraftKings' fantasy baseball contests during the Class Period.

126.    Plaintiff Christopher Lopez would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

127.     Plaintiff Lopez would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

128.     Plaintiff Lopez would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

**vii.     Plaintiff Warren Barber**

129.     Plaintiff Warren Barber was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit.  Plaintiff Barber placed hundreds of entries into DraftKings' fantasy baseball contests during the Class Period.

130.     Plaintiff Warren Barber would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

131.     Plaintiff Barber would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

132.     Plaintiff Barber would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

### viii. **Plaintiff Christopher Clifford**

133.    Plaintiff Christopher Clifford was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit. Plaintiff Clifford placed entries into DraftKings' fantasy baseball contests during the Class Period.

134.    Plaintiff Christopher Clifford would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

135.    Plaintiff Clifford would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

136.    Plaintiff Clifford would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

### ix. **Plaintiff Erik Liptak**

137.    Plaintiff Erik Liptak was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit. Plaintiff Olson placed thousands of entries into DraftKings' fantasy baseball contests during the Class Period.

138.    Plaintiff Liptak would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

139. Plaintiff Liptak would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

140. Plaintiff Liptak would not have entered into DraftKings' MLB DFS contests during the Class Period had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing.

## CLASS ALLEGATIONS

141. Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2) and 23(b)(3), as representatives of the class defined as follows (the "Nationwide Class")[84]:

> All individuals who participated in DraftKings' MLB DFS contests that took place from April 2, 2017 through October 30, 2019 and paid an entry fee for, and entered a lineup into, a DraftKings MLB DFS contest.

142. Plaintiff Olson also seeks to certify the following Massachusetts subclass (the "Massachusetts Subclass"):

> All individuals residing in the Commonwealth of Massachusetts who participated in DraftKings' MLB DFS contests that took place from April 2, 2017 through October 30, 2019 and paid an entry fee for, and entered a lineup into, a DraftKings MLB DFS contest.

143. Plaintiff Lopez also seeks to certify the following California subclass (the "California Subclass"):

> All individuals residing in the State of California who participated in DraftKings' MLB DFS contests that took place from April 2, 2017 through October 30, 2019 and paid an entry fee for, and entered a lineup into, a DraftKings MLB DFS contest.

---

[84] Collectively, the Class and the Subclasses defined below are referred to as the "Classes."

144.     Plaintiff Barber also seeks to certify the following Texas subclass (the "Texas

Subclass"):

> All individuals residing in the State of Texas who participated in
> DraftKings' MLB DFS contests that took place from April 2, 2017
> through October 30, 2019 and paid an entry fee for, and entered a lineup
> into, a DraftKings MLB DFS contest.

145.     Plaintiff Clifford also seeks to certify the following Florida subclass (the "Florida

Subclass"):

> All individuals residing in the State of Florida who participated in
> DraftKings' MLB DFS contests that took place from April 2, 2017
> through October 30, 2019 and paid an entry fee for, and entered a lineup
> into, a DraftKings MLB DFS contest.

146.     Plaintiff Liptak also seeks to certify the following Colorado subclass (the

"Colorado Subclass"):

> All individuals residing in the State of Colorado who participated in
> DraftKings' MLB DFS contests that took place from April 2, 2017
> through October 30, 2019 and paid an entry fee for, and entered a lineup
> into, a DraftKings MLB DFS contest.

147.     Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak, on behalf the Nationwide

Class, seek certification of claims against Defendants MLB and MLBAM for violation of the

MASS. GEN. LAW, Ch. 93A, § 1 *et seq.*, CAL. BUS. & PROF. CODE § 17200, *et seq.*, CAL. CIV.

CODE § 1750, *et seq.*, TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.*, and FLA. STAT. § 501.204,

*et seq.*,  and the substantially similar laws of the following states:

> Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, District of
> Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky,
> Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri,
> Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New
> York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island,
> South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington,
> West Virginia, Wisconsin, Wyoming.

148.     Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak, on behalf of the Nationwide Class, seek certification of claims against all Defendants fraud, unjust enrichment and negligence in violations of the laws of Massachusetts, California, Texas and Florida, and the substantially similar laws of the following states:

> Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

149.     Plaintiffs, on behalf of the Nationwide Class, seeks certification of a claim against Defendant Houston Astros for violation of the TEX. BUS. & COM. CODE ANN. § 17.41 *et seq*.

150.     Plaintiff Olson, on behalf of the Massachusetts Subclass, seeks certification of claims against Defendants MLB, MLBAM and Boston Red Sox for violation of the MASS. GEN. LAW, Ch. 93A, § 1, *et seq*., and against all Defendants for fraud, unjust enrichment and negligence.

151.     Plaintiff Lopez, on behalf of the California Subclass, seeks certification of claims against Defendants MLB and MLBAM for violations of CAL. BUS. & PROF. CODE § 17200, *et seq*., CAL. CIV. CODE § 1750, *et seq*., and against all Defendants for fraud, unjust enrichment and negligence.

152.     Plaintiff Barber, on behalf of the Texas Subclass, seeks certification of claims against Defendants MLB and MLBAM for violation of TEX. BUS. & COM. CODE ANN. § 17.41 *et seq*., and against all Defendants for fraud, unjust enrichment and negligence.

153.    Plaintiff Clifford, on behalf of the Florida Subclass, seeks certification of claims against Defendants MLB and MLBAM for violation of FLA. STAT. § 501.204, *et seq*, and against and against all Defendants for fraud, unjust enrichment and negligence.

154.    Plaintiff Liptak, on behalf of the Colorado Subclass, seeks certification of claims against Defendants MLB and MLBAM for violations of COLO. REV. STAT. § 6-1-101, *et seq*., and against all Defendants for fraud, unjust enrichment and negligence.

155.    Plaintiffs reserve the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to accommodate any of the Court's manageability concerns.

156.    All Defendants concealed the existence of their conduct.  Plaintiffs and the members of the Classes were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that would otherwise apply should be tolled to the earliest date of Defendants' wrongful conduct.  In addition, Defendants are estopped from relying on any applicable statute of limitation.

157.    ***Numerosity***. Members of the Classes are so numerous (consisting of millions of DraftKings users) and geographically dispersed that individual joinder is impracticable. Beginning no later than 2017, DraftKings operated in 43 states as well as the District of Columbia and collected entry fees for millions of entries purchased in states other than New York.  Data published by The Fantasy Sports & Gaming Association establishes that in 2017 and subsequent years covered by this lawsuit there were more than 50 million fantasy sports players of which approximately 39% participated in fantasy sports baseball.[85] Published data specific to

---

[85] *Industry Demographics*, FANTASY SPORTS & GAMING ASSOC., https://thefsga.org/industry-demographics/ (accessed Feb. 13, 2020).

DraftKings shows that in May 2018, DraftKings had approximately 19 million contestant entries, generating approximately $137 million in wagering handle and $14 million in revenue, with daily fantasy baseball responsible for 9.5 million of those entries.[86]

158. The members of the Class are readily identifiable from information and records in the possession, custody or control of MLB, and/or in the possession, custody or control of the MLB Defendants' joint venture partner, DraftKings.

159. ***Commonality and Predominance***. Common questions of law and fact exist as to all members of the Classes, which predominate over any questions affecting only individual members of the Classes, including, but not limited to:

   a. Whether the MLB Defendants engaged in false, misleading, deceptive and/or unfair acts or practices;

   b. Whether the MLB Defendants violated state consumer protection statutes;

   c. Whether the MLB Defendants made material omissions and/or misrepresentations;

   d. Whether the MLB Defendants' conduct constituted fraud.

   e. Whether the MLB Defendants are liable to Plaintiffs and the Classes for compromising the fairness of DraftKings MLB DFS contests;

   f. Whether the MLB Defendants' conduct constituted negligence;

   g. Whether the Houston Astros are liable to Plaintiffs and the Classes for compromising the fairness of DraftKings MLB DFS contests;

   h. Whether the Houston Astros engaged in false, misleading, deceptive and/or unfair acts or practices;

   i. Whether the Houston Astros violated the Texas Deceptive Trade Practices Act;

---

[86] Eric Ramsey, *DraftKings, FanDuel Generated About $220 Million In Entry Fees In May*, LEGAL SPORTS REPORT (June 7, 2018), https://www.legalsportsreport.com/20932/daily-fantasy-sports-data-may-2018/ (accessed Feb. 13, 2020).

j.   Whether the Houston Astros made material omissions and/or misrepresentations;

k.   Whether the Houston Astros' conduct constituted fraud.

l.   Whether the Houston Astros' conduct constituted negligence

m.   Whether the Boston Red Sox are liable to Plaintiffs and the Classes for compromising the fairness of DraftKings MLB DFS contests;

n.   Whether the Boston Red Sox engaged in false, misleading, deceptive and/or unfair acts or practices;

o.   Whether the Boston Red Sox violated the Massachusetts Consumer Protection Act;

p.   Whether the Boston Red Sox made material omissions and/or misrepresentations;

q.   Whether the Boston Red Sox' conduct constituted fraud.

r.   Whether the Boston Red Sox' conduct constituted negligence

s.   Whether the MLB Defendants, the Houston Astros and the Boston Red Sox have been unjustly enriched by their conduct;

t.   Whether Plaintiffs and the Classes are entitled to actual damages, statutory damages and/or punitive damages, and the measure of those damages;

u.   Whether Plaintiffs and the Classes are entitled to restitution, disgorgement and/or other equitable relief or injunctive relief.

160.   ***Typicality***. The Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes were injured through the same conduct described herein and they assert the same (or similar) claims for relief.

161.   ***Adequacy of Representation***. Plaintiffs will fairly and adequately protect the interests of the Classes. The interests of Plaintiffs are consistent with and not antagonistic to the interests of the other members of the Classes. Plaintiffs have lost significant amounts individually and have agreed to act for the benefit of all of the victims similarly situated and not to put their individual interests ahead of any member of the Classes. Plaintiffs have retained

competent counsel that is highly experienced in prosecuting complex fraud, consumer, and class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Classes.

162. ***Superiority***. A class action is superior to all other available methods for the fair and efficient adjudication of the claims of Plaintiffs and the members of the Classes. The damages suffered by individual members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendants. It would be extremely difficult for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Further, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court.

163. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

164. Class certification, therefore, is appropriate under FED. R. CIV. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Classes, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

165. Class certification is also appropriate under FED. R. CIV. P. 23(b)(1), because the prosecution of separate actions by numerous individual members of the Classes may create a risk

that inconsistent or varying adjudications would establish incompatible standards of conduct for the parties opposing the Classes, and may substantially impair or impede the interests of other members of the Classes to protect their interests.

166. Class certification is also appropriate under FED. R. CIV. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Classes as a whole.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## COMMON LAW FRAUD
**(Against the MLB Defendants)**

167. Paragraphs 1 through 167 of this Complaint are incorporated herein as if fully set forth.

168. As set forth above, during the time period relevant herein, MLB Commissioner Manfred made repeated public statements – in interviews, press releases and presentations to state governments – representing that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and committing MLB to protecting the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair.

169. Manfred's representations and commitments were made as the authorized spokesperson of MLB, on behalf of MLB and each of its member Clubs, and on behalf of MLBAM, and were approved by each of MLB's member teams and by MLBAM.

170. Manfred's representations and commitments were intended to assure the public that Major League Baseball was honestly and fairly conducted, that MLB would diligently act to

insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

171.    Manfred's representations and commitments were intended to assure DraftKings' MLB DFS contestants that DraftKings' fantasy baseball competitions were honestly and fairly conducted.

172.    MLB's member teams agreed that Manfred would serve as their spokesperson on these matters and ratified and approved Manfred's representations and commitments.

173.    Manfred's representations and commitments had the effect of assuring the public in general, and DraftKings' MLB DFS contestants in particular, that Major League Baseball was fairly and honestly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

174.    Manfred's representations and commitments had the effect of assuring DraftKings' fantasy baseball contestants that DraftKings' MLB DFS contests were fairly and honestly conducted and that MLB would not condone or knowingly allow any conduct by MLB teams or players that would compromise or corrupt the honesty and fairness of DraftKings' MLB DFS contests.

175.    Manfred's representations that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and his commitments that MLB would protect the integrity and honesty of the game of baseball, including in making sure that appropriate

safeguards were in place to insure that fantasy baseball wagering competitions were fair, were false.

176.    To the contrary, Manfred and MLB's member Clubs placed their desire to protect their financial interests from the adverse publicity and financial detriments that would result from investigation, remedial action and disclosure of member Club electronic sign stealing above maintaining the integrity of the game of baseball, and for that reason did not properly act to terminate, prevent and disclose member Club electronic sign stealing that violated MLB rules and regulations.

177.    As set forth above, the Astros made repeated statements in 2017, 2018 and 2019 asserting that the team's players' performance success was the result of player talent or other legitimate baseball factors.

178.    The Astros' statements were made in the Astros' capacity as a constituent member Club of defendant MLB and were made in furtherance of the interests of defendant MLB, and no other MLB member team publicly disavowed the Astros' statements.

179.    The Astros' statements were made in the Astros' capacity as an owner or partner of defendant MLBAM and were made in furtherance of the interests of defendant MLBAM, and no other owner or partner of MLBAM publicly disavowed the Astros' statements.

180.    The Astros' statements that Astros' players' performance success was the result of player talent or other legitimate baseball factors statements were false.

181.    The Astros' statements that the Astros' players' performance success was the result of player talent or other legitimate baseball factors were intended to cause the public, including DraftKings' MLB DFS contestants, to believe that Astros' players were performing well for legitimate baseball reasons.

182.     The Astros' statements that the Astros' players' performance success was the result of player talent or other legitimate baseball factors were intended to conceal from the public, including from DraftKings' MLB DFS contestants in particular, that defendant Astros was engaging in electronic sign stealing in violation of MLB rules and regulations and that Astros' player performance success was the result of such cheating.

183.     As set forth above, the Red Sox made repeated statements in 2017 and 2018 asserting that the team's players' performance success was the result of player talent or other legitimate baseball factors.

184.     The Red Sox's statements were made in the Red Sox's capacity as a constituent member Club of defendant MLB and were made in furtherance of the interests of defendant MLB, and no other MLB member team publicly disavowed the Red Sox's statements.

185.     The Red Sox's statements were made in the Red Sox's capacity as an owner or partner of defendant MLBAM and were made in furtherance of the interests of defendant MLBAM, and no other owner or partner of MLBAM publicly disavowed the Red Sox's statements.

186.     The Red Sox's statements that the Red Sox's players' performance success was the result of player talent or other legitimate baseball factors statements were false.

187.     The Red Sox's statements that the Red Sox's players' performance success was the result of player talent or other legitimate baseball factors were intended to cause the public, including DraftKings' MLB DFS contestants, to believe that Red Sox's players were performing well for legitimate baseball reasons.

188.     The Red Sox's statements that the Red Sox's players' performance success was the result of player talent or other legitimate baseball factors were intended to conceal from the

public, including from DraftKings' MLB DFS contestants in particular, that defendant Red Sox was engaging in electronic sign stealing in violation of MLB rules and regulations and that Red Sox's player performance success was the result of such cheating.

189.    Manfred and MLB's member Clubs knew that defendant Astros was unfairly and dishonestly engaging in electronic sign stealing, undermining the integrity, honesty and fairness of Major League baseball contests, but knowingly determined not to take action to stop such electronic sign stealing and not to disclose the Astros' cheating to the public.

190.    Manfred and MLB's member Clubs knew it was likely that other Major League Clubs were unfairly and dishonestly engaging in electronic sign stealing, undermining the integrity, honesty and fairness of Major League baseball contests, but knowingly determined not to take action to stop such electronic sign stealing or disclose such cheating to the public.

191.    Manfred and MLB's member Clubs determined to allow such cheating because they feared the negative public reaction and adverse financial consequences that would result from public disclosure of such electronic sign stealing.

192.    At all times mentioned herein, the MLB Defendants were equity owners of, and in partnership with DraftKings and, pursuant to their financial relationship and partnership with DraftKings agreed to and did actively promote and market DraftKings' MLB DFS contests and financially benefitted from the success of DraftKings.

193.    At all times mentioned herein, the MLB Defendants acted in partnership or as joint venturers to promote and market and facilitate their equity ownership in and partnership with DraftKings.

194.    At all times mentioned herein, Manfred and MLB's member Clubs, including the Astros and the Red Sox, were acting on behalf of and as agents of MLBAM in furtherance of

MLB's and MLBAM's partnership or joint venture, and the false statements by MLB and the Astros and Red Sox set forth herein were issued on behalf of and as agents of MLBAM in furtherance of the MLB Defendants' partnership or joint venture.

195. At all times mentioned herein, the MLB Defendants' promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant MLB's and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on the MLB Defendants to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

196. In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

197. Manfred and MLB's member Clubs, including the Astros and Red Sox, were aware that electronic sign stealing compromised and corrupted the player performance statistics upon which the fairness of DraftKings' MLB DFS contests depended.

198.     Manfred and MLB's member Clubs concealed the electronic sign stealing being engaged in by MLB Clubs even though they were aware that such electronic sign stealing compromised and corrupted DraftKings' MLB DFS contests.

199.     Manfred and MLB's member Clubs actively promoted wagering in DraftKings' MLB DFS contests and helped to market such contests, knowing that the fairness of the contests was compromised and corrupted by the electronic sign stealing being engaged in by MLB Clubs.

200.     Manfred and MLB's member Clubs were aware that members of the public were relying on the false statements by Manfred, the Astros and the Red Sox set forth herein in deciding to participate in DraftKings' MLB DFS contests.

201.     Manfred and MLB's member Clubs were aware that members of the public would not engage in DraftKings' MLB DFS contests if they knew that electronic sign stealing by the Astros, the Red Sox or other MLB Clubs was compromising and corrupting the player performance statistics upon which the fairness of DraftKings' MLB DFS contests depended.

202.     Manfred and MLB's member Clubs were aware that their investment in DraftKings would be substantially impaired if the public learned that electronic sign stealing by the Astros, the Red Sox and other MLB Clubs was compromising and corrupting the player performance statistics upon which the fairness of DraftKings' MLB DFS contests depended.

203.     Manfred and MLB's member Clubs allowed electronic sign stealing to continue and to remain undisclosed to further the financial interests of the MLB Defendants, including their financial interests in DraftKings' MLB DFS contests and their investment in DraftKings.

204.     At all times mentioned herein prior to November 2019, the MLB Defendants intentionally concealed and did not disclose to the public material information about MLB

Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

205.    The MLB Defendants intended, by their conduct described above, to deceive members of the public – including Plaintiffs and the Classes to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

206.    The MLB Defendants' concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

207.    The MLB Defendants' intentional failure to disclose material information to Plaintiffs and the Classes  engaging in DraftKings' MLB DFS wagering competitions (and the public) was in breach of their duty to provide the public with material information that members of the public, including Plaintiffs and the Classes, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

208.    Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by the MLB Defendants' intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

209.    Plaintiffs and the Classes reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth

herein, which were rendered false by the MLB Defendants' intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

210.    Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by the MLB Defendants' material omissions and false representations, and would not have done so had they known of such material omissions.

211.    As a direct and proximate result of the MLB Defendants' fraudulent statements and conduct, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

**SECOND CLAIM FOR RELIEF**

**UNFAIR/DECEPTIVE PRACTICES IN VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(Against the MLB Defendants)**

212.    Plaintiff repeats and incorporates herein by reference the above allegations.

**A.  Common Allegations**

213.    Each of the following allegations in this subheading are alleged and incorporated by reference into the allegations in each State's or States' subheading as to such State's or States' consumer protection statutes.

214.    At all material times, the MLB Defendants have engaged in false, misleading, deceptive and unfair acts and practices that violated State laws.

215.    The MLB Defendants have been and are engaged in trade and commerce as defined by the respective State consumer protection acts.  Major League Baseball is broadcast, advertised and promoted, and sales of merchandise take place, throughout the United States; and professional baseball games are held in states throughout the United States.  In addition, daily

fantasy sports participants reside throughout the United States. Defendant MLB is engaged in business on behalf of its constituent members teams and Major League Baseball in every State, and defendant MLBAM's internet and interactive services are likewise provided throughout the country. Moreover, defendant MLBAM is responsible for coordinating the partnership between DraftKings and Major League Baseball and its teams, and does so throughout the country.

216. At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have promoted their partnership with DraftKings and participated in soliciting participants in DraftKings' MLB DFS fantasy baseball contests.

217. In addition, at all material times, the MLB Defendants have realized substantial financial gain through their partnership with DraftKings, based on the MLB Defendants' equity interest in, sponsorship, advertising and promotion with and through DraftKings.

218. Fan participation in fantasy baseball contests directly resulted in increased financial benefit to the MLB Defendants. Not only did the MLB Defendants have a financial interest in the fees paid by DraftKings baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball, resulting in greater revenue for the MLB Defendants from broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

219. Thus, it was and is in the MLB Defendants' interest to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the MLB Defendants, which the MLB Defendants did at all material times, even while knowing that DraftKings' fantasy baseball contests were compromised and unfair as a result of MLB's member teams' misconduct, i.e., the electronic sign stealing schemes.

220.    At the same time the MLB Defendants were promoting DraftKings and DraftKings' fantasy baseball contests, the MLB Defendants knew of and failed to stop the electronic sign stealing schemes described above, which resulted compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiff and the Class participated corrupt and tainted.

221.    Further, the MLB Defendants affirmatively concealed and failed to disclose the electronic sign stealing misconduct of the Houston Astros and Boston Red Sox even though the MLB Defendants knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests they were separately promoting.

222.    At all material times, the MLB Defendants knew or recklessly disregarded the fact that the Major League Baseball games involving the Houston Astros and the Boston Red Sox resulted in compromised and dishonest player performance statistics.

223.    The MLB Defendants' conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that its member teams are compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its member teams' misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair and deceptive practices, conduct which violates the state consumer protection acts described below.

224.    As a result of their conduct, the MLB Defendants have engaged in unfair, deceptive, misleading and/or false acts or practices in violation of the state consumer protection acts listed below.

225.    As a direct, foreseeable and proximate result of the MLB Defendants' unfair, deceptive, misleading and/or false acts or practices, in violation of the state consumer protection

statutes, Plaintiffs and the Classes were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

226. The MLB Defendants' wrongful conduct was wanton, willful or in reckless disregard of the rights of Plaintiffs and the Classes. By reason of the foregoing, Plaintiffs and the Classes are entitled to all available damages and remedies available under the consumer protections statutes identified below, including, without limitation, applicable actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees. Further, because the MLB Defendants acted willfully or knowingly, Plaintiffs and the Classes, as applicable, are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees.

**B. Massachusetts**

227. Plaintiffs repeat and incorporate by reference herein the above allegations.

228. Plaintiff Olson, a resident of Massachusetts, asserts this Claim under Massachusetts Consumer Protection Law, M.G.L. c. 93A *et seq*. ("MCPL") against the MLB Defendants on behalf of the Massachusetts Subclass. Upon information and belief, MLB Defendants do not maintain a place of business in Massachusetts; nor do MLB Defendants maintain property or assets in Massachusetts. Plaintiff is thus not required to provide MLB Defendants with pre-suit written demand for relief pursuant to M.G.L 93A § 9(3).

229. Massachusetts prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." M.G.L. c. 93A § 2 *et seq*.

230. The MLB Defendants are engaged in "trade or commerce" pursuant to M.G.L. c. 93A § 1.

231.    Any person who has suffered a loss as a result of a violation of the Massachusetts Act may bring an action based on the MLB Defendants' unfair and/or deceptive acts and practices.

232.    The MLB Defendants engaged in deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression and omission of material facts in violation of M.G.L. c. 93A *et seq*. as alleged at length above and in the following ways.

233.    At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

234.    In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

235.    At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about

MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

236.     Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiffs and the Classes to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

237.     Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

238.     Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiffs and the Classes (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiffs and the Classes, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

239.     Plaintiff Olson and the Massachusetts Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

240.     Plaintiff Olson and the Massachusetts Subclass reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

241.     Plaintiff Olson and the Massachusetts Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material omissions and false representations, and would not have done so had they known of such material omissions.

242.     The MLB Defendants' conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that its member teams are compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its member teams' misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair and deceptive practices, conduct which violates M.G.L. c. 93A *et seq.*.

243.     As a result of their conduct, the MLB Defendants have engaged in unfair, deceptive, misleading and/or false acts or practices in violation of M.G.L. c. 93A *et seq*.

244.     The MLB Defendants' unfair and deceptive acts and practices were immoral, unethical, oppressive and unscrupulous, and caused substantial injury to the Plaintiff Olson Massachusetts Subclass, were not outweighed by the any countervailing benefits to consumers or competition, and the injury could not reasonably have been avoided.  Further, the acts and

practices were within the penumbra of common law, statutory or other established concepts of unfairness.

245.    As a direct, foreseeable and proximate result of the MLB Defendants' unfair, deceptive, misleading and/or false acts or practices, Plaintiff Olson and the Massachusetts Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

246.    Plaintiff Olson and the Massachusetts Subclass members seek relief under M.G.L. c. 93A§ 9, including, without limitation, actual damages, statutory damages, double or treble damages, injunctive and/or other equitable relief, and/or attorneys' fees and costs.

**C.    California**

247.    Plaintiffs repeat and incorporate by reference herein the above allegations.

248.    Plaintiff Lopez, a resident of California, asserts this Claim under Cal Bus. & Prof. Code § 17200 *et seq.*, against the MLB Defendants on behalf of the California Subclass.

249.    The MLB Defendants operate in California and have violated Cal Bus. & Prof. Code § 17200 *et seq.*, by engaging in unlawful, unfair, and/or fraudulent business acts and practices, and unfair, deceptive, untrue and/or misleading conduct that constitutes acts of "unfair competition" as defined in Cal Bus. & Prof. Code § 17200 *et seq.*, with respect to the California Subclass as alleged at length above and in the following ways.

250.    At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of

MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

251.    In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

252.    At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

253.    Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiffs and the Classes to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

254.    Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball

participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

255. Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiffs and the Classes (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiffs and the Classes, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

256. Plaintiff Lopez and the California Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

257. Plaintiff Lopez and the California Subclass reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

258. Plaintiff Lopez and the California Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material

omissions and false representations, and would not have done so had they known of such material omissions.

259.     The MLB Defendants' acts were fraudulent and unfair, in that Plaintiff Lopez and the California Subclass were likely to be deceived – and were deceived – by the MLB Defendants' conduct, which caused Plaintiff Lopez and the California Subclass to incur injury by wagering on DraftKings MLB DFS contests.

260.     The MLB Defendants' unfair acts and practices were immoral, unethical, oppressive, unscrupulous, and caused substantial injury to Plaintiff Lopez and the California Subclass, were not outweighed by the any countervailing benefits to consumers or competition, and the injury could not reasonably have been avoided.  Further, the acts and practices were within the penumbra of common law, statutory or other established concepts of unfairness.

261.     The MLB Defendants' acts and practices were also unlawful, in that they violated the California Consumer Legal Remedies Act, § 1750 *et seq.*, as set forth below.

262.     As a direct, foreseeable and proximate result of the MLB Defendants' unfair, deceptive and unlawful acts and practices, Plaintiff Lopez and the California Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

263.     Plaintiff Lopez and the California Subclass seek relief under Cal Bus. & Prof. Code § 17200 *et seq.*, including, without limitation, restitution, disgorgement, declaratory relief, injunctive and/or other equitable relief, and/or attorneys' fees and costs.

**D. California**

264. Plaintiffs repeat and incorporate by reference herein the above allegations.

265. Plaintiff Lopez intends to assert a claim under the California Consumer Legal Remedies Act, Cal Civil. Code § 1750 *et seq.*, ("CLRA"). The MLB Defendants were previously provided with a written demand for relief in accordance with CLRA § 1782(a). This Count provides notice to the MLB Defendants of the prospective claim. Subject to the response, if any, by the MLB Defendants within 30 days of the notice, Plaintiff Lopez, on behalf of himself and the Class, shall amend the Complaint to include this Claim for Relief and demand all appropriate relief.

266. Plaintiff Lopez, a resident of California, asserts this Claim under CLRA § 1750 *et seq.*, against the MLB Defendants on behalf of the California Subclass. The MLB Defendants operate in California and have violated Cal Bus. & Prof. Code § 1770, by engaging in proscribed conduct, *inter alia*: "Misrepresenting the source, sponsorship, approval, or certification of goods and services." (§ 1770(a)(2)); "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have…." (§ 1770(a)(5)); "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." (§ 1770(a)(7)); and "Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law." (§ 1770(a)(14)). The MLB Defendants engaged in this conduct as alleged at length above and in the following ways.

267. At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM),

with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

268.    In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

269.    At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

270.    Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiffs and the Classes to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

271.    Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball

participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

272.    Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiffs and the Classes (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiffs and the Classes, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

273.    Plaintiff Lopez and the California Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

274.    Plaintiff Lopez and the California Subclass reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

275.    Plaintiff Lopez and the California Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material

omissions and false representations, and would not have done so had they known of such material omissions.

276.     As a direct, foreseeable and proximate result of the MLB Defendants' conduct, Plaintiff Lopez and the California Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

277.     Plaintiff Lopez and the California Subclass seek relief under CLRA § 1750 *et seq.*, including, without limitation, damages, restitution, injunctive relief or other equitable relief as applicable, punitive damages as applicable, and attorneys' fees and costs.

**E.     Texas**

278.     Plaintiffs repeat and incorporate by reference herein the above allegations.

279.     Plaintiff Barber intends to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA") against the MLB Defendants.  Written notice of the specific complaint and damages was previously provided to MLB Defendants in accordance with TEX. BUS. & COM. CODE § 17.505.  This Claim for Relief provides notice to the MLB Defendants of the prospective claims alleged herein.  Subject to the response, if any, by the MLB Defendants within 60 days of the notice, Plaintiff Barber, on behalf of himself and the Texas Subclass, shall amend the Complaint to include this Claim and demand all appropriate relief under the TDTPA.

280.     Plaintiff Barber, a resident of Texas, asserts this Claim for false, misleading and deceptive acts and practices in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*.

281.     The TDTPA makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.

282. Any person who has suffered a loss as a result of a violation of the TDTPA may bring an action based on those misleading, false, deceptive and/or unfair acts.

283. At all material times, the MLB Defendants, which are engaged in trade or commerce pursuant to TEX. BUS. & COM. CODE § 17.46, engaged in misleading, false, deceptive and/or unfair acts that violated the TDTPA as alleged at length above and in the following ways.

284. At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

285. In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

286. At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about

MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

287.     Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiff Barber and the Texas Subclass to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

288.     Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

289.     Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiff Barber and the Texas Subclass (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiff Barber and the Texas Subclass, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

290.     Plaintiff Barber and the Texas Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

291.     Plaintiff Barber and the Texas Subclass reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

292.     Plaintiff Barber and the Texas Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material omissions and false representations, and would not have done so had they known of such material omissions.

293.     As a direct, foreseeable and proximate result of the MLB Defendants' deceptive, misleading, and/or false acts or practices, in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*., Plaintiff Barber and the Texas Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

294.     The MLB Defendants' wrongful conduct was wanton, willful or in reckless disregard of the rights of Plaintiff Barber and the Texas Subclass.

295.     By reason of the foregoing, Plaintiff Barber and the Texas Subclass are entitled to all available damages and remedies available under TEX. BUS. & COM. CODE § 17.41 *et seq*., including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees.  Further, because the MLB Defendants acted willfully or knowingly, Plaintiff Barber and the Texas Subclass are entitled to

recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the TDTPA.

**F.    Florida**

296.    Plaintiffs repeat and incorporate by reference herein the above allegations.

297.    Plaintiff Clifford, a resident of Florida, asserts this Claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*. ("FDUTPA") against the MLB Defendants on behalf of himself and the Florida Subclass.

298.    Florida law prohibits "[u]nfair methods of competition, unconscionable acts or practices and unfair or deceptive acts or practices in the conduct of any trade or commerce …." Fla. Stat. § 501.204.  The MLB Defendants are engaged in "trade or commerce" in the State of Florida under Fla. Stat. § 501.201 *et seq*.

299.    The MLB Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices in violation of Fla. Stat. § 501.204., as alleged at length above and in the following ways.

300.    At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

301.     In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

302.     At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

303.     Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiff Clifford and the Florida Subclass to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering competitions – into believing that such competitions were based on fair and honest player performance statistics.

304.     Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

305.     Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiff Clifford and the Florida Subclass (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiff Clifford and the Florida

Subclass, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

306. Plaintiff Clifford and the Florida Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

307. The MLB Defendants' conduct was likely to mislead – and did mislead – Plaintiff Clifford and the Florida Subclass, who reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

308. Plaintiff Clifford and the Florida Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material omissions and false representations, and would not have done so had they known of such material omissions.

309. In addition, the MLB Defendants engaged in unfair practices that offend established public policy, and that is immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

310.    As a direct, foreseeable and proximate result of the MLB Defendants' unfair, deceptive, misleading and/or false acts or practices in violation Fla. Stat. § 501.201 *et seq*., Plaintiff Clifford and the Florida Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

311.    Plaintiff Clifford and the Florida Subclass seek relief pursuant to Fla. Stat. § 501.201 *et seq*. for actual, attorneys' fees and all other applicable relief.

## G.    Colorado

312.    Plaintiffs repeat and incorporate by reference herein the above allegations.

313.    Plaintiff Liptak, a resident of Colorado, asserts this Claim under Colo. Rev. Stats. § 6-1-101 *et seq*. ("CRS"), against the MLB Defendants on behalf of the Colorado Subclass.

314.    The MLB Defendants operate in Colorado and have engaged in deceptive, unfair, and unlawful trade acts or practices in the course of the MLB Defendants' business in violation of CRS § 6-1-105(1) by, *inter alia*:

> (b) Knowingly mak[ing] a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;

> (e) Knowingly mak[ing] a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property….;

> (g) Represent[ing] that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model…;

> (i) Advertis[ing] goods, services, or property with intent not to sell them as advertised; and

> (u) Fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

315. At all times mentioned herein, defendant MLB's and MLBAM's promotion and marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendants MLB and MLBAM), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, and with the knowledge that MLB Clubs, through their impermissible electronic sign stealing in violation of MLB rules and regulations, were corrupting the accuracy of such statistics, imposed a duty on defendants MLB and MLBAM to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

316. In addition, given Manfred's and the MLB Defendants' public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros and the Red Sox about the basis and legitimacy of their players' performance, the MLB Defendants had a duty to disclose their knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

317. At all times mentioned herein prior to November 2019, defendants MLB and MLBAM intentionally concealed and did not disclose to the public material information about MLB Clubs' and players' electronic sign stealing misconduct and even after November 2019 continued to misrepresent the extent and involvement of MLB Clubs in such misconduct.

318. Defendants MLB and MLBAM intended, by their conduct described above, to deceive members of the public – including Plaintiff Liptak the Colorado Subclass to whom they were promoting and marketing and inducing to engage in DraftKings' MLB DFS wagering

competitions – into believing that such competitions were based on fair and honest player performance statistics.

319.     Defendants MLB's and MLBAM's concealment of MLB Clubs' and players' impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

320.     Defendants MLB's and MLBAM's intentional failure to disclose material information to Plaintiff Liptak the Colorado Subclass (and the public) engaging in DraftKings' MLB DFS wagering competitions was in breach of their duty to provide the public with material information that members of the public, including Plaintiff Liptak the Colorado Subclass, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

321.     Plaintiff Liptak the Colorado Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

322.     Plaintiff Liptak the Colorado Subclass reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein, which were rendered false by MLB's and MLBAM's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic

sign stealing and corruption of the MLB player performance statistic information material to such competitions.

323. Plaintiff Liptak the Colorado Subclass were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants MLB's and MLBAM's material omissions and false representations, and would not have done so had they known of such material omissions.

324. The MLB Defendants' acts and practices were immoral, unethical, oppressive, and unscrupulous, caused substantial injury to consumers that could not reasonably be avoided, and this substantial injury outweighed any benefits to consumers or competition.

325. As a direct, foreseeable and proximate result of the MLB Defendants' conduct, Plaintiff Liptak the Colorado Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

326. Plaintiff Liptak the Colorado Subclass seek relief under CRS § 6-1-101 *et seq.*, including, without limitation, compensatory damages, statutory damages, restitution, penalties, injunctive relief or other equitable relief as applicable, and attorneys' fees and costs.

## H.    Nationwide

327. Plaintiffs repeat and incorporate by reference herein the above allegations.

328. Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak, on behalf themselves and the Nationwide Class, assert these Claims under MASS. GEN. LAW, Ch. 93A, § 1 *et seq*., CAL. BUS. & PROF. CODE § 17200, *et seq*., CAL. CIV. CODE § 1750, *et seq*., TEX. BUS. & COM. CODE ANN. § 17.41 *et seq*., and FLA. STAT. § 501.204, *et seq.*, § 501.204, *et seq.*, CRS § 6-1-101 *et seq.*, and under the substantially similar State consumer protection statutes.

329.     As alleged above, the MLB Defendants have been and are engaged in trade and commerce as defined by the foregoing consumer protection statutes of Massachusetts, California, Texas, Florida, and Colorado, and as defined under the following State consumer protection statutes described below.  Major League Baseball is broadcast, advertised and promoted, and sales of merchandise take place, throughout the United States; and professional baseball games are held in states throughout the United States.  In addition, daily fantasy sports participants reside throughout the United States.  Defendant MLB is engaged in business on behalf of its constituent members teams and Major League Baseball in every State including Massachusetts, and defendant MLBAM's internet and interactive services are likewise provided throughout the country, including in Massachusetts.  Moreover, defendant MLBAM is responsible for coordinating the partnership between DraftKings and Major League Baseball and its team, and does so throughout the country, including in Massachusetts where DraftKings has its principal place of business.

330.     As a result of their conduct, the MLB Defendants have engaged in deceptive, misleading, false, and/or unfair acts or practices in violation of the foregoing consumer protection statutes and the state consumer protection acts listed below.

331.     Like Massachusetts, California, Florida, and Colorado, a significant number of states' consumer protection statutes closely track the language of the Federal Trade Commission Act ("FTCA"), proscribing "unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a)(1). The following states have consumer protection statutes that prohibit unfair and/or deceptive acts or practices:

**Alaska:** ALASKA STAT. § 45.50.471, *et seq*. provides that "unfair methods of competition and unfair or deceptive acts or practices in trade or commerce are declared to be unlawful."

**Connecticut:** CONN. GEN. STAT. § 42-110b, *et seq*. provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

**Georgia:** OFFICIAL CODE OF GA. § 10-1-390, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of consumer transaction and consumer acts or practices in trade or commerce are declared unlawful."

**Hawaii:** HAW. REV. STAT. § 480, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Illinois:** ILL. COMP. STAT. § 505/1, *et seq*. **and** § 510/1, *et seq*. provides "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce are hereby declared unlawful."

**Iowa:** IOWA CODE § 714.16, *et seq*. prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise…"

**Kentucky:** KY. REV. STAT. ANN. § 367.110, *et seq*. prohibits "[u]nfair, false, misleading or deceptive acts or practices in the conduct of any trade or commerce"

**Louisiana:** LA. REV. STAT. ANN. § 51.1405, *et seq*. provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Maine:** ME. REV. STAT. TIT. 5, § 205-A, *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**Maryland:** MD. CODE ANN., MD COM. LAW § 13-101, *et seq*. provides that [a] person may not engage in any unfair or deceptive trade practice, as defined in this subtitle or as further defined by the Division, in: (1) The sale . . . of any consumer goods."

**Michigan:** MICH. COMP. LAWS § 445.901, *et seq*. prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce…"

**Mississippi:** MISS. CODE. ANN. § 75-24-1, *et seq*. prohibits "[u]nfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce."

**Missouri: MO REV. STAT. § 407.010,** *et seq.* makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise…"

**Montana: MONT. CODE ANN. § 30-14-101,** *et seq.* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

**Nebraska: NEB. REV. STAT. § 59-1601, et seq., § 87-301,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful."

**New Hampshire: N.H. REV. STAT. ANN. § 358-A:1,** *et seq.* provides that "[i]t shall be unlawful for any person to use . . . any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."

**New Mexico: N.M. STAT. ANN. § 57-12-1,** *et seq.* prohibits the "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlawful."

**North Carolina: NC GEN. STAT. § 75-1.1,** *et seq.* provides that "unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

**Ohio: OHIO REV. CODE ANN. § 1345.01,** *et seq.* provides that [n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

**Oklahoma: OKLA. STAT. TIT. 15, § 751,** *et seq.* provides that [a] person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act. . . when, in the course of the person's business, the person: . . . (20) Commits an unfair or deceptive trade practice…"

**Pennsylvania: 73 PA. STAT ANN. § 201-1,** *et seq.* prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…"

**Rhode Island: R.I. GEN LAWS § 6-13.1-1,** *et seq.* provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

**South Carolina: S.C. CODE § 39-5-10,** *et seq.* provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce declared unlawful."

**Tennessee: TENN. CODE ANN. § 47-18-104,** *et seq*. prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."

**Vermont: VT. STAT. ANN. TIT. 9, § 2451,** *et seq*. provides that "unfair or deceptive acts or practices in commerce, are hereby declared unlawful."

**Washington: REV. CODE WA. § 19.86.010,** *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**West Virginia: W. VA. CODE § 46A-6-104,** *et seq*. provides that "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

**Wisconsin: WIS. STAT. § 100.20,** *et seq*. prohibits "[u]nfair methods of competition in business and unfair trade practices in business."

**Wyoming: WYO. STAT. ANN. § 40-12-101,** *et seq.* provides that "[a] person engages in a deceptive trade practice unlawful under this act when, in the course of his business and in connection with a consumer transaction, he knowingly: . . . (xv) Engages in unfair or deceptive acts or practices.

332.    The statutes identified in the preceding paragraph provide consumers with a private right of action for the MLB Defendants' unfair and deceptive acts or practices as alleged above, and such acts or practices are unlawful under these substantially similar or identical consumer protection and consumer fraud statutes set forth immediately above.

333.    Plaintiffs and the Nationwide Class have asserted claims under the Georgia Fair Business Practices Act, O.C.G.A. § 10-1-390 ("GFBPA"), against MLB Defendants. Upon information and belief, MLB Defendants do not maintain a place of business in Georgia, nor do MLB Defendants maintain property or asserts in Georgia. Plaintiffs and the Nationwide Class have are thus not required to provide MLB Defendants with pre-suit written demand for relief pursuant to O.C.G.A § 10-1-399(b).

334.    Plaintiffs and the Nationwide Class intend to assert a claim under the Maine Unfair Trade Practices Act ("MeUTPA") against MLB Defendants. Plaintiff Olson previously provided a written demand for relief describing the particular violations of MeUTPA to MLB

Defendants pursuant to ME. REV. STAT. § 212 TIT. 5 § 213(1-A). Subject to the response, if any, of MLB Defendants within 30 days from notice, Plaintiffs, on behalf of themselves and the Nationwide Class, shall amend the Complaint to include a Claim for Relief pursuant to ME. REV. STAT. § 212 TIT. 5 § 205-A, *et seq.* and demand all appropriate relief under the MeUTPA.

335.    Plaintiffs and the Nationwide Class intend to assert a claim under the Mississippi Consumer Protection Act ("MCPA") against MLB Defendants. Plaintiffs and the Nationwide Class intend, pursuant to MISS. CODE. ANN. § 75-24-15, to attempt to resolve his and the Class' MCPA claims through an informal dispute resolution program approved by the Attorney General. Subject to the outcome of the informal dispute resolution undertaking, Plaintiffs, on behalf of themselves and the Nationwide Class, shall amend the Complaint to include a Claim for Relief pursuant to MISS. CODE. ANN. § 75-24-1 *et seq.* and demand all appropriate relief under the MCPA.

336.    Plaintiffs and the Nationwide Class intend to assert a claim under the West Virginia Consumer Credit and Protection Act ("WVCCPA") against MLB Defendants. Plaintiff Olson previously provided MLB Defendants notice, in writing by certified mail, return receipt requested, of the alleged violation pursuant to W. VA. CODE § 46A-6-106(c). Subject to the response, if any, MLB Defendants within 20 days of the notice, Plaintiffs, on behalf of themselves and the Nationwide Class, shall amend the Complaint to include a Claim for Relief pursuant to W. VA. CODE § 46A-6-104, *et seq.*

337.    Plaintiffs and the Nationwide Class intend to assert a claim under the Wyoming Consumer Protection Act ("WCPA") against MLB Defendants. Plaintiff Olson previously provided notice in writing to MLB Defendants of the nature of the violations of MCPA pursuant to WYO. STAT. ANN. § 40-12-109. The Claim for Relief under WYO. STAT. ANN. § 40-12-101, *et*

*seq.* found below provides notice to MLB Defendants of the prospective claim against it by Plaintiffs and the Nationwide Class. Subject to the response, if any, of MLB Defendants within 15 days of the notice, Plaintiffs, on behalf of themselves and the Class, shall amend the Complaint to include a Claim for Relief pursuant to WYO. STAT. ANN. § 40-12-101, *et seq.* and demand all appropriate relief under the WCPA.

338.    As a result of their conduct, the MLB Defendants have engaged in unfair and deceptive acts or practices in violation of the foregoing state consumer protection statutes.

339.    In addition, a number of states' consumer protection statutes broadly prohibit false, misleading or deceptive acts or practices, but do not prohibit "unfair" practices. The following states have consumer protection statutes that prohibit deceptive acts or practices but do not prohibit "unfair" practices:

> **Alabama: ALA. CODE § 8-19-1, *et seq.*** sets forth a list of twenty-six unlawful trade practices and a catch-all provision that makes it unlawful to "engag[e] in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

> **Arkansas: ARK. CODE ANN. § 4-88-107, *et seq.*** prohibits "[d]eceptive and unconscionable trade practices," which include but are not limited to, a list of enumerated items, including "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade [.]"

> **Delaware: DEL. CODE ANN. TITLE 6, § 2511, *et seq.*** prohibits the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby."

> **District of Columbia: D.C. CODE § 28-3901, *et seq.*** provides that "[i]t shall be a violation of this chapter…for any person to: . . . (e) misrepresent as to a material fact which has a tendency to mislead" and "(t) use deceptive representations…in connection with goods or services."

> **Idaho: IDAHO CODE § 48-601, *et seq.*** provides that "[t]he following … unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby

declared to be unlawful, where a person knows, or in the exercise of due care should know, that he has in the past or is … [e]gaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer."[87]

**Indiana:** IND. CODE § 24-5-0.5-1, *et seq*. provides protection to "consumers from suppliers who commit deceptive and unconscionable sales acts…"

**Kansas:** KAN. STAT. § 50-623, *et seq*. provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction[;]"

**Minnesota:** MINN. STAT. § 325F.68, *et seq*. prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby …"

**Nevada:** NEV. REV. STAT. § 598.0903, *et seq*. provides that "[a] person engages in a 'deceptive trade practice' if, in the course of his business or occupation, he: . . . (13) Makes false or misleading statements of fact concerning the price of goods . . . for sale. (15) Knowingly makes any other false representation in a transaction."

**New Jersey:** N.J. STAT. ANN. § 56:8-1, *et seq*. provides that "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale . . . of any merchandise . . . is declared to be an unlawful practice."

**New York:** N.Y. GEN. BUS. § 349, *et seq*., prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

**North Dakota:** N.D. CENT. CODE § 51-15-01, *et seq*., prohibits "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale . . . of any merchandise . . ."

**Oregon:** OR REV. STAT. § 646.605, *et seq*. provides that: "[a] person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (s) Makes false or misleading representations of fact concerning the offering price of, or the person's cost for . . . goods."

---

[87] While Idaho's consumer protection statute refers to "unfair or deceptive acts or practices[,]", the court *in In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 110 (D. Mass. 2008) excluded it from the list of statutes that more closely track the FTC Act because the statute's "general prohibition refers to an enumerated list of prohibited practices, instead of simply prohibiting all unfair or deceptive practices."

**South Dakota: S.D. CODIFIED LAWS § 37-24-1,** *et seq*. prohibits "deceptive acts or practices", which are defined to include: [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby."

**Utah: UTAH CODE ANN. § 13-11-1,** *et seq*. prohibits "deceptive acts and practices by a supplier in connection with a consumer transaction." Specifically, "a supplier commits a deceptive act or practice if the supplier knowingly or intentionally: "(b) indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not." "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Act."

**Virginia: VA. CODE Ann. § 59.1-196,** *et seq*. makes unlawful certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction," including "[m]isrepresenting that goods or services are of a particular standard, quality, grade style or model."

340.     The statutes identified in the preceding paragraph provide consumers with a private right of action for the MLB Defendant's deceptive acts and practices, which are made unlawful under those statutes. As a result of their conduct described above, the MLB Defendants have violated these consumer statutes.

341.     Plaintiffs and the Nationwide Class have asserted claims under the Alabama Deceptive Trade Practices Act, ALA. CODE § 8-19-1, *et seq.* ("ADTPA") against MLB Defendants. Upon information and belief, MLB Defendants do not maintain a place of business in Alabama, nor do MLB Defendants maintain property or asserts in Alabama. Plaintiffs and the Nationwide Class are thus not required to provide MLB Defendants with pre-suit written demand for relief pursuant to ALA. CODE § 8-19-10.

342.     Plaintiffs and the Nationwide Class intend to assert a claim under the Indiana Deceptive Consumer Sales Act ("IDCSA") against MLB Defendants. Plaintiff Olson previously provided notice of the nature of the alleged violation and damages suffered within six months of the initial discovery of the deceptive act pursuant to IND. CODE § 24-5-0.5-5(a). The Claim for

Relief under IND. CODE § 24-5-0.5-1, *et seq*. provides notice to MLB Defendants of the prospective claim against it. Subject to the response, if any, of MLB Defendants within 30 days of the notice, Plaintiffs, on behalf of themselves and the Class, shall amend the Complaint to include a Claim for Relief pursuant to IND. CODE § 24-5-0.5-1, *et seq*. and demand all appropriate relief under the IDCSA.

343. As a direct, foreseeable and proximate result of the MLB Defendants' deceptive, misleading, false and/or unfair acts and practices, in violation of all of the foregoing State consumer protection statutes, Plaintiffs and the Nationwide Class were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

344. The MLB Defendants' wrongful conduct was wanton, willful or in reckless disregard of the rights of Plaintiffs and the Nationwide Class. By reason of the foregoing, Plaintiffs and the Nationwide Classes are entitled to all available damages and remedies available under the consumer protections statutes identified above, including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees. Further, because the MLB Defendants acted willfully or knowingly, Plaintiffs and the Nationwide Classes are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the State consumer protection statutes set forth above.

## THIRD CLAIM FOR RELIEF

## NEGLIGENCE
### (Against the MLB Defendants)

345.     Plaintiffs repeat and incorporate herein by reference the above allegations.

346.     At all material times, the MLB Defendants owned an interest in and were partners with DraftKings and solicited contestants to participate in and otherwise promoted DraftKings' MLB DFS contests.

347.     At all material times, the MLB Defendants realized substantial financial gain through their partnership with DraftKings and promotion of DraftKings' MLB DFS contests.

348.     At all material times, the MLB Defendants knew or should have known that contestants in DraftKings' MLB DFS contests relied on the honesty and accuracy of MLB's player performance statistics in deciding to participate in DraftKings' fantasy baseball contests.

349.     At all material times, the MLB Defendants knew or should have known that contestants in DraftKings' MLB DFS contests were unaware that defendant MLB's member teams, including the Astros and the Red Sox, were engaging in impermissible electronic sign stealing, in violation of MLB's rules and regulations, that compromised the honesty and integrity of DraftKings' fantasy baseball contests.

350.     By virtue of the MLB Defendants' ownership in and partnership with DraftKings and promotion of DraftKings' MLB DFS contests, all undertaken by the MLB Defendants for financial benefit, and in light of the MLB Defendants' knowledge that the honesty and accuracy of MLB's player performance statistics were critical to the fairness of DraftKings' MLB DFS contests, and in light of all of the above, the MLB Defendants had a duty (a) to take reasonable steps to ensure that MLB's player performance statistics were, in fact, honest and accurate and not compromised by team or player misconduct; (b) to investigate team or player misconduct

that might compromise the honesty and fairness of MLB's player performance statistics; (c) to take reasonable steps to prevent and deter any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics; and (d) to disclose to potential DraftKings' MLB DFS contestants any information that the MLB Defendants knew or should have known about any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics.

351.    Although the MLB Defendants knew or should have known of MLB's member team or player misconduct that compromised the honesty and fairness of MLB's player performance statistics, they breached their obligations to Plaintiffs and the Classes, in one or more of the following ways:

      a.      in that the MLB Defendants failed to take reasonable steps to ensure that MLB's player performance statistics were honest and accurate and not compromised by team or player misconduct;

      b.      in that the MLB Defendants failed to investigate reported team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics;

      c.      in that the MLB Defendants failed to take reasonable steps to prevent and deter any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics; and

      d.      in that the MLB Defendants failed to disclose to potential DraftKings' MLB DFS contestants information that the MLB Defendants knew or should have known about any team or player misconduct that might compromise the honesty and fairness of MLB's player performance statistics.

352.    As a direct and proximate result of the MLB Defendants' negligent conduct, Plaintiffs and the Classes have suffered injury and are entitled to damages in an amount to be proven at trial.

# FOURTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT
**(Against the MLB Defendants)**

353.     Plaintiffs repeat and incorporate herein by reference the above allegations.

354.     At all material times, the MLB Defendants have realized substantial financial gain from their partnership with DraftKings and promotion of and participation in DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

355.     Fan participation in fantasy baseball contests directly resulted in increased financial benefit to the MLB Defendants based not only on the foregoing revenue streams, but also through increased revenue from broadcasting, attendance, advertising, and the sale of merchandise and paraphernalia.

356.     At all material times, the MLB Defendants promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

357.     At all material times, the MLB Defendants knew and did not disclose that the Houston Astros and Boston Red Sox were engaged in electronic sign stealing in violation of MLB's rules and regulations, that resulted in compromised and dishonest player performance statistics that rendered DraftKings' fantasy baseball contests corrupt and tainted.

358.     Plaintiffs and the Classes conferred substantial monetary benefits on the MLB Defendants in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise.

359.    The MLB Defendants' wrongful conduct was knowing and intentional, and the MLB Defendants appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiffs and the Classes as a result of such wrongful conduct.

360.    Under principles of equity and good conscience, the MLB Defendants should not be permitted to retain the foregoing monetary benefits they wrongfully obtained at the expense of Plaintiffs and the Classes.

361.    As a direct and proximate result of the MLB Defendants' wrongful conduct, the MLB Defendants are liable to Plaintiffs and the Classes for the amount of the monetary benefits conferred upon the MLB Defendants, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

362.    The MLB Defendants should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the Classes all unlawful, inequitable and unjust proceeds received and/or realized as a result of their wrongful conduct.

## FIFTH CLAIM FOR RELIEF

### COMMON LAW FRAUD
**(Against Defendant Houston Astros, LLC)**

363.    Plaintiffs repeat and incorporate herein by reference the above allegations.

364.    At all times mentioned herein, defendant Astros, acting in partnership with DraftKings, promoted and helped market DraftKings' MLB DFS wagering competitions to the public, participated with DraftKings in inducing members of the public to engage in such competitions, and received financial remuneration from DraftKings for its promotion, marketing and participation in soliciting members of the public to engage in such competitions.

365.     At all times mentioned herein, defendant Astros knew that DraftKings' MLB DFS wagering competitions were predicated on MLB player performance statistics and that the fairness of the competitions depended on such data representing a fair statistical analysis of player ability and performance.

366.     Defendant Astros expressly represented when it agreed to the Major League Constitution that defendant Astros and its players would adhere to MLB's rules and regulations.

367.     Defendant Astros' General Manager, Field Manager and team players were aware that they were required to comply with MLB rules and regulations and represented and agreed that they would do so, including when they entered into their employment agreements with defendant Astros.

368.     Defendant Astros' impermissible electronic sign stealing was in knowing violation of MLB's rules and regulations.

369.     At all times mentioned herein, defendant Astros' General Manager, Field Manager, players and other employees were aware that their electronic sign stealing schemes were in violation of MLB's rules and regulations.

370.     At all times mentioned herein, defendant Astros highest-ranking field executive, Astros' Field Manager A.J. Hinch, was aware of the Astros' impermissible electronic sign stealing schemes in violation of MLB rules and regulations; was aware of his obligation under MLB rules and regulations to put an end to the schemes, but did not do so; and was aware of his duty to disclose the schemes to MLB officials and the public, but did not do so.

371.     At all times mentioned herein, defendant Astros' President of Baseball Operations and General Manager, Jeffrey Luhnow, was aware of the Astros' impermissible electronic sign stealing schemes in violation of MLB rules and regulations; was aware of his obligation under

MLB rules and regulations to put an end to the schemes, but did not do so; and was aware of his duty to disclose the schemes to MLB officials and the public, but did not do so.

372.    At all times mentioned herein, defendant Astros' General Manager, Field Manager, players and other employees were aware that defendant Astros' impermissible electronic sign stealing provided Astros players with an unfair and impermissible hitting advantage that corrupted their player performance statistics and substantially and materially undermined the fairness of DraftKings' MLB DFS wagering competitions.

373.    Prior to November 2019, defendant Astros concealed its perpetration of electronic sign stealing from members of the public and falsely attributed defendant Astros' player performance success to legitimate performance ability and use of modern analytics.

374.    To that end, as set forth above, the Astros made repeated statements in 2017, 2018 and 2019 asserting that the team's players' performance success was the result of player talent or other legitimate baseball factors.

375.    The Astros' representations that the Astros' players' performance success was the result of player talent or other legitimate baseball factors were intended to cause the public, including DraftKings' MLB DFS contestants, to believe that Astros' players were performing well for legitimate baseball reasons.

376.    The Astros' representations that the Astros' players' performance success was the result of player talent or other legitimate baseball factors were intended to conceal from the public, including from DraftKings' MLB DFS contestants in particular, that the Astros were engaging in electronic sign stealing in violation of MLB rules and regulations and that Astros' player performance success was the result of such cheating.

377.    The Astros' representations that Astros' players' performance success was the result of player talent or other legitimate baseball factors statements were false.

378.    Defendant Astros' players and other employees, including the team General Manager and Field Manager, engaged in implementing, concealing and/or failing to terminate or prevent the electronic sign stealing schemes described herein were acting within the scope of their employment with defendant Astros.

379.    At all times mentioned herein, defendant Astros knew that members of the public would not engage in DraftKings' MLB DFS wagering competitions if they knew that defendant Astros' players were benefitting from electronic sign stealing, in violation of MLB rules and regulations, that corrupted Astros players' performance statistics and undermined the fairness of DraftKings' MLB DFS wagering competitions.

380.    At all times mentioned herein, defendant Astros' promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant Astros), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, including Astros' players performance statistics, and with the knowledge that defendant Astros' impermissible electronic sign stealing in violation of MLB rules and regulations, was corrupting the accuracy of such statistics with respect to Astros' players and others MLB players competing against Astros' players, imposed a duty on defendant Astros to disclose its knowledge of its impermissible electronic sign stealing and the resulting distorted player performance statistics.

381.    At all times mentioned herein prior to November 2019, defendant Astros intentionally concealed and did not disclose to the public material information about its and its players' electronic sign stealing misconduct.

382.    Defendant Astros intended, by its conduct described above, to deceive members of the public – including Plaintiffs and the Classes – into believing that defendant Astros' team and player success was the result of legitimate performance ability and use of modern analytics.

383.    Defendant Astros' concealment of its impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

384.    Defendant Astros' intentional failure to disclose material information to Plaintiffs and the Classes engaging in DraftKings' MLB DFS wagering competitions (and the public), was in breach of its duty to provide the public with material information that members of the public would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

385.    As set forth above, during the time period relevant herein, MLB Commissioner Manfred made repeated public statements – in interviews, press releases and presentations to state governments – representing that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and committing MLB to protecting the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair.

386.	Manfred's representations and commitments were made on behalf of and as the agent of defendant Astros, who authorized Manfred to speak on its behalf and knew of, approved and availed itself of his statements.

387.	Manfred's representations and commitments were intended to assure the public that Major League Baseball was honestly and fairly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

388.	Manfred's representations and commitments were intended to assure DraftKings' MLB DFS contestants that DraftKings' fantasy baseball competitions were honestly and fairly conducted.

389.	Manfred's representations and commitments had the effect of assuring the public in general, and DraftKings' MLB DFS contestants in particular, that Major League Baseball was fairly and honestly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

390.	Manfred's representations and commitments had the effect of assuring DraftKings' fantasy baseball contestants that DraftKings' MLB DFS contests were fairly and honestly conducted and that MLB would not condone or knowingly allow any conduct by MLB teams or players that would compromise or corrupt the honesty and fairness of DraftKings' MLB DFS contests.

391. Manfred's representations that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and his commitments that MLB would protect the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair, were false.

392. Given Manfred's public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros about the basis and legitimacy of its players' performance, defendant Astros had a duty to disclose its knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

393. Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Astros' intentional failure to disclose material information concerning its impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

394. Plaintiffs and the Classes reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by defendant Astros and Manfred set forth herein, which were rendered false by the Astros' and MLB's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

395. Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Astros' material omissions and false representations, and would not have done so had they known of such omissions.

396.     As a direct and proximate result of defendant Astros' fraudulent statements and conduct, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT
**(TEX. BUS. & COM. CODE § 17.41 *ET SEQ.*)**
**(Against Defendant Houston Astros, LLC)**

397.     Plaintiffs repeat and incorporate herein by reference the above allegations.

398.     Plaintiffs and the Classes intend to assert a claim under the Texas Deceptive Trade Practices Act ("TDTPA") against defendant Houston Astros, LLC.  As alleged above, Plaintiff Olson previously provided written notice of the specific complaint and damages to the Houston Astros in accordance with TEX. BUS. & COM. CODE § 17.505.  Subject to the response, if any, by defendant Houston Astros within 60 days of the notice, Plaintiffs, on behalf of themselves and the Classes, shall amend the Complaint to include this Claim for Relief and demand all appropriate relief under the TDTPA.

399.     The TDTPA makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COM. CODE § 17.46.

400.     At all material times, the Houston Astros have engaged in misleading, false, deceptive and/or unfair acts that violated the TDTPA.

401.     Any person who has suffered a loss as a result of a violation of the TDTPA may bring an action based on defendant Houston Astros, LLC's deceptive and/or unfair acts and/or practices.

402.     Defendant Houston Astros have been and are engaged in trade and commerce under the TDTPA.  Houston Astros baseball is broadcast, advertised and promoted, and sales of merchandise take place in Texas and throughout the United States; and professional baseball

games in which the Houston Astros are involved are held in Texas and in states throughout the United States. In addition, daily fantasy sports participants who wager on contests that are and have been impacted by the performance and statistics of players in games involving the Houston Astros reside in Texas and throughout the U.S.

403. At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have operated and promoted their partnership with DraftKings and DraftKings' MLB DFS contests. In addition, the Houston Astros have a partnership with DraftKings, and has promoted its partnership with DraftKings and has participated in soliciting participants in DraftKings' daily and weekly MLB DFS contests.

404. At all material times, the Houston Astros have realized substantial financial gain through MLB's and its partnerships with DraftKings, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

405. Further, fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant the Houston Astros. Not only did the Houston Astros have a financial interest in the fees paid to DraftKings by baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball, including the Houston Astros, resulting in greater revenue for the Houston Astros from increased broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

406. Thus, it was and is in the Houston Astros' interest to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the Houston Astros, which the Houston Astros did at all material times, even while knowing that

DraftKings' fantasy baseball contests were compromised and unfair as a result of the Houston Astros' misconduct.

407. At the same time the Houston Astros were promoting DraftKings' fantasy baseball contests, the Houston Astros were engaged in the electronic sign stealing schemes described above, which were in violation of the rules, regulations and directives of Major League Baseball, and which resulted in compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiffs and the Classes participated corrupt and tainted.

408. At all material times, the Houston Astros knew or recklessly disregarded the fact that their secret electronic sign stealing misconduct resulted in compromised and dishonest player performance statistics.

409. Further, the Houston Astros affirmatively concealed and failed to disclose its electronic sign stealing misconduct even though the defendant Houston Astros, LLC knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests it was separately promoting.

410. Defendant Houston Astros' conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that the Astros' electronic sign stealing misconduct was compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair, deceptive, misleading and/or false practices, all conduct which violates TEX. BUS. & COM. CODE § 17.41 *et seq*.

411. At all times mentioned herein, defendant Astros' promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering

competitions (for and to the economic benefit of defendant Astros), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, including Astros' players performance statistics, and with the knowledge that defendant Astros' impermissible electronic sign stealing in violation of MLB rules and regulations, was corrupting the accuracy of such statistics with respect to Astros' players and others MLB players competing against Astros' players, imposed a duty on defendant Astros to disclose its knowledge of its impermissible electronic sign stealing and the resulting distorted player performance statistics.

412. At all times mentioned herein prior to November 2019, defendant Astros intentionally concealed and did not disclose to the public material information about its and its players' electronic sign stealing misconduct.

413. Defendant Astros intended, by its conduct described above, to deceive members of the public – including members of the public it was inducing to engage in DraftKings MLB DFS wagering competitions – into believing that defendant Astros' team and player success was the result of legitimate performance ability and use of modern analytics.

414. Defendant Astros' concealment of its impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

415. Defendant Astros' intentional failure to disclose material information to plaintiffs and other members of the public engaging in DraftKings' MLB DFS wagering competitions, was in breach of its duty to provide the public with material information that members of the public

would reasonably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

416.    As set forth above, during the time period relevant herein, MLB Commissioner Manfred made repeated public statements – in interviews, press releases and presentations to state governments – representing that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and committing MLB to protecting the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair.

417.    Manfred's representations and commitments were made on behalf of and as the agent of defendant Astros, who authorized Manfred to speak on its behalf and knew of, approved and availed itself of his statements.

418.    Manfred's representations and commitments were intended to assure the public that Major League Baseball was honestly and fairly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

419.    Manfred's representations and commitments were intended to assure DraftKings' MLB DFS contestants that DraftKings' fantasy baseball competitions were honestly and fairly conducted.

420.    Manfred's representations and commitments had the effect of assuring the public in general, and DraftKings' MLB DFS contestants in particular, that Major League Baseball was fairly and honestly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or

unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

421.     Manfred's representations and commitments had the effect of assuring DraftKings' fantasy baseball contestants that DraftKings' MLB DFS contests were fairly and honestly conducted and that MLB would not condone or knowingly allow any conduct by MLB teams or players that would compromise or corrupt the honesty and fairness of DraftKings' MLB DFS contests.

422.     Manfred's representations that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and his commitments that MLB would protect the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair, were false.

423.     Given Manfred's public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Astros about the basis and legitimacy of its players' performance, defendant Astros had a duty to disclose its knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

424.     Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Astros' intentional failure to disclose material information concerning its impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

425.     Plaintiffs and the Classes reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and

commitments by defendant Astros and Manfred set forth herein, which were rendered false by the Astros' and MLB's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

426.     Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Astros' material omissions and false representations, and would not have done so had they known of such omissions.

427.     As a result of its conduct, defendant Houston Astros, LLC has engaged in false, misleading and deceptive acts and practices in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*.

428.     Plaintiffs and the Classes are consumers within the meaning of the TDTPA who paid for the fantasy baseball services provided by DraftKings that were compromised and rendered dishonest by the Houston Astros, LLC's unfair, deceptive, misleading and/or false acts or practices in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*.

429.     As a direct, foreseeable and proximate result of defendant Houston Astros, LLC's unfair, deceptive, misleading and/or false acts or practices, in violation of TEX. BUS. & COM. CODE § 17.41 *et seq*., Plaintiffs and the Classes were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

430.     Defendant Houston Astros' wrongful conduct was wanton, willful or in reckless disregard of the rights of Plaintiffs and the Classes.

431.     By reason of the foregoing, Plaintiffs and the Classes are entitled to all available damages and remedies available under TEX. BUS. & COM. CODE § 17.41 *et seq*.,

including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees. Further, because the Houston Astros acted willfully or knowingly, Plaintiffs and the Classes are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the TDTPA.

## SEVENTH CLAIM FOR RELIEF

### NEGLIGENCE
**(Against Defendant Houston Astros, LLC)**

432. Plaintiffs repeat and incorporate herein by reference the above allegations.

433. At all times mentioned herein, defendant Astros, acting in partnership with DraftKings, promoted and marketed DraftKings' MLB DFS wagering competitions to the public, participated with DraftKings in inducing members of the public to engage in such competitions, and received financial remuneration from DraftKings for its promotion, marketing and participation in soliciting members of the public to engage in such competitions.

434. At all times mentioned herein, defendant Astros and defendant Astros' employees, including its General Manager, Field Manager, coaches and players knew or should have known that DraftKings' MLB DFS wagering competitions were predicated on MLB player performance statistics and that the fairness of the competitions depended on the honesty of such statistics.

435. At all times mentioned herein, defendant Astros' executives and management, including Astros' Field Manager, A.J. Hinch, and Astros' President of Baseball Operations and General Manager, Jeffrey Luhnow, were responsible for insuring that Astros' team players and other employees complied with MLB rules and regulations, including in particular MLB's regulation prohibiting electronic sign stealing.

436.     At all times mentioned herein, defendant Astros' Field Manager, A.J. Hinch, was aware that Astros' team players, assisted by at least one Astros' coach and other Astros' employees, were engaging in electronic sign stealing in violation of MLB rules and regulations and that such electronic sign stealing provided Astros players with an unfair and impermissible hitting advantage.

437.     At all times mentioned herein, Hinch failed to take action to prevent such player misconduct.

438.     At all times mentioned herein, defendant Astros' General Manager, Jeffrey Luhnow, was aware that Astros' players, assisted by at least one Astros' coach and other Astros' employees, were engaging in electronic sign stealing in violation of MLB rules and regulations and that such electronic sign stealing provided Astros players with an unfair and impermissible hitting advantage.

439.     At all times mentioned herein, Luhnow failed to take action to prevent such player misconduct.

440.     At all times mentioned herein, defendant Astros' players, coach(es) and other Club employees engaging in electronic sign stealing knew or should have known that such conduct was in violation of MLB rules and regulations that they were required to comply with and provided Astros players with an unfair and impermissible hitting advantage.

441.     At all times mentioned herein, no Astros players, coach(es) or other Club employees took proper action to prevent such electronic sign stealing misconduct.

442.     At all times mentioned herein, defendant Astros, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that its impermissible electronic sign stealing, in violation of MLB rules and regulations, undermined

the fairness of DraftKings' MLB DFS wagering competitions because, by providing Astros' hitters with an unfair hitting advantage, Astros' players' performance statistics, as well as the performance statistics of players opposing the Astros, were distorted and corrupted.

443. At all times mentioned herein, defendant Astros, its executives, General Manager, Field Manager, players, coaches and other Club employees concealed the team's perpetration of electronic sign stealing from members of the public and falsely attributed defendant Astros' player performance success to legitimate performance ability and use of modern analytics.

444. At all times mentioned herein, defendant Astros, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that information that defendant Astros were engaging in electronic sign stealing, in violation of MLB rules and regulations, was highly material to DraftKings' MLB DFS wagering contestants.

445. At all times mentioned herein, defendant Astros, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that members of the public would not engage in DraftKings' MLB DFS wagering competitions if they knew that defendant Astros were engaging in electronic sign stealing, in violation of MLB rules and regulations, that corrupted Astros and other players' performance statistics and undermined the fairness of DraftKings' MLB DFS wagering competitions.

446. Plaintiffs and the Classes would not have participated in DraftKings' MLB DFS wagering competitions had they known that defendant Astros was engaging in electronic sign stealing that corrupted the player performance statistics of Astros and opposing players.

447. At all times mentioned herein, defendant Astros' promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant Astros), imposed a duty on defendant

Astros to (a) not engage in actions that would undermine the fairness of such competitions; (b) keep apprised of the conduct of subordinate employees to prevent them from engaging in actions that would undermine the fairness of such competitions; (c) properly supervise and direct the conduct of subordinate employees to prevent them from engaging in actions that would undermine the fairness of such competitions; and (d) disclose to the fantasy baseball contestant public any knowledge that such competitions were unfair.

448.    At all times mentioned herein, defendant Astros' employees, including its General Manager, Field Manager, coaches, players and other Club employees, were acting within the scope of their employment by defendant Astros.

449.    The actions and omissions of defendant Astros, and its employees, for whose conduct defendant Astros is liable, breached their duty to Plaintiffs and the Classes in one or more of the following respects:

> a. in that defendant Astros failed to require its employees to comply with MLB rules and regulations prohibiting electronic sign stealing;
>
> b. in that defendant Astros promoted, marketed and sought to induce fantasy baseball contestants to engage in DraftKings' MLB DFS contests while defendant Astros knew that the fairness of such contests was undermined by defendant Astros' electronic sign stealing misconduct;
>
> c. in that, to the extent that management employees of defendant Astros in a position to require compliance with MLB's electronic sign stealing prohibition and/or disclosure of such electronic sign stealing, were unaware of defendant Astros' employees' electronic sign stealing, such management employees failed to exercise proper control over the actions of their subordinate employees, failed to keep themselves properly informed about the actions of their subordinate employees, failed to properly investigate the actions of their subordinate employees, and failed to properly supervise and direct the actions of their subordinate employees;

d.  in that defendant Astros, although knowing that its electronic sign stealing was information highly material to the decision of potential fantasy baseball competition contestants to participate in DraftKings' MLB DFS contests, failed to disclose its electronic sign stealing;

e.  in that defendant Astros, although knowing that its electronic sign stealing was information highly material to the decision of potential fantasy baseball competition contestants to participate in DraftKings' MLB DFS contests, concealed its electronic sign stealing.

450.    As a direct and proximate result of defendant Astros' negligent conduct as aforesaid, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
**(Against Defendant Houston Astros, LLC)**

451.    Plaintiffs repeat and incorporate herein by reference the above allegations.

452.    At all material times, defendant Houston Astros, LLC has realized substantial financial gain from its agreement with DraftKings and promotion of and participation in DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

453.    Fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant Houston Astros, LLC based not only on the foregoing revenue streams, but also through increased revenue from broadcasting, attendance, advertising, and the sale of merchandise and paraphernalia.

454.    At all material times, defendant Houston Astros, LLC promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

455.    Further, at all material times, defendant Houston Astros, LLC knew and did not disclose that it was engaged in electronic sign stealing in violation of MLB's rules and

regulations (and directives), that resulted in compromised and dishonest player performance statistics that rendered DraftKings' fantasy baseball contests corrupt and tainted.

456.    Plaintiffs and the Classes conferred substantial monetary benefits on defendant Houston Astros , LLC in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise revenue.

457.    Defendant Houston Astros , LLC further has received additional revenue from increased ticket prices and substantial added value to defendant's business by virtue of its winning the 2017 World Series, all while wrongfully injuring Plaintiffs and the Classes .

458.    Defendant Houston Astros, LLC's conduct was knowing and intentional, and defendant Houston Astros, LLC appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiffs and the Classes.

459.    Under principles of equity and good conscience, defendant Houston Astros, LLC should not be permitted to retain the foregoing monetary benefits it wrongfully obtained at the expense of Plaintiffs and the Classes.

460.    As a direct and proximate result of defendant Houston Astros, LLC's wrongful conduct, defendant Houston Astros, LLC is liable to Plaintiffs and the Classes for the amount of the monetary benefits conferred upon defendant Houston Astros, LLC, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

461.    Defendant Houston Astros, LLC should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the Classes all unlawful, inequitable and unjust proceeds received and/or realized as a result of its wrongful conduct.

## NINTH CLAIM FOR RELIEF

## COMMON LAW FRAUD
### (Against Defendant Boston Red Sox Baseball Club, L.P.)

462.    Plaintiffs repeat and incorporate herein by reference the above allegations.

463.    At all times mentioned herein, defendant Red Sox, acting in partnership with DraftKings, promoted and helped market DraftKings' MLB DFS wagering competitions to the public, participated with DraftKings in inducing members of the public to engage in such competitions, and received financial remuneration from DraftKings for its promotion, marketing and participation in soliciting members of the public to engage in such competitions.

464.    At all times mentioned herein, defendant Red Sox knew that DraftKings' MLB DFS wagering competitions were predicated on MLB player performance statistics and that the fairness of the competitions depended on such data representing a fair statistical analysis of player ability and performance.

465.    Defendant Red Sox expressly represented when it agreed to the Major League Constitution that defendant Red Sox and its players would adhere to MLB's rules and regulations.

466.    Defendant Red Sox's General Manager, Field Manager and team players were aware that they were required to comply with MLB rules and regulations and represented and agreed that they would do so, including when they entered into their employment agreements with defendant Astros.

467.    Defendant Red Sox's impermissible electronic sign stealing was in knowing violation of MLB's rules and regulations.

468.     At all times mentioned herein, defendant Red Sox's, Field Manager, players and other employees were aware that their electronic sign stealing schemes were in violation of MLB's rules and regulations.

469.     At all times mentioned herein during the 2018 season, defendant Red Sox's highest-ranking field executive, Red Sox Field Manager Alex Cora, was aware of the Astros' impermissible electronic sign stealing schemes in violation of MLB rules and regulations; was aware of his obligation under MLB rules and regulations to put an end to the schemes, but did not do so; and was aware of his duty to disclose the schemes to MLB officials and the public, but did not do so.

470.     At all times mentioned herein, defendant Red Sox's Field Manager, players and other employees were aware that defendant Red Sox's impermissible electronic sign stealing provided Astros players with an unfair and impermissible hitting advantage that corrupted their player performance statistics and substantially and materially undermined the fairness of DraftKings' MLB DFS wagering competitions.

471.     Prior to September 2017 and in 2018, defendant Red Sox concealed its perpetration of electronic sign stealing from members of the public and falsely attributed defendant Red Sox's player performance success to legitimate performance ability and use of modern analytics.

472.     To that end, as set forth above, the Red Sox made repeated statements in 2017, 2018 and 2019 asserting that the team's players' performance success was the result of player talent or other legitimate baseball factors.

473.     The Red Sox's representations that the Red Sox's players' performance success was the result of player talent or other legitimate baseball factors were intended to cause the

public, including DraftKings' MLB DFS contestants, to believe that Red Sox's players were performing well for legitimate baseball reasons.

474.    The Red Sox's representations that the Red Sox's players' performance success was the result of player talent or other legitimate baseball factors were intended to conceal from the public, including from DraftKings' MLB DFS contestants in particular, that the Red Sox were engaging in electronic sign stealing in violation of MLB rules and regulations and that Red Sox's player performance success was the result of such cheating.

475.    The Red Sox's representations that Red Sox's players' performance success was the result of player talent or other legitimate baseball factors statements were false.

476.    Defendant Red Sox's players and other employees, including the team Field Manager, engaged in implementing, concealing and/or failing to terminate or prevent the electronic sign stealing schemes described herein were acting within the scope of their employment with defendant Red Sox.

477.    At all times mentioned herein, defendant Red Sox knew that members of the public would not engage in DraftKings' MLB DFS wagering competitions if they knew that defendant Red Sox's players were benefitting from electronic sign stealing, in violation of MLB rules and regulations, that corrupted Red Sox players' performance statistics and undermined the fairness of DraftKings' MLB DFS wagering competitions.

478.    At all times mentioned herein, defendant Red Sox's promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant Red Sox), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, including Red Sox's players performance statistics, and with the knowledge that

defendant Red Sox's impermissible electronic sign stealing in violation of MLB rules and regulations, was corrupting the accuracy of such statistics with respect to Red Sox's players and others MLB players competing against Red Sox's players, imposed a duty on defendant Red Sox's to disclose its knowledge of its impermissible electronic sign stealing and the resulting distorted player performance statistics.

479.    At all times mentioned herein prior to November 2019, defendant Red Sox intentionally concealed and did not disclose to the public material information about its players' electronic sign stealing misconduct.

480.    Defendant Red Sox intended, by its conduct described above, to deceive members of the public – including members of the public it was inducing to engage in DraftKings MLB DFS wagering competitions – into believing that defendant Red Sox's team and player success was the result of legitimate performance ability.

481.    Defendant Red Sox's concealment of its impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

482.    Defendant Red Sox's intentional failure to disclose material information to Plaintiffs and the Classes  engaging in DraftKings' MLB DFS wagering competitions (and the public) was in breach of its duty to provide the public with material information that members of the public, including Plaintiffs and the Classes, would reasonably and justifiably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

483.    As set forth above, during the time period relevant herein, MLB Commissioner Manfred made repeated public statements – in interviews, press releases and presentations to

state governments – representing that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and committing MLB to protecting the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair.

484.     Manfred's representations and commitments were made on behalf of and as the agent of defendant Red Sox, who authorized Manfred to speak on its behalf and knew of, approved and availed itself of his statements.

485.     Manfred's representations and commitments were intended to assure the public that Major League Baseball was honestly and fairly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

486.     Manfred's representations and commitments were intended to assure DraftKings' MLB DFS contestants that DraftKings' fantasy baseball competitions were honestly and fairly conducted.

487.     Manfred's representations and commitments had the effect of assuring the public in general, and DraftKings' MLB DFS contestants in particular, that Major League Baseball was fairly and honestly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

488.     Manfred's representations and commitments had the effect of assuring DraftKings' fantasy baseball contestants that DraftKings' MLB DFS contests were fairly and

honestly conducted and that MLB would not condone or knowingly allow any conduct by MLB teams or players that would compromise or corrupt the honesty and fairness of DraftKings' MLB DFS contests.

489.    Manfred's representations that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and his commitments that MLB would protect the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair, were false.

490.    Given Manfred's public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Red Sox about the basis and legitimacy of its players' performance, defendant Red Sox had a duty to disclose its knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

491.    Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Red Sox's intentional failure to disclose material information concerning its impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

492.    Plaintiffs and the Classes reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by defendant Red Sox and Manfred set forth herein, which were rendered false by defendant Red Sox's and Manfred's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corrupt of the MLB player performance statistic information material to such competitions..

493. Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Red Sox's material omissions and false representations, and would not have done so had they known of such omissions.

494. As a direct and proximate result of defendant Red Sox's fraudulent statements and conduct, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

## TENTH CLAIM FOR RELIEF

### VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
#### (M.G.L. CHAPTER 93A)
#### (Against Defendant Boston Red Sox Baseball Club, L.P.)

495. Plaintiffs repeat and incorporate by reference the above allegations herein.

496. Plaintiff Olson intends to assert a claim under the Massachusetts Consumer Protection Act (the "Massachusetts Act") against defendant Boston Red Sox Baseball Club, L.P. Plaintiff Olson previously provided a written demand for relief in accordance with M.G.L. c. 93A § 9(3). This Count provides notice to defendant Boston Red Sox of the prospective claim by Plaintiff Olson and the Massachusetts Subclass. Subject to the response, if any, by the Boston Red Sox within 30 days of the notice, Plaintiff Olson, on behalf of himself and the Massachusetts Subclass, shall amend the Complaint to include this Claim for Relief and demand all appropriate relief under the Massachusetts Act.

497. The Massachusetts Act prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." M.G.L. c. 93A § 2.

498. At all material times, defendant Boston Red Sox Baseball Club, L.P. has engaged in unfair and deceptive conduct that violated the Massachusetts Act.

499.    Any person who has suffered a loss as a result of a violation of the Massachusetts Act may bring an action based on defendant Boston Red Sox Baseball Club, L.P.'s unfair and/or deceptive acts or practices.

500.    Defendant Boston Red Sox Baseball Club, L.P. has been and is engaged in trade and commerce under the Massachusetts Act.  Boston Red Sox baseball is broadcast, advertised and promoted, and sales of merchandise take place in Massachusetts and throughout the United States; and professional baseball games in which the Boston Red Sox are involved are held in Massachusetts and in states throughout the United States.  In addition, daily fantasy sports participants who wager on contests that are and have been impacted by the performance and statistics of players in games involving the Boston Red Sox reside in Massachusetts and throughout the U.S.

501.    At all material times, the MLB Defendants have had an ownership interest in DraftKings, and have operated and promoted their partnership with DraftKings and DraftKings' MLB DFS contests.  In addition, defendant Boston Red Sox Baseball Club, L.P. has a partnership with DraftKings, and has promoted its partnership with DraftKings and has participated in soliciting participants in DraftKings' MLB DFS contests.

502.    At all material times, defendant Boston Red Sox Baseball Club, L.P. has realized substantial financial gain through the partnerships between MLB and DraftKings and between the Boston Red Sox and DraftKings, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

503.    Further, fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant Boston Red Sox Baseball Club, L.P.. Not only did defendant Boston Red Sox Baseball Club, L.P. have a financial interest in the fees paid to DraftKings by

baseball fantasy participants, and receive revenue from DraftKings' sponsorship and advertising, but increased fantasy baseball participation also significantly increased viewership, attendance, and general interest in Major League Baseball, including the Boston Red Sox, resulting in greater revenue for defendant Boston Red Sox Baseball Club, L.P. from broadcasting, advertising, attendance and the sale of merchandise and paraphernalia.

504.    Thus, it was and is in the interest of defendant Boston Red Sox Baseball Club, L.P. to heavily promote DraftKings and to provide DraftKings with sponsorship, advertising and promotional opportunities with the Boston Red Sox, which defendant Boston Red Sox Baseball Club, L.P. did at all material times, even while knowing that DraftKings' fantasy baseball contests were compromised and unfair as a result of the Boston Red Sox's misconduct.

505.    At the same time defendant Boston Red Sox Baseball Club, L.P. was promoting DraftKings and DraftKings' fantasy baseball contests, the Boston Red Sox were engaged in the electronic sign stealing in violation of the rules, regulations and directives of Major League Baseball, and which resulted in compromised and dishonest MLB player performance statistics, rendering the fantasy baseball contests in which Plaintiff and the Class participated corrupt and tainted.

506.    At all material times, defendant Boston Red Sox Baseball Club, L.P. knew or recklessly disregarded the fact that their electronic sign stealing misconduct resulted in compromised and dishonest player performance statistics.

507.    Further, defendant Boston Red Sox Baseball Club, L.P. affirmatively concealed and failed to disclose its electronic sign stealing misconduct even though defendant Boston Red Sox Baseball Club, L.P. knew that such misconduct compromised the honesty and fairness of the DraftKings' MLB DFS contests they were separately promoting.

508.     Defendant Boston Red Sox Baseball Club, L.P.'s conduct in promoting wagering on DraftKings MLB DFS contests with knowledge that their electronic sign stealing misconduct is compromising the honesty and integrity of those contests, and without taking reasonable steps to prevent or remedy its misconduct or disclose the compromised nature of the fantasy contests, as alleged herein, constitutes unfair, deceptive, misleading and/or false practices, all conduct which violates M.G.L. c. 93A *et seq*.

509.     At all times mentioned herein, defendant Red Sox's promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant Red Sox), with the knowledge that the fairness of such competitions was dependent on the accuracy of MLB player performance statistics, including Red Sox's players performance statistics, and with the knowledge that defendant Red Sox's impermissible electronic sign stealing in violation of MLB rules and regulations, was corrupting the accuracy of such statistics with respect to Red Sox's players and others MLB players competing against Red Sox's players, imposed a duty on defendant Red Sox's to disclose its knowledge of its impermissible electronic sign stealing and the resulting distorted player performance statistics.

510.     At all times mentioned herein prior to November 2019, defendant Red Sox intentionally concealed and did not disclose to the public material information about its players' electronic sign stealing misconduct.

511.     Defendant Red Sox intended, by its conduct described above, to deceive members of the public – including members of the public it was inducing to engage in DraftKings MLB DFS wagering competitions – into believing that defendant Red Sox's team and player success was the result of legitimate performance ability.

512.     Defendant Red Sox's concealment of its impermissible electronic sign stealing conduct created a fraud on the fantasy baseball participating public with respect to the player performance statistics relied upon by plaintiffs and other DraftKings' MLB DFS wagering contestants in entering into such contests.

513.     Defendant Red Sox's intentional failure to disclose material information to plaintiffs and other members of the public engaging in DraftKings' MLB DFS wagering competitions, was in breach of its duty to provide the public with material information that members of the public would reasonably rely upon in deciding whether or not to enter into DraftKings' MLB DFS wagering competitions.

514.     As set forth above, during the time period relevant herein, MLB Commissioner Manfred made repeated public statements – in interviews, press releases and presentations to state governments – representing that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and committing MLB to protecting the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair.

515.     Manfred's representations and commitments were made on behalf of and as the agent of defendant Red Sox, who authorized Manfred to speak on its behalf and knew of, approved and availed itself of his statements.

516.     Manfred's representations and commitments were intended to assure the public that Major League Baseball was honestly and fairly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

517. Manfred's representations and commitments were intended to assure DraftKings' MLB DFS contestants that DraftKings' fantasy baseball competitions were honestly and fairly conducted.

518. Manfred's representations and commitments had the effect of assuring the public in general, and DraftKings' MLB DFS contestants in particular, that Major League Baseball was fairly and honestly conducted, that MLB would diligently act to insure the continued honesty and fairness of baseball, and that MLB would take affirmative action to prevent any dishonest or unfair conduct by MLB teams or players and discipline any MLB teams or players engaging in dishonest or unfair conduct.

519. Manfred's representations and commitments had the effect of assuring DraftKings' fantasy baseball contestants that DraftKings' MLB DFS contests were fairly and honestly conducted and that MLB would not condone or knowingly allow any conduct by MLB teams or players that would compromise or corrupt the honesty and fairness of DraftKings' MLB DFS contests.

520. Manfred's representations that maintaining the integrity and honesty of the game of baseball was MLB's most important priority and his commitments that MLB would protect the integrity and honesty of the game of baseball, including in making sure that appropriate safeguards were in place to insure that fantasy baseball wagering competitions were fair, were false.

521. Given Manfred's public statements about ensuring the honesty and integrity of the game of baseball, and the honesty and fairness of DraftKings' MLB DFS wagering competitions, and the statements by the Red Sox about the basis and legitimacy of its players' performance,

defendant Red Sox had a duty to disclose its knowledge of such impermissible electronic sign stealing and the resulting distorted and corrupted player performance statistics.

522.     Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Red Sox's intentional failure to disclose material information concerning its impermissible electronic sign stealing and corruption of the MLB player performance statistic information material to such competitions.

523.     Plaintiffs and the Classes reasonably and justifiably relied in participating in DraftKings' MLB DFS wagering competitions on the false statements, representations and commitments by defendant Red Sox and Manfred set forth herein, which were rendered false by defendant Red Sox's and Manfred's intentional failure to disclose material information concerning MLB Clubs' and players' impermissible electronic sign stealing and corrupt of the MLB player performance statistic information material to such competitions..

524.     Plaintiffs and the Classes were induced to, and did, participate in DraftKings' MLB DFS wagering competitions by defendants Red Sox's material omissions and false representations, and would not have done so had they known of such omissions.

525.     As a result of its conduct, defendant Boston Red Sox Baseball Club, L.P. has engaged in unfair and deceptive acts or practices in violation of M.G.L. c. 93A *et seq*.

526.     Plaintiff Olson and the Massachusetts Subclass are consumers who paid for the fantasy baseball services provided by DraftKings that were compromised and rendered dishonest by defendant Boston Red Sox Baseball Club, L.P.'s unfair and deceptive acts or practices in violation of M.G.L. c. 93A *et seq*.

527.     As a direct, foreseeable and proximate result of the unfair and deceptive acts or practices by defendant Boston Red Sox Baseball Club, L.P. in violation of M.G.L. c. 93A *et seq.*,

Plaintiff Olson and the Massachusetts Subclass were injured – and continue to be injured – and have suffered ascertainable loss and damages, including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions.

528.    The wrongful conduct by defendant Boston Red Sox Baseball Club, L.P. was wanton, willful or in reckless disregard of the rights of Plaintiff Olson and the Massachusetts Subclass.

529.    By reason of the foregoing, Plaintiff Olson and the Massachusetts Subclass are entitled to all available damages and remedies available under M.G.L. c. 93A *et seq.*, including, without limitation, actual damages, statutory damages, injunctive or other equitable relief, costs and reasonable attorneys' fees.  Further, because defendant Boston Red Sox Baseball Club, L.P. acted willfully or knowingly, Plaintiff and the Class are entitled to recover up to three times their actual damages, or additional punitive or exemplary damages and attorneys' fees as applicable under the Massachusetts Act.

## ELEVENTH CLAIM FOR RELIEF

### NEGLIGENCE
**(Against Defendant Boston Red Sox Baseball Club, L.P.)**

530.    Plaintiffs repeat and incorporate herein by reference the above allegations.

531.    At all times mentioned herein, defendant Red Sox, acting in partnership with DraftKings, promoted and marketed DraftKings' MLB DFS wagering competitions to the public, participated with DraftKings in inducing members of the public to engage in such competitions, and received financial remuneration from DraftKings for its promotion, marketing and participation in soliciting members of the public to engage in such competitions.

532.    At all times mentioned herein, defendant Red Sox and defendant Red Sox's employees, including its General Manager, Field Manager, coaches and players knew or should

have known that DraftKings' MLB DFS wagering competitions were predicated on MLB player performance statistics and that the fairness of the competitions depended on the honesty of such statistics.

533. At all times mentioned herein, defendant Red Sox's executives and management, including Red Sox's Field Manager and General Manager were responsible for insuring that Red Sox's team players and other employees complied with MLB rules and regulations, including in particular MLB's regulation prohibiting electronic sign stealing.

534. At all times mentioned herein, defendant Red Sox's players, coach(es) and team employees engaging in electronic sign stealing knew or should have known that such conduct was in violation of MLB rules and regulations that they were required to comply with and provided Red Sox players with an unfair and impermissible hitting advantage.

535. At all times mentioned herein, no Red Sox players, coach(es) or other Club employees took proper action to prevent such electronic sign stealing misconduct.

536. At all times mentioned herein, defendant Red Sox, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that its impermissible electronic sign stealing, in violation of MLB rules and regulations, undermined the fairness of DraftKings' MLB DFS wagering competitions because, by providing Red Sox's hitters with an unfair hitting advantage, Red Sox's players' performance statistics, as well as the performance statistics of players opposing the Red Sox, were distorted and corrupted.

537. At all times mentioned herein, defendant Red Sox, its executives, General Manager, Field Manager, players, coaches and other Club employees concealed the team's perpetration of electronic sign stealing from members of the public and falsely attributed defendant Red Sox's player performance success to legitimate performance ability.

538.     At all times mentioned herein, defendant Red Sox, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that information that defendant Red Sox were engaging in electronic sign stealing, in violation of MLB rules and regulations, was highly material to DraftKings' MLB DFS wagering contestants.

539.     At all times mentioned herein, defendant Red Sox, its executives, General Manager, Field Manager, players, coaches and other Club employees knew or should have known that members of the public would not engage in DraftKings' MLB DFS wagering competitions if they knew that defendant Red Sox were engaging in electronic sign stealing, in violation of MLB rules and regulations, that corrupted Red Sox and other players' performance statistics and undermined the fairness of DraftKings' MLB DFS wagering competitions.

540.     Plaintiffs and the Classes would not have participated in DraftKings' MLB DFS wagering competitions had they known that defendant Red Sox was engaging in electronic sign stealing that corrupted the player performance statistics of Red Sox and opposing players.

541.     At all times mentioned herein, defendant Red Sox's promotion, marketing and participation in inducing members of the public to engage in DraftKings' MLB DFS wagering competitions (for and to the economic benefit of defendant Red Sox), imposed a duty on defendant Red Sox to (a) not engage in actions that would undermine the fairness of such competitions; (b) keep apprised of the conduct of subordinate employees to prevent them from engaging in actions that would undermine the fairness of such competitions; (c) properly supervise and direct the  conduct of subordinate employees to prevent them from engaging in actions that would undermine the fairness of such competitions; and (d) disclose to the fantasy baseball contestant public any knowledge that such competitions were unfair.

542. At all times mentioned herein, defendant Red Sox's employees, including its General Manager, Field Manager, coaches, players and other team employees, were acting within the scope of their employment by defendant Red Sox.

543. The actions and omissions of defendant Red Sox, and its employees, for whose conduct defendant Red Sox is liable, breached their duty to Plaintiffs and the Classes in one or more of the following respects:

   a. in that defendant Red Sox failed to require its employees to comply with MLB rules and regulations prohibiting electronic sign stealing;

   b. in that defendant Red Sox promoted, marketed and sought to induce fantasy baseball contestants to engage in DraftKings' MLB DFS contests while defendant Red Sox knew that the fairness of such contests was undermined by defendant Red Sox's electronic sign stealing misconduct;

   c. in that, to the extent that management employees of defendant Red Sox in a position to require compliance with MLB's electronic sign stealing prohibition and/or disclosure of such electronic sign stealing, were unaware of defendant Red Sox's employees' electronic sign stealing, such management employees failed to exercise proper control over the actions of their subordinate employees, failed to keep themselves properly informed about the actions of their subordinate employees, failed to properly investigate the actions of their subordinate employees, and failed to properly supervise and direct the actions of their subordinate employees;

   d. in that defendant Red Sox, although knowing that its electronic sign stealing was information highly material to the decision of potential fantasy baseball competition contestants to participate in DraftKings' MLB DFS contests, failed to disclose its electronic sign stealing;

   e. in that defendant Red Sox, although knowing that its electronic sign stealing was information highly material to the decision of potential fantasy baseball competition contestants to participate in DraftKings' MLB DFS contests, concealed its electronic sign stealing.

544. As a direct and proximate result of defendant Red Sox's negligent conduct as aforesaid, Plaintiffs and the Classes have suffered damages in an amount to be proven at trial.

# TWELFTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT
### (Against Defendant Boston Red Sox Baseball Club, L.P.)

545.     Plaintiffs repeat and incorporate herein by reference the above allegations.

546.     At all material times, defendant Boston Red Sox Baseball Club, L.P. has realized substantial financial gain from its agreement with DraftKings and promotion of and participation in DraftKings' MLB DFS contests, through revenue sharing from fantasy baseball contest entry fees, sponsorship, advertising and promotion.

547.     Fan participation in fantasy baseball contests directly resulted in increased financial benefit to defendant Boston Red Sox Baseball Club, L.P. based not only on the foregoing revenue streams, but also through increased revenue from broadcasting, attendance, advertising, and the sale of merchandise and paraphernalia.

548.     At all material times, defendant Boston Red Sox Baseball Club, L.P. promoted DraftKings and DraftKings' MLB DFS contests to obtain and enhance this financial gain.

549.     Further, at all material times, defendant Boston Red Sox Baseball Club, L.P. knew and did not disclose that it was engaged in electronic sign stealing in violation of MLB's rules and regulations (and directives), that resulted in compromised and dishonest player performance statistics that rendered DraftKings' fantasy baseball contests corrupt and tainted.

550.     Plaintiffs and the Classes conferred substantial monetary benefits on defendant Boston Red Sox Baseball Club, L.P. in the form of contest entry fees paid to participate in DraftKings' MLB DFS contests, and conferred additional substantial monetary benefits through broadcasting, attendance, advertising, and merchandise revenue.

551.     Defendant Boston Red Sox Baseball Club, L.P. further has received additional revenue from increased ticket prices and substantial added value to defendant's business by

135

virtue of its winning the 2018 World Series, all while wrongfully injuring Plaintiffs and the Classes.

552.    Defendant Boston Red Sox Baseball Club, L.P.'s conduct was knowing and intentional, and defendant Boston Red Sox Baseball Club, L.P. appreciated and had knowledge of the monetary benefits conferred upon them by Plaintiffs and the Classes.

553.    Under principles of equity and good conscience, defendant Boston Red Sox Baseball Club, L.P. should not be permitted to retain the foregoing monetary benefits it wrongfully obtained at the expense of Plaintiffs and the Classes.

554.    As a direct and proximate result of defendant Boston Red Sox Baseball Club, L.P.'s wrongful conduct, defendant Boston Red Sox Baseball Club, L.P. is are liable to Plaintiffs and the Classes for the amount of the monetary benefits conferred upon the defendant Boston Red Sox Baseball Club, L.P., including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

Defendant Boston Red Sox Baseball Club, L.P. should be compelled to disgorge into a common fund or constructive trust for the benefit of Plaintiffs and the Classes all unlawful, inequitable and unjust proceeds received and/or realized as a result of its wrongful conduct.

## PRAYER FOR RELIEF

A.    Certify this action and the Classes as requested herein, appoint Plaintiff as Class Representative, and appoint Plaintiff's attorneys as Class Counsel.

B.    Enter judgment against Defendants and in favor of Plaintiff and the Class on the claims for relief asserted herein.

C.    Award to Plaintiff and each member of the Class actual, compensatory, general and/or statutory damages in an amount to be determined at trial.

D. Award Plaintiff and the Class disgorgement and restitution of all ill-gotten gains, together with all proceeds, interest, income, profits, and accessions thereto as a result of Defendants' unlawful conduct.

E. Award Plaintiff and the Class exemplary and/or punitive damages, as allowed by law, in an amount to be determined at trial.

F. Award Plaintiff and the Class injunctive and/or other appropriate equitable relief pursuant to the state consumer protection acts cited herein.

G. Award Plaintiff and the Class attorneys' fees and costs, as allowed by law.

H. Award Plaintiff and the Class prejudgment and post-judgment interest, as allowed by law.

I. Award such other relief as the Court deems just and equitable.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38, Plaintiffs and the Classes demand trial by a jury on all issues so triable.

DATED: February 14, 2020              **SILVER GOLUB & TEITELL LLP**

By:    /s/ David S. Golub
       DAVID S. GOLUB
       dgolub@sgtlaw.com
       STEVEN L. BLOCH
       sbloch@sgtlaw.com
       IAN W. SLOSS
       isloss@sgtlaw.com
       184 Atlantic Street
       Stamford, CT 06901
       Tel. (203) 325-4491

John D. Radice
Kenneth Pickle
Natasha Fernandez-Silber
April Lambert
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
kpickle@radicelawfirm.com
nsilber@radicelawfirm.com
falambert@radicelawfirm.com

Eric L. Cramer
Patrick F. Madden
BERGER AND MONTAGUE
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
pmadden@bm.net

*Counsel for Plaintiffs and the
Proposed Class*

## <u>CERTIFICATION</u>

I hereby certify that on February 14, 2020, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

BY:   /s/ *David S. Golub*   
             David S. Golub