# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD, AND ERIK LIPTAK, individually and on behalf of all others similarly situated, | : <br> : <br> : <br> : <br> : | Case No. 1:20-cv-00632-JSR |
| Plaintiffs, | : <br> : | |
| v. | : <br> : | |
| MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, L.P., | : <br> : <br> : <br> : <br> : | |
| Defendants. | : <br> : | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS MAJOR LEAGUE BASEBALL AND MLB ADVANCED MEDIA, L.P.'S MOTION TO DISMISS

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

GLOSSARY OF DEFINED TERMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

I.     PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    SUMMARY OF PLAINTIFFS' ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . 3

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       A.    MLB Defendants Entered into a Joint-Venture With DraftKings and
             Are Liable to Consumers Injured by Their Fraudulent, Unfair, and
             Deceptive Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

       B.    MLB Defendants Are Liable Even Absent a Direct Contractual
             Relationship or Other Form of Privity with MLB DFS Contestants . . . . . . . . . 10

             1.    Fraudulent Non-Disclosure  (First Claim for Relief) . . . . . . . . . . . . . . . 11

             2.    State Consumer Protection Acts  (Second Claim for Relief) . . . . . . . . . 13

             3.    Negligent Misrepresentation  (Third Claim for Relief) . . . . . . . . . . . . . 14

             4.    Unjust Enrichment  (Fourth Claim for Relief) . . . . . . . . . . . . . . . . . . 16

       C.    Plaintiffs' Complaint Alleges Actionable Deception . . . . . . . . . . . . . . . . . . 16

       D.    Plaintiffs Allege a Legally Cognizable Injury . . . . . . . . . . . . . . . . . . . . . . . 22

             1.    Plaintiffs Have Alleged that they Suffered Loss from their
                   Participation in DraftKings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

             2.    Plaintiff Have Alleged a Causal Nexus . . . . . . . . . . . . . . . . . . . . . . . 22

       E.    Plaintiffs' Common Law Claims Against MLB Are Not Barred . . . . . . . . . . . . 23

       F.    Plaintiffs' Unjust Enrichment Claims Are Not Barred . . . . . . . . . . . . . . . . . . 24

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

Cases                                                                                          Page

*14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*,
 43 So.3d 877 (Fla. Dist. Ct. App. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Alper Restaurant, Inc. v. Catamount Devel. Corp.*,
 29 N.Y.S.3d 604 (App. Div. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Backus v. Apishapa Land & Cattle Co.*,
 615 P.2d 42 (Colo. App. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Backus v. General Mills, Inc.*,
 122 F. Supp.3d 909 (N.D. Cal. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Baptist Hosp. of Miami, Inc. v. Medica Health Plans, Inc.*,
 385 F. Supp.3d 1289 (S.D. Fla. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Berger v. Sec. Pac. Info. Sys., Inc.*,
 795 P.2d 1380 (Colo. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
 506 F. App'x 32 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bruton v. Gerber Prod. Co.*,
 703 F. App'x 468 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cattie v. Wal-Mart Stores, Inc.*,
 504 F.Supp.2d 939 (S.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cheng v. Sonoco Inc.*,
 Civ. No. 09-40041-FDS, 2010 WL 5437235 (D. Mass. Dec. 22, 2010) . . . . . . . . . . 18, 20

*City of Pontiac Policemen & Firemen's Retirement Sys. v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*CMS Inv. Holdings, LLC v. Wilson-Harvey*,
 No. 2014CV031093, 2015 WL 9998040 (Colo. Dist. Ct. Dec. 01, 2015) . . . . . . . . . . . 18

*Collins v. eMachines, Inc.*,
 134 Cal. Rptr. 588 (Ct. App. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cook Consultants, Inc. v. Larson*,
    700 S.W.2d 231 (Tex. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*D&M Jupiter, Inc. v. Friedopfer*,
    853 So.2d 485 (Fla. Dist. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*DCV Const. Co. v. Cent. City Dev. Co.*,
    965 P.2d 115 (Colo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Estrada v. Progressive Direct Ins. Co.*,
    53 F.Supp.3d 484 (D. Mass. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Exxon Mobil Corporation v. Attorney General*,
    94 N.E.3d 786 (Mass. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Exxon Corp. v. Emerald Oil & Gas Co., L.P.*,
    348 S.W.3d 194 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*First State Sav. Bank v. Albright & Assocs. of Ocala, Inc.*,
    561 So. 2d 1326 (Fla. Dist. Ct. App. 1990), rev. den., 576 So.2d 284 (Fla. 1990) . . . . . 15

*Flenniken v. Longview Bank and Trust Co.*,
    661 S.W.2d 705 (Tex. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Galstaldi v. Sunvest Communities USA, LLC*,
    637 F. Supp.2d 1045 (S.D. Fla. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Golber v. Baybank Valley Trust Company*,
    704 N.E.2d 1191 (Mass. Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Gramercy Equities Corp. v. Dumont*,
    531 N.E.2d 629 (N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Greenwald v. Chase Manhattan Mortgage Corp.*,
    241 F.3d 76 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gutter v. Wunker*,
    631 So. 2d 1117 (Fla. Dist. Ct. App.  1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Hall v. Walter*,
   969 P.2d 224 (Colo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Hoggett v. Brown,
   971 S.W.2d 472 (Tex. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In CLC Roofing, Inc. v. Helzer*,
   No. 02-17-00229-CV, 2019 WL 3024483 (Tex. App. July 11, 2019) . . . . . . . . . . . . . 11

*J.P. Morgan Sec., LLC v. Geveran Inv. Limited*,
   224 So. 3d 316 (Fla. Dist. Ct. App. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kasky v. Nike, Inc.*,
   *45 P.3d 243 (Cal. 2003)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kattar v. Demoulas*,
   739 N.E.2d 246 (Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Knight v. International Harvester Credit Corp.*,
   627 S.W.2d 382 (Tex.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Kossian v. Am. Nat. Ins. Co.*,
   62 Cal. Rptr. 225 (Ct. App. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Krueger v. Wyeth, Inc.*,
   396 F. Supp.3d 931 (S.D. Cal. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Langan v. Johnson & Johnson Consumer Companies, Inc.*,
   897 F.3d 88 (2d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Lass v. Bank of America, N.A.*,
   695 F.3d 129 (1st Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Lovejoy v. AT&T Corp.*,
   111 Cal. Rptr. 2d 711 (Ct. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Makaeff v. Trump University, LLC*,
   145 F.Supp.3d 962 (S.D.Ca. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

iv

*Marshall v. Kusch*,
    84 S.W.3d 781 (Tex. App. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Martin v. Curran*,
    101 N.E.2d 683 (N.Y. 1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Massachusetts v. Mylan Labs.*,
    357 F. Supp. 2d 314 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mayer v. Belichek*,
    605 F.3d 205 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10

*Morgan v. AT & T Wireless Servs., Inc.*,
    99 Cal. Rptr.3d 768 (Ct. App. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nota Construction Corp. v. Keyes Assocs., Inc.*,
    694 N.E.2d 401 (Mass. App. Ct. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 15

*NuVasive, Inc. v. Renaissance Surgical Center North, L.P.*,
    853 F. Supp. 2d 654 (S.D. Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Oxina v. Land's End, Inc.*,
    2015 WL 4272058 (S.D. Ca. June 19, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Pepi Corp. v. Galliford*,
    254 S.W.3d 457 (Tex. App. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*PNR Inc. v. Beacon Property Mgmt., Inc.*,
    842 So.2d 773 (Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reisman v. KPMG Peat Marwick LLP*,
    57 Mass. App. Ct. 100 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Robinson v. Colorado State Lottery Div.*,
    179 P.3d 998 (Colo. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Robinson Helicopter Co., Inc. v. Dana Corp.*,
    102 P.3d 268 (Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rotello v. Ring Around Products, Inc.*,
    614 S.W.2d 455 (Tex. App. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Russell v. Sherman Williams Co.*,
    767 So.2d 592 (Fla. Dist. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Soderberg v. McKinney*,
    52 Cal. Rptr. 2d 635 (Ct. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Speakman v. Allmerica Finan. Life Ins.*,
    367 F. Supp.2d 122 (D. Mass 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wells v John Hancock Mutual Life Ins. Co.*,
    149 Cal. Rptr. 171 (Ct. App. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Williams v. Facebook, Inc.*,
    384 F.Supp.3d 1043 (N.D. Cal. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wilson v. EverBank, N.A.*,
    77 F. Supp.3d 1202 (S.D. Fla. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wolther v. Schaarschmidt*,
    738 P.2d 25 (Colo. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

STATUTES/OTHER AUTHORITIES:

Cal. Civ. Code §1782 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

California Unfair Competition Law, Cal Bus. & Prof. Code § 17200 et seq. . . . . . . . . . 14, 19, 20

Colorado Consumer Protection Act, Colo. Rev. Stats. § 6-1-101 et seq. . . . . . . . . . . . . . . . . . 14

Fed. R. Civ. P., Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

Fed. R. Civ. P., Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. . . . . . . . . . . . . . 14

Massachusetts Consumer Protection Act, M.G.L. Chapter 93A . . . . . . . . . . . . . . . . . . . 13, 14, 19

Restatement (Second) of Torts, § 531 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Restatement (Second) of Torts, § 551 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Restatement (Second) of Torts, § 552 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 et seq. . . . . . . . . . . 14, 20

## GLOSSARY OF DEFINED TERMS

**Parties**

| | |
|---|---|
| Astros | Houston Astros, LLC |
| Defendants | Boston Red Sox Baseball Club, L.P., Houston Astros, LLC, Major League Baseball, and MLB Advanced Media, L.P., collectively. |
| MLB | Major League Baseball |
| MLBAM | MLB Advanced Media, L.P. |
| MLB Defendants | Major League Baseball and MLB Advanced Media, L.P. |
| Plaintiffs | Named Plaintiffs Kristopher Olson, Christopher Lopez, Warren Barber, Christopher Clifford, and Erik Liptak, collectively. |
| Red Sox | Boston Red Sox Baseball Club, L.P. |

**Terms**

| | |
|---|---|
| DraftKings | DraftKings, Inc. |
| DFS | Daily fantasy sports contests |
| Electronic Sign Stealing | The use of electronic devices, particularly video cameras in MLB Club replay rooms, to view, decipher or communicate information concerning a catcher's signals. |
| MLB DFS | DraftKings' and Major League Baseball's "DraftKings Major League Baseball Daily Fantasy Sports" contests. |

**Filings**

| | |
|---|---|
| AC | Amended Complaint (ECF No. 20) |
| Astros Br. | Defendants Houston Astros, LLC's Memorandum of Law in Support of its Motions to Dismiss (ECF No. 37) |
| Astros Opp. Brief | Plaintiffs' Memorandum in Opposition to Defendant Houston Astros, LLC's Motion to Dismiss |
| Golub Dec. | Declaration of David S. Golub (ECF No.43) |
| Hardiman Dec. | Declaration of John Hardiman (ECF No. 29) |
| MLB Br. | Defendants Major League Baseball and MLB Advanced Media LP's Memorandum of Law in Support of Their Motion to Dismiss (ECF No. 28) |
| Moskowitz Dec. | Declaration of Lauren Moskowitz (ECF No. 32) |

**Filings (cont.)**

Sox Br.                Defendant Boston Red Sox Baseball Club, L.P.'s Memorandum of Law in
                       Support of its Motion to Dismiss (ECF No. 31)

Sox Opp. Brief         Plaintiffs' Memorandum in Opposition to Defendant Boston Red Sox
                       Baseball Club, L.P.'s Motion to Dismiss

**Statutes**

CCPA                   Colorado Consumer Protection Act, Colo. Rev. Stats. § 6-1-101 *et seq.*

CLRA                   California Consumer Legal Remedies Act, Cal Civil. Code § 1750 *et seq.*

FDUPTA                 Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et
                       seq.*

MCPA                   Massachusetts Consumer Protection Act, M.G.L. Chapter 93A

TDTPA                  Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41 *et
                       seq.*

UCL                    California Unfair Competition Law, Cal Bus. & Prof. Code § 17200 *et seq.*

## I.   PRELIMINARY STATEMENT

MLB Defendants' Motion to Dismiss virtually ignores the gravamen of Plaintiffs' claims in this action.

During the 2017-2019 MLB seasons, MLB Defendants marketed, promoted and induced consumers to pay to engage in MLB DFS contests, and reaped millions of dollars in entry fees and other revenue, knowing—and concealing—that the competitions were based on misleading statistical information. As a result of MLB Defendants' conduct, Plaintiffs (and the proposed Classes) suffered hundreds of millions of dollars of harm in lost entry fees.  Plaintiffs allege that, as with other wrongdoing that causes consumer injury, MLB Defendants are accountable for their conduct pursuant to established remedies provided by statutory consumer protection laws prohibiting unfair and deceptive trade practices and common law protections against fraud/fraudulent non-disclosure, negligence/negligent misrepresentation and unjust enrichment.

MLB Defendants promoted fantasy baseball as "a game of skill," and not gambling or chance:

> "I'm quite convinced it is a game of skill, as defined by the federal statute," [MLB Commissioner Robert] Manfred said. "And I'm comfortable with the idea that it's not gambling.
>
> "There's a huge difference between Rob Manfred, citizen, betting on whether Kansas City beats Toronto or whomever on the one hand, and Rob Manfred picking nine guys on 18 teams to try to see if he can accumulate more points within a given set of guidelines than a hundred guys trying to do the same thing."
> ....
> "Fantasy is not gambling, in my view."[1]

MLB DFS contestants pay entry fees to employ their skill at selecting real life MLB players for "fantasy teams" that compete against other contestants' teams for cash prizes. The contests are based on MLB player performance statistics, and the fairness of the contests

---

[1] *See* AC ¶ 7 (quoted in Exs. 4 & 5 of Hardiman Dec.).

necessarily depends on the legitimacy and reliability of those statistics. As with any game of skill (or, for that matter, any consumer transaction), contestants would not have paid to participate if they knew that information critical to the competition was compromised and unreliable. Plaintiffs allege that Defendants concealed that the MLB player statistics on which the contests were based were an illegitimate and unreliable measure of player performance, undermining the ability of consumers to make informed and accurate decisions about which players to draft, how to wager, and which contests to play. And Defendants did so despite MLB leadership's repeated representation not only that MLB would diligently protect the integrity of baseball, but further that it would safeguard the fairness of MLB DFS contests.

MLB Defendants argue that Plaintiffs are unable to state a viable legal theory for two principal reasons: *First*, citing to cases rejecting claims by disgruntled ticketholders, Defendants contend that plaintiffs have no cognizable right to sue for any misconduct arising out of the MLB DFS transactions. The ticketholder cases are plainly inapposite. These cases are based on the legal principle that a ticketholder "possesse[s] nothing more than a contractual right to a seat from which to watch a ... game," and that a league or team fulfills all of its legal obligations to its ticketholders by providing entry and a seat to the game. *Mayer v. Belichek*, 605 F.3d 205, 230 (3d Cir. 2010). But nothing in these cases limits the legal obligations of sports leagues or teams in their other commercial endeavors. MLB Defendants cannot simply disclaim duty (and liability) when they vouched for the fairness and credibility of the MLB DFS contests, and promoted and induced participation in the contests as games of skill, but then concealed that the basis for the contests – MLB statistics – were illegitimate and unreliable, corrupting the contests and nullifying the skills required to engage in these contests.

2

*Second*, MLB Defendants contend that the MLB DFS contests were operated solely by DraftKings and that MLB Defendants had "no relevant legal relationship" with Plaintiffs. MLB Defendants do not acknowledge or address their extensive promotion, marketing and financial benefit from the contests. Plaintiffs allege that MLB Defendants (a) acquired a substantial equity stake in DraftKings and formed a "comprehensive partnership" with DraftKings to promote MLB DFS; (b) actively promoted, marketed and induced consumers to enter into "co-branded" transactions marketed with MLB's trademark (as "Major League Baseball Daily Fantasy Sports"), and designated as MLB's "Official Fantasy Baseball Game;" and (c) shared in the multi-million dollar entry fees generated by the transactions. At a minimum, as joint venturers with DraftKings, MLB Defendants are subject to liability for their wrongful conduct.

Equally important, the legal premise of MLB Defendants' second argument is erroneous. Plaintiffs' claims under consumer protection acts and the common law of fraudulent non-disclosure and negligent misrepresentation do not require privity or a direct contractual relationship, and unjust enrichment is based on the *absence* of any contract between the parties. Even assuming they had no direct or formal legal relationship with Plaintiffs, they are still liable for their conduct.

## II.   SUMMARY OF PLAINTIFFS' ALLEGATIONS

In 2013 and 2015, MLBAM (a limited partnership owned by MLB's member Clubs) acquired equity stakes in DraftKings (AC ¶¶ 35-36) and, in 2015, MLB entered into a "comprehensive league partnership" with DraftKings to promote, market and induce consumer participation in MLB DFS contests under the MLB trademark, "Major League Baseball Daily Fantasy Sports," and designated as MLB's "Official Daily Fantasy Game." (*Id.*). Twenty-seven of MLB's 30 member Clubs, including the Astros and the Red Sox, entered into discrete

agreements with DraftKings to promote and market MLB DFS contests, including through co-branded in-stadium promotions. MLB executives stated that the partnership with DraftKings would enable MLB "to reap meaningful benefit from the rise of daily fantasy." (AC ¶ 37).

During the 2017-19 seasons, MLB Defendants actively participated in promoting and marketing MLB DFS contests, causing consumers to pay hundreds of millions of dollars of MLB DFS entry fees each baseball season, generating tens, if not hundreds, of millions of dollars of annual net revenue.  MLB Defendants shared in these MLB DFS entry fees. (AC ¶ 5).

MLB Defendants expressly promoted MLB DFS as a game of skill. (*See* AC ¶¶ 7, 38-41). MLB DFS contestants use skill to conduct a "salary draft" to select their fantasy teams of real-life players to compete against lineups of players selected by other contestants, in head-to-head or multi-thousand contestant match-ups. (AC ¶¶ 31-33). Contestants receive points based on the real-life performance of their hitters and pitchers (*e.g.*, home runs, hits, batting average, strike outs, earned run average), and the contestants whose teams generate the most points win a cash prize. (*Id.*). Since the points are tied directly to real-life performance metrics, a contestant's final ranking in each contest, and pecuniary gain or loss, is wholly dependent on player performance (and not affected by the actual outcome of any MLB game). (*Id.*).

Because the selection of players and the outcome of the contests are dependent on MLB player performance statistics, the fairness of the contests depends on the reliability and integrity of such statistics. MLB Defendants have, at all times, been aware that, as with any game of skill, consumers would not pay to participate in MLB DFS contests if they believed the contests were not fairly conducted and, in particular, would not pay to participate if they knew that the MLB player performance statistics were corrupted and unreliable. (AC ¶ 61).

4

Pursuant to the Major League Constitution agreed to by all of MLB's member Clubs, Commissioner Manfred is authorized to speak and act for the Clubs in all matters relating to the integrity and honesty of baseball games, and MLB's member Clubs have expressly ratified and approved his conduct and statements in such regard. (AC ¶¶ 43-47; *see* Hardiman Dec., Ex 1, (Major League Constitution) Art. II, § 4). Manfred also was authorized to speak and act for MLBAM, MLB's partner and joint venturer in dealings with DraftKings and promoting MLB DFS contests. (AC ¶¶ 38-39). Through Manfred, MLB Defendants have long represented to the public (including MLB DFS consumers) that MLB diligently enforces its Official Rules to ensure the honesty and integrity of the game, MLB's "most important priority." (AC ¶ 2, 51).

In 2015, when issues arose concerning the fairness of MLB DFS contests, Manfred sought to reassure MLB DFS consumers that MLB would take steps to safeguard the fairness of such contests:

> I think the biggest concern is the one that attracted the most publicity. You want to make sure that the fantasy organizations have appropriate safeguards in place to ensure that things are fair, that there's not an inappropriate use of information and that fans who engage on these platforms have an opportunity to win. (AC ¶ 39).

MLB further issued a public statement informing consumers that it had "reached out and discussed this matter with [DraftKings]." Manfred has also repeatedly reassured the public, including MLB DFS consumers, that, with the advent of laws allowing wagering on baseball, MLB would exercise care to maintain the integrity of baseball:

> The challenge for us is to make sure … those laws develop in a way where can protect the integrity of the sport. We want to be careful our product retains a pristine quality. (AC ¶ 41).

> It's having in place a set of policies for the industry that give us comfort on what is always our most important issue – that is integrity. (AC ¶ 40).

> We will never delegate responsibility for those integrity issues … We have our own expertise and no one is more motivated than the commissioner's office of baseball to make sure there is no threat to the integrity of our sport. (AC ¶ 52).

MLB has repeated these (and similar) statements to state legislatures considering sports gambling legislation, contending that MLB is entitled to an "integrity fee" to compensate MLB for its ongoing commitment to self-policing the MLB and insuring the integrity of the game of baseball as only MLB is best motivated and best able to do. (AC ¶ 52).

At all relevant times, MLB's rules and regulations prohibited electronic sign stealing. (AC ¶ 54). As MLB and its member Clubs were (and are) aware, electronic sign stealing substantially affects the honesty and fairness of player performance because a pitcher's ability to conceal the type of pitch being thrown (*e.g.*, its speed, movement, and/or location) is critical to the pitcher's success. (AC ¶ 57). A team that can steal the catcher's signs and alert its hitters about upcoming pitches has a substantial advantage, dramatically improving the batter's results. As one MLB pitcher has tweeted, "I would rather face a player that was taking steroids than face a player that knew every pitch that was coming." (*Id.*).

During the 2017-19 baseball seasons, team officials and players on the Astros, Red Sox and likely other MLB teams engaged in electronic sign stealing, in intentional violation of MLB rules. The Clubs' electronic sign stealing, especially by the Astros, was well known to other member Clubs, including team officials, scouts and players, and was reported to MLB's Office of the Commissioner on numerous occasions in 2017-2019. (AC ¶ 114).

MLB and its member Clubs were aware that if the electronic sign stealing by Clubs became public, there would be adverse fan and media reaction, and adverse financial effects on attendance, advertising and broadcast revenue. (AC ¶ 69). To avoid these adverse consequences, Manfred, with the acquiescence and approval of all of MLB's Clubs, determined to take no action to stop the Astros' or other Clubs' significant electronic sign stealing, deciding that avoiding the detrimental consequences that would result from the public disclosure outweighed

maintaining the honesty and integrity of baseball.  (*Id.*) In August 2018, for example, MLB took no action when the Oakland Athletics complained to the Commissioner that the Astros were engaged in electronic sign stealing. (AC ¶ 68). In October 2018, when another team's complaint about the Astros became public, Manfred falsely stated that MLB had conducted a "thorough investigation" of the Astros' conduct and had found no wrongdoing. Astros officials and players also made repeated false statements to conceal the team's electronic sign stealing. (*See* AC ¶¶ 96-100). During the 2018 season, the Red Sox also engaged in electronic sign stealing in violation of MLB rules and regulations (AC ¶¶ 107-08), and team officials and players made repeated false statements to conceal the team's conduct. (AC ¶ 111).

Manfred's representations that maintaining the integrity of baseball was MLB's "most important priority" and that MLB would make sure that safeguards were in place to ensure the fairness of DraftKings' contests were false. (AC ¶ 175). In fact, Manfred and MLB's member Clubs placed their desire to protect their financial interests from the adverse publicity and financial detriments that would result from disclosure of member Club electronic sign stealing above maintaining the integrity of the game and, thus, did not act to terminate or disclose member Club electronic sign stealing. (AC ¶¶ 176, 177, 189, 190, 191).

Rather, Manfred and MLB's member Clubs concealed the electronic sign stealing by the Astros and other Clubs, even though they knew that it compromised and corrupted MLB DFS competitions, in order, *inter alia*, to protect their financial interests and investment in DraftKings. (AC ¶¶ 198, 202). Manfred and MLB's member Clubs were aware that consumers were relying on their false statements and were being misled by their omissions in deciding to play MLB DFS and would not do so if they knew of the electronic sign stealing corrupting player performance statistics upon which the fairness of the contests depended. (AC ¶ 202).

MLB Defendants intended to deceive Plaintiffs that the MLB DFS competitions were based on fair and legitimate player performance statistics. (AC ¶¶ 171, 205). Plaintiffs reasonably and justifiably relied on Manfred's false representations and omissions and were induced to pay to play MLB DFS. (AC ¶¶ 209, 211).

Plaintiffs paid to compete in MLB DFS contests in 2017-2019. (AC ¶ 121, 125 129, 133, 137). They did not know of the Astros' electronic sign stealing during those seasons or of the Red Sox's electronic sign stealing during the 2018 season and would not have paid to participate in the contests had they known of the conduct. (AC ¶ 122-24, 126-28, 130-32, 134-36,138-40). As a result, Plaintiffs each lost significant amounts of money. (AC ¶ 161, 211).

## III.   ARGUMENT

### A.   MLB Defendants Entered into a Joint-Venture With DraftKings and Are Liable to Consumers Injured by Their Fraudulent, Unfair, and Deceptive Conduct.

MLB Defendants disclaim any "direct connection" with Plaintiffs and, on that basis, disavow any purported duty to them. MLB Defendants have actively engaged with DraftKings in co-marketing and co-promoting MLB DFS contests, have publicly lauded their "comprehensive partnership agreement" with DraftKings, and the MLB DFS contests have featured MLB's trademarked name and described the contests as MLB's "Official Daily Fantasy Game." On these facts, MLB Defendants were, at a minimum, joint venturers with DraftKings, and are, as a result, liable to Plaintiffs (and the Classes) for their wrongful conduct in connection with the MLB DFS transactions.

"A joint venture is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill and knowledge ....The essential elements of a joint venture are an agreement manifesting the intent of the parties to be associated as joint venturers, a contribution by the coventurers to the joint

8

undertaking (*i.e.*, a combination of property, financial resources, effort, skill or knowledge), some degree of joint proprietorship and control over the enterprise; and a provision for the sharing of profits and losses." *Alper Restaurant, Inc. v. Catamount Devel. Corp.*, 29 N.Y.S.3d 604, 606 (App. Div. 2016).   A joint venturer is directly liable for fraud it commits on third parties without the knowledge of its co-venturer.   *Gramercy Equities Corp. v. Dumont*, 531 N.E.2d 629, 633 (N.Y. 1988). And, a joint venturer has "liability under a contract … in the absence of privity where it is established that the defendant is in a joint venture or partnership with a signatory to the contract. *Alper Restaurant*, 29 N.Y.S.3d at 606.

MLB Defendants' relationship with DraftKings clearly satisfies the elements of a joint venture. *First*, MLB Defendants shared in the profits of their joint venture with DraftKings by receiving a share of the entry fees collected from MLB DFS participants and profiting from the increased valuation of MLB Defendants' part-ownership of DraftKings. (AC ¶ 3, 5). *Second*, MLB Defendants had control over key aspects of the joint-venture. They controlled, and gave DraftKings access to, their intellectual property, including their websites, trademarks and logos, and venues (AC ¶ 36), and had input over the safeguards in place to ensure the integrity of the MLB DFS contests.(AC ¶ 38). *Third*, the MLB Defendants contributed capital (in exchange for equity), property and promotional expertise to the venture. (AC ¶¶ 35, 37). *Fourth*, MLB Defendants publicly described their relationship with DraftKings in terms consistent with a joint venture and co-branded the product the venture was marketing. (AC ¶ 36).

Notwithstanding the above, MLB Defendants attempt to re-cast themselves as passive investors in DraftKings who did nothing more than enter into "sponsorship agreements" from time-to-time. (MLB Br. 16). It is not plausible that a league comprising teams collectively worth tens of billions of dollars entered into a binding agreement with a one-year old startup,

committed millions of dollars of capital to it, gave it access to their intellectual property and venues, committed MLB's name and reputation to the venture, and exercised *no* oversight in return. And that is now what plaintiffs allege.[2]

Relying on cases rejecting claims by "disgruntled" ticketholders who possessed nothing more than "a contractual right to a seat from which to watch a … game," (*Belichek*, 605 F.3d at 230), MLB Defendants contend that they have satisfied any purported duty to Plaintiffs who have suffered no "legally cognizable" injury against them. MLB Defendants' argument exposes their refusal to acknowledge the basis of Plaintiffs' claims. Plaintiff are not suing as ticketholders or because they are disappointed with the outcome of any game (or how it was played). Rather, the actionable wrong at the heart of Plaintiffs' claims is MLB Defendants' promotion of MLB DFS contests, based on and requiring honest and reliable MLB statistics that MLB Defendants knew, and failed to disclose, were distorted by electronic sign stealing conduct, irreparably corrupting those contests. The ticketholder cases do not address, and are inapplicable to determining, MLB Defendants' liability for misconduct in their MLB DFS venture.[3]

### B. MLB Defendants Are Liable Even Absent a Direct Contractual Relationship or Other Form of Privity with MLB DFS Contestants.

Even if, as MLB Defendants assert, they had no direct contractual relationship or other form of privity with Plaintiffs, MLB Defendants are still liable. The law (wholly unaddressed by MLB Defendants) is well-established that a contractual relationship or other form of privity is not a required element of Plaintiffs' claims.

---

[2] MLB Defendants assert that if their relationship with DraftKings supports Plaintiffs' claims, then MLB Defendants "are entitled to enforce the DraftKings arbitration agreement" against plaintiffs, and purport to reserve their right to do so. (MLB Br. 15-16, n. 11). In fact, DraftKings has rescinded the arbitration provisions in its terms of service. *See Terms of Use*, DraftKings (Jan. 9, 2020), https://www.draftkings.com/help/terms (accessed Mar. 3, 2020).

[3] Plaintiffs address the "disgruntled ticketholder" cases more fully in Sox Opp. Br. 12-14 & Astros Opp. Br. 2-7.

1.  Fraudulent Non-Disclosure (First Claim for Relief)

The principal basis of Plaintiffs' claim of fraud is MLB Defendants' failure to disclose that the statistics on which the MLB DFS contests were based were illegitimate and unreliable, corrupting the contests and undermining contestants' exercise of skill in engaging in the contests. MLB Defendants nowhere address the substance of this claim, contending they had no duty of disclosure to MLB DFS contestants.  MLB Defendants' contention is misguided – and wrong. Restatement (Second) of Torts, § 551 sets forth the black-letter law imposing liability for fraudulent non-disclosure on a party involved in a business transaction, irrespective of contract or privity with a plaintiff. Section 551, which has been adopted (or followed) in each of plaintiff's States,[4] provides, in relevant part:

> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to exercise reasonable care to disclose the matter in question.
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> …
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
> …
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the

---

[4] *See, e.g., Nota Construction Corp. v. Keyes Assocs., Inc.*, 694 N.E.2d 401, 404-05 (Mass. App. Ct. 1998)*; Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App. 1994); *Wells v John Hancock Mutual Life Ins. Co.*, 149 Cal. Rptr. 171, 175 & n. 8 (Ct. App. 1978); *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. App. 1995); *see In CLC Roofing, Inc. v. Helzer*, No. 02-17-00229-CV, 2019 WL 3024483, at *3 (Tex. App. July 11, 2019) ("the duty to disclose information in a commercial setting is derived from [§ 551]"and recognizing application of § 551(2)(b)(c) & (e) to fraudulent non-disclosure claims).

relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Courts have applied § 551(2)(e) to hold parties indirectly involved in a transaction (without privity) liable for failing to disclose "facts basic to the transaction." *See Nota Construction*, 694 N.E.2d at 404-05 (architect had duty to disclose information about property to subcontractor bidding on municipal school construction project, where although architect not in privity with subcontractor, it "knew or should have known that potential bidders on the project would indeed rely on the plans and specifications for preparation of their bids" and undisclosed facts were basic to the subcontractor's bid); *Gutter*, 631 So.2d at 1118 (attorneys receiving finder's fee for helping promoter secure investors were liable for failing to disclose to investors facts material to the investment); *Wells*, 149 Cal. Rptr. 175 & n. 8 (life insurance company had duty to notify insured's creditor accepting the policy as security for a debt that the policy lapsed).

There can be no question here, where the MLB DFS contests undeniably depended upon the reliability of the underlying MLB player performance statistics, that the corruption of those statistics was a "fact basic to the transaction" that MLB Defendants were required to disclose. *See Restatement*, § 551(2)(e), comment j (a basic fact is one "that goes to the basis or essence of the transaction, and is an important part of the substance of what is bargained for or dealt with"). The facts MLB Defendants withheld were material to the ability of consumers to make informed and accurate decisions about which players to draft, how to wager, and which contests to play. The undisclosed information involved facts within MLB Defendants' exclusive possession, that Plaintiffs and the Classes had no means to discover, and which MLB Defendants understood affected consumers' decisions whether or not to engage in the MLB DFS transactions.

Moreover, under § 551(2)(b), a party has a duty to make disclosure of matters that he knows to be necessary to prevent his prior partial or ambiguous statements of the facts from

being misleading; and under § 551(2)(c), a party who subsequently acquires information that he knows will make untrue or misleading a previous representation has a duty to disclose the new information even though the party may have believed his prior statements were true when made.[5] Both of these subsections of § 551(2) imposed obligations to disclose on MLB Defendants. MLB's public statements avowing to safeguard the fairness of MLB DFS contests were rendered untrue once MLB learned, and determined to conceal, its member Clubs' electronic sign stealing. Likewise, MLB's action in September 2017 to stop and publicly disclose the short period of such misconduct by the Red Sox misleadingly conveyed to the public that such conduct would not recur and, if it did, MLB would act similarly if other electronic sign stealing were discovered.

2.  State Consumer Protection Acts (Second Claim for Relief)

Plaintiffs' consumer protection claims seek to hold MLB Defendants' liable for their "unfair" *and* "deceptive" conduct. (MLB Defendants fail to address "unfair" conduct prong of Plaintiffs' claims, and, thus, have conceded the substantive viability of such claims.)[6] The law is

---

[5] *See e.g., Hoggett v. Brown,* 971 S.W.2d 472, 487–88 (Tex. App. 1997) (factors giving rise to "duty to disclose [include] … when one voluntarily discloses information, the whole truth must be disclosed; … when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; [or] when one makes a partial disclosure and conveys a false impression."), cited in *NuVasive, Inc. v. Renaissance Surgical Center North, L.P.,* 853 F. Supp. 2d 654, 661–63 (S.D. Tex. 2012).

[6] Plaintiffs can prevail on their claims of an "unfair" business practice independent of any claim of deceptive conduct and without proof of scienter or reliance. A practice is "unfair" under the MCPA "if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness;' 'is immoral, unethical, oppressive, or unscrupulous'; and 'causes substantial injury to consumers.'" *Exxon Mobil Corp. v. Attorney General,* 94 N.E.3d 786, 792 (Mass. 2018); *see also PNR Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So.2d 773, 777 (Fla. 2003) ("An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers'"); *Backus v. General Mills, Inc.,* 122 F. Supp.3d 909, 929 (N.D. Cal. 2015) ("a business practice is 'unfair' either under the FTC test if '(1) the consumer injury is substantial, (2) the injury is not outweighed by any countervailing benefits to consumers or competition, and (3) the injury could not reasonably have been avoided by consumers themselves' or, under the balancing test, if "the harm to the public from the business practice is greater than the utility of the practice").

clear that a direct contractual relationship or other form of privity is not required for *either* prong of Plaintiffs' claims.[7] The consumer protections apply to all parties whose conduct causes injury to consumers through an unfair or deceptive practice. *See, e.g.*, *Speakman v. Allmerica Finan. Life Ins.*, 367 F. Supp.2d 122 (D. Mass 2005) (upholding MCPA claim against corporate affiliates not in contractual privity based on affiliates' participation in statutory violations); *Galstaldi*, 637 F. Supp.2d at 1056-57 (upholding FDUPTA claim against developers not in contractual privity based on developers' promotion and participation in deceptive project); *Knight v. International Harvester Credit Corp.*, 627 S.W.2d 382, 389 (Tex.1982) (upholding TDTPA claim against finance company for deceptive clause in agreement notwithstanding lack of privity with buyer since company was "inextricably intertwined" with the challenged transaction); *Makaeff*, 145 F.Supp.3d at 979-80 ("fact that Plaintiffs entered into a transaction with Trump University rather than Trump himself" not dispositive).

### 3. Negligent Misrepresentation (Third Claim for Relief)

Nor does the absence of privity help MLB Defendants avoid liability for their negligent conduct resulting in the concealment of the corrupted MLB DFS contests. Restatement (Second) of Torts, § 552, provides in pertinent part:

---

[7] *See, e.g.*, *Kattar v. Demoulas*, 739 N.E.2d 246, 258 (Mass. 2000) ("parties need not be in privity for their actions to come within the reach of [the MCPA]"); *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983) ("privity between the plaintiff and defendant is not a consideration in deciding the plaintiff's status as a consumer under the [TDTPA]"); *Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp.2d 1045, 1056-57 (S.D. Fla. 2009) (liability under FDUTPA extends to persons not in privity with plaintiff who "participated" in violation); *Makaeff v. Trump University, LLC*, 145 F.Supp.3d 962, 979-80 (S.D.Ca. 2015) ("CRLA claim may be established independent of any contractual relationship between the parties"); *Kasky v. Nike, Inc.*, 45 P.3d 243 (Cal. 2003) (cause of action "under the UCL may be established independent of any contractual relationship between the parties"); *Hall v. Walter*, 969 P.2d 224, 231 (Colo. 1998) (plaintiff need not be an actual or potential consumer of defendant's product or service to bring a claim under the CCPA).

> One who, in the course of his business, profession or employment, or in any other transaction in which he had a pecuniary interest, supplied false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused by their justifiable reliance upon the information, if he failed to exercise reasonable care or competence in obtaining or communicating the information.[8]

No formal business relationship (or privity) is required to impose liability where the injured party is within the group of persons for whose benefit and guidance the information is supplied and relied upon in a transaction.

Pursuant to § 552, "although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other ... if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading ... as active misrepresentation, and half-truths may be as actionable as whole lies.'" *Golber v. Baybank Valley Trust Company*, 704 N.E.2d 1191, 1193 (Mass. Ct. App. 1999). In addition, comment F to § 552 provides that if a matter "requires investigation, the supplier of the information must exercise reasonable care and competence to ascertain the facts on which his statement is based." *See Russell v. Sherman Williams Co.*, 767 So.2d 592, 592-95 (Fla. Dist. Ct. App. 2000) (citing § 552, Comment F).[9]

---

[8] *See, e.g.*, *Nota Construction*, 704 N.E.2d at 405; *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 234-35 (Tex. App. 1985); *First State Sav. Bank v. Albright & Assocs. of Ocala, Inc.*, 561 So. 2d 1326, 1328–30 (Fla. Dist. Ct. App. 1990), rev. den., 576 So.2d 284 (Fla. 1990); *Wolther v. Schaarschmidt*, 738 P.2d 25, 28 (Colo. App. 1986); *Soderberg v. McKinney*, 52 Cal. Rptr. 2d 635, 638–44 (Ct. App. 1996).

[9] Defendants argue that plaintiffs' negligent misrepresentation claims are barred by the economic loss doctrine. (MLB Br. 18). "This argument is without merit. An exception to the doctrine permits recovery for economic losses resulting from negligent misrepresentation." *Nota Construction*, 704 N.E.2d at 405; accord *D&M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 487 (Fla. Dist. Ct. App. 2003) ("the economic loss rule does not bar tort actions based on fraudulent inducement and negligent misrepresentation"); *Robinson Helicopter Co., Inc. v. Dana Corp.*, 102 P.3d 268, 274-75 (Cal. 2004) (same).

4.  Unjust Enrichment (Fourth Claim for Relief)

MLB Defendants argue that because they had no direct contract or formal privity with Plaintiffs, their relationship with them is "too attenuated" to support a claim for unjust enrichment. But unjust enrichment "does not require any contractual or fiduciary relationship between the parties." *Greenwald v. Chase Manhattan Mortgage Corp.*, 241 F.3d 76, 78 n.1 (1st Cir. 2001).[10] Defendants additionally argue that Plaintiffs "have not alleged a benefit conferred by them upon MLB or MLBAM." This, too, is wrong, as Plaintiffs allege that the "benefits to defendants" included a "share of DraftKings' enormous fantasy baseball fees" (paid by Plaintiffs) as well as an "increase in the value of [MLB Defendants'] equity investment in DraftKings." (AC ¶¶ 119, 5). And, the fact that Plaintiffs paid DraftKings does not defeat Plaintiffs' claims as "[u]njust enrichment does not require that a defendant receive direct payments from a plaintiff." *Mass. v. Mylan Labs.*, 357 F. Supp. 2d 314, 323 (D. Mass. 2005).[11]

**C. Plaintiffs' Complaint Alleges Actionable Deception.**

MLB Defendants wrongly contend that all of Plaintiffs' claims require dismissal because there was no "actionable deception." (MLB Br. 8). In making this argument, MLB Defendants' exempt and do not address Plaintiffs' claims of fraudulent non-disclosure (*see* MLB Br. 13 n. 9) or consumer protection act claims based on Defendants' "unfair" trade practices.[12] Nor do MLB

---

[10] Accord *Kossian v. Am. Nat. Ins. Co.*, 62 Cal. Rptr. 225, 227 (Ct. App. 1967); *14th & Heinberg, LLC v. Terhaar & Cronley Gen. Contractors, Inc.*, 43 So.3d 877, 880 (Fla. Dist. Ct. App. 2010); *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).

[11] Accord *Wilson v. EverBank, N.A.*, 77 F. Supp.3d 1202, 136-37 (S.D. Fla. 2015); *DCV Const. Co. v. Cent. City Dev. Co.*, 965 P.2d 115, 119-20 (Colo. 1998).

[12] MLB Defendants' failure to address Plaintiffs' claims of "unfairness" under their States' consumer protection statutes not only requires denial of their motion to dismiss those claims, it also renders invalid MLB Defendants' argument that plaintiffs lack standing to assert claims on behalf of a nationwide class under the consumer protection laws of other states (MLB Br. 8 n .3). *Richards v. Direct Energy Servs.*, LLC, 915 F.3d 88, 106 (2d Cir. 2019), cited by Defendants, makes clear that a Rule 12(b)(6) challenge such as this to standing can only be raised if a

Defendants address Plaintiffs' unjust enrichment claims insofar as they are based on MLB Defendants' unfair conduct. Standing alone, this dooms MLB Defendants' argument.

Even putting aside the claims they ignore, MLB Defendants do not substantively address Plaintiffs' fraud claim but, instead, attempt to tease apart selective elements, arguing that deficiencies in Plaintiffs' pleading require dismissal.[13] Plaintiffs have properly pled actionable deceptive statements through Defendants' numerous false representations and omissions rendering representations false and misleading. MLB Defendants argue that none of those statements is "actionable" because they were purportedly not made with the requisite intent, which Defendants define as "a false promise to DraftKings participants by [MLB] that, because it had a sponsorship relationship with DraftKings, the baseball underlying their fantasy contests would be ... bereft of any rule violations." (MLB Br. 11).[14]

Defendants' contention that Plaintiffs are required to prove (or allege) that MLB Defendants made their representations with the specific intent to influence MLB DFS consumers is incorrect as a matter of law. Rather, Plaintiffs only need establish that MLB Defendants had

---

plaintiff's home consumer protection claim is dismissed. *See Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 96 (2d Cir. 2018) (cited in *Richards*) (holding that "whether a plaintiff can bring a class action under the state laws of multiple states is a question of predominance under Rule 23(b)(3), not a question of standing under Article III").

[13]  In this section of their Brief, Defendants focus principally on claimed deficiencies in plaintiffs' allegations of intent, and do not identify or discuss other elements of Plaintiffs' causes of action. Plaintiffs respond to Defendants' arguments as framed in this section. Plaintiffs' Sox Opp. Br. and Astros Opp. Br. address the elements of each of Plaintiffs' various claims at length and Plaintiffs incorporate those discussions here.

[14]  MLB Defendants suggest that their representations about maintaining the integrity of baseball should be treated as "puffery." MLB Br. 12 n. 7. Manfred's statements were not, however, "aspirational", boilerplate statements in an offering memorandum, *City of Pontiac Policemen & Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014), or "routine" "generic [and] indefinite" statements, *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012), but rather repeated reaffirmations to the public and to state governments of MLB's deep-seated commitment, and may hardly be dismissed as puffery.

"reason to expect" that MLB DFS contestants would rely upon the misstatements and omissions.

Restatement (Second) of Torts, § 531 addresses this precise issue:

> One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or *has reason to expect* to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or *has reason to expect their conduct to be influenced.* [Emphasis added].

As the Massachusetts court of appeals has explained, in relying on § 531 to reject a

specific intent argument similar to the one MLB Defendants assert here:

> [Defendant] offers no Massachusetts appellate authority to support its contention that [plaintiffs] must show that, when [defendant] made its misrepresentations, [defendant] did so with the purpose of inducing the [plaintiffs] specifically to enter the [particular] deal. .... *[Plaintiffs] were not required to show that the [defendant's] misstatements were made with the specific purpose of inducing the [plaintiffs'] reliance. They could also satisfy their burden by showing, as they did, that they were among those whom [defendant] had reason to expect would rely upon its misstatements.*

*Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 109-10 (2003) (emphasis added);

accord, *Cheng v. Sonoco Inc.*, Civ. No. 09-40041-FDS, 2010 WL 5437235, *4 (D. Mass. Dec.

22, 2010) ("Under Massachusetts law, a party asserting a claim of fraud need not show that the

allegedly fraudulent statements were made with the specific purpose of inducing reliance ... The

party need only demonstrate that it was among those who could have reasonably been expected

to rely on the misrepresentations"). Section 531 has been adopted (or followed) in Plaintiffs'

States, and the case law accords with *Reisman*.[15]

---

[15] *See Lovejoy v. AT&T Corp.*, 111 Cal. Rptr. 2d 711, 716–17 (Ct. App. 2001) ("liability [for fraud] is affixed not only where the plaintiff's reliance is *intended* by the defendant but also where it is *reasonably expected* to occur" (emphasis in original); *Exxon Corp. v. Emerald Oil & Gas Co., L.P.*, 348 S.W.3d 194, 218–19 (Tex. 2011) (§ 531 standard "is consistent with Texas fraud jurisprudence");[2] *Marshall v. Kusch*, 84 S.W.3d 781, 785 (Tex. App. 2002) ("A person who makes a misrepresentation is liable to the person or class of persons the maker intends or 'has reason to expect' will act in reliance upon the misrepresentation"); *CMS Inv. Holdings, LLC v. Wilson-Harvey*, No. 2014CV031093, 2015 WL 9998040, at *26 (Colo. Dist. Ct. Dec. 01,

Moreover, even though not required, Plaintiffs have alleged MLB Defendants' specific intent to deceive MLB DFS contestants that MLB Defendants assert is lacking:

> Manfred and MLB's member Clubs were aware that members of the public would not engage in MLB DFS contests if they knew that electronic sign stealing by the Astros, the Red Sox or other MLB Clubs was compromising and corrupting the player performance statistics upon which the fairness of the DFS contests depended. (AC ¶201).

> MLB Defendants intended to deceive members of the public – including Plaintiffs and the Classes to whom they were promoting and marketing and inducing to engage in MLB DFS competitions – into believing that such competitions were based on fair and honest player performance statistics. (AC ¶ 205).

> Plaintiffs and the Classes reasonably and justifiably relied in participating in the MLB DFS contests on the false statements, representations and commitments by Manfred (and the MLB Defendants), and the Astros and the Red Sox set forth herein … [and] were induced to, and did, participate in the contests by MLB Defendants' material omissions and false representations.  (AC ¶¶ 209, 210).

While MLB Defendants apparently dispute these allegations, that is not an issue that is properly raised or resolved on a motion to dismiss. *See e.g.*, *Cheng*, 2010 WL 5437235 at *5.[16]

---

2015) ("The maker of a false representation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act in reliance upon the misrepresentation, including indirect representations to third persons"); *see also J.P. Morgan Sec., LLC v. Geveran Inv. Limited*, 224 So. 3d 316, 326 n. 22 (Fla. Dist. Ct. App. 2017) (liability for fraud is stricter than liability for negligent misrepresentation and only requires reliance, not justifiable reliance).

[16] MLB Defendants misleadingly do not differentiate between the elements of common law fraud and consumer protection deception claims. But a cause of action based on deception or misrepresentation brought under consumer protection acts does *not* require the same quantum of proof as a common law fraud claim. *See Estrada v. Progressive Direct Ins. Co.*, 53 F.Supp.3d 484, 499 (D. Mass. 2014) (An act or practice is deceptive for purposes of the "deceptive" prong of the MCPA "if it has the 'capacity or tendency' to deceive. ... [t]he plaintiff need not necessarily prove actual reliance on a misrepresentation; rather, the plaintiff must prove a causal connection between the deception and the loss and that the loss was foreseeable as a result of the decep-tion"); *Collins v. eMachines, Inc.*, 134 Cal. Rptr. 588, 595 (Ct. App. 2011) ("Unlike common law fraud, a UCL fraud claim 'can be shown even without allegations of actual deception, reasonable reliance and damage'; what is required to be shown is 'that members of the public are likely to be deceived.' ... 'In order to be deceived, members of the public must have had an expectation or an assumption about' the matter in question); *Krueger v. Wyeth, Inc.*, 396 F. Supp.3d 931, 942 (S.D. Cal. 2019) ("Actual falsehood, the perpetrator's knowledge of falsity, and perhaps most importantly, the victim's reliance on the false statements, each of

MLB Defendants also assert two flawed factual arguments. First, they argue that Plaintiffs were on "notice" that "players often commit intentional rules violations" and thus cannot claim to have been deceived. (MLB Br. at 1, 9). Assuming *arguendo* that this contention is properly raised on a Rule 12(b)(6) motion, it is clearly baseless. Accepting this premise would mean that because the public knows that companies engage in accounting fraud, every investor should expect, and be charged with knowledge of, such conduct, precluding claims for securities fraud. This is an absurd proposition. But, more important, MLB Defendants' misconstrue the deception that forms the basis for Plaintiffs' claims. The deception is not MLB's member Clubs' cheating, but MLB Defendants' failure to disclose that the MLB DFS contests, which require the reliability of MLB statistics, were tainted. Plaintiffs did not know that MLB would knowingly tolerate and conceal such cheating so to allow it to become more than just an isolated incident, but instead the *modus operandi* of its championship teams. It is one thing for players to secretly cheat; it is a completely different matter – unknown to Plaintiffs or the public – that the League would know of and allow such cheating to avoid the financial harm that disclosing the cheating would bring about.

Moreover, what was publicly known was that in September 2017, MLB learned of and purported to immediately put an end to an isolated and brief instance of electronic sign stealing by the Red Sox with "absolute assurances from the Red Sox that there will be not future violations."[17] If anything, this conduct falsely apprised the public that the Red Sox would not

---

which are elements of common-law fraud claims, are not required to show a violation of [the UCL]"); *Rotello v. Ring Around Products, Inc.* 614 S.W.2d 455, 462 (Tex. App. 1981) (*scienter* or intent to deceive is not required under TDTPA).

[17] In September 2017, the New York Yankees submitted a complaint, supported by video evidence, of electronic sign stealing by the Red Sox. Manfred publicly announced that the Red Sox had admitted committing the violation for "several weeks" and issued a small fine (AC ¶ 101-02), stating, "I have received absolute assurances from the Red Sox that there will be no

engage in electronic sign stealing in the future, and that MLB would act promptly to stop any electronic sign stealing, not that it would conceal it and allow it to go on unrestrained. What the public was not told was that MLB had received numerous complaints about the Astros' electronic sign stealing in 2017, 2018 and 2019, that MLB determined not to investigate such complaints or disclose the Astros' misconduct even though the Astros' electronic sign stealing was an "open secret" to the "whole industry" during those years (AC ¶¶ 11, 76 & n. 10); and that the Astros' public statements  denying electronic sign stealing and MLB's public statement that it had conducted a "thorough investigation" that cleared the Astros were false.[18]

MLB Defendants next argue that "plaintiffs do not allege that the statistics used by DraftKings [were] inaccurate" and that Plaintiffs got just what they bargained for. (MLB Br. 10). While it is true that the statistics correctly reflected players' performance as affected (positively or negatively) by the secret electronic sign stealing cheating, that fact affords no basis for dismissal of Plaintiffs' claims. MLB Defendants marketed a game of skill and plaintiffs bargained to participate in such a contest. The crux of Plaintiffs' claims is that it is unfair and deceptive to market a competition as a game of skill knowing that, unbeknownst to consumers, their employment of skill to win or lose is completely thwarted.

---

future violations of this type."  Golub Dec., Ex. 1 (Commissioner's Statement, Sep. 15, 2017); Ex. 2 (*Boston* Herald, Sep. 15, 2017, quoting same).  Plaintiffs submit information in the public domain to complete the information submitted in the Moskowitz Dec. *See* Sox. Br. 11 n. 3.

[18] MLB Defendants feign outrage that plaintiffs allege that MLB's October 2018 public statement that it conducted a "thorough investigation" of the Astros' conduct was false. (MLB Br. 13). MLB Defendants argue the Astros' misconduct in October 2018 was different from the misconduct exposed in November 2019. But the 2018 incident came on the heels of the Oakland Athletics' now revealed August 2018 complaint of the precise Astros' electronic sign stealing conduct revealed in 2019. Even assuming the Astros' conduct in October was somehow different (which plaintiffs do not concede), the notion that a "thorough investigation" would not have revealed the Astros' broader ongoing misconduct is fanciful.

### D. Plaintiffs Allege Legally Cognizable Injury.

1. <u>Plaintiffs Have Alleged that they Suffered Loss from their Participation in DraftKings</u>

MLB Defendants erroneously contend that Plaintiffs have failed to plead they suffered losses caused by their participation in the MLB DFS competitions. But Plaintiffs expressly allege that they "have lost significant amounts individually," (AC ¶ 161), "including, without limitation, the money wagered on DraftKings' corrupt and dishonest fantasy baseball competitions" (AC ¶ 225). Further, Plaintiffs "suffered damages" as a "direct and proximate result" of the misconduct at issue in each of plaintiffs' first three Claims for Relief, (AC ¶¶ 211, 225, 352), and further allege, with respect to their unjust enrichment claim, that they "conferred monetary benefits" on MLB Defendants  and that "under principles of equity and good conscience, MLB Defendants should not be permitted to retain the foregoing monetary benefits they wrongfully obtained at the expense of Plaintiffs ..." (AC ¶¶ 358, 360).

2. <u>Plaintiff Have Alleged a Causal Nexus.</u>

MLB Defendants further contend that Plaintiffs have failed to demonstrate a causal nexus between Defendants' alleged misrepresentations and omissions and Plaintiffs' losses because Plaintiffs "have not alleged that any statement by MLB or MLBAM about the League's rules actually caused them to participate in, and win or lose money on, DraftKings fantasy contests." (MLB Br. 21-22).  Plaintiffs have asserted the very allegations that MLB Defendants claim are lacking – that MLB Defendants' material misrepresentations and omissions were intended to and had the effect of inducing Plaintiffs to pay to play MLB DFS (AC ¶¶ 171, 173, 174, 195, 196, 199, 201, 204-208); that Plaintiffs reasonably and justifiably relied on Defendants' false representations and omissions and were induced thereby to play MLB DFS (AC ¶209); and that as a direct and proximate result of the MLB Defendants' fraudulent conduct, Plaintiffs suffered damages from paying to play MLB DFS. (AC ¶ 211).

**E. Plaintiffs' Common Law Claims Against MLB Are Not Barred.**

MLB seeks dismissal of Plaintiffs' common law claims against it on the ground that it is an unincorporated association which, under New York law, is not subject to common law liability unless all of its members have either authorized or ratified the alleged wrongdoing at issue. (MLB Br. 22-23, citing *Martin v. Curran*, 101 N.E.2d 683 (N.Y. 1951)).[19] As MLB acknowledges, plaintiffs have expressly alleged such authorization and ratification. (*Id.* 23). MLB argues that the Court should reject such allegations – which MLB describes as asserting that "all thirty clubs 'ratified and approved' electronic sign stealing by their opponents" (citing AC ¶12) – as "absurd." (MLB Br. 24).

MLB misstates Plaintiffs' allegations. Plaintiffs do not allege that the thirty Clubs ratified and approved electronic sign stealing. Rather, Plaintiffs allege that Manfred's representations and commitments about maintaining the integrity of the game were made "as the authorized spokesperson of MLB, on behalf of MLB and each of its members Clubs ... and were approved by each of MLB's member teams," (AC ¶169); that MLB's member teams "ratified and approved Manfred's representations" intended to assure MLB DFS contestants that the contests were honestly and fairly conducted" (AC ¶171); and that "MLB's Clubs ratified and approved Manfred's knowing failure to take action to stop or disclose the member team misconduct described in this Complaint." (AC ¶12). As Plaintiffs explain:

> Manfred and MLB's member Clubs placed their desire to protect their financial interests from the adverse publicity and financial detriments that would result from investigation, remedial action and disclosure of member Club electronic sign

---

[19] Plaintiffs allege that MLB is "a partnership governed by a written agreement (the Major League Constitution)." (AC ¶ 22). MLB, citing to ¶ 22, asserts it is an "unincorporated association," (MLB Br. 3). Plaintiffs do not agree that MLB may, without supporting evidence or discussion, re-characterize plaintiffs' allegation. Indeed, MLB's member Clubs cannot dispute that they have agreed to the benefits of, and to be bound by, the Major League Constitution. *See* Hardiman Dec., Ex. 1 (Major League Constitution) at 1 (Article I).

stealing above maintaining the integrity of the game of baseball, and for that reason did not properly act to terminate, prevent and disclose member Club electronic sign stealing that violated MLB rules and regulations. (AC ¶ 176).

There is nothing "absurd" about plaintiffs' claims that MLB's member Clubs authorized Manfred's statements and ratified and approved his failure to terminate or disclose member Club electronic sign stealing in order to protect themselves from the adverse publicity and financial effects that disclosing the misconduct would cause. Indeed, given the widespread knowledge among the Clubs of the Astros' misconduct (AC ¶ 11), there is no other plausible reason for the Clubs' willingness to tolerate Manfred's failure to take any action against the Astros.[20]

## F.  Plaintiffs' Unjust Enrichment Claims Are Not Barred.

MLB Defendants argue that Texas and California do not recognize unjust enrichment as an independent cause of action and that Massachusetts and Florida do not allow claims for unjust enrichment when claims at law have been alleged. Previously, there was a split of authority in California but the California Supreme Court ruled in 2015 in favor of allowing the claim. *See Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017); *accord Williams v. Facebook, Inc.*, 384 F. Supp.3d 1043, 1057 (N.D. Cal. 2018). Massachusetts and Florida allow a plaintiff to plead in the alternative and seek recovery on an unjust enrichment claim if he does not prevail on his claims at law. *Lass v. Bank of America, N.A.*, 695 F.3d 129, 140-41 (1st Cir. 2012) ("it is accepted practice [under Mass. law] to pursue both theories at the pleading stage");

---

[20] Nor are MLB Defendants' entitled to dismissal of Plaintiffs' CRLA claims based on challenges to Plaintiff's pre-suit notice under Cal. Civ. Code §1782 . Well over 30 days have now passed since notice was provided (on January 23, 2020), and MLB Defendants have indicated no intention to resolve this matter, so notice should be deemed satisfied.  Moreover, dismissal is not required to satisfy the purposes of the notice requirement. *See Morgan v. AT & T Wireless Servs., Inc.*, 99 Cal. Rptr.3d 768, 788-89 (Ct. App. 2009); *Oxina v. Land's End, Inc.*, 2015 WL 4272058, at \*3-4 (S.D. Ca. June 19, 2015) (rejecting reasoning of *Cattie v. Wal-Mart Stores, Inc.*, 504 F.Supp.2d 939, 950 (S.D. Cal. 2007)). Nor is there a basis to abate the Texas DTPA claim.

*Baptist Hosp. of Miami, Inc. v. Medica Health Plans, Inc.*, 385 F. Supp.3d 1289, 1293 (S.D. Fla. 2017) (under Florida law, "plaintiff may pursue the alternative claims of breach of contract, unjust enrichment and promissory estoppel in separate counts").   Colorado law (not mentioned by Defendants) is to the same effect. *Backus v. Apishapa Land & Cattle Co.*, 615 P.2d 42, 44 (Colo. App. 1980).   Finally, while there is a split of authority in Texas, numerous courts have allowed unjust enrichment as standalone claims. *See e.g.*, *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App. 2007) ("Unjust enrichment is an independent cause of action").   Plaintiffs address this issue in their Astros Opp. Br. at 22-23.

IV.   **<u>CONCLUSION</u>**

For the foregoing reasons, and those set forth in Plaintiffs' additional opposition Memoranda, MLB Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

Date: March 6, 2020

By:  /s/ David S. Golub
  David S. Golub
  Steven L. Bloch
  Ian W. Sloss
  SILVER GOLUB & TEITELL LLP
  184 Atlantic Street
  Stamford, CT 06901
  Tel (203) 325-4491
  Email: dgolub@sgtlaw.com
  Email: sbloch@sgtlaw.com
  Email: isloss@sgtlaw.com

  John D. Radice
  Kenneth Pickle
  Natasha Fernandez-Silber
  April Lambert
  RADICE LAW FIRM, P.C.
  475 Wall Street
  Princeton, NJ 08540
  Tel (646) 245-8502
  Email: jradice@radicelawfirm.com
  Email: kpickle@radicelawfirm.com
  Email: nsilber@radicelawfirm.com
  Email: alambert@radicelawfirm.com

  Eric L. Cramer (*pro hac vice*)
  Patrick F. Madden (*pro hac vice*)
  BERGER MONTAGUE PC
  1818 Market St., Suite 3600
  Philadelphia, PA 19103
  Tel (215) 875-3000
  Email: ecramer@bm.net
  Email: pmadden@bm.net

  *Counsel for Plaintiffs and the Proposed*
  *Class*

## CERTIFICATION

I hereby certify that on March 6, 2020, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

  /s/ David S. Golub          
DAVID S. GOLUB

27