# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD, AND ERIK LIPTAK, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, L.P., <br><br> Defendants. | Case No. 1:20-cv-00632-JSR |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT HOUSTON ASTROS, LLC'S MOTION TO DISMISS

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Plaintiffs Bring this Class Action as Defrauded MLB DFS Consumers,
                Not "Disgruntled Fans." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      Plaintiffs State a Claim for Common Law Fraud . . . . . . . . . . . . . . . . . . 7

                1.      The Complaint adequately alleges fraud based on the Astros'
                        misrepresentation and omission of material facts . . . . . . . . . . . . . . . . 8

                        a.      The Complaint alleges numerous misrepresentations
                                of material facts made by the Astros . . . . . . . . . . . . . . . . . . . . 8

                        b.      The Astros had a duty to disclose their electronic
                                sign-stealing scheme to Plaintiffs . . . . . . . . . . . . . . . . . . . . . 9

                2.      The Complaint adequately alleges the Astros intended to
                        deceive Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                3.      The Complaint adequately alleges Plaintiffs relied upon the
                        Astros' misrepresentation and/or omission of material facts
                        to their detriment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        C.      Plaintiffs State a Claim for Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        D.      Plaintiffs State a Claim Under the Texas Deceptive Trade Practices Act . . . . . . 18

                1.      Daily fantasy sports players are "consumers" within the meaning
                        of the DTPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

                2.      The Complaint adequately alleges that conduct by the Astros
                        was a "producing cause" of Plaintiffs' damages . . . . . . . . . . . . . . . . . 22

        E.      Plaintiffs State a Claim for Unjust Enrichment . . . . . . . . . . . . . . . . . . . . 22

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

# TABLE OF AUTHORITIES

## Cases

*Alessi v. Mayweather (In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.),*
   942 F.3d 1160, 1164 (9th Cir. 2019) ..................................................................6

*Bradford v. Vento,*
   48 S.W.3d 749 (Tex. 2001)...................................................................7, 10, 13

*Brass v. Am. Film Techs., Inc.,*
   987 F.2d 142, 150 (2d Cir. 1993)........................................................................10

*Castillo v. Tyson,*
   701 N.Y.S.2d 423, 425 (App. Div. 1st Dept. 2000)..............................................6

*Celanese Corp. v. Coastal Water Auth.,*
   475 F. Supp. 2d 623, 638 (S.D. Tex. 2007) ........................................................15

*CLC Roofing, Inc. v. Helzer,*
   2019 Tex. App. LEXIS 5927, at *8 (Tex. App. July 11, 2019)............................10

*Collins v. Ky. Lottery Corp.,*
   399 S.W.3d 449, 453 (Ky. Ct. App. 2012) .........................................................20

*Connick v. Suzuki Motor Co., Ltd.,*
   675 N.E.2d 584, 593 (Ill. 1996)..........................................................................11

*Elias v. Pilo,*
   781 F. App'x 336, 338 (5th Cir. 2019) ................................................................22

*Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,*
   51 S.W.3d 573, 578 (Tex. 2001)......................................................................7, 14

*FDIC v. Munn,*
   804 F.2d 860, 865 (5th Cir. 1986) ......................................................................18

*Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.,*
   941 S.W.2d 138, 146-47 (Tex. App. 1995) .........................................................10

*Fortune Prod. Co. v. Conoco, Inc.,*
   52 S.W.3d 671, 673, 683-86 (Tex. 2000) ...........................................................22

*Guidry v. Bank of LaPlace,*
   954 F.2d 278, 288 (5th Cir. 1992) ......................................................................14

*HECI Expl. Co. v. Neel,*
   982 S.W.2d 881, 891 (Tex. 1998)........................................................................22

*Heldenfels Bros., Inc. v. Corpus Christi,*
   832 S.W.2d 39, 41 (Tex. 1992)............................................................................21

*Herndon v. First Nat'l Bank of Tulia,*
    802 S.W.2d 396, 398-99 (Tex. App. 1991) ............................................................18

*Hoggett v. Brown,*
    971 S.W.2d 472, 487 (Tex. App. 1997)................................................................10

*Kinnard v. Circle K Stores,*
    966 S.W.2d 613 (Tex. App. 1998)...........................................................19, 20, 21

*Lochabay v. Southwestern Bell Media, Inc.,*
    828 S.W.2d 167, 171-72 (Tex. App. 1992) ..........................................................18

*Lonergan v. A.J.'s Wrecker Serv. of Dall., Inc.,*
    1999 U.S. Dist. LEXIS 10494, at *9-10 (N.D. Tex. July 6, 1999) ......................18

*Matthews v. Am. Honda Motor Co.,*
    2012 U.S. Dist. LEXIS 90802, at *7-8 (S.D. Fla. June 6, 2012) .........................10

*Mayer v. Belichick,*
    605 F.3d 223, 237 (3d Cir. 2010)..........................................................................6

*Melody Home Mfg. Co. v. Barnes,*
    741 S.W.2d 349, 351-52 (Tex. 1987) ..................................................................18

*Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.),*
    490 F. Supp. 2d 784, 792-93 (S.D. Tex. 2007).....................................................7

*Newby v. Enron Corp. (In re Enron Corp. Secs.),*
    2010 U.S. Dist. LEXIS 145220 (S.D. Tex. Jan. 19, 2010) ...........................13, 14, 15

*Nuvasive, Inc. v. Renaissance Surgical Ctr. N., L.P.,*
    853 F. Supp. 2d 654, 663 (S.D. Tex. 2012) .........................................................10

*Pepi Corp. v. Galliford,*
    254 S.W.3d 457, 460 (Tex. App. 2007).................................................................23

*Playboy Enters. v. Editorial Caballero,*
    202 S.W.3d 250 (Tex. App. 2006).................................................................passim

*Ralston Purina Co. v. McKendrick,*
    850 S.W.2d 629, 633-36 (Tex. App. 1993) ..........................................................10

*Smith v. Ford Motor Co.,*
    749 F. Supp. 2d 980, 987 (N.D. Cal. 2010) .........................................................11

*SmithKline Beecham v. Jane Doe,*
    903 S.W.2d 347, 352 (Tex. 1995)........................................................................10

*State Nat'l Bank v. Farah Mfg. Co.,*
    678 S.W.2d 661, 681 (Tex. App. 1984)................................................................10

*Timberlake v. Synthes Spine Co.,*
    2009 U.S. Dist. LEXIS 29074, at *19-20 (S.D. Tex. Mar. 31, 2009)....................15

*United States ex rel. Russell v. EPIC Healthcare Mgmt. Group,*
    193 F.3d 304, 308 (5th Cir. 1999) ........................................................14

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,*
    125 F.3d 899, 903 (5th Cir. 1997) ........................................................14

*United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.,*
    414 F.3d 558, 566 (5th Cir. 2005) ........................................................10

*W. Invs., Inc. v. Urena,*
    162 S.W.3d 547, 550 (Tex. 2005).........................................................16

**Statutes**

31 U.S.C. § 5362 .........................................................................................4

Tex. Bus. & Com. Code Ann. § 17.45(4).................................................18

Tex. Bus. & Com. Code Ann. § 17.50(a) ................................................18

Tex. Penal Code § 47.02............................................................................19

**Rules**

Fed. R. Civ. P. 9(b)...............................................................................7, 15

**Treatises**

Restat. 2d of Torts § 531 .......................................................................8, 14

Restat. 2d of Torts § 551 ...........................................................................10

# I.    INTRODUCTION

In their Amended Complaint (ECF 20, "Compl."), Plaintiffs (on behalf of themselves and members of the proposed Class) allege that Defendant Houston Astros, LLC (the "Astros")— along with Major League Baseball ("MLB"), MLB Advanced Media, L.P. ("MLBAM"), and the Boston Red Sox (collectively, with the Astros, "Defendants")—fraudulently induced members of the public to pay millions of dollars in fees to enter DraftKings' "Major League Baseball Daily Fantasy Sports" (or "MLB DFS") contests by promoting those contests (to their own financial benefit) as games of skill based on player performance consistent with MLB rules. In so doing, Defendants concealed the fact that from 2017 to 2019, the Astros (followed by the Red Sox) were engaged in an impermissible electronic sign-stealing scheme of unprecedented scale and sophistication. This sign-stealing operation—which occurred with the knowledge of the Astros' coaching staff and management (and eventually, MLB)—altered the dynamics of play so dramatically that the Astros (and then the Red Sox) were catapulted almost immediately to World Series wins. Had Plaintiffs known that such egregious misconduct, which corrupted three seasons of MLB performance statistics, could occur without consequence, they never would have paid entry fees to enter MLB DFS contests.[1]

These allegations form the basis of Plaintiffs' valid claims against the Astros for fraud, negligence, unjust enrichment, and violation of the Texas Deceptive Trade Practices Act (DTPA). None of these claims require Plaintiffs to allege privity between themselves and the Astros, as the Astros half-heartedly assert in their motion to dismiss (without citing a single

---

[1] A summary of Plaintiffs' factual allegations is set forth more fully in Plaintiffs' MLB Opp. Br. (ECF 42) and incorporated herein.

supporting case).[2] Nor do these claims require Plaintiffs to establish some general duty on the part of MLB and its member teams to provide "attendees or viewers" with sporting events free of injury, rules violations, and the like, as the Astros also suggest.[3] Plaintiffs do not and need not allege that the Astros owed any duty to attendees or viewers of its games; instead, Plaintiffs allege that the Astros owed a duty to consumers of a product, MLB DFS contests, which the Astros aggressively promoted and profited from, not to deceive them for economic gain, as indisputably occurred here.

By partnering with DraftKings, as well as promoting and profiting from MLB DFS contests, MLB and its member teams, including the Astros, took on a set of duties and obligations to MLB DFS consumers, and opened themselves up to the attendant liability. This is how the law of torts works, as well as consumer protection law. Playing baseball does not provide Defendants with blanket immunity from suit. The Astros' attempt to disclaim any and all responsibility towards consumers they fraudulently induced to enter MLB DFS contests—even for harms caused by the Astros' own outrageous misconduct—is untenable. Their motion to dismiss must be denied.

## II.     ARGUMENT

### A.     Plaintiffs Bring this Class Action as Defrauded MLB DFS Consumers, Not "Disgruntled Fans."

In its motion to dismiss, the Astros characterize Plaintiffs as "disgruntled fans" who, like "attendees or viewers" of their games, had "no . . . right to an event free of penalties, undisclosed

---

[2] *See* Memorandum of Law in Support of Defendant Houston Astros, LLC's Motion to Dismiss (ECF 37) ("Astros' Br."), at 1.

[3] *Id.* at 1-2.

injuries, rules violations, cheating, or similar conduct."[4] While this sentiment is perhaps what led the Astros to engage in such disgraceful misconduct in the first place, it has no bearing upon this case. Plaintiffs bring this suit not as spectators of MLB events, but as consumers who paid fees to enter MLB DFS competitions. These contests were sold to consumers as games of skill in which they could actively participate (not sporting events for them to passively view), and they involve a set of commercial transactions that are separate and apart from the purchase and sale of licenses to watch or attend MLB events. Whatever impact the Astros' misconduct may have had on "attendees or viewers" of their games, their actions defrauded consumers who entered MLB DFS contests.[5] Understanding the nature of this commercial activity—and how it differs from simply paying to attend a ballgame—is critical to understanding Plaintiffs' claims here.

Fantasy baseball is a statistics-based competition in which contestants assemble lineups (or "fantasy teams") by selecting (or "drafting") real-life MLB players and compete against the lineups of MLB players selected by other contestants.[6] The performance of a contestant's fantasy lineup is directly tied to the real-life performance of the players that comprise the contestant's team.[7] Points are awarded to each player on a contestant's fantasy baseball team based on the player's objectively measurable performance statistics (*e.g.*, home runs, hits, batting averages, strike outs, earned run averages).[8] The contestant whose fantasy team earns the most points wins the contest and the contest's cash prize.[9]

---

[4] *Id.* at 7.

[5] Compl. at ¶ 428.

[6] Compl. at ¶ 27.

[7] Compl. at ¶ 28.

[8] Compl. at ¶ 28.

[9] Compl. at ¶ 28.

Fantasy baseball competitions are permitted in most states only because they are considered "games of skill" (as opposed to sports gambling).[10] This designation, which MLB has enthusiastically embraced,[11] is grounded in the recognition that fantasy baseball players with a better understanding of MLB performance statistics (as well as the rules of the game, player injuries, the effects of weather, and other legitimate factors) will be better at selecting players whose on-field performance will translate into better fantasy scores, and thus more likely to win competition (cash) prizes.[12] Players with less understanding of these factors will be more likely to lose competitions (and their entry fees) participating in fantasy sports leagues.[13]

Of course, fantasy baseball contests can operate as "games of skill" only if the MLB competitions upon which they are based adhere to a common, publicly disclosed, and consistently applied set of rules. Without this substrate of rules and regulations, performance statistics would be meaningless for predicting future outcomes and fantasy players would be unable to select lineups with any degree of skill.

In many ways, Plaintiffs in this case are more akin to defrauded investors than to "disgruntled fans." At all times relevant to this action, MLB and its member teams, including the Astros, publicly promoted a product, MLB DFS contests (which were designated the "Official

---

[10] Compl. at ¶¶ 7, 29. Fantasy sports competitions are exempted from federal prohibitions on internet gambling. *See* Unlawful Internet Gambling Enforcement Act of 2006 (UIGEA), 31 U.S.C. § 5362 (excluding "fantasy or simulation sports game[s]" from Congress's definition of prohibited "betting or wagering").

[11] *See* Declaration of John L. Hardiman ("Hardiman Decl.") (ECF 29), Ex. 4 (Mark Feinsand, *MLB commissioner Rob Manfred defends DraftKings partnership, says fantasy sports 'not gambling'*, N.Y. DAILY NEWS (Oct. 26, 2015) ("'I'm quite convinced it is a game of skill, as defined by the federal statute,' [MLB commissioner Robert D.] Manfred said. 'And I'm comfortable with the idea that it's not gambling.'").

[12] Compl. at ¶¶ 27-28.

[13] Compl. at ¶¶ 27-28.

Fantasy Game" of Major League Baseball[14]) for their own financial gain.[15] Through partnership agreements with DraftKings, the Astros and other teams took a cut of the hundreds of millions of dollars in fees paid to DraftKings,[16] and leveraged the increasing popularity of fantasy baseball competitions into increased interest in MLB games, as well as increased revenues from viewership, attendance, and merchandise sales.[17] In the process of promoting MLB DFS contests, MLB and its member teams, including the Astros, made numerous statements designed to assure the public (including the fantasy baseball playing public) that MLB DFS contests functioned as games of skill based on honestly-derived performance statistics, and that appropriate safeguards were in place to keep fantasy baseball competitions fair.[18] In reliance on these representations and at the express encouragement of MLB and its member teams (including the Astros), Plaintiffs paid fees to compete in MLB DFS competitions.[19] Unbeknownst to Plaintiffs, at the same time that the Astros and other MLB clubs were aggressively promoting MLB DFS to the public, the Astros were engaged in an electronic sign-stealing scheme that was dramatically altering player performance statistics and compromising the fairness of fantasy baseball contests.[20] As a result of this misconduct, Plaintiffs' ability to skillfully select players for their fantasy baseball teams was impaired, rendering MLB DFS contests reliant on chance, not skill, and resulting in significant financial harm to Plaintiffs.[21]

---

[14] Compl. at ¶ 5.
[15] Compl. at ¶¶ 118-120.
[16] Compl. at ¶ 118-120.
[17] Compl. at ¶¶ 119, 3.
[18] *See* Compl. at ¶¶ 3 & n.3, 7
[19] Compl. at ¶ 7.
[20] Compl. at ¶¶ 6, 7, 10, 60, 93.
[21] Compl. at ¶¶ 380, 396, 429, 457.

Notwithstanding these facts, and ignoring that entry into a MLB DFS contest is a consumer transaction that is distinct from viewing or attending an MLB game, the Astros cast Plaintiffs as nothing more than "disgruntled fans" who, as such, have no private right of action against the Astros. In support of this erroneous contention, the Astros cite a series of cases involving class actions brought by fans who requested refunds after misconduct occurred in sporting events they paid to view or attend.[22] These suits were dismissed on the ground that a ticketholder "possesse[s] nothing more than a contractual right to a seat from which to watch a . . . game,"[23] and that plaintiffs ultimately got what they paid for—a "regulation" sporting event and "the right to view whatever . . . transpired" therein.[24]

But the "disgruntled fan" cases are inapposite. This body of law governs a specific commercial transaction: the purchase and sale of a license to attend or view a professional sporting event. It does not govern all other transactions that in some way relate to sporting events. Plaintiffs in this case are not MLB spectators who bargained for a few hours of entertainment; nor do they seek refunds for monies paid to view or attend MLB events. Instead, Plaintiffs were and are participants in a separate and unrelated commercial transaction: competing in MLB DFS contests, which MLB and the Astros promoted (to their own financial benefit) as a game of skill with adequate safeguards in place to maintain fairness and integrity.

---

[22] *See, e.g., Mayer v. Belichick*, 605 F.3d 223, 237 (3d Cir. 2010) (proposed class action against New England Patriots and its coach on behalf of season ticket holders of opposing teams claiming Patriots' sign stealing scheme violated the contractual expectations and rights of ticket holders); *Castillo v. Tyson*, 701 N.Y.S.2d 423, 425 (App. Div. 1st Dept. 2000) (proposed class action brought by fans against boxer, fight promoters, and fight telecasters seeking refund of money plaintiffs paid to view fight in which boxer was disqualified for biting); *Alessi v. Mayweather (In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.)*, 942 F.3d 1160, 1164 (9th Cir. 2019) (proposed class action by boxing spectators against boxers and promoters of boxing match alleging defendants concealed a preexisting injury to one of the boxers).

[23] *See Mayer*, 605 F.3d at 230.

[24] *See In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*, 942 F.3d at 1171-72 (internal citations omitted); *Castillo*, 701 N.Y.S.2d at 424-25.

Plaintiffs paid fees to enter MLB DFS competitions in reliance on these representations and were financially harmed by the Astros' undisclosed sign-stealing scheme, which corrupted player performance statistics and the fairness of MLB DFS contests. Had Plaintiffs known the Astros and other teams were causing the statistics to be compromised and unreliable, they never would have paid fees to compete in MLB DFS contests because the contests would not have been games of skill, but rather only chance. On account of the Astros' misconduct and the harm it caused, Plaintiffs have causes of action sounding in fraud, negligence, unjust enrichment, and for violation of the Texas Deceptive Trade Practices Act (DTPA). These claims are discussed in further detail below.

## B. Plaintiffs State a Claim for Common Law Fraud.

Plaintiffs state a claim for common law fraud based on the Astros' electronic sign-stealing scheme and efforts to conceal from or otherwise not disclose that scheme to the public. Under Texas law, to prevail on a claim for common law fraud, a plaintiff must allege defendants "(1) made a misstatement or omission (2) of material fact (3) with the intent to defraud (4) on which the plaintiff relied, and (5) which proximately caused the plaintiff injury."[25] Pursuant to Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud or mistake," but may "allege[] generally" elements like "malice, intent, knowledge, and other conditions of a person's mind."[26] Texas law "recognizes a common law fraud cause of

---

[25] *Newby v. Enron Corp. (In re Enron Corp. Sec., Derivative & ERISA Litig.)*, 490 F. Supp. 2d 784, 792-93 (S.D. Tex. 2007). *See also Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001) (stating that under Texas law, common law fraud occurs when "(a) a party conceals or fails to disclose a material fact within the knowledge of that party, (b) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth, (c) the party intends to induce the other party to take some action by concealing or failing to disclose the fact, and (d) the other party suffers injury as a result of acting without knowledge of the disclosed fact").

[26] *See* Fed. R. Civ. P. 9(b).

7

action [even] where the false representation was made with the intent of reaching and deceiving a third person and thereby causing that third party injury; privity is not required between the fraudfeasor and the person he is trying to influence."[27]

1. **The Complaint adequately alleges fraud based on the Astros' misrepresentation and omission of material facts.**

Defendant Astros argue that Plaintiffs have failed to make out a claim of fraud on the grounds that the Complaint does not allege any material representations and because the Astros owed no duty to disclose their sign-stealing scheme to Plaintiffs.[28] Both arguments lack merit.

　　a. The Complaint alleges numerous misrepresentations of material facts made by the Astros.

The Complaint alleges with particularity a host of material misrepresentations made by the Astros to the public, including the fantasy baseball playing public. The Complaint alleges, *inter alia*, the following:

- On October 17, 2018, the Astros' President of Baseball Operations and General Manager, Jeffrey Luhnow, when confronted with allegations that his team was engaging in systematic cheating, falsely denied that the Astros had violated MLB rules against electronic sign stealing and falsely claimed that the Astros' suspected efforts to place an individual with a camera in position to view an opposing team's dugout was solely to make sure the opposing team was not cheating. "We do it in every stadium we go into," claimed Luhnow. "We dispatch someone from the travel party to go out to center field, look at a particular area that might be suspicious or a certain monitor. I'm sure other clubs do this as well, but we're just trying to protect ourselves the best we can."[29] At the time of this statement, and at all times relevant to this action,

---

[27] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 409 F. Supp. 2d at 794 (citing Restatement (Second) of Torts § 531); *accord Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578-80 (Tex. 2001) (noting that consistent with § 531 of the Second Restatement of Torts, Texas recognizes a common law fraud cause of action in the absence of privity so long as the fraudfeasor has "information that would lead a reasonable man to conclude there is an especial likelihood that it will reach those [third] persons and will influence their conduct").

[28] Astros' Br. at 10-11.

[29] Compl. at ¶ 65.

Luhnow was aware that the Astros were engaged in impermissible electronic sign stealing.[30]

- The Astros issued numerous, almost daily, fraudulent statements that concealed from the public (including the fantasy baseball playing public) the Astros' misconduct and falsely attributed the Astros' success during the 2017 season (when the Astros won the World Series[31]) to player ability, hard work, and modern analytics.[32] For example, on May 28, 2017, an Astros player named Jake Marisnick stated that his offensive success in the 2017 season was due to offseason training and improvements in his swinging mechanics. "[It's] hard to get specific," explained Marisnick, "[but] I had to revamp everything and that's what I did this whole offseason and that's what spring training for me was for was getting used to this new swing and its starting to come out right now and it feels good." Analysis, however, shows that improvements in Marisnick's performance were due to the Astros' sign-stealing scheme, which resulted in trash cans being banged during over 22% of pitches thrown to Marisnick during Astros home games in 2017, which tipped him off to upcoming pitches.[33]

- For the 2017 baseball season, the Astros adopted a false public theme, "Earn History," to counteract any suspicion of cheating. They placed this catchphrase on souvenir cups, t-shirts, rally towels, baseball caps, banners, and social media accounts. One sign placed in the underground tunnel connecting the Astros' clubhouses and offices read, "What does it really mean to make history? To do something that has never been done. To write your name in the books? There's only one way—you've got to earn it. . . ." This "Earn History" theme falsely represented that the Astros' success was "earned" based upon player performance and other legitimate baseball factors, rather than upon impermissible cheating through electronic sign stealing.[34]

      b. <u>The Astros had a duty to disclose their electronic sign-stealing scheme to Plaintiffs.</u>

The Complaint also adequately alleges fraud based on a theory of fraudulent concealment.[35] In order to establish a fraudulent concealment claim, plaintiffs must first establish

---

[30] Compl. at ¶¶ 72, 89, 90.

[31] Compl. at ¶ 457.

[32] Compl. at ¶¶ 96, 97, 373, 382, 413, 443, 471.

[33] Compl. at ¶¶ 96-97

[34] Compl. at ¶ 98.

[35] Compl. at ¶¶ 373-77.

the existence of a duty to disclose.[36] Under Texas law—and consistent with section 551 of the

Second Restatement of Torts[37]—a duty to disclose may arise, even in the absence of a fiduciary

or confidential relationship, where, as here, one party, who possesses superior information,

makes a partial disclosure to another, which, while technically true, nonetheless conveys a false

impression:

> [Under Texas law] when one voluntarily discloses information, he
> has a duty to disclose the whole truth; when one makes a
> representation, he has a duty to disclose new information when the
> new information makes the earlier representation misleading or

---

[36] *Playboy Enters. v. Editorial Caballero*, 202 S.W.3d 250, 259 (Tex. App. 2006) ("As a general rule, a failure to disclose information does not constitute fraud unless there is a duty to disclose the information.") (citations omitted).

[37] While the Texas Supreme Court has yet to adopt § 551 (which imposes a general duty to disclose facts in a commercial setting), it has acknowledged that several Texas courts of appeals have held that a general duty to disclose information may arise in an arm's length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See Bradford*, 48 S.W.3d at 755 (quoting Restat. 2d of Torts § 551 and citing cases). And, indeed, several Texas courts of appeals have relied on this section of the Restatement (or its principles). *See, e.g.*, *CLC Roofing, Inc. v. Helzer*, 2019 Tex. App. LEXIS 5927, at *8 (Tex. App. July 11, 2019) (stating "[t]he duty to disclose information in a commercial setting is derived from [§ 551]" and recognizing application of § 551(2)(b)(c) & (e) to fraudulent non-disclosure claims); *Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex. App. 1997) (pet. denied) (finding duty disclose in absence of absence of special relationship); *accord Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633-36 (Tex. App. 1993) (writ denied); *SmithKline Beecham v. Jane Doe*, 903 S.W.2d 347, 352, 38 Tex. Sup. Ct. J. 1058 (Tex. 1995); *Formosa Plastics Corp. v. Presidio Engineers & Contractors, Inc.*, 941 S.W.2d 138, 146-47 (Tex. App. 1995) (per curiam), *rev'd on other grounds*, 960 S.W.2d 41, 44 (Tex. 1998); *State Nat'l Bank v. Farah Mfg. Co.*, 678 S.W.2d 661, 681 (Tex. App. 1984). Texas federal courts have also interpreted Texas law as recognizing that "[a] duty to disclose can exist absent a fiduciary relationship," consistent with § 551 of the Restatement. *See, e.g., Nuvasive, Inc. v. Renaissance Surgical Ctr. N., L.P.*, 853 F. Supp. 2d 654, 663 (S.D. Tex. 2012) (finding *Bradford v. Vento*, 48 S.W.3d at 752-54, a case in which the Texas Supreme Court declined to impose a duty to disclose where there was no special relationship between the parties, was "based upon the plaintiff's equal opportunity to discover withheld information" and that "absent such an equal opportunity to discover withheld information, a duty to disclose might exist"); *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 566 (5th Cir. 2005) ("[I]t would be fair to say that courts after *Bradford* (including this court) have . . . continued to find that a duty to disclose can exist in Texas absent a confidential or fiduciary relationship.") (citing cases).

untrue; and when one makes a partial disclosure and conveys a false impression, he has the duty to speak.[38]

As alleged in the Complaint, the Astros' duty to disclose their electronic sign-stealing scheme, which they knew was corrupting player performance statistics, arose as a result of numerous partial disclosures made to members of the public, including the fantasy baseball playing public, that created the false impression that the Astros were adhering to MLB's rules and regulations, and that MLB DFS contests were games of skill based on honestly-derived player performance statistics consistent with MLB rules. The Complaint alleges the following:

- The Astros represented to the public that the team would adhere to all MLB rules and regulations by signing onto the Major League Constitution, pursuant to which they agreed to be bound by all rules and regulations relating to "games, ballparks … and other matters."[39] At all times relevant to this action, MLB rules expressly prohibited the use of electronic devices to monitor or decipher communications between pitchers and catchers.[40] Even if the Astros' claim that it adhered to all MLB rules of play was true when made, it was later

---

[38] *Playboy Enters*, 202 S.W.3d at 260 (noting that in the absence of a fiduciary or confidential relationship, "a duty to speak may arise in an arms-length transaction in at least three other situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has the duty to speak"). Courts in other states have imposed a similar duty to speak in commercial settings. *See, e.g., Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("New York recognizes a duty by a party to a business transaction to speak . . . where the party has made a partial or ambiguous statement . . . [or] where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge. . . ."); *Matthews v. Am. Honda Motor Co.*, 2012 U.S. Dist. LEXIS 90802, at *7-8 (S.D. Fla. June 6, 2012) (finding Florida consumer protection law claim exists where "the defendant knowingly fails to disclose a material defect that diminishes a product's value"); *Smith v. Ford Motor Co.*, 749 F. Supp. 2d 980, 987 (N.D. Cal. 2010) (recognizing duty to disclose under California consumer protection laws when defendant had exclusive knowledge of material facts and actively concealed those facts or made a partial misrepresentation); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996) ("[A] duty to disclose material facts may arise out of a situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.").

[39] Compl. at ¶ 44.

[40] Compl. at ¶ 54.

rendered false by the Astros' electronic sign-stealing scheme, giving rise to a duty on the part of the Astros to disclose this new information to the public.[41]

- The Astros represented to fans that its offensive successes in the 2017 season were related to talent, hard work, modern analytics, and other legitimate baseball factors, without disclosing the impact of sign stealing.[42] Even if these legitimate factors played a part in the Astros' success, once the Astros decided to make voluntary public disclosures on the subject, they were obligated to convey the "whole truth," which included the fact that its players' performance statistics were being buoyed by systematic cheating.[43]

- On numerous occasions (in interviews, press releases and presentations to state governments), MLB Commissioner Robert D. Manfred, Jr.—who was the Astros' duly authorized agent and spokesperson[44]—publicly represented that maintaining the integrity and honesty of the game of baseball was MLB's most important priority; committed MLB to protecting the integrity and honesty of the game of baseball (including making sure that appropriate safeguards were in place to ensure that fantasy baseball competitions were fair); and characterized fantasy baseball as a game of skill.[45] In an October 2015 radio interview, Manfred (acting on behalf of MLB and its constituent clubs and as the duly authorized agent for the Astros) stated, "I think the biggest concern is the one that attracted the most publicity. You want to make sure that the fantasy organizations have appropriate safeguards in place to ensure that things are fair, that there's not an inappropriate use of information and that fans who engage on these platforms have an opportunity to win."[46] Such statements created the false impression that MLB performance statistics (including those of Astros players) were honest and could be relied upon by MLB DFS contestants to make skillful drafting decisions. To dispel this false impression, the Astros had a duty to disclose (either directly or through its spokesperson, Commission Manfred) that it was engaged in impermissible electronic sign stealing that resulted in corrupted player performance statistics and compromised the fairness of MLB DFS competitions.[47]

- Commissioner Manfred explicitly stated publicly that fantasy baseball competitions are games of skill. In October of 2015, to justify MLB's

---

[41] *See, e.g., Playboy*, 202 S.W.3d at 263.

[42] Compl. at ¶ 367.

[43] *See, e.g., Playboy*, 202 S.W.3d at 263.

[44] Compl. at ¶¶ 8, 22, 47, 169, 172.

[45] Compl. at ¶¶ 8, 39, 385-92.

[46] Compl. at ¶ 8.

[47] *See, e.g., Playboy*, 202 S.W.3d at 263.

partnership with DraftKings, Manfred stated, "I'm quite convinced [fantasy baseball] is a game of skill, as defined by the federal statute. And I'm comfortable with the idea that it's not gambling."[48] Even if Manfred's claim was true when made, it was later rendered false or misleading by the Astros' electronic sign-stealing scheme, which turned MLB DFS competitions into games of chance rather than skill, giving rise to a duty on the part of the Astros to disclose this new information to the public, either directly or through Manfred.[49]

- The Astros aggressively marketed and promoted DraftKings fantasy baseball competitions to the public, inducing members of the public to engage in MLB DFS competitions for and to the economic benefit of the Astros.[50] These promotional efforts gave the public the false impression that MLB DFS contests were games of skill, that safeguards were in place to ensure the fairness and integrity of these contests, and that the player performance statistics upon which these contests were based were consistent with MLB rules.[51] Such representations imposed a duty on the Astros to disclose to the public its knowledge that the team was engaged in impermissible electronic sign stealing, which systematically distorted player performance statistics.[52]

These allegations—which establish a duty to disclose and a breach thereof—are sufficient to state a plausible claim for fraudulent concealment against the Astros under Texas law.[53]

---

[48] Hardiman Decl., Ex. 4. *See also* Compl. at ¶¶ 3 & n.3, 7.

[49] *See, e.g., Playboy*, 202 S.W.3d at 263.

[50] Compl. at ¶¶ 118-20.

[51] Compl. at ¶¶ 364-80.

[52] *See, e.g., Playboy*, 202 S.W.3d at 263.

[53] *See Newby v. Enron Corp. (In re Enron Corp. Secs.)*, 2010 U.S. Dist. LEXIS 145220, at *209-10 (S.D. Tex. Jan. 19, 2010) (plaintiffs stated plausible claim for common law fraud based on non-disclosure where they alleged "(a) Enron concealed or failed to disclose material facts regarding its actual financial condition within its knowledge, aided by accounting tricks and improper SPE-generated off-balance sheet debt . . . (b) Enron knew that Plaintiffs and other potential investors were ignorant of these facts and did not have an equal opportunity to discover the truth, and it developed extremely complex methods of concealing the truth; (c) Enron intended to induce the Plaintiffs and other investors to purchase Enron securities to feed its Ponzi scheme . . . ; and (d) Plaintiffs suffered pecuniary injury as a result of being induced to purchase Enron securities without knowledge of the undisclosed facts") (citing *Bradford*, 48 S.W. 3d at 754-55).

## 2. The Complaint adequately alleges the Astros intended to deceive Plaintiffs.

Plaintiffs plausibly allege that the Astros intended to deceive Plaintiffs through its misrepresentation and concealment of material facts. As set forth in the Complaint, the Astros induced consumers to pay to enter MLB DFS contests—to the Astros' enormous financial benefit—by misrepresenting to the public that these contest were "games of skill" based upon honestly-derived player performance statistics,[54] protected from corruption by appropriate safeguards,[55] and by concealing and/or failing to disclose the fact (which was known to Astros' players, coaches, and management) that the team was engaged in an electronic sign-stealing scheme that dramatically distorted player statistics.[56] The Astros had reason to expect that Plaintiffs would be induced to pay fees to enter MLB DFS contests—to the Astros' enormous financial benefit—in reliance on these misrepresentations and omissions, and that if Plaintiffs knew of the Astros' impermissible sign-stealing scheme, they would not have paid fees to enter MLB DFS competitions.

Such allegations of fact provide a more than sufficient basis from which to infer Defendant Astros' intent to fraudulently induce Plaintiffs to participate in MLB DFS contests. Under Texas law (and consistent with § 531 of the Restatement (Second) of Torts), intent to defraud can be inferred—even in the absence of privity or some other special relationship between the alleged fraudfeasor and the victim—where, as here, a speaker "makes a misrepresentation . . . to a person or class of persons . . . [who the speaker] 'has reason to expect' will act in reliance upon the misrepresentation."[57] Moreover, plaintiffs need not plead intent with

---

[54] Compl. at ¶¶ 3 & n.3, 7; Hardiman Decl., Ex. 4.

[55] Compl. at ¶¶ 3 & n.3, 7; Hardiman Decl., Ex. 4.

[56] Compl. at ¶ 2, 11, 96, 111, 182, 195.

[57] *See Ernst & Young*, 51 S.W.3d at 578 (citing Restat. 2d of Torts § 531).

particularity in order to survive a motion to dismiss.[58] Plaintiffs need only allege intent to

deceive "and other conditions of [a defendants'] mind . . . generally."[59] Courts also recognize

that the level of specificity required to plead intent is "relaxed" where, as here, facts relating to

the fraud are "peculiarly within the perpetrator's knowledge."[60]

### 3. The Complaint adequately alleges Plaintiffs relied upon the Astros' misrepresentation and/or omission of material facts to their detriment.

Plaintiffs satisfy the reliance element by alleging that they "would not have entered into

DraftKings' MLB DFS contests . . . had [they] known" the games were compromised by the

Astros' misconduct, and that they suffered financial harm by engaging in MLB DFS contests in

reliance on the Astros' various misrepresentations and omissions regarding the nature of that

consumer product.[61]

Defendant Astros' argument that Plaintiff's allegation of reliance fails for lack of

particularity is unavailing.[62] "Rule 9(b) does not require [p]laintiffs to plead reliance with

particularity or state how they specifically relied on each statement."[63] "[U]nder Texas law a

fraud victim's reliance on a material misrepresentation or omission can be inferred from

circumstantial evidence and there is no requirement that there be a direct relationship between

---

[58] Astros' Br. at 11-12.

[59] *In re Enron Corp. Secs.*, 2010 U.S. Dist. LEXIS 145220, at *216 (citing *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992)).

[60] *United States ex rel. Russell v. EPIC Healthcare Mgmt. Group*, 193 F.3d 304, 308 (5th Cir. 1999) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

[61] *See* Compl. at ¶¶ 122, 126, 134, 138.

[62] Astros' Br. at 11-13.

[63] *Timberlake v. Synthes Spine Co.*, 2009 U.S. Dist. LEXIS 29074, at *19-20 (S.D. Tex. Mar. 31, 2009) (finding sufficient for claim of fraud by affirmative misrepresentation the allegation that named plaintiffs relied on defendant's misrepresentations in their decision to have a particular kind of artificial disc implanted in their backs).

the plaintiff and the defendant."[64] Even conclusory allegations of reliance are sufficient, because, as one court has explained, "[a]llegations of reliance are inherently conclusory."[65] Courts have also held that "[r]eliance is . . . a question for the fact-finder" and thus inappropriate for adjudication on the pleadings.[66]

Plaintiffs have also sufficiently alleged that they suffered an injury by relying on the Astros' material misrepresentations and omissions. As alleged in the Complaint, the Astros' sign-stealing scheme "distorted" in unknown and unpredictable ways player statistics (which are "a material consideration" in fantasy league drafting) and that fans' ability to select players skillfully was impaired by the Astros' electronic sign-stealing scheme.[67] Establishing the precise value of Plaintiffs' damages is a question of fact which Plaintiffs will establish at trial.

## C.    Plaintiffs State a Claim for Negligence.

To make out a claim of negligence, Texas law requires parties to "establish the existence of a duty, a breach of that duty, and damages proximately caused by the breach."[68] The Astros argue that Plaintiffs have not and cannot make out a negligence claim because the Astros owned no legal duty to Plaintiffs as daily fantasy players.[69] In particular, the Astros aver that they had

---

[64] *In re Enron Corp. Secs.*, 2010 U.S. Dist. LEXIS 145220, at *223-24.

[65] *Id.* at *229-30 ("While . . . plaintiff's allegations of reliance are conclusory, this is inherently true of reliance allegations.") (internal citations omitted).

[66] *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 638 (S.D. Tex. 2007) (applying Texas law). *See also In re Enron Corp. Secs.*, 2010 U.S. Dist. LEXIS 145220, at *229-30 ("[W]hile reliance, or lack thereof, may be established as a matter of law based on the evidence of record on summary judgment, it is not proper matter for dismissal on the pleadings").

[67] Compl. at ¶¶ 10, 31, 117.

[68] *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

[69] Astros' Br. at 14.

no general "duty to ensure that . . . DraftKings MLB DFS wagering competitions[] are fair."[70] This argument is unavailing for a number of reasons.

As alleged in the Complaint, the Astros aggressively promoted MLB DFS competitions to the public, to its own financial benefit, at the same time that the team (with the knowledge and participation of its players, coaches, managers, and executives) engaged in an impermissible electronic sign-stealing scheme.[71] The Astros had a duty not to engage in any activity, such as electronic sign stealing, that it knew or should have known would compromise the fairness of a commercial activity that the Astros were promoting and profiting from, and harm consumers.[72] Moreover, as alleged in the Complaint and discussed above, the Astros—having made numerous partial, misleading disclosures about the fairness of MLB DFS contests, the reliability of player performance statistics, and the reason for its own successes—had a duty to disclose the whole truth, including their engagement in electronic sign stealing, which they breached.[73]

The Complaint also plausibly alleges that, as a direct and proximate result of the Astros' breach of its duty not to engage in an impermissible sign-stealing scheme and/or to disclose this activity to the public, Plaintiffs were unable to skillfully draft fantasy teams for MLB DFS competitions that they paid to enter, causing Plaintiffs financial harm in an amount to be proven at trial.[74] As alleged in the Complaint, Plaintiffs would not have participated in MLB DFS competitions at all if they had known that as a result of the Astros' and other teams' misconduct, the MLB player performance statistics intrinsic to the fairness of the contests were corrupted,

---

[70] Astros' Br. at 14-15.

[71] Compl. at ¶¶ 345-357.

[72] Compl. at ¶¶ 447, 448.

[73] *See supra* section II.B.1.b.

[74] Compl. at ¶ 352.

turning what they thought was a game of skill into a game of chance.[75] In short, the Astros actively undermined the value to consumers of a product—MLB DFS contests—that they were actively promoting to those same consumers, and are liable for negligence.

### D. Plaintiffs State a Claim Under the Texas Deceptive Trade Practices Act.

Under the Texas Deceptive Trade Practices Act (DTPA), a consumer may maintain an action where "the use or employment by any person of a false, misleading, or deceptive act or practice" constitutes a "producing cause" of economic damages.[76] To qualify as a "consumer" within the meaning of the DTPA, a plaintiff must "seek[] or acquire[] by purchase or lease, . . . goods or services,"[77] and "the [acquired] goods or services must form the basis of [the plaintiff's] complaint."[78] "Although the DTPA does not cover the purchase of intangibles, a plaintiff can nonetheless bring the acquisition of services associated with the intangible within the DTPA by alleging he would not have sought or purchased the intangible but for the collateral services offered along with those items."[79]

Plaintiffs here plausibly allege that they are consumers within the meaning of the DTPA because they paid for "fantasy baseball services" provided by DraftKings that were compromised and rendered unfair by corrupted player performance statistics (and the many false and

---

[75] Compl. at ¶ 446.

[76] Tex. Bus. & Com. Code Ann. § 17.50(a).

[77] Tex. Bus. & Com. Code Ann. § 17.45(4).

[78] *Lonergan v. A.J.'s Wrecker Serv. of Dall., Inc.*, 1999 U.S. Dist. LEXIS 10494, at *9-10 (N.D. Tex. July 6, 1999) (citing *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 351-52 (Tex. 1987)).

[79] *Lochabay v. Southwestern Bell Media, Inc.*, 828 S.W.2d 167, 171-72 (Tex. App. 1992) (writ denied); *accord Herndon v. First Nat'l Bank of Tulia*, 802 S.W.2d 396, 398-99 (Tex. App. 1991) (writ denied); *FDIC v. Munn*, 804 F.2d 860, 865 (5th Cir. 1986) (stating "the key principle to determining consumer status under the DTPA" is whether "the purchased goods or services [are] . . . an objective of the transaction, [or] merely incidental to it").

misleading statements the Astros made to conceal its misconduct), causing Plaintiffs considerable economic harm.[80]

### 1. Daily fantasy sports players are "consumers" within the meaning of the DTPA.

Defendant Astros contend that Plaintiffs do not qualify as "consumers" within the meaning of the DTPA because participating in fantasy sports competitions is "gambling," which is not covered by the DTPA.[81] While the Astros are correct that gambling instruments, such as lottery tickets, are not "goods or services" under the DTPA,[82] this observation is of no moment here. Fantasy sports competitions are *not* gambling, but rather games of skill, as Defendants have repeatedly maintained to their benefit.[83]

*Kinnard v. Circle K. Stores*, which the Astros rely upon in their brief, merely underscores why—in the context of consumer transactions involving the acquisition of "intangibles"—skills-based transactions (such as fantasy sports competitions) merit protection under the DTPA, whereas games of chance (such as lotteries) do not. *Kinnard* involved a suit brought under the DTPA by the purchaser of lottery tickets against Circle K Stores alleging the defendant's store clerk failed to properly process the plaintiff's payslip, which contained the winning combination of six numbers, and that as a result of Circle K's error, this combination did not register with the Lottery Commission's computer, and the plaintiff did not win the jackpot.[84] Affirming the lower

---

[80] Compl. at ¶ 428.

[81] Astros' Br. at 15-16.

[82] *See, e.g.*, *Kinnard v. Circle K Stores*, 966 S.W.2d 613, 618 (Tex. App. 1998).

[83] Indeed, if fantasy baseball were classified as gambling, it would be outlawed in many states, including Texas. *See* Tex. Penal Code § 47.02 (banning gambling in Texas with very limited exceptions). Defendants have repeatedly represented that fantasy baseball is a game of skill publicly, in court, and before governmental authorities across the country. *See* Compl. at ¶ 3 & n.3. They should not be allowed to argue otherwise here.

[84] *Kinnard*, 966 S.W.2d at 615-16.

court's dismissal of the plaintiffs' DTPA claim, the Texas Court of Appeals found that "the object of the transaction was [nothing more than] a chance to participate in the Texas Lotto drawing for that date," which it characterized as an "intangible" not covered by the DTPA's definition of "goods and services."[85] As the court further explained, "when a transaction's central objective is the acquisition of an intangible," a plaintiff may still bring suit under the DPTA based upon a "collateral service" rendered in conjunction with the transaction;[86] however, in these cases, "Texas law requires that the collateral service be not merely incidental to the performance of a transaction . . . , but an important objective of the transaction," citing "investment advice" as "an example of such a collateral service."[87] The court concluded that since "Circle K's participation . . . was merely incidental to the [lottery playing] transaction," it could not form the basis of a DTPA claim.[88]

As the *Kinnard* decision makes clear, in commercial transactions involving no skill (such as playing the lottery, where participants choose a series of numbers, each with the same odds of winning), services rendered in conjunction with the transaction (such as transmitting numbers to a state lottery database) are unlikely to be important to the consumer's objective, and thus are unlikely to be covered by the DTPA. As one court explained, lottery tickets are not covered by the DTPA because the lottery "is merely a game of chance resulting in a temporary and ephemeral association between the [lottery administrator] and the purchaser of the ticket."[89] Even if a store clerk transposes the numbers on a customer's playslip when inputting selected combinations into the system, as occurred in *Kinnard*, that mistake will have no effect

---

[85] *Id.* at 618.

[86] *Id.*

[87] *Id.*

[88] *Id.*

[89] *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 453 (Ky. Ct. App. 2012).

whatsoever on the likelihood of that customer winning or losing money, because, *ex ante*, all combinations have the same chance of hitting the jackpot.

By contrast, services rendered in conjunction with skills-based transactions (such as securities investment advice) are far more likely to be important to the objective of the activity (*i.e.*, whether to buy or sell), and to affect consumer welfare. For example, if a broker gives a client false or misleading information—or if he relays to the client a fraudulent representation about a publicly traded company—that communication is very likely to impact which securities the investor will purchase or sell, and to alter the likelihood that the investor will make or lose money. Investment advice is therefore a collateral service that is "not merely incidental to the performance of [the investment transaction] . . . , but an important objective of the transaction."[90] As such, it warrants protection under the DTPA.

Here, it is clear that DraftKings fantasy baseball services are not "merely incidental to the performance of" MLB DFS contests. Unlike lottery ticket vendors, which each perform the same, simple, routine task (transmitting number combinations to a database), DraftKings creates a unique interactive platform for multiple contestants to compete against one another in a complex, statistics-based game of skill. Without the services provided by DraftKings (including managing and transmitting huge amounts of player performance data to participants), MLB DFS competitions would be impossible, and Plaintiffs would not have engaged in daily fantasy baseball competitions at all. The collateral services provided by DraftKings are therefore critical to consumers and warrant protection under the DTPA. These services may therefore form the basis of a DTPA claim.[91]

---

[90] *Kinnard*, 966 S.W.2d at 618.

[91] *Id.*

## 2. The Complaint adequately alleges that conduct by the Astros was a "producing cause" of Plaintiffs' damages

Plaintiffs have plausibly alleged that the Astros' misconduct caused them financial damages in an amount to be proven at trial, as noted above in section II.B.3, *supra*.

## E. Plaintiffs State a Claim for Unjust Enrichment.

Under Texas law, to plead a claim for unjust enrichment, a plaintiff must allege that "one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage."[92] Here, Plaintiffs plausibly allege that the Astros obtained enormous benefits, at the expense of Plaintiffs and members of the proposed Class, from their wrongful promotion of MLB DFS contests and their failure to disclose their electronic sign-stealing scheme to the public, which fraudulently induced Plaintiffs to pay millions of dollars in fees to participate in MLB DFS contests.[93] Plaintiffs allege that the financial benefits that the Astros and the other Defendants obtained from this misconduct include not only their share of DraftKings' MLB DFS contest fees (pursuant to the Astros' and MLB' partnership agreements with DraftKings), but also increased fan attendance, advertising and television revenues, and revenues from the sale of MLB paraphernalia.[94] The Astros also profited tremendously from winning the 2017 World Series, with resulting increases in fan attendance and seat prices, advertising and broadcast revenue, merchandise sales, and team valuations.[95]

Defendant Astros' argument that Plaintiffs cannot bring a claim for unjust enrichment because it is not an independent cause of action under Texas law should be rejected.[96] While

---

[92] *Heldenfels Bros., Inc. v. Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

[93] Compl. at ¶ 118-20.

[94] Compl. at ¶ 118-20.

[95] Compl. at ¶ 118-20.

[96] Astros' Br. at 18-19.

"[c]ourts of appeals in Texas appear split on whether unjust enrichment is an independent cause of action,"[97] the Texas Supreme Court has expressly "affirm[ed] an award of unjust enrichment damages,"[98] and Texas courts of appeals have affirmed on numerous occasions that unjust enrichment is a valid standalone claim under Texas law.[99] This Court should follow suit and find Plaintiffs' standalone claim for unjust enrichment to be valid.

### III. CONCLUSION

For the foregoing reasons, the Astros' Motion to Dismiss should be denied.

---

[97] *Elias v. Pilo*, 781 F. App'x 336, 338 (5th Cir. 2019).

[98] *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 673, 683-86 (Tex. 2000). *See also HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (recognizing cause of action for unjust enrichment where defendant has benefited at plaintiff's expense).

[99] *See, e.g., Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App. 2007) ("Unjust enrichment is an independent cause of action.").

Respectfully submitted,

Date: March 6, 2020

By: /s/ David S. Golub
David S. Golub
Steven L. Bloch
Ian W. Sloss
SILVER GOLUB & TEITELL LLP
184 Atlantic Street
Stamford, CT 06901
Tel (203) 325-4491
Email: dgolub@sgtlaw.com
Email: sbloch@sgtlaw.com
Email: isloss@sgtlaw.com

Eric L. Cramer (*pro hac vice*)
Patrick F. Madden (*pro hac vice*)
BERGER MONTAGUE PC
1818 Market St., Suite 3600
Philadelphia, PA 19103
Tel (215) 875-3000
Email: ecramer@bm.net
Email: pmadden@bm.net

John D. Radice
Kenneth Pickle
Natasha Fernandez-Silber
April Lambert
RADICE LAW FIRM, P.C.
475 Wall Street
Princeton, NJ 08540
Tel (646) 245-8502
Email: jradice@radicelawfirm.com
Email: kpickle@radicelawfirm.com
Email: nsilber@radicelawfirm.com
Email: alambert@radicelawfirm.com

*Counsel for Plaintiffs and the Proposed Class*

## CERTIFICATION

I hereby certify that on March 6, 2020, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

/s/ David S. Golub
DAVID S. GOLUB