## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

KRISTOPHER R. OLSON,
CHRISTOPHER LOPEZ, WARREN
BARBER, CHRISTOPHER CLIFFORD
and ERIK LIPTAK,

               Plaintiffs,

        v.

MAJOR LEAGUE BASEBALL; MLB
ADVANCED MEDIA, L.P.; HOUSTON
ASTROS, LLC; and BOSTON RED SOX
BASEBALL CLUB, LP,

               Defendants.

------------------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

20 Civ. 632 (JSR)

## DEFENDANT MAJOR LEAGUE BASEBALL'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR PROTECTIVE ORDER

John L. Hardiman
Benjamin R. Walker
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB
Advanced Media LP*

March 30, 2020

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ...................................................................................1

**BACKGROUND** ........................................................................................................3

    A.    The Astros and Red Sox Investigations. ....................................................3

    B.    Plaintiffs' Discovery Requests.....................................................................5

**ARGUMENT** ..............................................................................................................7

I.    THE INVESTIGATION MATERIALS ARE PROTECTED BY THE WORK PRODUCT DOCTRINE.................................................................................7

    A.    The Investigation Materials Are Work Product........................................7

    B.    Plaintiffs Are Not Entitled to Production of MLB's Work Product. ....................10

II.    THE INVESTIGATION MATERIALS ARE SUBJECT TO ATTORNEY-CLIENT PRIVILEGE..............................................................................14

    A.    The Investigation Materials Reflect Confidential Attorney-Client Communications. ...................................................................................16

    B.    The Investigation Materials Are "Predominantly of a Legal Character." .............18

**CONCLUSION** ........................................................................................................**20**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambac Assur. Corp.* v. *Countrywide Home Loans, Inc.*,
   57 N.E. 3d 30 (N.Y. 2016) ...........................................................................................16

*Amtrust N. Am., Inc.* v. *Safebuilt Ins. Servs., Inc.*,
   2016 WL 3260370 (S.D.N.Y. June 10, 2016) ...............................................................12

*Bacchi* v. *Mass. Mut. Life Ins. Co.*,
   110 F. Supp. 3d 278 (D. Mass. 2015) ............................................................................16

*Calvin Klein Trademark Trust* v. *Wachner*,
   124 F. Supp. 2d 207 (S.D.N.Y. 2000) ...........................................................................20

*Cicel (Beijing) Science & Tech. Co., Ltd.* v. *Misonix, Inc.*,
   331 F.R.D. 218 (E.D.N.Y. 2019) ..................................................................................10

*In re Cty. of Erie*,
   473 F.3d 413 (2d Cir. 2007) ..........................................................................................19

*Fine* v. *ESPN, Inc.*,
   2014 WL 12586847 (W.D.N.Y. Oct. 16, 2014) .............................................................17

*In re Gen. Motors LLC Ignition Switch Litig.*,
   80 F. Supp. 3d 521 (S.D.N.Y. 2015) ...................................................................9, 10, 18

*Int'l Cards Co.* v. *Mastercard Int'l Inc.*,
   2014 WL 4357450 (S.D.N.Y. Aug. 27, 2014) ...............................................................19

*Greenberg* v. *Smolka*,
   2006 WL 1116521 (S.D.N.Y. Apr. 27, 2006) ...............................................................13

*Hickman* v. *Taylor*,
   329 U.S. 495 (1947) ...............................................................................................7, 8, 14

*Kraus* v. *Brandstetter*,
   586 N.Y.S.2d 270 (N.Y. App. Div. 1992) .....................................................................19

*Maloney* v. *Sisters of Charity Hosp.*,
   165 F.R.D. 26 (W.D.N.Y. 1995) ...................................................................................14

*McSweeney* v. *Bayport-Bluepoint Sch. Dist.*,
   2010 WL 11700817 (E.D.N.Y. Jan. 11, 2010) ..............................................................13

*Pal* v. *New York Univ.*,
    2007 WL 1522618 (S.D.N.Y. May 22, 2007) ........................................................14

*Parneros* v. *Barnes & Noble, Inc.*,
    332 F.R.D. 482 (S.D.N.Y. 2019) ...............................................................15, 17

*Patel* v. *L-3 Commc'ns Holdings, Inc.*,
    2016 WL 4030704 (S.D.N.Y. July 25, 2016) ...........................................................8

*In re Processed Egg Prod. Antitrust Litig.*,
    2014 WL 6388436 (E.D. Pa. Nov. 27, 2014) ..........................................................16

*Rossi* v. *Blue Cross & Blue Shield*,
    540 N.E.2d 703, 706 (N.Y. 1989) ...................................................................18

*S.E.C.* v. *Treadway*,
    229 F.R.D. 454 (S.D.N.Y. 2005) ....................................................................13

*Schaeffler* v. *United States*,
    806 F.3d 34 (2d Cir. 2015)...........................................................................7

*Spectrum Sys. Int'l Corp.* v. *Chemical Bank*,
    581 N.E.2d 1055 (N.Y. 1991) ....................................................................15, 19

*In re Symbol Techs., Inc. Sec. Litig.*,
    2016 WL 8377036 (E.D.N.Y. Sept. 30, 2016) ..........................................................8

*United States* v. *Adlman*,
    134 F.3d 1194 (2d Cir. 1998).....................................................................7, 10

*United States* v. *Jackson*,
    969 F. Supp. 881 (S.D.N.Y. 1997)....................................................................20

*United States* v. *Mt. Sinai Hosp.*,
    185 F. Supp. 3d 383 (S.D.N.Y. 2016).........................................................7, 10, 13

*Upjohn Co.* v. *United States*,
    449 U.S. 383 (1981).......................................................................10, 15, 18, 19

*In re Veeco Instr., Inc. Sec. Litig.*,
    2007 WL 724555 (S.D.N.Y. Mar. 9, 2007) .............................................................7

*In re von Bulow*,
    828 F.2d 94 (2d Cir. 1987)..........................................................................20

**Other Authorities**

Fed. R. Civ. P. 26 .......................................................................2, 7, 11, 13

## PRELIMINARY STATEMENT

Plaintiffs' effort to turn this Court into a forum for disgruntled fans to air their grievances about Major League Baseball ("MLB") clubs breaking league rules has now turned to exploiting the discovery process to attempt to satisfy Plaintiffs' curiosity about the contents of MLB's privileged and highly sensitive internal investigation files.  Specifically, Plaintiffs have demanded production of any materials generated by MLB in the course of its recent investigations into allegations of electronic sign stealing by the Houston Astros and Boston Red Sox.  Plaintiffs are already getting thousands of documents turned over to MLB by the Astros and Red Sox in the course of MLB's investigations.  But they also want MLB to produce its own internal documents from the investigations—both of which began after the putative class period and one of which remains open—including: (i) confidential memoranda prepared by MLB lawyers to advise the Commissioner of Baseball with respect to the outcome of the investigations, (ii) summaries of interviews conducted during the investigations, also prepared by lawyers and reflecting their mental impressions and judgments, and (iii) notes of the witness interviews taken by MLB lawyers and investigators working under the direction of the lawyers.  Plaintiffs are not entitled to these materials (collectively, the "Investigation Materials").

Just as Plaintiffs' disappointment with the conduct of baseball players on the field is not grounds for a legal claim against MLB based on their participation in fantasy baseball contests offered by DraftKings, Plaintiffs' apparent interest in getting an exclusive peek at some of MLB's most sensitive documents, which are tangential, at best, to the causes of action actually pled in their complaint, is not grounds for invading the league's legal privileges.  The Court should grant a protective order for at least two reasons:

*First*, the materials that Plaintiffs seek are protected by the work product doctrine. They were created by MLB's Department of Investigations ("DOI") in the course of internal

investigations conducted against the backdrop of potential litigation or arbitration with club employees.  The materials reflect attorneys' legal judgments, mental impressions and analysis and thus are entitled to protection from disclosure under Rule 26 of the Federal Rules of Civil Procedure.  And even if any of the work product materials could be viewed as purely factual, Plaintiffs have not met their high burden under Rule 26 to show a "substantial need" for disclosure of such materials.  The Investigation Materials are marginally relevant, at best, to Plaintiffs' claims against MLB.  MLB could not possibly have had a duty to disclose information during the putative class period that MLB learned through investigations that took place after the putative class period, and the Investigation Materials say nothing about MLB's relationship with DraftKings and shed no light on why Plaintiffs participated in DraftKings contests.  Nor have Plaintiffs established the requisite "undue burden" in obtaining the additional facts they believe they need through ordinary discovery devices, such as depositions, which they have not yet even begun.  If Plaintiffs want to further develop their theory that the player statistics used in their DraftKings contests were allegedly "corrupted" by electronic sign stealing, even though they concede the statistics accurately reflected the action taking place during MLB games, they should do their own work.  They are not entitled to piggyback on MLB's privileged investigations, particularly since the Investigation Materials would not help them prove the claims they have actually alleged.

*Second*, the Investigation Materials are protected by attorney-client privilege.  The memoranda, summaries and notes reflect confidential attorney-client communications between MLB attorneys (and their agents) and employees of the league's members.  They set forth the analysis of those attorneys regarding the culpability of, and potential discipline for, those involved and provide legal advice to the Commissioner of Baseball with respect to potential violations of MLB's rules and the resulting disciplinary action.  These communications are legal in nature and

employ classic attorney skills and functions: gathering of facts, analysis of rules and precedent, and legal judgment and counsel.

## BACKGROUND

### A.     The Astros and Red Sox Investigations.

DOI was formed by the Office of the Commissioner to assist the Commissioner in exercising his authority under the MLB Constitution to investigate and discipline violations of MLB's rules.  (Declaration of Bryan Seeley ("Seeley Decl.") ¶¶ 2, 3.)  DOI reports to Dan Halem, MLB's Chief Legal Officer, and regularly conducts investigations into suspected misconduct of various kinds and advises the Commissioner with respect to the findings of those investigations and potential courses of action available to him.  (*Id*.)  MLB's rules of procedure for investigations provide that investigations are overseen by legal staff and Mr. Halem, and that the Office of the Commissioner is not obligated to disclose investigation materials to clubs or club officials.  (*Id.* ¶ 3.)  DOI is currently overseen by Bryan Seeley, a former federal prosecutor.  (*Id.* ¶ 2.)

In November 2019, the Commissioner of Baseball, Robert D. Manfred, Jr., and Mr. Halem directed DOI to conduct an investigation into allegations that the Houston Astros engaged in electronic sign stealing in violation of MLB's rules (the "Astros Investigation"), in order to advise the Commissioner on whether violations occurred and to assess the culpability of, and potential discipline for, those involved.  (*Id.* ¶ 4.)  Mr. Seeley, Moira Weinberg, Vice President of Investigations and Deputy General Counsel and also a former prosecutor, and their colleagues— three additional in-house attorneys and two non-lawyer investigators—conducted the Astros Investigation.  (*Id.* ¶ 5.)  From the inception of the Astros Investigation, DOI anticipated that if its investigation resulted in discipline against club officials, it could lead to litigation or arbitration, as other investigations had in the past.  (*Id.* ¶ 6.)  The investigation thus was conducted with the

prospect of litigation in mind, and Mr. Seeley and his colleagues discussed the potential for litigation throughout their investigation.  (*Id.*)

DOI's work during the Astros Investigation included interviews of 68 current and former players and non-player employees or contractors of MLB and its member clubs, led by DOI attorneys and investigators working at Mr. Seeley and Ms. Weinberg's direction.  (*Id.* ¶ 7.) In each interview of a current MLB player, to encourage him to speak freely, DOI made an explicit commitment to the witness that it would not publicly identify him as someone DOI interviewed or publicly attribute to him any statements made during the interviews.  (*Id.* ¶ 7.)  The Major League Baseball Players Association ("MLBPA") cooperated in DOI's investigation and attended the players' interviews, and it received similar assurances of confidentiality.  (*Id.*)  Because of the nature of DOI's investigations, all interview participants generally shared the expectation that materials generated by MLB in connection with those interviews would not be disclosed to the Astros, to other clubs or to the public.  (*Id.* ¶ 3.)

The interviews were not recorded and no transcripts were created; instead, the interviews were memorialized in notes taken by the DOI attorneys and investigators who attended each interview.  (*Id.* ¶ 9.)  At Mr. Halem's direction, interview summaries were prepared highlighting the information learned in each interview that was determined to be potentially material to the ultimate report to the Commissioner and any discipline he would impose.  (*Id.* ¶ 10.) At the conclusion of the Astros Investigation, MLB attorneys prepared a memorandum to the Commissioner to provide their analysis of the findings of the investigation, to explain the facts underlying such analysis, to opine on the relevant rule and policy framework and to discuss

applicable precedents with respect to MLB discipline.  (*Id.* ¶ 11.)[1]  The interview summaries that DOI prepared were included as exhibits to the memorandum, along with other key documents DOI believed would assist the Commissioner's decision-making process.  (*Id.*)  On January 13, 2020, Commissioner Manfred publicly announced his conclusion that the Astros engaged in electronic sign stealing in violation of MLB's rules during the 2017 and 2018 seasons and released a public statement explaining the findings of the investigation and the basis for his decision to discipline the club and certain of its employees.

       While the Astros Investigation was pending, new allegations of electronic sign stealing by the Red Sox were publicly reported by the media, and the Commissioner and MLB's Chief Legal Officer directed that DOI open a new investigation (the "Red Sox Investigation").  (*Id.* ¶ 12.)  As with the Astros Investigation, the Red Sox Investigation involved interviews of dozens of current and former player and non-player employees or contractors and resulted in a memorandum, drafted by MLB attorneys, advising the Commissioner of DOI's findings and analysis.  (*Id.* ¶¶ 12–14.)  Also as with the Astros Investigation, DOI anticipated that the Red Sox Investigation could result in litigation and conducted the investigation accordingly.  (*Id.* ¶ 13.)  Although work on the Red Sox Investigation is substantially complete, Commissioner Manfred has not yet finalized or publicly released his conclusions, which have been delayed by the ongoing public health crisis.  (*Id.*)

**B.   Plaintiffs' Discovery Requests.**

       This case, brought on behalf of a putative class of participants in fantasy baseball contests organized by DraftKings between April 2, 2017 and October 30, 2019, was filed shortly

---

[1] *See* Robert D. Manfred, Jr., *Statement of the Commissioner*, Office of the Commissioner of Baseball (Jan. 13, 2020),
 https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf.

after the Commissioner announced the results of the Astros Investigation.  Defendants' motions to dismiss the Amended Complaint remain pending.  (*See* ECF Nos. 27, 30 & 36.)

While awaiting a decision on the viability of Plaintiffs' legal claims, the parties are engaged in discovery and have exchanged document requests, interrogatories and requests for admission.  Defendants have already produced thousands of pages of documents, including (i) MLB's contracts with DraftKings, (ii) documents concerning MLB's rules, regulations and policies regarding electronic sign stealing and related disciplinary actions, and (iii) materials and minutes from MLB's internal boards and committees concerning electronic sign stealing and MLB's relationship with DraftKings.  MLB is in the process of reviewing emails and other documents concerning any complaints about electronic sign stealing during the putative class period (or otherwise concerning potential violations of the rules prohibiting electronic sign stealing), and will produce responsive emails, among other documents (*e.g.*, promotional materials for DraftKings), shortly.  MLB is also working with the Astros and Red Sox to coordinate the production to Plaintiffs of thousands of documents that each club turned over to MLB in the course of its investigations.  Plaintiffs, of course, are already in possession of MLB's public report setting forth the relevant facts, analysis and outcome of the Astros Investigation, and will have access to MLB's public report concerning the Red Sox once it is released.

MLB objected to producing "all documents prepared by MLB in connection with [its] investigation[s]" of electronic sign stealing.  (*See* Declaration of John L. Hardiman ("Hardiman Decl.") Ex. 1 at Requests Nos. 24, 25 & 26; Ex. 2 at Responses Nos. 24, 25 & 26.) Notwithstanding Defendants' agreement to produce to Plaintiffs a significant volume of confidential, sensitive investigatory material, the early stage of the discovery process and the uncertainty over the fundamental viability of Plaintiffs' claims, Plaintiffs insisted on prematurely

pressing for the most sensitive, privileged material to which even the Astros and Red Sox themselves are not privy.  This motion for a protective order followed.

## ARGUMENT

### I.   THE INVESTIGATION MATERIALS ARE PROTECTED BY THE WORK PRODUCT DOCTRINE.

#### A.   The Investigation Materials Are Work Product.

The work product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects from disclosure documents "prepared in anticipation of litigation or for trial." *See also Hickman* v. *Taylor*, 329 U.S. 495 (1947).  To determine whether documents were prepared "in anticipation of litigation" and therefore protected by the work product doctrine, courts in the Second Circuit apply a "because of" test, asking whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation."  *United States* v. *Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998).  To satisfy this standard, a document need not be prepared "primarily or exclusively to assist in litigation."  *Id.* at 1198, 1202.  Rather, work product protection extends to documents prepared for multiple purposes, so long as litigation was one of them.  *See, e.g.*, *Schaeffler* v. *United States*, 806 F.3d 34, 43 (2d Cir. 2015) ("Documents prepared in anticipation of litigation are work product, even when they are also intended to assist in business dealings."); *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL 724555, at *5 (S.D.N.Y. Mar. 9, 2007) ("[A] document created for two purposes—a business purpose as well as a litigation purpose—is protected under the work product doctrine as long as the document would not have been prepared in substantially similar form if not for the prospect of litigation.").  Materials also "need not be prepared by a lawyer" to "be eligible for the work product protection."  *United States* v. *Mt. Sinai Hosp.*, 185 F. Supp. 3d 383, 390 (S.D.N.Y. 2016) (citing Rule 26(b)(3)(A)).

MLB's Investigation Materials are quintessential work product, reflecting DOI attorneys' mental impressions of the facts gathered through the course of their investigation and their legal judgments and advice to the Commissioner.  Indeed, private memoranda prepared by an attorney to summarize witness interviews, like those MLB has withheld here, are precisely the type of material the Supreme Court found were protected from disclosure in *Hickman*, the case that originated the work product doctrine.  329 U.S. at 498, 510 (prohibiting discovery of attorney's records of interviews with witnesses to accident memorialized in "written statements [and] private memoranda").

Accordingly, courts routinely hold that materials prepared in the course of an internal investigation are eligible for work product protection where the investigation was conducted against a backdrop of potential litigation, and this remains the case even if the company had a separate business reason for investigating those same matters.  *See, e.g.*, *In re Symbol Techs., Inc. Sec. Litig.*, 2016 WL 8377036, at *9 (E.D.N.Y. Sept. 30, 2016) ("Symbol had an interest in assuaging the public, its shareholders and the entire business community that it was acting in the manner expected of a responsible business entity.  However, conducting an investigation for business purposes on the one hand and in anticipation of litigation on the other are not mutually exclusive . . . ."); *Patel* v. *L-3 Commc'ns Holdings, Inc.*, 2016 WL 4030704, at *3 (S.D.N.Y. July 25, 2016) (protecting internal investigation files as work product because "[w]hile L-3 would have, or at least should have, conducted a review upon learning of the fraud allegation, the scope and manner of conducting the investigation was clearly influenced by the expectation and reality of litigation").

Here, "[t]he scope, scale and conduct of [DOI's] investigation[s] was informed by" the likelihood of litigation, something DOI attorneys were aware of throughout the investigations.

(Seeley Decl. ¶¶ 6, 13.)  In general, the matters DOI investigates are inherently sensitive and contentious and could result in adversarial litigation or arbitration, and some have in the past, so DOI's investigations are at all times carried out with an eye toward the threat of litigation. (*Id.* ¶¶ 3, 6.)  This was especially true for the Astros and Red Sox Investigations.  Because Commissioner Manfred had previously advised clubs that their General Manager and Field Manager would be held accountable for any violations of the electronic sign stealing rules, DOI anticipated from the outset that the investigations could result in discipline against, and thus could lead to litigation with, high-level club officials.  (*Id.* ¶ 6.)

In addition, given the intense public scrutiny and attention to the matters that were the subject of the investigations, there was a prospect of litigation brought by third parties, as Plaintiffs here ultimately demonstrated.  In fact, Sports Illustrated published an article in November 2019 commenting on the likelihood that the Astros would face litigation by third parties based on the alleged electronic sign stealing,[2] and many of the interviews conducted in the Red Sox investigation occurred after the initial complaint in this case was filed.

Moreover, DOI's witness interviews were designed ultimately to provide legal advice to Commissioner Manfred in the context of potential litigation and were, therefore, "shaped by the specter of litigation."  *In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 532 (S.D.N.Y. 2015).  DOI attorneys directed the questioning in order to elicit the information that they determined they would need to counsel the Commissioner on the investigation and any implications flowing from its conclusions.  (Seeley Decl. ¶ 8.)  Interview subjects were advised that they were meeting with MLB attorneys and investigators as part of DOI's investigation to

---

[2] *See, e.g.*, Michael McCann, *Could Fans Sue Astros Over Sign-Stealing Scandal?* (Nov. 14, 2019) available at https://www.si.com/mlb/2019/11/14/astros-sign-stealing-lawsuit.

determine whether violations of the rules occurred and to assess the culpability of, and potential discipline for, those involved. (*Id.* ¶¶ 7, 12.)  Materials memorializing interviews conducted under similar circumstances and for similar purposes have been previously deemed non-discoverable work product by courts in this circuit.  *See, e.g.*, *Cicel (Beijing) Science & Tech. Co., Ltd.* v. *Misonix, Inc.*, 331 F.R.D. 218, 232 (E.D.N.Y. 2019) (holding that investigatory materials, including "notes taken by . . . attorneys during those interviews" that "reflect the questions counsel chose to ask and mental impressions and opinions of the attorneys who took the notes . . . are entitled to the highest level of work product protection"); *In re Gen. Motors*, 80 F. Supp. 3d at 532 (denying request for interview materials where "[a]ll witnesses were informed 'that the purpose of the interview[s] was to gather information to assist in providing legal advice to New GM,' and the interviews were conducted with an eye towards the goal of 'facilitat[ing the] provision of legal advice'").

### B.     Plaintiffs Are Not Entitled to Production of MLB's Work Product.

Work product that reflects attorneys' "mental impressions, conclusions, opinions, or legal theories" and "tend[s] to reveal the attorney's mental process . . . receive[s] special protection" from disclosure.  *Adlman*, 134 F.3d at 1197.  The memoranda, interview summaries and interview notes that comprise the Investigation Materials here are entitled to this special protection.  *See Upjohn Co.* v. *United States*, 449 U.S. 383, 399 (1981) ("Forcing an attorney to disclose notes and memoranda of witness' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes."); *Mt. Sinai Hosp.*, 185 F. Supp. 3d at 400 ("If the notes include or reveal the 'mental impressions, conclusions, opinions, or legal theories' of counsel—as attorney notes tend to do—they would constitute opinion work product.").

Critically, the Investigation Materials reflect not only the facts gathered by DOI attorneys and investigators, but, in the case of the interview notes and summaries, their strategy

-10-

for conducting the interviews and overall investigation and, in the case of the memoranda to the Commissioner and attached exhibits (which include the attorneys' interview summaries), the opinions of MLB's attorneys about their investigation, their analysis of the facts and relevant issues and their advice to the Commissioner.  All of the Investigation Materials were prepared in the context of a risk that club officials, or other individuals found to be implicated in any rules violations, might initiate litigation regarding the results of the investigation.  All reflect the mental impressions, conclusions, opinions or legal theories of MLB's counsel.  The interview notes are not transcripts but instead the attorney's or investigator's memorialization of the meeting, necessarily reflecting what they chose to write down during the interview.  (Seeley Decl. ¶ 9.)  The interview summaries, similarly, were edited by Mr. Seeley and Ms. Weinberg and reflect their impressions and judgments of the facts that would be relevant to assessing conduct and culpability.  (*Id.* ¶ 10.)  And both investigations culminated in a memorandum to the Commissioner providing the findings, opinions and analysis of DOI attorneys.  (*Id.* ¶¶ 11, 14.)

To the extent that Plaintiffs intend to draw a distinction between the interview notes on the one hand, and the interview summaries or final memoranda to the Commissioner, which expressly set forth counsel's legal analysis, on the other, or argue that the interview notes should be considered purely factual work product, such a purported distinction would still not justify their disclosure.  Plaintiffs cannot show either of the two conditions required by Rule 26 to overcome work product protection for such materials: that Plaintiffs (i) have a "substantial need for the materials to prepare [their] case" and (ii) "cannot, without undue hardship, obtain" the information otherwise.  Fed. R. Civ. P. 26(b)(3)(A)(ii).

"A substantial need exists 'where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be liable for the acts

alleged, or carries great probative value on contested issues." *Amtrust N. Am., Inc.* v. *Safebuilt Ins. Servs., Inc.*, 2016 WL 3260370, at *5 (S.D.N.Y. June 10, 2016) (no substantial need where party "ha[s] access to the same underlying . . . data" reflected in work product).  Plaintiffs have MLB's report on the Astros and will also have the MLB report that will come out on the Red Sox. However, this is still Plaintiffs' case, based on Plaintiffs' allegations, and it is their burden to prove them.  They cannot shift that burden to MLB just because MLB conducted its own investigations of the Astros and Red Sox.  And their claims against MLB do not justify such an intrusion into MLB's internal processes because those claims relate to conduct and MLB's knowledge *before* the investigations occurred and the Investigation Materials were generated.  MLB's knowledge was not an issue in its investigations.

Moreover, the Investigation Materials would not help Plaintiffs prove that they were individually impacted by electronic sign stealing.  As a general matter, the Investigation Materials do not focus on the details of what happened in specific games, and thus could not be used to show that sign stealing did or did not affect the outcomes of Plaintiffs' fantasy contests. Nor do they have any bearing on Plaintiffs' participation in DraftKings contests, their alleged reliance on MLB's relationship with DraftKings, or their claim that MLB failed to stop or disclose violations of the sign stealing rules because of its relationship with DraftKings.

The Investigation Materials are also not "essential" or "crucial" to advancing Plaintiffs' claims against the Astros and the Red Sox.  Plaintiffs assert that they "would not have entered into DraftKings' MLB DFS contests during the Class Period had [they] known" what they now know from the Commissioner's public Astros report and from other allegations in the press. (*See, e.g.*, Amended Complaint ¶¶ 122, 126, 130, 134, 138.)  Any underlying detail contained in the Investigation Materials is thus not essential, because Plaintiffs claim they would not have

participated in DraftKings during the putative class period just based on what they have learned from public sources since the putative class period ended.  Plaintiffs thus have no need for the Investigation Materials to prove the theory they have actually alleged.[3]  Any marginal benefit the Investigation Materials might bring to Plaintiffs' case is outweighed by their sensitive, confidential nature.  *See, e.g.*, *Greenberg* v. *Smolka*, 2006 WL 1116521, at *10-11 (S.D.N.Y. Apr. 27, 2006) (granting protective order because Rule 26 "gives the court broad discretion to tailor discovery to the needs of the case and the interests of the discovered party," taking into account "privacy and other confidentiality interests that might be harmed by release of the material sought"); *McSweeney* v. *Bayport-Bluepoint Sch. Dist.*, 2010 WL 11700817, at *2 (E.D.N.Y. Jan. 11, 2010) (denying motion to compel production where "the invasion of . . . privacy clearly outweighs the minimal and remote benefit, if any, that production of the requested [document] would provide").

Even if Plaintiffs could show that they have a substantial need for the Investigation Materials, Plaintiffs still could not overcome the presumption of work product protection because they do not need to free ride on MLB's confidential investigation work to avoid "undue hardship."  At a minimum, Plaintiffs' attempt to reach MLB's work product is premature.  Plaintiffs have "the full range of ordinary discovery available to them" to develop their case, including the ability to question witnesses at depositions or trial to elicit the facts underlying MLB's investigations.  *Mt. Sinai Hosp.*, 185 F. Supp. 3d at 400; *see also S.E.C.* v. *Treadway*, 229 F.R.D. 454, 456 (S.D.N.Y. 2005) ("No case cited by Defendants concludes that parties cannot, by deposing witnesses, obtain

---

[3] The Amended Complaint speculates that the Commissioner was not sufficiently "transparent" in the public report concerning the Astros investigation (*see* Amended Complaint ¶¶ 88–91), but that allegation has no bearing on Plaintiffs' claims.  Plaintiffs could not have relied on statements in 2020 in choosing to participate in DraftKings contests during the putative class period.  (*See* MLB's Memorandum of Law in Support of Motion to Dismiss at 13 n.8.)  And, again, the underlying detail reflected in the Investigation Materials is irrelevant to Plaintiffs' claims against the Astros.

'the substantial equivalent' of earlier attorney interview notes of the same witnesses without 'undue hardship.'").  Plaintiffs have not demonstrated that "the witnesses are no longer available or can be reached only with difficulty," *Hickman*, 329 U.S. at 511, or that available discovery devices "would be unlikely to reveal the substance of any non-privileged" underlying facts, *Maloney* v. *Sisters of Charity Hosp.*, 165 F.R.D. 26, 30–31 (W.D.N.Y. 1995) (plaintiffs failed to make required showing of undue hardship where, *inter alia*, "[t]here is no indication in the record regarding whether Mr. McNamara has been deposed or even noticed for deposition by plaintiff, and there is ample time remaining in the discovery period to do so").  Plaintiffs have not noticed, much less taken, a single deposition, nor have they reviewed the forthcoming production of thousands of documents that MLB received in the course of its investigations that speak to what club personnel knew or did about electronic sign stealing during the putative class period.  Moreover, Plaintiffs already have MLB's production of its rules, regulations and communications with clubs around sign stealing, and the Commissioner's public Astros report (and soon will have his findings on the Red Sox).  Through ordinary discovery and the public record, taken together, Plaintiffs will effectively have the same data reflected in the material DOI generated in its investigations, missing only MLB attorneys' analysis of the same facts.  Plaintiffs thus cannot claim that they must resort to MLB's work product to prove their case.

## II.     THE INVESTIGATION MATERIALS ARE SUBJECT TO ATTORNEY-CLIENT PRIVILEGE.

MLB is entitled to a protective order for the independent reason that the Investigation Materials reflect confidential communications that are protected by the attorney-client privilege.  Under New York law,[4] attorney-client privilege "fosters the open dialogue

---

[4] In this diversity case, questions of privilege are governed by New York law.  *See Pal* v. *New York Univ.*, 2007 WL 1522618, at *2 (S.D.N.Y. May 22, 2007) ("Because this case is founded on

between lawyer and client that is deemed essential to effective representation" and applies to communications "made for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship" that are "primarily or predominantly of a legal character." *Spectrum Sys. Int'l Corp.* v. *Chemical Bank*, 581 N.E.2d 1055, 1059–60 (N.Y. 1991).   The privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn*, 449 U.S. at 390; *see also Spectrum*, 581 N.E.2d at 1060 (attorney-client privilege protects both "a client's communications to an attorney" and extends "as well to communications from attorney to client").

Here, DOI's investigations were undertaken to advise the Commissioner on whether violations of MLB rules occurred and to assess the culpability of, and potential discipline for, those involved.  (Seeley Decl. ¶ 4, 12.)  DOI attorneys engaged in a fact-gathering process that was understood and expected to be confidential.  They exercised judgment in synthesizing, explaining and interpreting their findings.  Both the fundamental purpose and the end result of the Astros and Red Sox Investigations was the provision of legal advice to Commissioner Manfred. (*See id.* ¶¶ 4, 11, 12, 14.)  The Investigation Materials that were created in that process reflect the attorneys' impressions, judgments and analysis, as well as the communication of facts to the attorneys to enable that analysis, and are thus privileged.

---

diversity jurisdiction and raises only state law claims, New York law ordinarily would govern any privilege issues.").  The Court can also look to federal authority on attorney-client privilege because "it has long been recognized that New York law on attorney-client privilege is generally similar to accepted federal doctrine."  *See Parneros* v. *Barnes & Noble, Inc.*, 332 F.R.D. 482, 491 n.4 (S.D.N.Y. 2019).

A.    **The Investigation Materials Reflect Confidential Attorney-Client Communications.**

As a threshold matter, DOI's investigation took place in the context of a confidential relationship between MLB, its member clubs and the player and non-player employee interview subjects that should remain undisturbed.  Confidentiality is the hallmark of attorney-client privilege, which "exists to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment."  *Ambac Assur. Corp.* v. *Countrywide Home Loans, Inc.*, 57 N.E. 3d 30, 34 (N.Y. 2016).

The attorney-client privilege clearly encompasses communications between MLB's attorneys and the Commissioner concerning DOI's investigations, including the memoranda at issue here.  It also covers DOI attorneys' and investigators' communications with the player and non-player club employees who were interviewed in the investigations. Confidential communications between attorneys for an unincorporated association like MLB and employees of its members are privileged to the extent they relate to legal affairs of the association, even if the members or employees have different perspectives or interests (just as employees interviewed in a company's internal investigation could have).  *See*, *e.g.*, *In re Processed Egg Prod. Antitrust Litig.*, 2014 WL 6388436, at *12 (E.D. Pa. Nov. 27, 2014) (conversations between counsel for an unincorporated association and its member may be privileged if they are "within the scope of the member's role within the association and . . . for the sake of advising the association"); *see also Bacchi* v. *Mass. Mut. Life Ins. Co.*, 110 F. Supp. 3d 278, 283 (D. Mass. 2015) ("Case law discussing the privilege status of communications between trade association members and the association's attorney is somewhat sparse but those courts that have addressed the issue appear to take a case-by-case approach and focus on the substance of the communications

-16-

at issue and whether they were made with an expectation of confidentiality.").  The privilege also extends to communications by or to agents of the association's attorneys, including non-lawyer investigators.  *See*, *e.g.*, *Parneros*, 332 F.R.D. at 495 (notes of non-lawyer prepared at direction of lawyer were protected, since "[f]actual investigations conducted by an agent of the attorney, such as gathering statements from employees, clearly fall within the attorney-client rubric").

DOI conducted its investigations pursuant to the Commissioner's investigatory authority granted to him by the 30 member clubs in the MLB Constitution.  (Seeley Decl. ¶ 2.)  In this context, DOI's communications with member clubs and their employees were for the purpose of advising the association and within the scope of the members' roles and responsibilities.  The MLB employees conducting the interviews identified themselves at the outset of each interview as attorneys or investigators working on behalf of the Commissioner to advise him on his response to the allegations of sign stealing.  (*Id.* ¶¶ 7, 12.)  Each current player interviewed was explicitly told that he would not be publicly identified as someone DOI interviewed and that no statements made during the interviews would be publicly attributed to him.  (*Id.*)  The MLBPA received similar explicit assurances.  (*Id.*)  The DOI attorneys, club representatives, players and non-player interview subjects and the MLBPA all shared the general expectation that materials generated by DOI in the course of its investigations would be kept confidential and would not be disclosed to the Astros or Red Sox, other MLB clubs, the MLBPA or the general public.  (*Id.* ¶ 3.)  MLB has treated these materials in accordance with these expectations and has carefully controlled access to them.  (*Id.* ¶¶ 3, 15.)

Serious policy considerations support this expectation of confidentiality, because disclosure "may have a potentially chilling effect upon the candor of communications necessary for proper fulfillment of an attorney's role."  *Fine* v. *ESPN, Inc.*, 2014 WL 12586847, at *5

(W.D.N.Y. Oct. 16, 2014); *see also Upjohn*, 449 U.S. at 389 (the purpose of attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice"); *In re Gen. Motors*, 80 F. Supp. 3d at 527 ("Furthermore, failing to consistently and predictably protect communications between corporate counsel and lower-level employees would threaten to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law."). If players, club officials or the MLBPA suspected that specifics of their conversations with MLB's attorneys or investigators or their identities could be revealed to outsiders, it would significantly hamper the Commissioner's ability to exercise his investigatory and disciplinary powers under the MLB Constitution.   (Seeley Decl. ¶ 16.)   Interview subjects would be much less likely to voluntarily engage in any conversations about potential rule violations, let alone candid conversations, if those conversations, or DOI's legal analysis of them, were at risk of being disclosed.   (*Id.*)   Moreover, if clubs or the MLBPA could not trust in the confidentiality of communications with the Commissioner or DOI, it would hamstring MLB's ability to work with and govern its member clubs and negatively impact its relationship with the players' union in matters like this.   That would be an ironic result in this case, which is premised on the theory that MLB did not enforce its own rules well or quickly enough.

### B.    The Investigation Materials Are "Predominantly of a Legal Character."

The Investigation Materials reflect communications "primarily or predominantly of a legal character" and are therefore privileged.  *See, e.g.*, *Rossi* v. *Blue Cross & Blue Shield*, 540 N.E.2d 703, 706 (N.Y. 1989) (protecting memorandum prepared by in-house counsel and finding "[t]hat the memorandum does not reflect legal research is not determinative, where the communication concerns legal rights and obligations and where it evidences other professional skills such as lawyer's judgment and recommended legal strategies").   Communications are

-18-

sufficiently "legal" to warrant protection where they "involve[] the interpretation and application of legal principles to guide future conduct or to assess past conduct" or "require[] a lawyer to rely on legal education and experience to inform judgment." *In re Cty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Here, DOI attorneys exercised legal judgment and applied legal analysis in the course of their investigations, and the Investigation Materials display "the earmarks of a privileged communication" because the memoranda and the interview summaries they incorporate "convey[] the lawyer's assessment of" the Commissioner's position and options with respect to potential rules violations. *Spectrum*, 581 N.E.2d at 1060. The interview notes are also privileged because "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Upjohn*, 449 U.S. at 390–91.

The fact that DOI's Investigation Materials reflect lawyers' interpretation and application of MLB rules and policies rather than case law or statutes does not change their "legal character." Interpreting and applying an organization's internal rules to assess conduct and potential discipline is a "legal concern" within the ambit of an attorney's role. *Kraus* v. *Brandstetter*, 586 N.Y.S.2d 270, 271 (N.Y. App. Div. 1992) (committee of attorneys "whose function and purpose" included "interpret[ing] the hospital's by-laws" was addressing "legal concerns"); *see also*, *e.g.*, *Int'l Cards Co.* v. *Mastercard Int'l Inc.*, 2014 WL 4357450, at *5 (S.D.N.Y. Aug. 27, 2014) (attorney's "analysis of [company's] internal rules and determination of the parameters of a potential penalty were legal in nature" and thus "legal advice protected by the attorney-client privilege").[5]

---

[5] In their rush to involve the Court in the parties' discovery dispute, Plaintiffs never articulated to MLB why they believe they are entitled to disclosure of the Investigation Materials notwithstanding their privileged and protected nature. To the extent Plaintiffs believe that MLB has waived (or will waive) privilege through the release of the Commissioner's public reports, they

## CONCLUSION

For the foregoing reasons, MLB's Motion for Protective Order should be granted and the Investigation Materials should remain protected.

Dated: March 30, 2020

Respectfully submitted,

*/s John L. Hardiman/*
John L. Hardiman
Benjamin R. Walker
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB
Advanced Media LP*

---

are wrong.  Waiver of privilege "typically involve[s] situations in which the party making the disclosure was seeking to use it affirmatively in the controversy in issue without permitting its adversary to inquire about the basis or accuracy of the disclosure: in other words, the classic sword instead of shield."  *Calvin Klein Trademark Trust* v. *Wachner*, 124 F. Supp. 2d 207, 210 (S.D.N.Y. 2000) (Rakoff, J.).  MLB has not attempted to use the Commissioner's public statement affirmatively to defend this case.  Moreover, an "extrajudicial disclosure" that does not legally prejudice an adversary waives privilege only as to communications "actually disclosed" to the public.  *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987).  Where, as here, an extrajudicial disclosure like the Commissioner's statement does not reveal "remarks" or "questions" between a client and attorney, a privileged communication has not been "actually disclosed."  *United States* v. *Jackson*, 969 F. Supp. 881, 883 (S.D.N.Y. 1997).

-20-