# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

KRISTOPHER R. OLSON,                     :
CHRISTOPHER LOPEZ, WARREN          :
BARBER, CHRISTOPHER CLIFFORD,     :
AND ERIK LIPTAK, individually and on   :
behalf of all others similarly situated,      :
                                                            :
                              Plaintiffs,          :
                                                            :          Case No. 1:20-cv-00632-JSR
v.                                                         :
                                                            :
MAJOR LEAGUE BASEBALL; MLB       :
ADVANCED MEDIA, LP; HOUSTON      :
ASTROS, LLC; and BOSTON RED SOX   :
BASEBALL CLUB, LP,                          :
                                                            :
                              Defendants.        :          MAY 5, 2020


# PLAINTIFFS' MEMORANDUM IN SUPPORT OF
# MOTIONS TO ALTER, AMEND OR VACATE JUDGMENT
# AND FOR LEAVE TO AMEND

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.     The PAC Alleges Facts Establishing that Defendants' Involvement in
             Plaintiffs' Fantasy Transactions Was Neither Remote Nor Attenuated . . . . . . . . 3

     B.     The PAC Establishes Defendants' Express Written Representations to
             Plaintiffs that the MLB Fantasy Contests Would be Conducted as
             "Contests of Skill." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.     The PAC Specifically Identifies Defendants' Misrepresentations Known to
             Plaintiffs and Plaintiffs' Specific Reliance on the Misrepresentations . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.     LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II.     PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND . . . . . . . . . . . . . . . . . . . 15

III.     THE COURT SHOULD VACATE OR SET ASIDE ITS APRIL 7 JUDGMENT . . . . 17

     A.     Plaintiffs' New Evidence Should Be Considered as a Basis for Granting
             Plaintiffs' Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     B.     The Claims Set Forth in the PAC Are Not Futile . . . . . . . . . . . . . . . . . . . . . . . . . 20

          1.     State Consumer Protection Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          2.     Fraud/Fraudulent Non-Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          3.     Negligent Misrepresentation Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

          4.     Unjust Enrichment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cases                                                                                                          Page

*Aspinall v. Philip Morris Companies, Inc.*,
    813 N.E.2d 476 (Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Billhofer v. Flamel Technologies*, S.A.,
    07CIV9920, 2012 WL 3079186 (S.D.N.Y. July 30, 2012) . . . . . . . . . . . . . . . . . . . . . . 16

*Chabner v. United of Omaha Life Ins. Co.*,
    225 F.3d 1042 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*City of Almaty v. Kazakhstan*,
    1:15CV5345, 2019 WL 2324587 (S.D.N.Y. May 29, 2019) . . . . . . . . . . . . . . . . . . . . . 16

*City of Boston v. Purdue Pharma, LP, et al.*,
    2020 WL 977056  (Mass. Super. Jan. 31, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Coffey v. WCW & Air, Inc.*,
    2018 WL 4154256 (N.D. Fla. Aug. 30, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Church & Dwight Co., Inc. v. Huey*,
    961 S.W.2d 560 (Tx. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Crisp Human Capital, Ltd. v. Authoria, Inc.*,
    613 F. Supp. 2d 136 (D. Mass. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Foman v. Davis*,
    371 U.S.178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 15, 17

*Francis v. City of New York*,
    17 CIV 1453, 2018 WL 4659478 (SDNY Aug. 21, 2018) (Rakoff, J.) . . . . . . . . . . . . . 15

*Galstaldi v. Sunvest Communities USA, Ltd.*,
    637 F. Supp.2d 1045 (S.D. Fla. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hamm v. Mercedes-Benz USA, LLC*,
    5:16cv3370, 2019 WL4751911 (N.D. Cal. Sept. 30, 2019) . . . . . . . . . . . . . . . . . . . . . 21

*In re Louisiana Crawfish Producers*,
    852 F.3d 456 (5th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*In re Packaged Seafood Prods. Antitrust Litig.*,
    242 F. Supp. 1033 (S.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Telexfree Secs. Litig.*,
    389 F. Supp.3d 101 (D. Mass. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Linkage Corp. v. Trustees of Boston Univ.*,
    425 Mass. 1 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Loughridge v. Goodyear Tire and Rubber Co.*,
    192 F. Supp.2d 1175 (D. Colo. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Marram v. Kobrick Offshore Fund, Ltd.*,
    809 N.E.2d 1017 (Mass. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Matarazzo v. Friendly Ice Cream Corp.*,
    70 F.R.D. 556 (E.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mirkin v. XOOM Energy, LLC*,
    931 F.3d 173 (2d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*,
    136 F.3d 273 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pettiford v. City of Yonkers*,
    14cv6271, 2020 WL 1989419 (S.D.N.Y. Apr. 27, 2020) . . . . . . . . . . . . . . . . . . . . . . 19

*PNR , Inc. v. Beacon Property Mgt., Inc.*,
    842 So.2d 773 (Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ryan v. Ryan*,
    889 F.3d 499 (8th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Schwartz v. Capital Liquidators, Inc.*,
    984 F.2d 53 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*State Farm Mutual Automobile Ins. Co. v. Medical Svc. Center of Fla., Inc.*,
    No. 1:14-cv-20625, 2014 WL 11910630  (S.D. Fla. Sept. 15, 2014) . . . . . . . . . . . . . . 22

*U.S. v. Hudson*,
    152 F.R.D. 6 (D. Conn. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*U.S. v. Potamkin Cadillac Corp.*,
    697 F.2d 491 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*,
　　889 F.2d 1248 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*,
　　956 F.2d 1245 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams v. Citigroup, Inc.*,
　　659 F.3d 208 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14, 17, 18

STATUTES:

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ. P. 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ P. 59(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fed. R. Civ P. 60(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Restatement (Second) of Torts § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23

Restatement (Second) of Torts § 552 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

31 U.S.C. § 5361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

OTHER AUTHORITIES:

Wright & Miller, Federal Practice & Procedure, v. 5A, §1300 (2020 update) . . . . . . . . . . . . . 23

Wright & Miller, Federal Practice & Procedure, v. 6, §1488 (2020 update) . . . . . . . . . . . . . . 16

Plaintiffs Kristopher R. Olson, Christopher Lopez, Warren Barber, Christopher Clifford and Erik Liptak submit this memorandum in support of their motions (1) pursuant to Fed. R. Civ P. 59(e) and 60(b), to alter, amend or vacate the Judgment entered by the Court in this matter on April 7, 2020 (ECF 56), and (2) pursuant to Fed. R. Civ. P. 15(a)(2), to grant plaintiffs leave to amend their Amended Class Action Complaint ("Complaint") (ECF 20), filed February 14, 2020.

**INTRODUCTION**

In these Motions, plaintiffs respectfully request that the Court reconsider its April 3, 2020 Opinion and Order (ECF 55) ("Opinion" or "Op."), insofar as the Court decided, in that Opinion, to dismiss the Complaint with prejudice. Plaintiffs further call on the Court to set aside its April 7, 2020 Judgment based on that Opinion, and to grant plaintiffs leave to file the Proposed Second Amended Complaint ("PAC"), attached to plaintiffs' Notice of Motion as Exhibit A.

The Court – in dismissing the Complaint with prejudice – stated that: "[w]hile a few of [the deficiencies found by the Court] might conceivably be cured by giving plaintiffs another chance to amend . . . , most could not." Op. 31. Plaintiffs submit, to the contrary, that all of the perceived deficiencies discussed by the Court in its Opinion can be cured, and, in fact, have been cured in plaintiffs' PAC.

Under controlling Second Circuit precedent, plaintiff's motions are governed by the liberal standards set forth in *Williams v. Citigroup, Inc.*, 659 F.3d 208, 212-14 (2d Cir. 2011), and *Mirkin v. XOOM Energy, LLC*, 931 F.3d 173, 177-78 (2d Cir. 2019); *see also Foman v. Davis*, 371 U.S.178, 182 (1962). Under these standards, the Court should set its April 7, 2020 Judgment aside and grant plaintiffs leave to file the PAC.

**BACKGROUND**

The Court's decision to dismiss the Complaint with prejudice was based primarily on two perceived deficiencies in plaintiffs' allegations, which the Court believed could not be cured, and which, in the Court's view, undermined all of the claims asserted in the Complaint.

First, the Court determined that the Complaint failed to allege any sufficiently direct transaction or other relationship between plaintiffs, as persons paying entry fees to DraftKings in order to engage in fantasy baseball contests, and the defendants – Major League Baseball and its affiliate, MLB Advanced Media L.P. ("MLBAM") (together "MLB defendants"), and the Houston Astros, LLC and the Boston Red Sox Baseball Club, L.P. (the "Clubs"). In essence, the Court concluded that the relationship between defendants and the transactions on which plaintiffs' claims are based was too "attenuated" to support any of plaintiffs' claims – whether for fraud, negligence, violations of state consumer protection laws, or unjust enrichment.[1]

Second, the Court determined that plaintiffs' claims were deficient because the Complaint failed adequately to allege any affirmative misrepresentation relating to the integrity

---

[1] The Court's precise reasoning varied from claim to claim, however, at bottom, its decision to reject each claim was based on the perceived remoteness of defendants from the relevant transactions. For example, in the context of plaintiffs' fraudulent non-disclosure claims, the Court found that plaintiffs could not meet the requirements of § 551 of the Restatement (Second) of Torts because there was no "business transaction" between plaintiffs and any defendant. Op. 17-18. The Court acknowledged that the Restatement does not always require a defendant to be a party to a transaction, but found that the requirement was only dispensed with where "defendants [had] a much closer relationship to the transaction." *Id*. 19. The Court dismissed plaintiffs' negligence claims "for essentially the same reasons that their fraud claims fail," *id*. 22, and plaintiffs' state consumer protection claims because they "fail to identify a sufficient nexus between the transaction that allegedly harmed them and the defendants." *Id*. 25-26 ("The asserted connection between defendants and that allegedly harmful transaction . . . is simply too attenuated to support liability"). The Court held that plaintiffs did not allege that defendants were "substantial participants in the transaction between plaintiffs and DraftKings." *Id.* 28.

of fantasy baseball on which plaintiffs could justifiably rely.[2] The Court considered, but rejected, plaintiffs' claim that defendants falsely represented that the fantasy baseball games were "games of skill," while knowing that the Astros and the Red Sox – by their electronic sign stealing – were distorting the player statistics upon which the contests were based. The Court held that the Complaint only referred to "a single news article" containing the "game of skill" representation and that the statement merely constituted a "lay opinion" by MLB Commissioner Robert Manfred. Op. 10.

Plaintiffs' PAC directly addresses these issues.

### A. The PAC Alleges Facts Establishing that Defendants' Involvement in Plaintiffs' Fantasy Transactions Was Neither Remote Nor Attenuated.

In finding that the Complaint "fail[ed] to demonstrate that defendants were substantial participants" in plaintiffs' transactions with DraftKings, the Court stated that "[a]t most, plaintiffs allege that the defendants allowed DraftKings to use their marks and stadiums to advertise MLB DFS contests." Op. 28. This characterization of plaintiffs' allegations is consistent with defendants' characterization of the Complaint in their motions to dismiss,[3] however, it fails to acknowledge the <u>repeated</u> allegations in the Complaint of defendants'

---

[2] The Court found this perceived deficiency undermined plaintiffs' fraud claims based on affirmative misrepresentations. Op. 9-10. It also rejected plaintiffs' argument, in support of its fraudulent omission claim, that "by advertising Draft Kings competitions, the defendants assumed" a duty to "disclose to MLB DFS contestants any knowledge that such competitions were unfair" on the grounds that such a duty would arise only if a defendant "made an express factual representation that gave rise to a duty." *Id.* at 20-21. The Court rejected plaintiffs' negligence claims for the same reasons, *id.* at 22, and it rejected plaintiffs' consumer protection claims, in part, because it found plaintiffs had failed to allege any misrepresentation. *Id.* at 27.

[3] *See, e.g.*, MLB Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed Feb. 21, 2020 (ECF 28) at 16.

"promotion, marketing and participation in inducing members of the public to engage" in the transactions. (*See e.g.*, Complaint, ¶ 196; *see also* ¶ 5 ["actively promoting and marketing"]).[4]

In any event, to the extent the 30 separate allegations in plaintiffs' Complaint of defendants' involvement in marketing and promoting the contests left this issue unclear, the PAC clearly shows defendants' substantial involvement and participation in virtually every aspect of the MLB-branded fantasy contest business, all for enormous financial gain, and supports plaintiffs' request for leave to amend the Complaint.

Specifically, the PAC (¶¶ 30-31) alleges the following facts about the extent of defendants' involvement in the relevant transactions:

> 30.      Pursuant to their agreement [with DraftKings], defendants were directly and substantially involved in every aspect of the commercial venture, including (1) creating the MLB-branded fantasy baseball contests at issue, and authorizing the complete array of MLB and MLB Club trademarks and logos to brand and market the contests; (2) exercising direct control over the form, terms and conditions of participation (including the content of notice to contestants of the Conditions of Participation), entry fees, and all advertising and marketing of the contests by DraftKings; (3) assuming contractual obligations to market and promote the contests; (4) direct participation in the sale of the contests; (5) direct participation via MLB platforms, in providing enhancements to participating contestants to foster continued contestant involvement in the contests ██████████
> ████████████████████████████████████████████████
> ██████████████████████████████

> 31.  Thus, defendants:

> a. participated in creating the product (MLB-branded fantasy baseball games) and controlled, through a contractual right of <u>pre</u>-approval, the

---

[4] The Complaint literally alleges defendants' involvement in marketing and promoting the transactions, including inducing members of the public to engage in the transactions, in 30 separate paragraphs. *See* ¶¶ 5, 23, 24, 42, 49, 118, 196, 206, 234, 237, 251, 254, 268, 271, 285, 288, 301, 304, 316, 319, 365, 381, 412, 434, 447. 463, 478, 509, 531, 541.

form of the contests ("Approved Fantasy Games") and any changes to the form of the contests;[5]

b. controlled, through a contractual right of pre-approval, the conditions of participation for the contests, including any changes to the terms or conditions, and, further, required DraftKings to cause the contests to comply with all MLB Official Rules and Regulations and not be a form of gambling; (*Id.*, § VII ;and Exs.C, C-I-F & II, C-1(g); Ex. D-VII [00000448; 00000471; 00000473-74; 00000494).

c. set the maximum entry fee for the contests; (*Id.*, Ex. C.I.B [00000471]).

d. required all "Approved Fantasy Games" to be "skill-based games" conducted as "contests of skill;" (*Id.*, § I.C; Exs. C-I-F, C-1(g) &(j) [00000442, 00000471, 00000473, 00000474-75).

e. required written notification to all contestants that the contests were conducted as "contests of skill" and all contestants' pre-participation acknowledgment and approval of that condition of the contests; (*Id.*, Ex. C-1(g) & (j) ("Conditions of Participation") [00000473, 00000474-75].

f. controlled, through a contractual right of pre-approval, the content of all DraftKings' advertising and marketing of the contests; (*Id.*, Ex. D-I-A-I ("Approval Rights") [00000485]).

g. committed to undertaking highly-specified marketing and promotion of the contests ("Assumption of Marketing Commitments") through television and radio advertising and promotion; direct email promotion to MLB.TV subscribers; marketing and promotion across all MLB social media, and internet, television and streaming television media platforms; as well through member Club advertising and promotion on television and radio, on Club digital media, and through in-stadium promotions – all in accordance with ███████████████████████████████

███████████████████████████████████████████

---

[5] *See* Amended and Restated Game License and Marketing Rights Agreement ("Agreement") [MLB-Olson 00000442-501] at §§ I.C; VII and Exs. C-I-F & II, (granting all of the MLB Parties, including MLB and MLB's participating Clubs, a right of pre-approval of any MLB fantasy baseball games to be offered [00000442, 00000448, 00000471] and of any changes to the form of the games [00000471]). It should be noted that the citations to the Agreement included in the above text of PAC ¶ 31 are not included in the PAC, but have been added here as an aid to the Court's review.

█████████████. The agreement required the parties to agree upon an annual marketing plan each year; *(Id.*, § III; Ex. B & Sch. B-1, B-2, B-3 [00000445; 00000455-57; 00000458-60; 00000461-68; 00000469-70]).

h. caused MLB's interactive media platforms to be used to sell the contests to contestants through a direct link from MLB's platforms to the contests' sign-up forms; *(Id.*, Ex. A-II-B [00000452]).

i. provided contestants with integrated follow-up tracking of the performances of their fantasy team players through MLB's "Fantasy Tracker" application on MLBAM's Media Player requiring (at additional cost to contestants) paid subscriptions to MLB.TV, as well as live "fantasy alerts" over MLB.com's iPhone application and fantasy highlights also over MLBAM's Media Player. (*Id.*, Ex. A-II-A-iii [00000451; *see also* DraftKings' July 31, 2015 press release ("DraftKings Announces Exclusive Partnerships with 27 MLB Teams") at 1 [ASTR_000002].



And defendants █████████████████████. Thus, PAC ¶ 44 alleges:

44. ████████████████████████████████

To the extent plaintiffs' Complaint may have left the matter unclear, these allegations unequivocally establish defendants' direct involvement, ████████████████████, in the creation and marketing to plaintiffs of the fantasy baseball transactions and are clearly sufficient to support liability under each of the theories alleged in the PAC.

**B.    The PAC Establishes Defendants' Express Written Representations to Plaintiffs that the MLB Fantasy Contests Would be Conducted as "Contests of Skill."**

Plaintiffs believe that the Court did not appreciate the significance of plaintiffs' contentions concerning the "game of skill" issue.  To be legal in this country, fantasy sports <u>must</u> be conducted as games of skill (*see* Complaint ¶ 29), and it is unfair and deceptive, not to mention illegal, to market fantasy baseball contests if they are not conducted as games of skill. As PAC  ¶ 18 explains:

> 18.  In 2006, when Congress enacted the Unlawful Internet Gambling Enforcement Act (the "UIGEA"), 31 U.S.C. § 5361, *et seq*., it exempted fantasy sports competitions from the law's anti-gambling prohibitions as long as
>
>> all winning outcomes reflect the relative knowledge of the participants and are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case of sports events) in multiple real-world sporting or other events.
>
> 31 U.S.C. § 5362(1)(E)(ix)(ii).  The Congressional Record reflects that representatives of MLB urged Congress to adopted that exemption.  *See* Cong. Rec., H4974, July 11, 2006.

---

[6] *See* MLB-Olson 00001657 ██████████████████████ 00000507, 00000527 ████████████████████ 00002728 ██████████████.

Consistent with the UIGEA, the "Approved Fantasy Games" authorized by MLBAM were expressly defined in the Agreement with DraftKings to mean "skill-based" fantasy games "governed by and operated in accordance with ... 'Conditions of Participation'" pre-approved by MLBAM (and not subject to change without MLBAM's consent) that provided:

> DraftKings markets DFS [Daily Fantasy Sports] as "Contests of Skill."....
> [W]inners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules. *(*Agreement, Ex. C-1(j) [MLB-Olson 00000474-75). (PAC ¶ 33).

Every contestant was provided with these Conditions of Participation, and every contestant – as a *pre-condition* to participating in an Approved contest – was required to electronically acknowledge and agree to them. (*Id.*)

Thus, <u>at MLB's insistence</u>, all of the named Plaintiffs and every proposed Class member in this action were expressly advised in writing that the MLB fantasy baseball games were "contests of skill," and were required to confirm their knowledge of, and agreement to, that term before being allowed to pay entry fees to participate in the contests. These Conditions of Participation were incorporated into and applied to each and every MLB contest that Plaintiffs and the members of the Classes entered. (*Id.*).

This was no insignificant matter to MLB, which has long opposed any association between baseball and gambling. (PAC ¶¶ 34-36). In the Agreement, MLB required DraftKings to agree that the contests would not be operated in a way that involved gambling. (PAC ¶ 31b). It was so important to MLB that it not be associated, in any way, with a gambling activity, that the Agreement contained the highly unusual provision that MLBAM was authorized to terminate the Agreement if a governmental entity even *alleged* that the games, as conducted, violated any

law. (Agreement, § I-J(i) ("Compliance Event") (00000443) (PAC ¶ 36). MLB's lawyers vetted the legality of fantasy baseball before defendants entered into their Agreement with DraftKings (PAC ¶ 37), and Manfred's public statements that fantasy baseball was a game of skill and not gambling were issued in direct response to the New York Attorney General's initiation of an investigation into whether fantasy sports constituted illegal gambling. (PAC ¶ 38).

C.    **The PAC Specifically Identifies Defendants' Misrepresentations Known to Plaintiffs and Plaintiffs' Specific Reliance on the Misrepresentations.**

In its Opinion, the Court held that plaintiffs had failed to satisfy the requirements of Rule 9(b) for their fraud and consumer protection claims because plaintiffs had not identified any specific misrepresentations by defendants that the MLB-branded fantasy baseball contests were games of skill and further had failed to plead, with the requisite specificity, their reliance on the particular misrepresentations alleged as to each defendant in the Complaint. Op. 9-10. The PAC expressly cures these perceived deficiencies for the named Plaintiffs and the Classes.

Thus, for example, the PAC alleges as to Plaintiff Olson:

151.    Plaintiff Olson was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

152.    In July 2015, Plaintiff Olson received and reviewed the MLB fantasy baseball contests' Conditions of Participation, which advised him the contests were contests of skill. Plaintiff Olson electronically acknowledged and agreed to the Conditions of Participation.

153.    Plaintiff Olson was aware that the MLB contests were offered at different levels of skill, depending upon the knowledge and experience of the contestant. Plaintiff Olson initially played at the "Beginner" level, before graduating to the higher contest level.

154.    Plaintiff Olson relied on the representation in the MLB fantasy baseball

contests' Conditions of Participation that the contests were conducted as games of skill in deciding to pay to participate in the contests.

155. The fact that MLB fantasy baseball contests were games of skill was a material consideration to plaintiff Olson's decision to pay to participate in such contests. He had no interest in participating, let alone paying to participate, in fantasy sports contests based on random chance. Plaintiff Olson has never bet on baseball and has no interest in doing so. He would not have paid to participate in the MLB-branded fantasy contests if he known they were not games of skill.

(PAC ¶¶ 151-55). The PAC contains similar allegations as to each named Plaintiff (PAC ¶¶ 175-78 [Lopez]; ¶¶ 193-95 [Barber]; ¶¶ 208-11 [Clifford]; ¶¶225-27 [Liptak]).



On September 15, 2017, in response to a complaint by the New York Yankees concerning electronic sign stealing by the Red Sox, Manfred issued a public statement, disseminated to the media nationwide, stating that during the course of its investigation, MLB had determined that the Yankees had misused a dugout telephone during an earlier season in "technical" violation of MLB rules, but that the Yankees had not improperly communicated sign information in violation of any MLB Rule or Regulation. (PAC ¶¶ 404). Olson, a Massachusetts resident and Red Sox fan (and Yankee non-fan), was aware of the Yankees' complaint against the Red Sox and of Manfred's statement. (PAC ¶ 156).



Plaintiff Olson was also aware of public statements by Manfred and by Astros' President and General Manager Jeffrey Luhnow on October 17, 2018 in response to a complaint by the Red Sox that the Astros had attempted to engage in electronic sign stealing during the Red Sox-Astros playoff series. Luhnow denied the Red Sox's accusation and Manfred stated that MLB had conducted a "thorough investigation" and exonerated the Astros. (PAC ¶¶ 157, 98, 100).

Luhnow's and Manfred's October 17, 2018 statements were intentionally false. The Astros were, in fact, engaged in electronic sign stealing, and MLB had not, in fact, conducted a "thorough investigation" of the Astros and had no basis to exonerate the Astros. (PAC ¶¶ 98-99, 101). Indeed, to the contrary, Manfred had received (and concealed) a complaint in August 2018 about the Astros' sign stealing misconduct from the Oakland Athletics based on information obtained from Mike Fiers, a former Astros' pitcher then playing for the Athletics who was,

ultimately, the source of the news article that publicly exposed the Astros' misconduct in November 2019.  (PAC ¶¶ 93-94, 104).

The PAC expressly alleges Olson's knowledge of and reliance on ███████████ ██████ October 17, 2018 statements:



159. ....  Plaintiff Olson, who was closely following the Red Sox during that playoff series, was aware from television and newspaper reports of the Red Sox's complaint and Luhnow's and Manfred's statements in response.

160.     Luhnow's and Manfred's October 2018 statements caused Plaintiff Olson to believe that the Astros had not engaged in electronic sign stealing and that electronic sign stealing would not tolerated by MLB and was not being perpetrated.

161.     Plaintiff Olson was aware that electronic sign stealing was prohibited by MLB rules.

162.     Plaintiff Olson was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners.  He was also aware that the effects of electronic sign stealing would be variable (depending, for example, on which games, which players and which at bats it affected) and could not, therefore, be accurately factored into fantasy team player selection decisions, thus preventing the exercise

of skill to win or lose a contest.

163.    The fact that one or more MLB Clubs was engaging in electronic sign stealing was material to plaintiff Olson's decision to pay to participate in such contests.

164.    Plaintiff Olson relied ███████████████████████████████, the RedSox's "absolute assurance" in September 2017 that it would not engage in electronic sign stealing again, and Luhnow's and Manfred's statements in October 2018 in deciding to continue paying to participate in MLB fantasy baseball contests.  Plaintiff Olson would not have continued to pay to participate in the contests if he knew that one or more teams was engaging in electronic sign stealing or if he learned that MLB was lying about its investigations of electronic sign stealing.  (PAC ¶¶ 156-64).

## ARGUMENT

## I.    LEGAL STANDARDS

The legal standards that apply on this application are set forth in two controlling Second Circuit decisions – *Williams,* 659 F.3d at 212-14, and *Mirkin,* 931 F.3d at 177-78.  In both cases, the lower courts dismissed the complaints with prejudice, entered judgment, and then denied plaintiffs' post-judgment motions for leave to amend.  And, in both, the Second Circuit reversed those denials of leave to amend on appeal.

In *Williams*, the Second Circuit made it clear that – while "postjudgment motions for leave to replead must be evaluated with due regard to both the value of finality and the policies embodied in Rule 15," *Williams,* 659 F.3d at 213 – it is error to "overemphasize[ ] considerations of finality at the expense of the liberal amendment policy embodied in the Federal Rules of Civil Procedure."  *Id.* at 210; *accord Mirkin*, 931 F.3d at 178.  In support of this approach, both *Williams* and *Mirkin* relied upon the Supreme Court's decision in *Foman v. Davis*, 371 U.S.178 (1962), which involved exactly the same situation – *i.e.*, the dismissal of a complaint with prejudice followed by denial of a post judgment motion for leave to amend.

There, the Supreme Court – in enunciating its well-established liberal standards favoring amendment, *see* 371 U.S. at 182 – did not even mention considerations of finality as a factor in finding that the district court abused its discretion in denying the plaintiff's motion to amend.

Thus, although *Williams* and *Mirkin* acknowledged that considerations of finality are relevant in deciding post-judgment motions for leave to amend, and also referred to Rules 59(e) and 60(b) as potentially applicable, neither decision actually performed any analysis under either of those rules. Indeed, the *Williams* court stated: "In reviewing the district court's denial of this motion, we are mindful of the nature of the relief that *Williams* sought: namely leave to amend her complaint," 659 F.3d at 212-13, and added:

> [C]onsiderations of finality do not always foreclose the possibility of amendment, even when leave to replead is not sought until after the entry of judgment. Thus, we have stated that "in view of the provision in rule 15(a) that 'leave [to amend] shall be freely given when justice so requires,' it might be appropriate in a proper case to take into account the nature of the proposed amendment in deciding whether to vacate the previously entered judgment. *Id*. at 213.

Thereafter, the Second Circuit – without reference to Rules 59 or 60 – scrutinized the district court's conclusion that plaintiff's motion for leave to amend was "untimely," rejected the district court's apparent conclusion that "the liberal spirit of Rule 15 necessarily dissolves as soon as final judgment is entered," and remanded for a determination of whether plaintiff's proposed amendment would be "futile." *Id*. at 214. In *Mirkin,* the court – similarly with no analysis under Rules 59 or 60 – reversed the district court's denial of plaintiff's post-judgment motion for leave to amend and remanded with instructions to allow the proposed amendment "notwithstanding its presentation after judgment was entered." 931 F.3d at 178.

*Williams* and *Mirkin*, taken together, stand for the proposition that, where a party – following dismissal of a complaint with prejudice in the early stages of a litigation – promptly

14

seeks post-judgment leave to amend to correct pleading deficiencies, the judgment may properly be reopened without a showing that the traditional requirements of Rules 59(e) or 60(b) have been met. Rather, the issue before a court in those circumstances is simply whether the proposed amended complaint meets the *Foman* standards for leave to amend under Rule 15.

## II. PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND.

Rule 15(a) provides that leave to amend "shall be freely given when justice so requires," and the Supreme Court has instructed that "this mandate is to be heeded." *Foman*, 371 U.S. at 182; *see Francis v. City of New York*, 17 CIV 1453, 2018 WL 4659478 at *2 (S.D.N.Y. Aug. 21, 2018) (Rakoff, J.). Accordingly, as the Supreme Court held in *Foman*, 371 U.S. at 182:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be given an opportunity to test his claim on the merits. In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require be 'freely given.' Of course grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely an abuse of that discretion and inconsistent with the Federal Rules.

This liberality "reinforces one of the basic policies of the federal rules – that pleadings are not an end in themselves but are only a means to assist in the presentation of a case to enable it to be decided on the merits." *U.S. v. Hudson*, 152 F.R.D. 6, 7 (D. Conn. 1993) (Cabranes, J.).

Here, there is no conceivable basis for a finding of "undue delay, bad faith or dilatory motive." The original complaint was filed January 23, 2020; that complaint was amended once, on February 14, 2020; defendants moved to dismiss a week later, on February 21, 2020; information in discovery documents on which plaintiffs now rely (in part) in the PAC were

produced on and after March 12, 2020; and the Court issued its Opinion on April 3, 2020. Amendments have routinely been permitted at <u>much</u> later procedural stages, including, *e.g.*, the completion of discovery, following the pretrial conference, and at the beginning, during and after the close of trial. *See* 6 Wright & Miller, Federal Practice & Procedure ("Wright & Miller"), §1488 (2020 update) (citing cases).

Nor can plaintiffs be said to have acted in a dilatory manner. On the contrary, they are now seeking leave to amend promptly following the Court's decision to dismiss the Complaint and the production of the documents described above, and, as the courts have noted, "discovery often justifies a subsequent amendment to the complaint." *Matarazzo v. Friendly Ice Cream Corp.*, 70 F.R.D. 556, 559 (E.D.N.Y. 1976); *see also Billhofer v. Flamel Technologies*, S.A., 07CIV9920, 2012 WL 3079186 at *4 (S.D.N.Y. July 30, 2012).

There is also no possibility of "undue prejudice" to defendants. It is clear that the burden of responding to a well-pleaded complaint does not constitute prejudice under Rule 15. *See City of Almaty v. Kazakhstan*, 1:15CV5345, 2019 WL 2324587 at *3 (S.D.N.Y. May 29, 2019) ("concern about additional liability . . . does not constitute prejudice for purposes of deciding a motion to amend"), nor is the burden of discovery. *United States v. Continental Illinois Nat'l Bank & Trust Co. of Chicago*, 889 F.2d 1248, 1255 (2d Cir. 1989).

Finally, without agreeing that their February 14, 2020 Complaint failed to state a claim, plaintiffs believe they have addressed the issues upon which the Court based its decision in their accompanying PAC, and that their proposed amendment would not be "futile." Specifically, the PAC provides detailed allegations showing that defendants – based on their contractual rights (among other things) to pre-approve and control the MLB-branded contests (including

DraftKings' advertising and marketing) and their contractual obligation to actively market MLB fantasy games – were substantial participants in the transactions. The PAC further details, in compliance with Rule 9(b), defendants' deceptive statements and plaintiffs' justifiable reliance on those statements and clarifies their additional claims as to which Rule 9(b) is not applicable.

## III.   THE COURT SHOULD VACATE OR SET ASIDE ITS APRIL 7 JUDGMENT.

As shown above, where a party seeks to reopen a judgment – following dismissal of its complaint on a motion to dismiss – for the sole purpose of amending the complaint to remedy perceived pleading defects, both the Supreme Court and the Second Circuit have focused exclusively on the appropriateness of allowing the proposed amendment under Rule 15. *Foman*, 371 U.S. at 182; *Williams*, 659 F.3d at 212-14; *Mirkin*, 931 F.3d at 177-78. In each case, once the courts found that amendment was appropriate, they simply assumed that it would also be correct to reopen the judgment to allow that amendment. Plaintiffs submit that it is appropriate, under the liberal standards of Rule 15, to grant plaintiffs leave to amend in this case, and that – as in *Foman, Williams* and *Mirkin* – no analysis under Rules 59(e) or 60(b) is required.

However, if such an analysis were required, the Court's April 7, 2020 Judgment should be set aside under the standards set forth in Rules 59(e) and 60(b), both of which authorize reopening a judgment based on newly discovered evidence.[7]

### A.   Plaintiffs' New Evidence Should Be Considered as a Basis for Granting Plaintiffs' Motions.

On March 12, 2020 – six days after plaintiffs submitted their opposition to defendants'

---

[7] Under Rule 59(e), "[t]he major grounds justifying reconsideration are 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Virgin Atlantic Airways, Ltd. v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992), quoting 18 Federal Practice & Procedure, § 4478.

motions to dismiss – defendants began to produce documents in response to plaintiffs'
outstanding discovery requests. Defendants' document production was ongoing at the time the
Court issued its April 3, 2020 Opinion. While discovery was incomplete, the documents the
MLB Defendants produced are inconsistent with important aspects of the Court's decision to
dismiss the Complaint with prejudice, and – for purposes of any Rule 59(e) or 60(b) analysis –
they should be treated as "newly discovered evidence."

In determining whether evidence should be deemed "newly discovered" for purposes of
reopening a judgment (in circumstances not involving only a request for leave to amend), the
Second Circuit has considered, among other things, whether the evidence in question is "truly
newly discovered or could not have been found by due diligence," *U.S. v. Potamkin Cadillac
Corp.*, 697 F.2d 491, 493 (2d Cir. 1983), and whether it goes to the merits of the litigation.
*Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 54 (2d Cir. 1993). Other courts have, more
recently, also considered the "reason for plaintiffs' default," and potential prejudice to the party
opposing the motion for reconsideration. *See, e.g., In re Louisiana Crawfish Producers*, 852
F.3d 456, 466 (5th Cir. 2017).

Here, it is clear that the new evidence "goes to the merits of the litigation." As shown in
the PAC, it goes directly to issues that the Court found dispositive in dismissing the Complaint
with prejudice – the extent of defendants' substantial involvement and participation in the
transactions, and proof of defendants' required representations to all MLB fantasy game
participants that the games were contests of skill. It is also difficult to imagine that defendants
would be unfairly prejudiced, at this early procedural stage, if the Court were to consider
plaintiffs' new allegations based on the documents in deciding whether to allow plaintiffs to

amend their Complaint.

As to whether the relevant documents are "truly newly discovered," they were produced after plaintiffs had responded to defendants motions to dismiss, but before the Court issued its April 3 Opinion and entered its April 7 Judgment. Some courts have declined to consider documents produced at this juncture, *see e.g.*, *Pettiford v. City of Yonkers*, 14cv6271, 2020 WL 1989419, at *1 (S.D.N.Y. Apr. 27, 2020), while others have concluded that evidence that first becomes available after a party has submitted its response to a motion may be considered. *See Ryan v. Ryan*, 889 F.3d 499, 509 (8th Cir. 2018) (court – noting "Rule 15(a)(2) considerations that favor affording parties an opportunity to test their claims on the merits" – finds document "first discovered after briefing and submission" of motions to dismiss could be "newly discovered"); *Louisiana Crawfish*, 852 F.3d at 466-69 (abuse of discretion to refuse to consider new deposition evidence, where district court granted summary judgment before official deposition transcript was available).

The *Ryan* court noted, in support of its holding, that the document at issue had been in defendants' "custody and control" when they submitted their motions to dismiss, and "contradict[ed] the factual basis" for those motions. 889 F.3d at 509. The same is true here. For example, the Court – accepting defendants' assertions that defendants had only a "sponsorship" relationship with DraftKings, MLB Brief at 16 – concluded that "[a]t most, plaintiffs allege that

the defendants allowed DraftKings to use their marks and stadiums to advertise MLB DFS

contests." Op. 28. Defendants should not be rewarded for mischaracterizing their involvement

with the transactions.

In the present circumstances, where plaintiffs only seek to reopen the Judgment insofar as

it dismissed the Complaint with prejudice and seek leave to replead, *see Williams*, 659 F.3d at

213; *Mirkin*, 931 F.3d at 178, plaintiffs submit that the Court should consider the basis for

plaintiffs' new allegations.

### B.  The Claims Set Forth in the PAC Are Not Futile.

#### 1.  State Consumer Protection Laws

The Court dismissed plaintiffs' claims under the consumer protection laws of their

various states based on its conclusions (1) that those claims "fail to satisfy the heightened

pleading requirements of Rule 9(b)," and (2) that "plaintiffs fail to identify a sufficient nexus

between the transaction that allegedly harmed them and the defendants to support a consumer

protection claim." Op. 25. The PAC cures both of these perceived deficiencies.

Considering first the "nexus" between defendants and the transactions that injured

plaintiffs, the PAC alleges (and defendants' discovery production confirms) that defendants

participated in and controlled every aspect of the commercial venture with DraftKings, including

(i) establishing and pre-approving the form of the contests and the conditions of participation

contestants were required to acknowledge and accept; (ii) pre-approving all advertising and

marketing of the contests by DraftKings; (iii) setting the maximum entry fee for the contests; and

(iv) assuming specified and comprehensive marketing obligations to induce consumer to

participate in the contests. ████████████████████████████████

These allegations provide a more than sufficient "nexus" to support liability under the relevant state consumer protection laws.[8] Indeed, it would be an unusual interpretation of consumer protection laws to hold that parties actively involved in creating and marketing a product cannot be sued for unfair or deceptive marketing practices.

The PAC also cures the Court's concerns with the sufficiency of plaintiffs' consumer protection claims under Rule 9(b). These consumer statutes provide a remedy for unfair or deceptive conduct. With respect to plaintiffs' claims based on deception, the PAC specifically identifies defendants' deceptive acts and conduct and how they caused plaintiffs' injury. (*See*

---

[8] *See, e.g., Coffey v. WCW & Air, Inc.*, 2018 WL 4154256, at * 4 (N.D. Fla. Aug. 30, 2018) (denying motions to dismiss by manufacturer of water purification system and third party marketers; all are potentially liable under FDUTPA, where they directly participated in the unlawful marketing); *Galstaldi v. Sunvest Communities USA, Ltd.*, 637 F. Supp.2d 1045, 1056 (S.D. Fla. 2009) ("To state a claim under FDUTPA, one need not show the defendant was the principal actor . . . or that the defendant initiated those acts . . . . It is sufficient to allege that a party directly participated in a violation of FDUTPA . . . .") ; *In re Telexfree Secs. Litig.*, 389 F. Supp.3d 101, 105 (D. Mass. 2019) ("A defendant acting with knowledge of deception who either directly participates in that deception or has the authority to control the deceptive practice of another, but allows the deception to proceed" engages in a deceptive practice under MCPL); *City of Boston v. Purdue Pharma, LP, et al.*, 2020 WL 977056 at *7 (Mass. Super. Jan. 31, 2020) (rejects argument by opioid distributors that there was no "direct commercial transaction" based on distributors involvement in opioid sales); *Hamm v. Mercedes-Benz USA, LLC,* 5:16cv3370, 2019 WL4751911 at *5 (N.D. Cal. Sept. 30, 2019) ("a transactional relationship is not required . . . to assert UCL and CLRA claims"); *Loughridge v. Goodyear Tire and Rubber Co.*, 192 F. Supp.2d 1175 (D. Colo. 2002) ("Plaintiffs allege that Goodyear and Heatway embarked on [a] joint [marketing] campaign despite knowledge of problems with the product[ ] . . . . Although Goodyear denies that any joint marketing agreement existed, . . . there is sufficient evidence to create a genuine issue of material fact"); *Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560, 565 (Tx. Ct. App. 1997) (manufacturer of defective product need not be directly involved in transaction, where its advertising was used in effectuating the transaction).

*e.g.*, PAC ¶¶ 284-91, 292). Neither reliance, nor intent to deceive, or even a defendant's

knowledge that a representation is false is a required element of these statutes. *See e.g., Aspinall*

*v. Philip Morris Companies, Inc.*, 813 N.E.2d 476, 486 (Mass. 2004) ("A successful G.L. c. 93A

action based on deceptive acts or practices does not require proof that a plaintiff relied on the

representation ... or that the defendant intended to deceive the plaintiff ... or even knowledge on

the part of the defendant that the representation was false."); *Coffey*, 2018 WL 415425 at *3

("Because FDUTPA claims focus on the defendant's conduct, whether an individual plaintiff

relied on the unfair or deceptive practice is irrelevant.").

The statutes' prohibition on "unfair" conduct makes actionable a wide array of activity

that is not grounded in fraud[9] and, thus, not subject to Rule 9(b).[10] While plaintiffs previously

asserted consumer claims based on both unfairness and deception (*see e.g.*, Complaint, ¶¶ 225,

233), the PAC explicitly separates out plaintiffs' claims based on unfairness to clarify they are

---

[9] *See, e.g., Linkage Corp. v. Trustees of Boston Univ.*, 425 Mass. 1, 27 (1997) ("A practice is unfair if it is within the penumbra of some common law, statutory or other established concept of infairness, . . . is immoral, unethical, oppressive, unscrupulous; [and . . . causes substantial injury"); *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048-49 (9th Cir. 2000) (California UCL "defines 'unfair competition' very broadly to include' anything that can properly be called a business practice and that at the same time is forbidden by law'"); *PNR , Inc. v. Beacon Property Mgt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (a unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers'")

[10] *See, e.g., Crisp Human Capital, Ltd. v. Authoria, Inc.*, 613 F. Supp. 2d 136, 139 (D. Mass. 2009) ("to the extent it does not involve fraud, a Chapter 93A claim is not subject to a heightened pleading requirement"); *State Farm Mutual Automobile Ins. Co. v. Medical Svc. Center of Fla., Inc.*, No. 1:14-cv-20625, 2014 WL 11910630, at *4 (S.D. Fla. Sept. 15, 2014) ("the general rule is that the heightened pleading requirement for fraud under Rule 9(b) does not apply to claims under FDUTPA"). *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 1033, 1072-73 (S.D. Cal. 2017) ("fraud is not a necessary element under the [California Consumers Legal Remedies Act] and [California's Unfair Competition Law];" Rule 9(b) does not apply to claims not grounded in fraud).

not based on deception.  (*See e.g.,* PAC ¶¶ 276-83 (unfair); ¶¶ (deceptive) 284-92).  Finally, even where Rule 9(b) might apply, it is typically the case that dismissals based on Rule 9(b) are accompanied by leave to replead.[11]

### 2.   Fraud/Fraudulent Non-Disclosure

The PAC addresses and cures the Court's perceived deficiencies regarding (1) the adequacy of plaintiffs' allegations concerning the MLB Defendants' "game of skill" misrepresentations, and (2) plaintiffs' reliance on that misrepresentation.  (See, e.g., PAC ¶¶ 398, 399-40).  And the PAC also alleges additional specific misrepresentations relied upon by plaintiffs.  (See, e.g., PAC ¶¶ 404-05, 407-08, 410, 415).

The PAC also cures the basis for the Court's rejection of plaintiffs' fraudulent non-disclosure.  While the Court recognized that Restatement (Second) of Torts § 551 "does not actually require a transaction between the parties . . . to impose a duty to disclose," it concluded that the cases finding liability in the absence of a direct transaction "all involved defendants with a much closer relationship to the transaction than those alleged here."  Op. 19-20.  Plaintiffs' PAC establishes that defendants' relationship to the transactions at issue here (as persons who created, approved the form, advertised and marketed the transactions, ██████████████████ ███ , and approved and required to be disseminated the false "contest of skill" representations during the class period) was sufficiently close to support liability.

---

[11] *Olsen v. Pratt & Whitney Aircraft Div. of United Techs. Corp.*, 136 F.3d 273, 276 (2d Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant Rule 9(b) are typically given an opportunity to amend their complaints"); *see generally* 5A Wright & Miller, § 1300 ("in most instances, when a motion based on lack of sufficient particularity under Rule 9(b) is granted . . . it will be with leave to amend the deficient pleading).

### 3.    Negligent Misrepresentation

In their PAC, plaintiffs do not reassert their negligence claims, but have reformulated their negligent misrepresentation claims, which the Court held failed to state a claim for relief pursuant to § 552 of the Second Restatement of Torts because plaintiffs had not alleged their justifiable reliance on defendants' false information.  Op. 23.  The PAC addresses the Court's holding, identifying, in particular, defendants' false representation that the contests were games of skill (PAC ¶ 437(a)) and other false information (PAC ¶ 437b, c, d); expressly pleading plaintiffs' awareness of and justifiable reliance on the information (PAC ¶ 440); and explaining the basis for plaintiffs' justifiable reliance, (PAC ¶ 441; *see also* ¶¶ 155, 162-64 [quoted at pp. 9-10, 12-13 above], detailing the basis for plaintiff Olson's reliance on the false information).  The law is clear that whether a plaintiff justifiably relied is a question of fact for the trier.  *See e.g., Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1031 (Mass. 2004).

### 4.    Unjust Enrichment Claims.

The Court rejected plaintiffs' unjust enrichment claims "because plaintiffs have failed to plausibly allege that the defendants were enriched at plaintiffs' expense."  Op. 29.  In particular, the Court rejected the Complaint's allegation (in ¶ 119) that defendants benefitted through a "share of DraftKings' enormous fantasy baseball fees," because plaintiffs "fail[ed] to explain what these alleged fees were, how they came at plaintiffs' expense, or how they were purportedly shared between Draft Kings and the defendants."  Op. 29-30.

Plaintiffs' PAC addresses and cures these perceived deficiencies:





**CONCLUSION**

For the reasons stated above, the Court, pursuant to Fed. R. Civ. P. 59(e) and 60(b), should alter, amend or vacate the Judgment entered in this action on April 7, 2020 and grant plaintiffs leave, pursuant to Fed. R. Civ. P. 15(a)(2), to file their Proposed Amended Complaint.

DATED: May 5, 2020　　　　　　　　SILVER GOLUB & TEITELL LLP


By:　/s/ David S. Golub
　　　David S. Golub
　　　Steven L. Bloch
　　　Ian W. Sloss
　　　SILVER GOLUB & TEITELL LLP
　　　184 Atlantic Street
　　　Stamford, CT 06901
　　　Tel. (203) 325-4491
　　　dgolub@sgtlaw.com
　　　sbloch@sgtlaw.com
　　　isloss@sgtlaw.com

　　　John D. Radice
　　　Kenneth Pickle
　　　Natasha Fernandez-Silber
　　　April Lambert
　　　RADICE LAW FIRM, P.C.
　　　475 Wall Street
　　　Princeton, NJ 08540
　　　Tel: (646) 245-8502
　　　jradice@radicelawfirm.com
　　　kpickle@radicelawfirm.com
　　　nsilber@radicelawfirm.com
　　　alambert@radicelawfirm.com

　　　Eric L. Cramer
　　　Patrick F. Madden
　　　BERGER AND MONTAGUE
　　　1818 Market Street
　　　Suite 3600
　　　Philadelphia, PA 19103
　　　Tel: (215) 875-3000
　　　ecramer@bm.net
　　　pmadden@bm.net

　　　*Counsel for Plaintiffs and the Proposed Classes*