# Exhibit A-1
# [REDACTED]

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD, and ERIK LIPTAK, individually and on behalf of all others similarly situated, <br><br> Plaintiffs <br><br> v. <br><br> MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, L.P., <br><br> Defendants | Case No. 1:20-CV-00632-JSR <br><br> **[PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **[REDACTED]** |

## INTRODUCTION

1.      Plaintiffs Kristopher R. Olson, Christopher Lopez, Warren Barber, Christopher Clifford, and Erik Liptak bring this action, individually and as a class action on behalf of all others similarly situated, to recover damages for defendants' wrongful marketing and promotion of MLB fantasy baseball contests as "games of skill," which defendants caused to be, and knew, were based on corrupted statistical data that, unknown to contestants, precluded any exercise of participant skill and rendered the contests unfair and deceptive games of chance.

2.      Major League Baseball ("MLB"), its member Clubs and their affiliates entered into an exclusive partnership with DraftKings, Inc. ("DraftKings") – the "Official Partner of Major League Baseball" – to commercialize MLB-branded fantasy baseball contests – the "Official Daily Fantasy Game of Major League Baseball."  Defendants and DraftKings collectively marketed and promoted the contests to the consuming public as sophisticated contests based on, and indeed requiring, participants' "skill and knowledge of … sports

information" to successfully compete.  Participants were expressly advised in writing, and required to acknowledge and expressly agree, that the contests were "contests of skill" as a pre-condition to being allowed to pay to participate in the contests.

3.      Pursuant to defendants' agreements with DraftKings, defendants participated in and controlled every aspect of the commercial venture with DraftKings, including (i) establishing the product being offered, *e.g.*, MLB-branded contests; (ii) pre-approving the form of the contests and the conditions of participation that contestants were required to acknowledge and accept; (iii) setting the maximum entry fee for the contests; (iv) pre-approving all advertising and marketing of the contests by DraftKings; (v) assuming specified and comprehensive marketing obligations to induce consumers to participate in the contests. ██████████████

██████████████  ██████  ██████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████.[2]

4.      ███████████████████████████████████████████

MLB permitted and concealed impermissible electronic sign stealing by MLB Clubs that pervasively corrupted the MLB statistics upon which the contests were based.  The Clubs' misconduct prevented MLB fantasy baseball contestants from exercising skill to win or lose the contests.  Defendants' concealment of the misconduct and marketing of the contests as "games of skill" was unfair and deceptive and wrongly induced Plaintiffs and the proposed Classes into paying to participate in contests that were not skill-based and that neither Plaintiffs nor the Classes would have knowingly paid to enter.

---

[1] MLB-Olson-00001657.

[2] MLB-Olson-00002729.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative class members as defined below, and minimal diversity exists because a majority of putative class members are citizens of a state different than Defendants.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendants reside in and are subject to the court's personal jurisdiction in this District in that they either have their principal places of business in this District or transact substantial business in this District on an ongoing basis and are subject to the court's personal jurisdiction with respect to this action.

## PARTIES

**A.    Plaintiffs**

7.      Plaintiff Kristopher R. Olson is a citizen of the Commonwealth of Massachusetts.

8.      Plaintiff Christopher Lopez is a citizen of the State of California.

9.      Plaintiff Warren Barber is a citizen of the State of Texas.

10.     Plaintiff Christopher Clifford is a citizen of the State of Florida.

11.     Plaintiff Erik Liptak is a citizen of the State of Colorado.

**B.    Defendants**

12.     Defendant Major League Baseball ("MLB") is comprised of the thirty Major League Baseball Clubs, which have formed a partnership governed by a written agreement (the Major League Constitution).  Pursuant to the member Clubs' agreement, MLB's Office of the

Commissioner d/b/a Major League Baseball, is expressly authorized "to act on any matter that involves the integrity of, or public confidence in, the national game of Baseball,"[3] and acts on behalf of and serves as spokesperson for all of the Clubs on such matters.  At all times relevant to plaintiffs' claims herein, Robert D. Manfred, Jr. has served as defendant MLB's Commissioner, and his statements and actions, as described herein, were duly-authorized, approved and ratified by all of MLB's member Clubs.

13.     Defendant MLB Advanced Media, L.P. ("MLBAM") is a limited partnership owned and controlled principally by MLB's member Clubs (through their affiliates) and financially supported by the Clubs.  Defendant MLBAM has responsibility for internet and interactive marketing for MLB and coordinating such marketing with other MLB media and marketing affiliates, as well as with each of MLB's Clubs.  At all times mentioned herein, defendant MLBAM acted in concert with, as partner or joint venturer with, defendant MLB and its Clubs and with other MLB media and marketing affiliates in furthering their business relationship with DraftKings to establish, monitor, market and promote MLB fantasy baseball contests on a nationwide basis across social media and MLB's media platforms and mobile applications, as well as through off-line activities.

14.     Defendants MLB and MLBAM (collectively, the "MLB Defendants") were, at all times mentioned herein, acting collectively to further their joint interests in marketing, promoting and receiving the financial benefits of their agreements and relationships with DraftKings, and authorized, approved and ratified each other's conduct, statements and representations in such regards, including the statements and representations by Manfred and by other representatives of MLB and of MLB's Clubs cited in this Complaint.

---

[3]  Major League Constitution at § 4.

15.     Defendant Houston Astros, LLC (the "Houston Astros" or the "Astros") is a Texas limited liability corporation that owns and operates the Houston Astros professional major league baseball team and is an MLB member Club and an owner (through its affiliate) of MLBAM. At all times relevant to the events at issue, the Astros acted individually and as a member of MLB and directed and approved the activities of MLBAM at issue in this lawsuit.

16.     Defendant Boston Red Sox Baseball Club L.P. (the "Boston Red Sox" or the "Red Sox") is a Massachusetts limited partnership that owns and operates the Boston Red Sox professional major league baseball team and is an MLB member Club and an owner (through its affiliate) of MLBAM. At all times relevant to the events at issue, the Red Sox acted individually and as a member of MLB and directed and approved the activities of MLBAM at issue in this lawsuit.

## FACTUAL BACKGROUND

17.     Fantasy sports are internet-based games in which participants assemble simulated teams comprised of professional players in major league (and other) sports and compete for cash prizes against other participants' simulated teams based on the actual statistical performance of their teams' professional players.  Fantasy sports are legal in this country because they have been determined to be games of skill.

18.     In 2006, when Congress enacted the Unlawful Internet Gambling Enforcement Act (the "UIGEA"), 31 U.S.C. § 5361, *et seq.*, it exempted fantasy sports competitions from the law's anti-gambling prohibitions <u>as long as</u>:

> all winning outcomes reflect the relative knowledge and skill of the participants and are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case of sports events) in multiple real-world sporting or other events.

31 U.S.C. § 5362(1)(E)(ix)(ii).  The Congressional Record reflects that representatives of defendant MLB urged Congress to adopt that exemption for fantasy sports.[4]

19.     For a number of years, before and after the enactment of the UIGEA, the MLB Defendants offered and promoted fantasy baseball competitions for cash prizes.  Prior to 2013, these branded competitions, "MLB.com Fantasy Baseball," were featured daily on MLB's web site and on MLB's broadcast and streaming television networks.  As offered daily by the MLB Defendants prior to 2013, the contests were <u>free</u> – participants were urged (as the daily banner on MLB.com in 2012 stated) to:

> Play Fantasy Baseball
>
> Join a league today and compete to win $10,000 in MLB.com's free head-to-head fantasy game.  Play now.[5]

20.     The contest rules for each of the MLB.com Fantasy Baseball competitions offered by the MLB Defendants prior to 2013, published daily on MLB's web site, provided that each competition was "a skill contest" that "may not be used for any form of gambling."[6]

21.     The MLB Defendants promoted these free fantasy baseball competitions prior to 2013 as a way to heighten fan interest and engagement with the game of baseball and, thus, increase fan attendance at games and television and radio audiences – leading to increased revenues for MLB Clubs through greater ticket and related in-stadium product and services sales,

---

[4] *See* Congressional Record, H4974, July 11, 2006.

[5] *Fantasy Baseball Game and Leagues*, MLB.COM (May 12, 2012), https://web.archive.org/web/20120512015041/http://mlb.mlb.com/mlb/fantasy/?tcid=nav_mlb_fantasy (accessed Apr. 16, 2020).

[6] *2012 MLB.com Fantasy Baseball – Official Rules*, MLB.COM (May 8, 2012), https://web.archive.org/web/20120508130713/http:/mlb.mlb.com/mlb/fantasy/fb/info/official_rules.jsp (accessed Apr. 16, 2020) ("2012 MLB.com Fantasy Baseball is a skill contest designed to increase consumer awareness of and interest in Major League Baseball and MLB.com, the Official Site of Major League Baseball. This Contest may not be used for, or in connection with, any form of gambling.).

increased broadcast and sponsor revenue, and increased merchandise and paraphernalia sales.
As MLB Commissioner Manfred stated in October 2015, "[F]antasy [baseball] is an important
source of fan engagement and has been for a long time."[7]

22.     During the period prior to 2013, other internet sites, including ESPN.com, CBS
Sports.com and Yahoo.com also offered internet fantasy sports competitions for cash prizes.
These sites offered the contests to increase consumer interest in the sites and, like the MLB
Defendants, charged no entry fee (although, in some instances, they did charge minimal fees to
set-up or administer a fantasy league).

23.     By the early part of the 2010 decade, internet fantasy sports had exploded in
popularity, presenting an opportunity for entrepreneurs (and, ultimately, the MLB Defendants as
well) to take commercial advantage of what, to that time, had been offered to consumers as a free
experience.  In 2012, DraftKings was formed, with a business model based on charging
consumers entry fees to participate in "Daily Fantasy Sports" ("DFS") competitions offering
multi-thousand (and even million) dollar cash prizes.  Baseball, with its 162-game schedule, was
a particularly attractive form of DFS for DraftKings (as opposed to the original season-long
fantasy leagues that had previously been offered).  Other companies, in particular, FanDuel, Inc.
("FanDuel"), developed a similar business model for fantasy sports contests.

24.     DraftKings' business model proved enormously popular and lucrative.  By 2014,
DraftKings reported over $300 million in DFS entry fees and over $30 million in revenue,[8]  and

---

[7] Mark Feinsand, *MLB commissioner Rob Manfred defendants DraftKings partnership, says fantasy sports 'not gambling'*, N.Y. DAILY NEWS (Oct. 26, 2015), https://www.nydailynews.com/sports/baseball/fantasy-sports-not-gambling-mlb-commissioner-manfred-article-1.2412347 (accessed Feb. 13, 2020).

[8] *See* Darren Heitner, *DraftKings Reports $304 Million of Entry Fees in 2014*, FORBES (Jan. 22, 2015), https://www.forbes.com/sites/darrenheitner/2015/01/22/draftkings-reports-304-million-of-entry-fees-in-2014/ (accessed Jan. 22, 2020) ("Daily fantasy sports operator DraftKings has released its key annual

boasted it would pay over $200 million in DFS cash prizes.[9]  In particular, with respect to

fantasy baseball competitions, DraftKings reported an eight-fold increase that year in participants

in its DFS baseball contests.[10] For the period from September 2016 through August 2017, DFS

operators nationwide handled over $3.3 billion in DFS contest fees, resulting in over $327

million in revenue.[11]

     25.     The MLB Defendants recognized that DraftKings' business model presented them

with an opportunity to monetize the fantasy baseball contests they had previously been offering

for free.  Initially, in 2013, the MLB Defendants entered into an agreement with DraftKings to

help market and promote DraftKings' fantasy baseball contests as MLB contests █████████

████████████████████████████████████████████████████████████████████████

█████████  At the request of MLB, the arrangement was not publicly disclosed.[13]

     26.     In March 2015, the MLB Defendants expanded their relationship with

DraftKings, agreeing to establish MLB-branded fantasy baseball contests and to co-market the

contests to consumers across the country in what they publicly described as "the most

---

fiscal year 2013 and 2014 financials for the first time, which shows entry fees of $45 million in 2013 and a rise to $304 million in 2014. Revenues were $4 million and $30 million, respectively.").

[9] *See* Ryan Lawler, *DraftKings Raises Another $41M And Acquires Daily Fantasy Sports Competitor StarStreet,* TECHCRUNCH (Aug. 25, 2014), https://techcrunch.com/2014/08/25/draftkings-41m-starstreet/ (accessed May 1, 2020).

[10] *Id.*

[11] Dustin Gouker, *How Much Money Did DraftKings, FanDuel And The DFS Industry Make In The Past Year? Now We Know Almost Exactly*, LEGAL SPORTS REPORT (Oct. 20, 2017), https://www.legalsportsreport.com/16152/draftkings-fanduel-dfs-revenue/ (accessed May 1, 2020).

[12] MLB-Olson-00000562 ████████████████████████

[13] Albert Chen, *Billion Dollar Fantasy: The High-Stakes Game Between FanDuel and DraftKings That Upended Sports in America*, 174 (2019) ("[DraftKings'] 2013 marketing partnership with MLB was a watershed moment because it was the first daily fantasy partnership with a professional sports league, *but it also was a ghost deal— at MLB's behest, there was no press release at the time, simply DraftKings signage popping up in major league ballparks and DraftKings banners on MLB.com.*") (emphasis added).

comprehensive league partnership in daily fantasy sports history."[14]  DraftKings was designated as "The Official Partner of Major League Baseball," and the MLB-branded contests were described as "The Official Daily Fantasy Game of Major League Baseball."[15]

27.    On March 31, 2015, MLBAM and DraftKings entered into a licensing and marketing agreement (the "MLB-DraftKings agreement" or the "agreement") setting forth their joint understandings and mutual commitments to establish and co-market MLB fantasy baseball contests.  In entering into the agreement, MLBAM acknowledged it was acting on behalf of MLB, MLB's participating member Clubs and MLB's other marketing and media affiliates, defined in the agreement as the "MLB Parties," all of which committed to the obligations of the agreement.

28.    Robert Bowman, MLB President of Business and Media, ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ the Clubs would receive from the partnership with DraftKings in an April 1, 2015 memorandum circulated to all MLB Club Presidents:

> "[T]he five year Program totals no less than ▮▮▮▮▮ consisting of both ▮ ▮▮▮▮▮ … Of that amount, ▮▮▮▮▮ will be distributed to the clubs directly, with the remainder staying with [MLBAM] for a future distribution to all 30 clubs."[16]

29.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



"described by league executives as sizeable enough to reap meaningful benefit from the rise of

---

[14]  Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed May 4, 2020) (accessed Jan. 22, 2020).

[15]  *Id.*

[16]  ASTR_000027.

daily fantasy."[17]  Investing in DraftKings was a win-win proposition for MLB.  Not only would

the MLB Defendants be able to benefit financially from the multi-million dollars of daily entry

fees fantasy baseball contestants paid DraftKings annually, but fan interest in the game of

baseball would be heightened by participation in fantasy baseball, especially among younger

contestants critical to sustaining baseball in the future.  As Bowman stated when the 2015

investment was announced, MLB's relationship with DraftKings "is as important philosophically

as it is economically.  Daily fantasy skews very young and drives great awareness in the game."

[18]  And, as Bowman wrote to all of the Club Presidents, "Giving our fans, particularly our

younger fans, the opportunity to play fantasy baseball on a daily time frame, rather than the

typical season-long activity, will surely help expand the reach of MLB."[19]

          30.     The MLB Defendants were not simply an investor in DraftKings or a passive

beneficiary of the business venture. Pursuant to their agreement, the MLB Defendants were

directly and substantially involved in every aspect of the commercial venture, including (1)

creating the MLB-branded fantasy baseball contests at issue, and authorizing the complete array

of MLB and MLB Club trademarks and logos to brand and market the contests; (2) exercising

direct control over the form, terms and conditions of participation (including the content of

notice to contestants of the Conditions of Participation), entry fees, and all advertising and

marketing of the contests by DraftKings; (3) assuming contractual obligations to market and

promote the contests; (4) direct participation in the sale of the contests; (5) direct participation,

via MLB platforms, in providing enhancements to participating contestants to foster continued

---

[17]  Eric Fisher, *A look into DraftKings' MLB Deal*, SPORTS BUSINESS JOURNAL (Apr. 20, 2015),
https://www.sportsbusinessdaily.com/Journal/Issues/2015/04/20/Media/DraftKings-MLB.aspx  (accessed
Jan. 10, 2020)(emphasis added).

[18] *Id.*

[19] *Id.*

contestant involvement in the contests (generating additional subscription revenues shared with

DraftKings), and (6) ███████████████████████████████████████████████

██████████████████████████████.

31.    Thus, defendants:

    a.    participated in creating the product (MLB-branded fantasy baseball games) and controlled, through a contractual right of <u>pre</u>-approval, the form of the contests ("Approved Fantasy Games") and any changes to the form of the contests;

    b.    controlled, through a contractual right of pre-approval, the terms of service and conditions of participation for the contests, including any changes to the terms or conditions, and, in particular, required DraftKings to cause the contests to comply with all MLB Official Rules and Regulations and not be a form of gambling;

    c.    set the maximum the entry fee for the contests;

    d.    required all "Approved Fantasy Games" to be conducted as "contests of skill;"

    e.    required written notification to all contestants that the contests were conducted as "contests of skill" and all contestants' pre-participation acknowledgment and approval of that condition of the contests;

    f.    controlled, through a contractual right of pre-approval, the content of all DraftKings' advertising and marketing of the contests;

    g.    committed to undertaking highly-specified marketing and promotion of the contests ("Assumption of Marketing Commitments") through television and radio advertising and promotion; direct email promotion to MLB.TV subscribers; marketing and promotion across all MLB social media, and internet, television and streaming television media platforms; as well through member Club advertising and promotion on television and radio, on Club digital media, and through in-stadium promotions – all in accordance with detailed requirements as to the time, place and content of the marketing, including required daily fantasy baseball programming, specifically advertising and promoting the contests, on MLB's broadcast and streaming network.  The agreement required the parties to agree upon an annual marketing plan each year;

h.      caused MLB's interactive media platforms to be used to sell the contests
        to contestants through a direct link from MLB's platforms to the contests'
        sign-up forms;

i.      provided contestants with integrated follow-up tracking of the
        performances of their fantasy team players through MLB's "Fantasy
        Tracker" application on MLBAM's Media Player requiring (at additional
        cost to contestants) paid subscriptions to MLB.TV, as well as live "fantasy
        alerts" over MLB.com's iPhone application and fantasy highlights also
        over MLBAM's Media Player.[20]

32.     The agreement provided for the appointment of a senior MLBAM executive to
serve on an "Approval Committee" with a senior DraftKings executive to deal with the pre-
approval rights granted the MLB Parties by the agreement.  Violation of any pre-approval
requirement was a ground for termination of the agreement by MLBAM.

33.     The "Approved Fantasy Games" were expressly defined in the agreement to mean
"skill-based" fantasy games to be conducted pursuant to contestant Terms of Use, including
"Conditions of Participation" pre-approved by MLBAM.  The approved Terms of Use, including
the Conditions of Participation, which every contestant was provided in writing and required to
acknowledge and agree to electronically as a pre-condition to participating in any contest, were
attached as an exhibit to the agreement.  The Terms of Use, subsection (g), "Conditions of
Participation" stated:

        [W]inners are determined by the individuals who use their skill and knowledge of
        relevant sports information and fantasy sports rules to accumulate the most points
        according to the corresponding scoring rules.[21]

The Conditions of Participation were incorporated into and applicable to every MLB fantasy
baseball contest.

---

[20] *See* Amended and Restated Game License and Marketing Rights Agreement ("Agreement") MLB-
Olson 00000442-501; *see also* DraftKings' July 31, 2015 press release ("DraftKings Announces
Exclusive Partnerships with 27 MLB Teams") at 1. ASTR_000002.

[21] MLB-Olson-0000473-75.

34.     The provisions in the MLB-DraftKings agreement expressly requiring, in numerous respects, that all MLB fantasy baseball contests were to be conducted and marketed to contestants as games of skill were of material importance to MLB, which believed that requirement was necessary for the contests to be legal and essential to maintaining MLB's long-standing public opposition to sports gambling.

35.     Indeed, in 2016, Manfred reiterated baseball's continuing public opposition to being associated in any way with gambling when he refused to lift the lifetime ban against former MLB star Pete Rose, who had been excluded from MLB because of his involvement with gambling on baseball.[22]

36.     The MLB Defendants felt so strongly about this point that they included a provision in the MLB-DraftKings agreement giving them the right to terminate the agreement if any government authority even *alleged* publicly that the games were illegal gambling.

37.     Prior to entering into its "league partnership" with DraftKings, MLB's attorneys investigated and confirmed, to the satisfaction of MLB, that fantasy baseball contests operated as "games of skill" were legal under federal and state law and did not constitute a form of gambling.

38.     In October 2015, shortly after the New York Attorney General opened a publicly-reported inquiry into whether fantasy sports constituted illegal gambling,[23] MLB Commissioner Manfred – a Harvard Law School graduate and an experienced practicing attorney in New York

---

[22] Jerry Crasnick, *Q&A: Rob Manfred reflects on his 1-year anniversary as MLB commissioner*, ESPN (Jan. 25, 2016), https://www.espn.com/mlb/story/_/id/14636894/qa-rob-manfred-one-year-mlb-commissioner (accessed Feb. 13, 2020).

[23] Joe Drape & Jacqueline Williams, *New York Attorney General Opens Inquiry Into Fantasy Sports Sites*, N.Y. TIMES (Oct. 7, 2015), https://www.nytimes.com/2015/10/07/sports/draftkings-fanduel-inquiry-new-york-attorney-general.html.

prior to joining MLB -- publicly defended the legality of fantasy baseball as a game of skill,

stating:

> "We did thoroughly investigate the games that were available on the [DraftKings] site, that was a major factor in selecting a partner in the fantasy space.  And we were completely comfortable with the idea that those games were consistent with the existing federal law. [24]
>
> ….
>
> "I'm quite convinced it is a game of skill, as defined by the federal statute," Manfred said. "And I'm comfortable with the idea that it's not gambling.
>
> "There's a huge difference between Rob Manfred, citizen, betting on whether Kansas City beats Toronto or whomever on the one hand, and Rob Manfred picking nine guys on 18 teams to try to see if he can accumulate more points within a given set of guidelines than a hundred guys trying to do the same thing."[25]

As Manfred reiterated in another public interview that week, "Fantasy is not gambling, in my

view."[26]

      39.    All of the MLB Clubs ratified and approved the MLB Defendants' undertaking

with DraftKings and the terms of the MLB-DraftKings agreement, and agreed to comply with

the obligation to market and promote the MLB fantasy baseball contests, as required by the

agreement.

      40.    Thereafter, as anticipated in the agreement, twenty-seven of MLB's Clubs (all

that were legally permitted to do so) entered into individual "partnership" agreements with

DraftKings to market and promote MLB fantasy baseball contests.  In July 2015, DraftKings

announced these individual "partnerships" with the 27 Clubs, including the Astros and the Red

---

[24] Mark Feinsand, *MLB commissioner Rob Manfred defendants DraftKings partnership, says fantasy sports 'not gambling'*, N.Y. DAILY NEWS (Oct. 26, 2015), https://www.nydailynews.com/sports/baseball/fantasy-sports-not-gambling-mlb-commissioner-manfred-article-1.2412347 (accessed Feb. 13, 2020).

[25] *Id*.

[26] *See* Rovell, *infra*, at note 44.

Sox, intended to "complement DraftKings' existing partnership with MLB."[27]  In combination

with the requirements imposed on the Clubs by the MLB-DraftKings agreement, the Clubs

individually committed to marketing and promoting the contests, including, *inter alia*, on their

digital media, through stadium banners and other in-stadium promotions (described as "one-in-a-

lifetime, market-specific in-ballpark experiences), and through television and radio spots. These

partnerships designated the MLB contests as the "Official Daily Fantasy Game of [Participating

Club]."[28]

      41.    Pursuant to the MLB-DraftKings agreement, DraftKings agreed that the contests

would not be operated in a way that violated MLB's Official Rules and Regulations or that

involved unlawful gambling.  The MLB Parties, for their part, agreed they would "not use

deceptive, misleading, illegal or unethical practices in marketing or promoting the Approved

Fantasy Games," and further agreed to keep DraftKings "informed as to any problems

encountered with the Approved Fantasy Games."

      42.



---

[27] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/draftkings-mlb-team-deals/ (accessed Jan. 22, 2020).

[28] MLB-Olson 00000453.

43.     From 2015 on, acting as DraftKings' "partner,"[29] the MLB Parties engaged in the marketing and promotion required by their agreements with DraftKings ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████This programming, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ contained expert recommendations of specific MLB players for inclusion in MLB fantasy contest lineups. In addition, the MLB Defendants separately published on their media platforms and applications, on a daily basis, recommended complete lineups of hitters and pitchers for selection in the contests. As required by the agreement, the MLB Defendants further granted DraftKings broad promotional and advertising rights, including use of MLB league and team marks and logos, and authorized designation of the contests as MLB's "Official Daily Fantasy Game."[30]

44.     ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ █ █████████

---

[29] *See* Press Release, *DraftKings Becomes the Official Daily Fantasy Game of Major League Baseball*, BUSINESSWIRE (Apr. 2, 2015), https://www.businesswire.com/news/home/20150402006154/en/DraftKings-Official-Daily-Fantasy-Game-Major-League (accessed Jan. 22, 2020).

[30] *See* Dustin Gouker, *Play Ball: DraftKings Announces Deals with 27 Major League Baseball Teams*, LEGAL SPORTS REPORT (July 31, 2015), https://www.legalsportsreport.com/2827/ draftkings-mlb-team-deals/ (accessed Jan. 22, 2020) ("DraftKings' existing partnership with Major League Baseball included a provision that it is the only DFS site that can sign deals with individual teams.").

[31] MLB-Olson-00001657 ██████████████████████████.



45.     In October 2015, there were publicly-reported allegations that a DraftKings employee had used his access to non-public DraftKings contestant lineup information to place lineup entries in DFS contests at FanDuel, DraftKings' rival and had won $350,000.[35] Responding to consumer concerns about that incident that threatened to depress sales, Manfred emphasized that MLB understood the need to safeguard the fairness of fantasy baseball contests to insure that contestants have a fair opportunity to win, publicly stating:

> You want to make sure that the fantasy organizations have appropriate safeguards in place to insure that things are fair, that there's not an inappropriate use of information and that fans who engage on these platforms have an opportunity to win.[36]

Consistent with Manfred's representation, MLB issued a statement indicating it had "reached out and discussed this matter with [DraftKings].[37]

---

[32] MLB-Olson-00002728

[33] *Id.*

[34] MLB-Olson-00000507, 00000527

[35] Joe Drape & Jacqueline Williams, *Scandal Erupts in Unregulated World of Fantasy Sports*, N.Y. TIMES (Oct. 6, 2015), https://www.nytimes.com/2015/10/06/sports/fanduel-draftkings-fantasy-employees-bet-rivals.html (accessed Apr. 23, 2020).

[36] Darren Rovell, *Commissioners say daily fantasy not akin to gambling, but needs regulation*, ESPN (Oct. 27, 2015), https://abc7news.com/sports/commissioners-say-daily-fantasy-not-akin-to-gambling-but-needs-regulation/1053610/ (accessed May 4, 2020).

[37] ESPN News Services, *DraftKings says employee didn't have unfair advantage on FanDuel*, ESPN (Oct. 6, 2015), https://www.espn.com/chalk/story/_/id/13821770/draftkings-defends-integrity-says-employee-had-no-unfair-fanduel-advantage (accessed Fe. 13, 2020).

46.     Defendant MLB has, moreover, long represented to the public (including members of the public that it has sought to induce to participate in MLB fantasy baseball contests) that it carefully enforces its Official Rules and regulations to ensure the honesty and integrity of the game, described by Manfred as MLB's "most important priority."[38]

47.     As Manfred has stated on behalf of MLB and its member Clubs, "We will never delegate responsibility for those integrity issues … We have our own expertise and no one is more motivated than the commissioner's office of baseball to make sure there is no threat to the integrity of our sport."[39]  In this regard, MLB has, through Manfred and other MLB representatives, asserted to state legislatures considering sports gambling legislation, that MLB is entitled to an "integrity fee" to be assessed on any gambling transactions in the given state to compensate MLB for its ongoing commitment to self-policing Major League baseball and insuring the integrity of the game of baseball as only MLB is best motivated and best able to do.[40]  MLB has sought legislation entitling it to an "integrity fee" on this basis in numerous states (at least 18).

48.     Manfred, on behalf of MLB, publicly reiterated the importance MLB placed on establishing and following policies that maintained the integrity of the game of baseball in an era of increased sports gambling, stating on November 27, 2018:

> It's more than just making a business deal [with a sports gambling operator].  It's having in place a set of policies for the industry that give us comfort on what is always our most important issue – that is integrity.[41]

---

[38] *See* Chandler, *infra*, at note 80.

[39] *See* Candee, *infra,* at note 50.

[40] *Id.* ("That's our job. We're not going to delegate it to some regulator in New Jersey or whatever, with all due respect. We care more about it. It's what we're about.").

[41] Billy Witz, *M.L.B., Once Averse to Gambling, Strikes a Deal With MGM Resorts*, N.Y. TIMES (Nov. 27, 2018), https://www.nytimes.com/2018/11/27/sports/mlb-gambling-mgm-resorts.html (accessed Feb. 13, 2020).

49.     And Manfred further reassured the public that, with the advent of laws legalizing

sports gambling, MLB would exercise care to maintain the integrity of baseball:

> The challenge for us is to make sure … those laws develop in a way where we can
> protect the integrity of the sport.  We want to be careful our product retains a
> pristine quality.[42]

50.     MLB's long-time representations to the public of its commitment to maintaining

the integrity of the game of baseball were intended to and did promote public confidence in the

honesty of the game and that MLB would not allow conduct by member Clubs that undermined

the fairness or integrity of the game.  This was material to promoting consumer participation in

MLB fantasy baseball contests as it provided assurance to contestants that MLB would not

knowingly allow the fairness of the contests to be tainted by cheating.

51.     DraftKings' and the MLB Defendants' aggressive marketing and promotion of

MLB fantasy baseball contests as "games of skill" induced hundreds of thousands of consumers

to pay to participate in the contests, generating hundreds of millions of dollars of contest entry

fees, and tens, if not hundreds, of millions of dollars of annual revenue, all to the financial

benefit of the MLB Defendants and the Clubs, including the Astros and the Red Sox.

52.     What Plaintiffs and the other MLB fantasy baseball contestants did not know,

however, was that while defendants were actively marketing and promoting the contests as a

game of skill and while MLB was assuring the public of its commitment to protecting and

ensuring the honesty and integrity of the game of baseball, MLB's Clubs were engaged in

corrupt and fraudulent electronic sign stealing, in knowing and intentional violation of MLB's

---

[42] Adam Candee, *MLB Commish On Sports Betting: 'We Will Never Delegate Responsibility For Those
Integrity Issues To State Regulators'*, LEGAL SPORTS REPORT (July 18, 2018),
https://www.legalsportsreport.com/22146/mlb-commissioner-integrity-fees/ (accessed Feb. 13, 2020).

Official Rules and regulations, that resulted in player statistics distorted by cheating and precluded the exercise of skill by MLB fantasy baseball contestants. The corrupt conduct of at least two of those Clubs – the Astros and the Red Sox – has now been publicly exposed, ███████

████████████████████████████████████████████████████████████████

███████ revealing that MLB fantasy baseball contests were, ███████████████

█████████████████ tainted by cheating and compromised.

53.     Throughout this period ███████████████████████████, Manfred and MLB's Clubs were well aware that MLB Clubs were engaging in this misconduct.  In particular, the fraudulent conduct of the Astros was an "open secret" among MLB league executives, scouts and players.[43]  Manfred, with the other Clubs' approval, intentionally did not disclose or take appropriate action to prevent or stop the Astros' misconduct.

54.     The Astros, Red Sox ██████████████████ were well aware of their cheating, which was perpetrated with the direct knowledge of team officials.  MLB's Clubs ratified and approved Manfred's knowing concealment and failure to take action to disclose the Club misconduct described in this Complaint because MLB and its Clubs did not want to suffer the public relations disaster and adverse financial effects that disclosing and remedying MLB team and player fraudulent conduct would engender.  As MLB All-Star pitcher Trevor Bauer has stated well, "You've seen the backlash on the MLB side.  It's a black eye for baseball.  They

---

[43] *See* Barry Svrluga and Dave Shienin, *The world just learned of the Astros' cheating. Inside baseball, it was an open secret.*, THE WASHINGTON POST (Feb. 11, 2020), https://www.washingtonpost.com/sports/mlb/astros-cheating-open-secret/2020/02/11/1830154c-4c41-11ea-9b5c-eac5b16dafaa_story.html (accessed Feb. 13, 2020)("According to people at all levels through [baseball] – players, clubhouse staff, scouts and executives – the idea that the Astros employed nefarious methods was an open secret.  'The whole industry knows they've been cheating their asses off for three or four years,' said an executive from a team that faced the Astros in the playoffs during that span. 'Everybody knew it.'").

don't want that coming out … Until the lid gets blown off publicly, nothing comes out publicly."[44]

55.     Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak – like the hundreds of thousands, and likely millions, of other similarly-situated MLB fantasy baseball contestants – were victims of this wrongful conduct by MLB and its corrupt Clubs.  Believing the MLB fantasy baseball contests to be true "games of skill," Plaintiffs and their fellow contestants paid to participate in contests that were compromised and unfair as a result of the cheating by MLB's teams and their players that MLB deliberately concealed.  Neither plaintiffs, nor any other MLB fantasy contestants would have paid to participate in the contests if they had known that the players' performance statistics on which the exercise of skill and the fairness of the contests depended were compromised and corrupted.

56.     Plaintiffs now bring this action, on their own behalf and on behalf of their fellow MLB fantasy baseball contestants, to recover the amounts they paid and lost in entry fees in these corrupt contests, as well as for statutory and punitive damages, attorneys' fees and costs, and such other relief as warranted by applicable law.

**A.**     **MLB Fantasy Baseball Contests Are Games of Skill Based upon MLB Player Performance Statistics, and Corrupted Statistics Destroy the Ability of Contestants to Exercise Skill and Render the Contests Unfair and Deceptive.**

57.     MLB fantasy baseball contests, like all fantasy sports contests, are statistics-based competitions in which player selection decisions and contest winners and losers are determined based upon actual MLB player performance statistics.  Contestants in MLB fantasy competitions select a fantasy lineup of MLB players pursuant to a "salary cap" draft.  In this draft, each real-

---

[44] Trevor Bauer, *Pardon My Take Episode*, BARSTOOL GOLD (Jan. 20, 2020), https://www.barstoolsports.com/gold/video-podcast/1680951/pmt-120-super-bowl-54-is-set-chiefs-vs-niners-trevor-bauer-on-astros-cheating-scandal-and-more (accessed May 4, 2020).

life MLB player is assigned a subjective value, or "salary," based on trailing professional performance statistics.  Fantasy contestants are allotted a set amount – the salary cap – to be used to choose – draft – their lineups of players.  The better a real-life MLB player has performed – and thus is expected to perform --, the higher his "salary," which counts against the total salary cap for each fantasy contestant. Contestants are required to draft a fantasy team with players whose aggregate salary is within the salary cap allocated to the contestants in each given competition.  The past statistical performance of the real-life MLB players available to be drafted by contestants is, thus, a material consideration for contestants, who rely on the accuracy of the past statistics in making decisions about whether to draft a player to their lineups and how much to "spend" on a player in the draft.

58.     MLB daily and weekly fantasy contests typically take one of two forms: head-to-head contests, which feature only two competing contestants and lineups, and tournaments, which can include tens of thousands of user lineups. Fantasy contestants pay an entry fee – as much as $500 in some multi-thousand contestant tournaments -- to join each competition.  Fixed cash prizes – as much as millions of dollars -- are awarded to contest winners.

59.     In contrast to traditional fantasy sports contests, which typically last an entire season, MLB contests start and end in a much shorter period (*i.e*, a single day or week). The contests begin once the first real-life MLB games on which the contest is based commence. For example, in a weeklong competition, the contest begins when the first MLB game of the week begins.

60.     The performance of a contestant's fantasy lineup in a given contest is, thus, directly tied to the actual day-to-day on-field performance of the players that comprise the contestant's team.  Points are awarded to each player on a contestant's fantasy baseball team

based on the player's objectively measurable statistical baseball performance achievements (*e.g.*, home runs, hits, batting average, wins, strike outs, ERA). The total points the contestant's line-up of professional players generates during each specific competition determines the contestant's ranking – and success – in the contest. Because the points are tied directly to actual performance metrics, a contestant's final ranking in the contest, and whether the contestant qualifies for one of the contest's cash prizes, is wholly dependent on professional player performance.

61. The actual outcome of any MLB game is wholly irrelevant to the outcome of each MLB fantasy contest. But contest success is dependent on the reliability of the underlying statistical information reflecting each fantasy player's day-to-day performance. And both lineup selection and contest success are impacted when that statistical information is corrupted. Fantasy lineups (and contest success) are directly impacted when electronic sign stealing enhances certain hitters' performances or diminishes opposing pitchers' performances: Fantasy lineups with enhanced hitting performances achieve better results; fantasy opponents of those enhanced lineups are disadvantaged. Similarly, fantasy lineups that include pitchers whose actual performances are diminished as a result of facing hitters engaged in electronic sign stealing are disadvantaged in fantasy contests. And, in the same vein, the relative performances of other fantasy players participating in MLB games impacted by electronic sign stealing are also enhanced or diminished as a result. For example, the at-bats of other hitters on the team with players engaged in electronic sign stealing are different than they otherwise would have been, as are the at-bats of the hitters on the opposing team, who are facing altered circumstances. Likewise, pitchers on a team engaged in electronic sign stealing are pitching under different circumstances than they otherwise would face.

62.     Most important, there is no way for fantasy contestants to reliably account for the impact of electronic sign stealing misconduct on player performance because, aside from the fact that it was unknown to the consuming public, it is also variable in effect (depending, for example, on which games, which players and which at bats it occurs).  Accordingly, even if known or anticipated by a contestant, electronic sign stealing – and its impact on player performance – cannot be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

63.     On November 11, 2015, New York's Attorney General issued cease-and-desist letters to DraftKings and FanDuel, ordering both companies to stop accepting entries inside New York because they were "engaged in illegal gambling under New York law, causing the same kinds of social and economic harms as other forms of illegal gambling, and misleading New York consumers."[45]

64.     On November 13, 2015, DraftKings and FanDuel filed petitions seeking to enjoin the Attorney General's action.  DraftKings and MLB (acting through the New York Yankees) further hired law firms and lobbying firms, as did Fan Duel, in an effort to persuade the New York General Assembly to pass legislation declaring daily fantasy contests legal games of skill under New York law.

65.     On December 8, 2015, the New York Assembly held a hearing to examine daily fantasy sports games in New York State and their impact on New York consumers and the State. Attorney Jonathan Schiller represented DraftKings and MLB Club, the New York Yankees, at

---

[45] *A.G. Schneiderman Issues Cease-And-Desist Letters to FanDuel And DraftKings, Demanding That Companies Stop Accepting Illegal Wagers in New York State* (Nov. 11, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-issues-cease-and-desist-letters-fanduel-and-draftkings-demanding (accessed Apr. 23, 2020).

the hearing, expressly advising the legislators that he also represented the New York Yankees: "I do also want to say I represent the New York Yankees . . . [T]hey're one of the owners of DraftKings."[46]

66.    Schiller testified on the topic of "skill versus chance" in fantasy baseball, explaining:

> "Daily fantasy players . . . they're general managers of virtual sports teams, fantasy teams . . . the success of a general manager, like a DFS players, is achieved by making selections for each athlete, each position by analyzing data points . . . success at these games is determined by how skillfully a player assembles her team."
> . . . .
> "I want to detail for you the variety of skills that have been put in evidence. A daily fantasy player must exercise extensive skill and research preparation and strategy to account for factors that include: weather, injury reports, statistical history of backup athletes, coach and athlete strategic tendencies; which players are overvalued or undervalued, offensive and defensive data."[47]

67.    In his testimony, Schiller identified a number of published peer-reviewed studies that confirmed that fantasy baseball contests are a game of skill:

> a.    Skilled human players in [a study performed by Ed Miller and Daniel Singer] as a matter of statistics, defeated the computers in the following way: In Major League Baseball fantasy contests, skilled players won 82.8 percent of the time over the random computer selected lineups."
>
> b.    "Professor Gilula, the former Chair of the Department of Statistics at Hebrew University and he's currently Professor of Statistics at the University of Chicago; he performed a study by examining the win percentage of 28 of DraftKings' most successful players. And he concluded, quote: It is overwhelmingly unlikely, closed quote; that their success could be due to chance. Based on his study, one player won 70 out of 70 Major League Baseball fantasy games that he or she played. He concluded: The probability that such a record could occur by chance, quote, is one in one-millionth raised to the power of 50. As my partner, David Boies, likes to say: That's 300 zeros."

---

[46] *See White v. Cuomo*, Record on Appeal Vol. II, Ex. Q: Notice and transcript of Public Hearing conducted on Dec. 8, 2015, No. 528026 (3rd Dept. 2019).

[47] *Id*. at 42, 43.

      c.   "The fact that this could be done with skill is demonstrated by the fact that 1.3 percent of DraftKings' players won 91 percent of the prizes in [the Miller and Singer] study; a result that could not occur unless skill controlled the outcome of the DFS contest."[48]

68.     Schiller concluded his public testimony by stating that the fact that fantasy sports contests are games of skill is "why the New York Yankees and a number of other distinguished sports teams and leagues after seven, eight, nine years of this invested in DraftKings and *participate in daily fantasy sports businesses*."[49]

69.     Several additional peer-reviewed studies conducted subsequent to 2015 support the position taken by Schiller on behalf of DraftKings and MLB.  In 2018, an MIT-conducted study entitled *Luck and the Law: Quantifying Chance in Fantasy Sports and Other Contests* analyzed "data from daily fantasy competitions played on FanDuel during the 2013 and 2014 seasons." The authors concluded that not only were MLB fantasy baseball contests predominantly skill-based, but that it was the only major sport in North America where *the outcomes of DFS contests were more dependent on skill of the DFS players than the athletes competing in the underlying sports competition.*[50]

70.     Another study published in 2018, entitled *Evidence of Skill and Strategy in Daily Fantasy Basketball,* analyzed "draft selections of thousands of participants in daily fantasy basketball" and, using econometric analysis, found that such contests are "game[s] in which skill

---

[48] *Id.* at 46-47, 49.

[49] *Id.* at 49-50 (emphasis added).

[50] Getty, Daniel, Hao Li, Masayuki Yano, Charles Gao, and A. E. Hosoi. *Luck and the Law: Quantifying Chance in Fantasy Sports and Other Contests*, 60 SIAM REVIEW 869, 882 (2018)(comparing R* values for fantasy sports and real life sports).

is necessary for success" and that "winning participants utilize different strategies than losing participants."[51]

71.     Finally, a study published in 2019 placed 35 randomly-generated entries in MLB fantasy baseball contests from September 8, 2016 through October 13, 2016.[52] As stated by the authors, "i[f] [MLB] contests are games of chance, then each participant has an equal probability of winning" and thus "a randomly selected team, which represents an unskilled participant, should perform as well as any strategy."[53] The "most astonishing result" of the study was that *not a single entry won a payout*[54] and the average performance of the randomly-selected teams was worse than 93.88% of the other entries in the contests entered. The authors summed up the results as follows:

> It is difficult to truly comprehend the extreme rarity of losing all 35 contests. This is less likely than a single ticket winning the Powerball®. It is less likely than flipping a coin and getting heads 28 times in a row. It is 300 times less likely than being struck by lightning this year. The probability of losing all 35 contests is so ridiculously small that one can state that unskilled participants probabilistically never win in DFS.[55]

72.     On June 14, 2016, the New York General Assembly amended New York law to make clear that fantasy sports are legal games of skill, finding:

> Interactive fantasy sports are not games of chance because they consist of fantasy or simulation sports games or contests in which the fantasy or simulation sports teams are selected based upon the skill and knowledge of the participants and not based on the current membership of an actual team that is a member of an amateur or professional sports organization.[56]

---

[51] Brent A. Evans, Justin Roush, Joshua D. Pitts & Adam Hornby, *Evidence of Skill and Strategy in Daily Fantasy Basketball*, 34 J. GAMBLING STUD. 757 (2018)

[52] Todd Easton & Sarah Newell, *Are Daily Fantasy Sports Gambling?*, 5 J. OF SPORTS ANALYTICS 35 (2019)

[53] *Id.* at 40.

[54] *Id.* (emphasis added).

[55] *Id.* at 41. (citations omitted).

[56] N.Y. RAC. PARI-MUT. WAG. & BREED. LAW § 1400 (MCKINNEY).

73.     Fantasy sports contests are authorized games of skill not only in New York, but in 42 other states and the District of Columbia.

**B.     Major League Baseball's Official Rules and Regulations Expressly Prohibit the Use of Electronic Devices to Steal Signs.**

74.     Defendant MLB, through its predecessors the National League and American League, has conducted baseball competition according to a written set of rules and regulations since the National League's inception in 1876.  MLB's Official Rules covering on-the-field conduct were codified in 1949. In addition to MLB's Official Rules, MLB issues and enforces policies via regulations which are implemented via league-wide memoranda.

75.     Pursuant to the Major League Constitution, all of MLB's member Clubs have agreed, *inter alia*, to be bound by all rules and regulations relating to games, ballparks … and other matters," including bulletins and directives "relating to the Commissioner's functions and the administration of the game of baseball."  This provision of the Constitution extends to all team owners, officials, employees and players.[57]

76.     MLB's Official Rules and regulations have, throughout the period at issue in this lawsuit, expressly prohibited the use of electronic equipment or devices during MLB games to monitor, decipher or communicate information about a catcher and pitcher's coded communications with each other about each upcoming pitch.

   a.     As of the start of the 2017 season, Major League Baseball regulations expressly prohibited the use of electronic equipment or devices during games, providing that no such equipment "may be used for the purpose of stealing signs or conveying information designed to give a Club an advantage."

   b.     On September 15, 2017, after learning of an intentional violation by the Boston Red Sox of what he described as the above "clear Regulation,"

---

[57] Major League Constitution, Article XI, § 3.

Manfred issued a memorandum reiterating the rules prohibiting the use of electronic equipment or devices to steal signs and making clear that the General Manager and Field Manager of all Major League Clubs were responsible for ensuring compliance with the rules.

c.      During the 2017-18 baseball offseason, the prohibition on electronic sign stealing was expressly discussed and re-stressed at MLB's General Managers Meetings, including the need for monitoring of team behavior because of team violations of the prohibition.

d.      Thereafter, in March 2018, immediately prior to the start of the 2018 baseball season, the Office of the Commissioner issued a memorandum to all Clubs stating, in relevant part:

i.      Major League Baseball Regulation 1-1 prohibits all uniformed personnel, clubhouse staff and equipment staff from using or possessing telephones or similar electronic devices, including any type of walkie-talkies, mobile phones, 'smart watches' (e.g., Apple watches), laptop computers, tablets or other communication devices, in or near the dugout, in the bullpens or on the playing field once batting practice has begun.  MLBR 1-1 also prohibits the use of such devices in the clubhouse within 30 minutes of the start of a game.  The prohibition includes the use of any electronic equipment that has the capability to receive electronic messages by any person occupying the bench or in the bullpen.
….
Electronic equipment, including game feeds in the Club replay room and/or video room, may never be used during a game for the purpose of stealing the opposing team's signs.  In this respect, MLBR 1-1 expressly provides that "under no circumstances may electronic equipment or devices be used for the purpose of stealing signs or conveying other information designed to give a Club a competitive advantage."  **To be clear, the use of any equipment in the clubhouse or in a Club's replay or video rooms to decode an opposing Club's signs during the game violates this Regulation.** [Emphasis in original.]  Clubs (and Club employees) who are found to have utilized equipment in the replay or video rooms for such purposes during a game will be subject to discipline by the Commissioner's Office.

77.      At all times, MLB's prohibition on "stealing signs" with the aid of electronic equipment or devices applied to each of MLB's Clubs and to all of MLB's Clubs' players and employees.

78.     All of MLB's Clubs ratified and expressly agreed to comply with MLB's prohibition on electronic sign stealing and represented, in writing, that they were doing so.

79.     As MLB and its member Clubs were (and are) well aware, violation of MLB's prohibition on electronic sign stealing substantially affects the honesty and fairness of MLB player performance.  A pitcher's ability to conceal from a hitter the type of pitch being thrown, and the intended speed, movement, and location of the pitch, is critical to a pitcher's success. A team that can successfully steal the catcher's signs and alert its hitters to information about forthcoming pitches will have a substantial hitting advantage in that knowing what type of pitch is coming, and where, dramatically improves a professional major league hitter's ability to hit the pitched ball and to hit the pitched ball with substantial contact.

80.     As star Yankee outfielder Giancarlo Stanton has stated, "If I knew what was coming in '17, I could have hit 80-plus homers."[58]  Retired star pitcher Curt Schilling put it this way, "It's fixing a game … If they were doing it to me in the post-season, I wouldn't have gotten one out."[59]  Long time All-Star pitcher C.C. Sabathia has stated, "If you know what the f*** is coming, I got no chance to get you out."[60]  2017 All-Star pitcher Alex Wood has tweeted, "I would rather face a player that was taking steroids than face a player that knew every pitch that was coming."[61]  Trevor Bauer, retweeting Wood's comment, agreed, "All day every for the rest

---

[58] Max Goodman, *Giancarlo Stanton: "If I Knew What Was Coming in '17, I Would Have Hit 80-Plus Home Runs"*, SPORTS ILLUSTRATED (Feb. 19, 2020), https://www.si.com/mlb/yankees/news/yankees-giancarlo-stanton-astros-sign-stealing (accessed May 5, 2020).

[59] 'Moose & Maggie' Show, *Curt Schilling Has "NO DOUBT" The Astros used Buzzers*, WFAN (Feb. 13, 2020), https://www.youtube.com/watch?v=u1DexukUxTc (accessed May 5, 2020).

[60] Ryan Ruocco & C.C. Sabathia, *Uninterrupted Podcast*, STITCHER.COM (Feb. 27, 2020), https://www.stitcher.com/podcast/panoply/r2c2-is-uninterrupted/e/67637703 (accessed May 5, 2020).

[61] Alex Wood (@Awood45), TWITTER (Jan. 16, 2020, 1:37 PM), https://twitter.com/Awood45/status/1217923855156760577 (accessed Jan. 22, 2020). Similarly, Hank Greenberg, a Hall of Fame player for the Detroit Tigers from 1930 through 1945 "loved" knowing what pitch was coming and proclaimed that he "was the greatest hitter in the world when I knew what kind of

of time."[62]  And, as multi-year MVP Mike Trout said, "Me going up to the plate and knowing what's coming – it would be pretty fun up there."[63]

81.     The opportunity for impermissible electronic sign stealing was substantially increased by MLB's adoption in 2014 of the instant replay challenge process, which allows MLB Clubs to challenge certain field decisions made by MLB umpires during the course of MLB games. In order to determine whether to challenge a call, Clubs are permitted to create rooms ("replay rooms") with television monitors receiving a live video feed of the games.  The replay rooms are staffed with team employees tasked with immediately reviewing video footage of a play so Clubs can decide whether to challenge a call within the permitted period of time.

82.     Several of MLB's Clubs, including the Astros, the Red Sox ██████████████ realized that the live video feeds in their replay rooms provided an opportunity for them to easily view and decipher an opposing team's pitcher and catcher signals and devised ways to relay the information from the replay room to the dugout and to team hitters as they were batting.

83.     Unknown to the public until November 2019, the Houston Astros and Boston Red Sox ██████████████████████████████ (and most likely other MLB teams)  engaged in persistent and continuous violations of MLB rules regarding electronic sign stealing during the ███████ 2017, 2018 and 2019 seasons.

84.     Although MLB was well aware of its Clubs' violations of its rules prohibiting electronic sign stealing and although MLB was well aware of the likely impact of any such

---

pitch was coming up." *The Cambridge Companion to Baseball*, 185, (Leonard Cassuto and Stephen Partridge eds.).

[62] Trevor Bauer, (@BauerOutage), TWITTER (Jan. 16, 2020, 4:39 P.M) https://twitter.com/BauerOutage/status/1217924460252205063 (accessed May 5, 2020).

[63] *See* Alden Gonzalez, *Angels star Mike Trout rips Astros, calls for more punishment*, ABC NEWS (Feb. 17, 2020), https://abcnews.go.com/Sports/angels-star-mike-trout-rips-astros-calls-punishment/story?id=69032169 (accessed May 5, 2020).

violations on player performance, MLB did not take action to prevent, stop or disclose to the public – including, as relevant here, to MLB fantasy baseball contestants -- the existence of such team and player misconduct.  MLB's member Clubs acquiesced in and ratified the Commissioner's determination to turn a blind eye to the ongoing electronic sign stealing misconduct.

C.    **The Houston Astros' Impermissible Electronic Sign Stealing Corrupted the Statistics Upon Which MLB Fantasy Baseball Contests are Based, Preventing Contestants from Exercising Skill to Win or Lose.**

85.    Prior to the start of the 2017 baseball season, front office employees of the Houston Astros devised a scheme to use the Astros' replay room video equipment to engage in electronic sign stealing.  Astros' front office employees developed an algorithm that enabled the team to decode opposing catcher's coded signals to opposing pitchers viewed on the Astros' replay room video equipment.  The Astros' front office personnel called this algorithm "Codebreaker" and referred to the scheme to steal signs electronically as the "dark arts."

86.    Pursuant to the Astros' impermissible electronic sign stealing scheme, once the opposing teams' signals were decoded, Astros players reaching second base were able to determine what pitches Astros hitters would receive and to signal that information to the hitters in advance of the pitch.  As discussed above, this information provided Astros hitters with a significant, impermissible, hitting advantage.

87.    Shortly after the season began, the Astros' electronic sign stealing scheme was enhanced during Astros' home games.  Two uniformed Astros -- Alex Cora, then a bench coach for the Astros, and Carlos Beltran, then an Astros player, with the assistance of the Astros' baseball operations staff, set up a "[video] feed from a camera in center field, fixed on the opposing catcher's signs, hooked up to a television monitor that was placed on a wall steps from

the team's home dugout at Minute Maid Park."[64]  During home games, one or more Astros players would watch the feed and decode the opposing team's signs and would then "bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter."[65]

88.    The Astros perpetrated these electronic sign stealing schemes for the entire 2017 season, including the 2017 post-season playoffs and World Series.

89.    The Astros' impermissible electronic sign stealing, although unknown to the public (including MLB fantasy baseball contestants), was "an open secret" among MLB executives, scouts and players and made known to the Office of the Commissioner by numerous MLB teams.[66]

90.    The Office of the Commissioner, with the ratification and approval of MLB's Clubs, determined not to investigate the Astros' conduct, not to stop the Astros' impermissible electronic sign stealing, and not to disclose the Astros' conduct.

91.    The Astros won the World Series in 2017, utilizing the impermissible electronic sign stealing misconduct described above.

92.    After the 2017 season, the Astros continued to perpetrate electronic sign stealing in violation of MLB's rules and regulations throughout the 2018 and 2019 seasons.

---

[64] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/  (accessed Jan. 22, 2020).

[65] Rob Manfred, *Statement of the Commissioner*, MAJOR LEAGUE BASEBALL (Jan. 13, 2020), at 2, https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Jan. 22, 2020).

[66] *See* Barry Svrluga and Dave Shienin*, The world just learned of the Astros' cheating. Inside baseball, it was an open secret,* THE WASHINGTON POST (Feb. 11, 2020), ("'It was a big open secret, really big,' said a veteran scout from another team whose coverage included the Astros. 'Throughout baseball, throughout the scouting community, for several years, not just starting in 2017.  I would say probably 2016, maybe earlier, through [2019], things were going on [with the Astros] that were blatantly against the rules."(bracketed material in original).

93.     During the 2018 season, Mike Fiers, an MLB player who had pitched for the

Astros in 2017, played for the Oakland Athletics, another MLB Club.  Fiers advised his Oakland

teammates of the electronic sign stealing schemes the Astros had employed during the 2017

season.  During a game against the Astros in August 2018, Oakland Athletic players determined

that the Astros players were clapping in the dugout before pitches to relay electronically stolen

signs to Astros' hitters (in what would be a modified version of the Astros' 2017 use of trash can

banging).[67]

94.     The Oakland Athletics formally complained about the Astros' electronic sign

stealing to the Office of the Commissioner.[68]  The Commissioner did not seek to investigate the

Astros' conduct, nor was any action taken against the Astros on account of the incident, nor was

the matter ever disclosed publicly prior to November 2019.[69]

95.     On October 8, 2018, during a post-season playoff series between the Astros and

the Cleveland Indians, another MLB Club, Cleveland became aware that the Astros had situated

an Astros' employee in a photographers' camera well next to the Cleveland dugout and that the

Astros employee, who had visible Astros' credentials, was filming the Cleveland dugout in a

---

[67] Jeff Passan, *Sources: Red Sox were warned by Indians about Astros attempting to steal signs and information*, YAHOO SPORTS (Oct. 16, 2018), https://sports.yahoo.com/sources-red-sox-warned-indians-astros-attempting-steal-signs-information-032027336.html (accessed May 4, 2020).

[68] Susan Slusser, *A's filed complaint about Astros' sign-stealing before Mike Fiers' allegations*, S.F. Chronicle (Feb. 12, 2020), https://www.sfchronicle.com/athletics/article/Bob-Melvin-says-A-s-complained-about-Astros-15050783.php (accessed May 5, 2020)("On Tuesday, asked by The Chronicle if the A's had complained to the league, Oakland manager Bob Melvin said that they had.'Yeah,' he said. 'But I don't know what else they could have done at that point.'").

[69] Joon Lee, *Catcher Jonathan Lucroy says he was changing signs every pitch vs. Astros*, ESPN (Feb. 20, 2020), https://www.espn.com/mlb/story/_/id/28744346/catcher-jonathan-lucroy-says-was-changing-signs-every-pitch-vs-astros (accessed May 5, 2020)("I was with Oakland, and we had let MLB know, [MLB] just called [the Astros] and said something. They didn't go through the whole investigation. It wasn't until Fiers came out publicly that they went and looked at it really hard.").

blatant maneuver to electronically steal signs sent by Cleveland's manager and bench coach to Cleveland's catcher and other players.

96.     The Cleveland Indians formally complained about the Astros' electronic sign stealing to the Office of the Commissioner.  The Commissioner did not, at that time, investigate the Astros' conduct, nor was any action taken against the Astros on account of the incident.

97.     On October 13, 2018, during a game between the Astros and the Red Sox in the Astros' subsequent playoff series, the same Astros' employee attempted to engage in the same misconduct from a media-credentialed area near the Red Sox dugout.  The Red Sox had, however, become aware of what had happened during the recent Cleveland series and had the Astros' employee removed.  The Red Sox complained about the Astros' misconduct to the Office of the Commissioner.

98.     In response to the Red Sox's complaint, the Astros' then President of Baseball Operations and General Manager Jeffrey Luhnow falsely denied that the Astros had or were violating MLB rules against electronic sign stealing, falsely stating that the Astros' conduct was solely to make sure that the opposing team was not cheating.  Luhnow falsely stated on October 17, 2018:

> We do it every stadium we go into.  We dispatch someone from the travel party to go out to center field, look at a particular area that might be suspicious or a certain monitor.  I'm sure other clubs do this as well, but we're just trying to protect ourselves the best we can.[70]

---

[70] Bob Nightengale, *MLB clears Astros of cheating, Houston GM Jeff Luhnow says team was 'playing defense',* USA TODAY (Oct. 17, 2018), https://www.usatoday.com/story/sports/mlb/2018/10/17/astros-cleared-cheating-sign-stealing-jeff-luhnow-mlb-playoffs/1675379002/ (accessed Feb. 13, 2020).

99.     In fact, the Astros had sent the individual to Fenway Park to engage in electronic sign stealing, as the Astros had similarly done the week before in the Astros' series against Cleveland.

100.    MLB, through the Office of the Commissioner, purported to investigate the Astros' conduct at that time and issued a public statement on October 17, 2018 asserting that it had conducted a "thorough investigation" and that the "Astros employee was monitoring the field to ensure the opposing club was not violating any rules."

101.    MLB's public assertion that it had conducted a "thorough investigation" of the Astros' conduct was false, as was its assertion that the Astros had not violated MLB's prohibition on electronic sign stealing.

102.    The Astros continued its electronic sign stealing misconduct during the 2019 season. While the misconduct remained known to other MLB Clubs' players, officials and employees, it was not disclosed to or known by the public.

103.    MLB's Clubs, while aware of the Astros' electronic sign stealing misconduct, acquiesced to and ratified the Commissioner's failure to take action against the Astros because they, like the Commissioner, determined that the adverse public relations and adverse financial effects on fan, advertising and broadcast support that would result from public disclosure of the Astros' misconduct outweighed maintaining the honesty and integrity of baseball.

104.    The Astros' electronic sign stealing misconduct remained secret until November 2019, when it was reported by Ken Rosenthal and Evan Drellich in a November 12, 2019 article in *The Athletic* that described the Astros' use at home games of a centerfield video feed linked to a monitor adjacent to the Astros' home dugout and the Astros' use of trash can banging to alert

36

Astros' hitters to upcoming pitches.  Mike Fiers, who in 2018 had alerted his Oakland teammates to the Astros' misconduct, was a publicly named source in *The Athletic* article.[71]

105.    Video evidence confirming the allegations in *The Athletic* article soon emerged. The trash can banging described in the article was plainly audible in video footage of Astros' players batting in their home stadium, and the footage further demonstrated that the players were aware of the nature of the pitch being signaled by the banging, to their significant hitting advantage.

106.    Six days after *The Athletic* first revealed the trash can banging scheme to the public, evidence emerged that MLB had long been aware of the scheme and yet remained silent. On November 18, 2019, *The Houston Chronicle* reported that MLB told video monitors it placed in the Astros' Minute Maid Park during the 2019 season to "listen for banging sounds emanating from the Astros' dugout,"[72] indicating that MLB knew of the Astros' trash can scheme far in advance of *The Athletic* article and had intentionally failed to disclose the scheme to the public.

107.    Manfred has acknowledged that MLB had prior awareness of the Astros' misconduct, admitting in an interview with *The Houston Chronicle* on November 19, 2019, "We have over time monitored various rumors that you hear throughout the industry, made preliminary investigations and tried to satisfy ourselves that we know exactly what was going on. But certainly not with the depth and detail."

---

[71] *See* Ken Rosenthal & Evan Drellich, *The Astros stole signs electronically in 2017 — part of a much broader issue for Major League Baseball*, THE ATHLETIC (Nov. 12, 2019), https://theathletic.com/1363451/2019/11/12/the-astros-stole-signs-electronically-in-2017-part-of-a-much-broader-issue-for-major-league-baseball/ (accessed Jan. 22, 2020).

[72] Chandler Rome, *MLB told video monitors to listen for Astros' banging sounds in 2019*, THE HOUSTON CHRONICLE (Nov. 18, 2019), https://www.houstonchronicle.com/sports/astros/article/MLB-told-video-monitors-to-listen-for-Astros-14844792.php (accessed Jan. 16, 2020).

108.    In the face of the public disclosure of the Astros' electronic sign stealing misconduct, Manfred announced on November 19, 2019 that MLB would conduct a "very active" and "really, really thorough investigation."[73]  Manfred stated that the investigation would not be limited to the 2017 season.[74]

109.    On January 13, 2020, Manfred issued a public statement purporting to contain the results of MLB's investigation of the Astros' electronic sign stealing conduct.  In the statement, Manfred stated that "transparency with our fans and our Clubs regarding what occurred is extremely important, and this report is my attempt to achieve that objective."[75]

110.    Manfred's representation that his public statement would contain a "transparent" description of the Astros' misconduct was false.  Although, as set forth below, Manfred disclosed that Astros' team players had engaged in electronic sign stealing during the 2017 and "part" of the 2018 seasons, in violation of MLB rules, Manfred disingenuously characterized the misconduct as "player-driven," even though MLB's investigators had determined that Astros' non-uniformed front office employees had developed and implemented use of the "Codebreaker" algorithm and even though MLB investigators had obtained substantial documentary information -- including emails to and from Luhnow in 2017 from the Astros' director of advance information, referencing "the system" and "our dark arts, sign-stealing department"[76] --

[73] T.R. Sullivan, *Manfred: Astros investigation will be thorough*, MLB.COM (Nov. 19, 2019), https://www.mlb.com/news/rob-manfred-addresses-astros-sign-stealing (accessed Feb. 13, 2020).

[74] *Id.*

[75] Robert D. Manfred, Jr., *Statement of the Commissioner*, OFFICE OF THE COMMISSIONER OF BASEBALL (Jan. 13, 2020), https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty27l7.pdf (accessed Feb. 13, 2020).

[76] *See* Jared Diamond, '*Dark Arts' and 'Codebreaker': The Origins of the Houston Astros Cheating Scheme*, WALL STREET JOURNAL (Feb. 7, 2020), https://www.wsj.com/articles/houston-astros-cheating-scheme-dark-arts-codebreaker-11581112994   (accessed Feb. 13, 2020). Although Manfred sent Luhnow a letter 11 days before Manfred's statement was released stating that Luhnow was aware of Codebreaker, the team's sign-stealing algorithm, the January 13, 2020 statement makes no reference to that fact.

establishing that the scheme had been undertaken with the knowledge of Luhnow, the Astros'

President of Baseball Operations and General Manager, as well as Astros' Field Manager A.J.

Hinch.  Manfred's "transparent" report further failed to mention the Astros' development and use

of the "Codebreaker" algorithm or explain the extent to which the Astros' impermissible

electronic sign stealing had continued throughout the 2018 season (including into the 2018

playoffs) and 2019 season.  Manfred further disingenuously failed to disclose in his report that

the Astros had engaged in impermissible electronic sign stealing during Astros' away games.

111.    Manfred's minimization of the Astros' misconduct and his omission of the

involvement of Astros' front office executives in the misconduct, while not directly impacting

Plaintiffs and the Classes, is evidence of MLB's attempts to avoid, as much as possible, public

disclosure of embarrassing information (especially any such information that would impact MLB

Club ownership and valuation) and confirms MLB's motive in failing to disclose the Astros' (or

other teams') electronic sign stealing misconduct until, as Trevor Bauer stated, "the lid gets

blown off publicly."

112.    After Manfred's statement was issued, Luhnow – who received and sent emails

about the scheme – issued a public statement admitting that the Astros had engaged in

impermissible electronic sign stealing, but falsely denying that he had any knowledge of it:

> I did not know rules were being broken. ….  The [Astros'] sign-stealing initiative
> was not planned or directed by baseball management;  the trash-can banging was
> driven and executed by players, and the video decoding of signs originated and
> was executed by lower-level employees working with the bench coach.  I am
> deeply upset that I wasn't informed of any misconduct because I would have
> stopped it. [77]

---

[77] Jeff Luhnow, *Statement by Jeff Luhnow*, ASSOCIATED PRESS (Jan. 13, 2020),
https://apnews.com/PR%20Newswire/92872c1fc2ac64279d395da6241ed72f  (accessed Feb. 13, 2020).

113.    Notwithstanding the patent shortcomings of Manfred's January 13, 2020 report, it nonetheless contained the following relevant findings of electronic sign stealing misconduct by the Astros in violation of MLB rules and regulations:

  a. At the beginning of the 2017 season, employees in the Astros' video replay review room began using the live game feed from the center field camera to attempt to decode and transmit opposing teams' sign sequences (*i.e.*, which sign flashed by the catcher is the actual sign) for use when an Astros runner was on second base. Once the sign sequence was decoded, a player in the video replay review room would act as a "runner" to relay the information to the dugout, and a person in the dugout would notify the players in the dugout or signal the sign sequence to the runner on second base, who in turn would decipher the catcher's sign and signal to the batter from second base.

  b. Approximately two months into the 2017 season, a group of players, including Beltrán, discussed that the team could improve on decoding opposing teams' signs and communicating the signs to the batter. Cora arranged for a video room technician to install a monitor displaying the center field camera feed immediately outside of the Astros' dugout [. . .] One or more players watched the live feed of the center field camera on the monitor, and after decoding the sign, a player would bang a nearby trash can with a bat to communicate the upcoming pitch type to the batter; and

  c. [T]he Astros' replay review room staff continued, at least for part of the 2018 season, to decode signs using the live center field camera feed, and to transmit the signs to the dugout through in-person communication.[78]

114.    And, significantly, Manfred's report makes clear that the Astros' team players participated in the wrongful scheme with knowledge that it was wrong:

  Most of the position players on the 2017 team either received sign information from the banging scheme or participated in the scheme by helping to decode signs or bang on the trash can. Many of the players who were interviewed admitted that they knew the scheme was wrong because it crossed the line from what the player believed was fair competition and/or violated MLB rules.[79]

---

[78] *See* Manfred, *supra*, at note 83.

[79] *Id.*

115.    The Astros' electronic sign stealing inflated the Astros' player performance statistics used by MLB fantasy contestants in selecting their fantasy lineups and deflated the statistics of opposing pitchers, compromising and corrupting the fairness of the contests and preventing contestants from exercising skill.

116.    Analyses have shown that the Houston Astros' sign stealing schemes were effective and allowed the Astros players to improve their performance "at a level unparalleled in the last 100 years."[80]  Jayson Stark and Eno Sarris of *The Athletic* have examined the Astros' performance data and determined that the Astros as a team went from striking out the fourth-most in baseball and the eighth-most in the *history of the game* in 2016 to striking out less than any team in the league in 2017.[81]  This statistical analysis of the Astros' strikeout rates "found essentially no parallel between the 2017 Astros *and any other team in the live-ball era,* in the ability to appreciably cut down on strikeouts everywhere—but by a much larger margin at home," [82] where the Astros utilized the trash can banging scheme.

117.    The Astros' ability to know what pitch was coming unsurprisingly further led to significant improvement in their ability to hit those pitches.  For example, Stark and Sarris observed that the Astros improved their slugging percentage on strikes by 70 percentage points in 2017 as compared to 2016.[83]  No other team in the history of baseball has improved so dramatically at hitting strikes.[84]  The various advantages conferred on Astros players as a result

---

[80] Jayson Stark & Eno Sarris, *Does electronic sign stealing work? The Astros' numbers are eye-popping*, THE ATHLETIC (Jan. 31, 2020).

[81] *Id.*

[82] *Id.* (emphasis in original).

[83] *Id.*

[84] *Id.*

of electronic sign stealing were worth, by some estimates, as much as five additional wins over the course of the regular season in 2017.[85]

118.    The Astros' electronic sign stealing misconduct in 2017, 2018 and 2019 corrupted the performance statistics of Astros players and their opponents in those seasons, preventing the exercise of contestant skill in MLB fantasy baseball contests and rendering the contests based on such performance statistics corrupted and unfair.

119.    The Astros not only engaged in impermissible electronic sign stealing that corrupted the statistics critical to fair MLB fantasy baseball contests, but further issued numerous fraudulent statements that concealed from the public (including MLB fantasy baseball contestants) the Astros' misconduct and falsely attributed the Astros' hitting success to player ability, team hard work and modern analytics.  These false statements included fraudulent denials of public accusations that the Club was engaging in electronic sign stealing:

      a.    "Hard to get specific, I had to revamp everything and that's what I did this whole offseason and that's what spring training for me was for was getting used to this new swing and its starting to come out right now and it feels good." **Astros player Jake Marisnick on May 28, 2017 commenting on his offensive success.[86] Analysis has shown that the Astros banged on trash cans during over 22% of pitches thrown to Marisnick during home games in 2017.[87]**

      b.    "He's a middle of the order bat whose leading off the game and once it rolls back around you can see how productive he can be getting the most at-bats of the night . . . . its incredible to watch him grow as a hitter and do some things behind the scenes that he is maturing with pretty quickly."

---

[85] Jake Mailhot, *Which Players Might Have Benefited from the Astros' Sign-Stealing?*, FANGRAPHS (Nov. 27, 2019), https://blogs.fangraphs.com/which-players-might-have-benefited-from-the-astros-sign-stealing/ (accessed Feb. 12, 2020).

[86] Adam Wexler, *Catching up with Astros outfielder Jake Marisnick*, CLICK2HOUSTON.COM, https://www.click2houston.com/sports/2017/05/29/catching-up-with-astros-outfielder-jake-marisnick/ (accessed Feb. 13, 2020).

[87] Tony Adams, *Astros Bangs: Team Total*, SIGN STEALING SCANDAL, http://signstealingscandal.com/ (accessed Feb 13, 2020).

**Astros Manager A.J. Hinch on June 28, 2017 discussing Astros player George Springer's hitting ability after defeating the Oakland Athletics 11-8.[88] Game footage reveals that the Astros banged on the trash can *26 times* and *10 times* during George Springer's at-bats during that game.[89]**

c.  "That inning just continued to go. It's one of the proudest moments that I have about our team or one of the things I love the most about our team is that we just keep coming at you. At bat after at-bat continues to be good and we can put some big innings on some really good pitchers. **Astros Manager A.J. Hinch on July 14, 2017, after defeating the Minnesota Twins 10-5.[90] Game footage reveals that the Astros banged on the trash can *48 times* during that game.[91]**

d.  "It's not unusual for us to have big nights when we put good at-bats together." **Astros Manager A.J. Hinch on Aug. 4, 2017, after defeating the Toronto Blue Jays 16-7.[92] Game footage reveals that the Astros banged on the trash can *54 times* during that game.[93]**

e.  "We've got guys that have been putting up pretty good at bats. It was nice to break out and get a couple of runs. Throughout the day I think our at bats were pretty good." **Astros Manager A.J. Hinch on Aug. 23, 2017, after defeating the Washington Nationals 6-1.[94] Game footage reveals that the Astros banged on the trash can *47 times* during that game.[95]**

f.  "They threw him a couple breaking balls in a row and he hung in there…his hard hit rate is off the chart he's really good at making contact on the barrel with some length and the ball carries pretty far out there so he's what they call a professional hitter and it doesn't matter what country or what level, this guy can really hit." **Astros Manager A.J. Hinch on**

[88] A.J. Hinch, *Hinch on Offensive outburst*, MLB.COM (June 28, 2017), https://www.mlb.com/video/hinch-on-offensive-outburst-c1551448283 (accessed Feb. 13,2020).

[89] *See* Adams, *supra*, at note 95.

[90] A.J. Hinch, *Hinch on 10-5 wins over Twins*, MLB.COM (July 14, 2017), https://www.mlb.com/mets/video/hinch-on-10-5-win-over-twins-c1606863683 (accessed Feb. 13, 2020).

[91] *See* Adams, *supra*, at note 95.

[92] *See* Associated Press, *Ex-Dodgers Pitcher Mike Bolsinger Sues Astros, Says Their Sign Stealing Ended His MLB Career* (Feb. 10, 2020), KTLA4, https://ktla.com/2020/02/10/ex-dodgers-pitcher-mike-bolsinger-sues-astros-says-their-sign-stealing-ended-his-mlb-career/ (accessed Feb. 13, 2020).

[93] *See* Adams, *supra*, at note 95.

[94] A.J. Hinch, *Hinch of Fiers' performance*, MLB.COM (Aug. 23, 2017), https://www.mlb.com/video/hinch-on-fiers-performance-c1764557383 (accessed Feb. 13, 2020).

[95] *See* Adams, *supra*, at note 95.

**Sept. 23, 2017 discussing Astros player Carlos Correa's hitting ability after defeating the Chicago White Sox 4-3.**[96] **Analysis has concluded the Astros can be heard banging on the trash can *31 times* and *10 times* during Carlos Correa's at-bats.**[97]

g.      "We talk internally about being on the 'bleeding edge.' We know we're going to have some cuts, some nicks, some bruises because if we're not, it's similar to base running. If you have a player on first, and he never gets thrown out at third on a single to right field, he's not being aggressive enough. If you don't ever get thrown out at third, you're leaving runs on the table. I consider it the same way in terms of how quickly we implement new technologies and try and squeeze out a competitive advantage.– **Astros General Manager Jeff Luhnow in June 2018 to McKinsey Quarterly.**[98]

h.      "The old way of looking at a season's worth of performance data and using that to predict the future is kind of obsolete . . . . [w]e get tens of thousands of rows of data—about every swing, every pitch, every fielder movement—and we need to decide what to do with that information." – **Brandon Taubman, Astros Assistant General Manager in Spring 2018**.[99]

i.      "I wish I knew [which pitch was coming]…every time we got hits now everyone thinks somebody's tipping . . . can you have [Alex Rodriguez] help us out and let us know?" – **Astros player Alex Bregman on October 16, 2019 in response to Alex Rodriguez alleging the Astros knew the pitches in advance.**[100]

[96] A.J. Hinch, *Hinch on Peacock's Performance*, MLB.COM (Sept. 20, 2017), https://www.mlb.com/astros/video/hinch-on-peacock-s-performance-c1842902783 (accessed Feb. 13, 2020).

[97] *See* Adams, *supra,* note 95.

[98] Aaron De Smet & Allen Web, *A view from the front lines of baseball's data-analytics revolution*, MCKINSEY QUARTERLY (June 2018), https://web.archive.org/web/20191030085219/https://www.mckinsey.com/business-functions/organization/our-insights/how-the-houston-astros-are-winning-through-advanced-analytics# (accessed Feb. 13, 2020).

[99] Brad Herzog, Houston, *We Solved a Problem – How baseball analytics guru Brandon Taubman '07 helped lead the Astros to their first-ever World Series win*, CORNELL ALUMNI MAGAZINE (Mar./Apr. 2018), http://cornellalumnimagazine.com/houston-solved-problem/ (accessed Feb. 13, 2020).

[100] Mark Berman (@MarkBermanFox26), Alex Rodriguez (@AROD) Tweeted Luis Severino was tipping his pitches..Astros knew what was coming. Alex Bregman (@ABREG_1) says not the case: "I wish I knew..Every time we get hits now everyone thinks somebody's tipping..(Jokingly said) "Can u have him help us out & let us know." TWITTER (Oct. 16, 2019, 12:28 AM), https://twitter.com/markbermanfox26/status/1184325169206235136?lang=en  (accessed Feb. 13, 2020).

j.     "In reality, it's a joke. But Major League Baseball does a lot to ensure the fairness of the game. There's people everywhere. If you go through the dugouts and the clubhouses and the hallways, there's like so many people around." **A.J. Hinch on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[101]

k.     "It sucks for our players . . . because those guys are so talented. And I don't think anything should take away from what they're able to accomplish. And so in that aspect, it's disappointing. . . . But I think we know what's going on there. Look at what we're getting accused of. How many runs did we score in that first game? But I understand where the paranoia comes from. We have it. I have it.' **Astros Pitcher Justin Verlander on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[102]

l.     "Not everything is about tipping . . . .[w]e can hit, too . . . . [b]ut I think it's disrespectful that every time we score a lot of runs, people talk about tipping. Nobody was tipping today and we scored, what, eight runs? We're great hitters. We've been doing it for a whole season." **Astros player Carlos Correa on October 17, 2019 responding to New York Yankees' allegations that the Astros were illegally stealing signs.**[103]

120.    As the above-mentioned quotes demonstrate, on a nearly daily basis the Astros disseminated statements to the public misrepresenting that the team's players' success was due to, *inter alia*, their embrace of analytics and their approach to batting rather than as a result of the Astros' impermissible electronic sign stealing.  And, in direct response to allegations in October 2019 that the team was illegally stealing signs, the team manager, star hitters and star pitcher expressly denied the accusations.

121.    Moreover, for the 2017 baseball season, the Houston Astros adopted a false public theme "Earn History" and placed the phrase on souvenir cups, t-shirts, rally towels, baseball

---

[101] Associated Press, *Hinch blows whistle, calls sign stealing suspicions 'a joke'*, USA TODAY (Oct. 17, 2019), https://www.usatoday.com/story/sports/mlb/2019/10/17/hinch-blows-whistle-calls-signal-suspicions-a-joke/40335919/ (accessed Feb. 13, 2020).

[102] Bob Nightengale, *'It's a joke': Astros livid about cheating allegations in ALCS vs. Yankees*, USA TODAY (Oct. 17, 2019), https://www.usatoday.com/story/sports/mlb/columnist/bob-nightengale/2019/10/17/houston-astros-cheating-yankees-alcs/4013592002/  (accessed Feb. 13, 2020).

[103] *Id.*

caps, banners, social media outlets, and more. The Astros placed signs around Minute Maid Park

explaining the theme. One sign was placed in the underground tunnel connecting clubhouses and

offices and read:

> What does it really mean to make history? To do something that has never been done. To write your name in the books? There's only one way—you've got to earn it. We're talking about respect and creating a legacy. So who cares what everyone else says? History won't remember them. Stay relentless. Unleash greatness and create your own destiny. For Houston, for H-Town, for the H. It's time to show the world who we are. Earning our place in history together.[104]

122.     Through the use of this false "Earn History" theme, the Astros falsely represented

that the team's success was "earned" based on player performance and other legitimate baseball

factors, rather than impermissible cheating through electronic sign stealing.  Defendant Astros'

use of this false motto, in 2017 and in ensuing years, was ubiquitous.  Defendant Astros

displayed the motto on pennants and banners, posters, stadium signage, pole banners, programs,

advertisements, online screenshots, promotional videos about the team, team clothing (including

hats, shirts, sweatshirts, and rally towels) and merchandise (such as souvenir cups).

**D.     The Boston Red Sox's** ▮▮▮▮▮▮▮▮▮▮ **Impermissible Electronic
Sign Stealing Corrupted the Statistics Upon Which MLB Fantasy Baseball
Contests are Based, Preventing Contestants from Exercising Skill to Win or
Lose.**

123.     During the 2017 and 2018 seasons, defendant Red Sox also engaged in electronic

sign stealing, in knowing violation of MLB's rules and regulations prohibiting such conduct.

124.     During the 2017 season, defendant Red Sox positioned one of its employees in the

team replay room and had the employee review video replay from the center field cameras to

decipher the opposing team's catcher's sign sequences when a Red Sox runner was on second

---

[104] Kevin Schindler, *Final World Series Blog, 2017: Astros Earn History*, ARIZONA DAILY SUN (Nov. 1, 2017), https://azdailysun.com/news/local/final-world-series-blog-astros-earn-history/article_7f41ba28-9c8a-59d3-8e71-6bbd41c3c090.html  (accessed Feb 14, 2017).

base.  The Red Sox employee in the replay room then communicated the sign sequences to Red

Sox players who served as "runners" from the replay room to the dugout, where the sign

information was given to players in the dugout who would then relay it to runners on second

base, enabling the baserunner to interpret the catcher's signs and transmit information about the

coming pitch to the batter.

125.     By early July 2017, the Red Sox replaced the runner's video room-to-dugout relay

function with text messages conveying the sign information to the smart watch or other device of

Red Sox athletic trainers in the dugout, who conveyed the information to Red Sox players.  The

Red Sox were aware that their scheme violated MLB rules against electronic sign stealing.

126.     The effect of the Red Sox's impermissible electronic sign stealing in 2017 was to

afford Red Sox batters a substantial competitive hitting advantage and to disadvantage opposing

pitchers whenever a Red Sox runner was on second base.

127.     Defendant Red Sox's impermissible electronic sign stealing during the 2017

season could not have succeeded without the knowledge, participation and support of Red Sox

players and Red Sox management, including the Red Sox Field Manager.

128.     The Red Sox electronic sign stealing in 2017 resulted in corrupted player

performance statistics for Red Sox hitters and for opposing pitchers, that compromised and

rendered unfair MLB DFS contests in 2017.

129.     In August 2017, the New York Yankees filed a formal complaint with the Office

of the Commissioner, supported by photographic evidence of the Red Sox's electronic sign

stealing misconduct.

130.     ███████████████████████████████████████

███████████████████████████████████ MLB purported to conduct a "thorough

investigation" of the Red Sox's conduct and announced the results of its investigation on September 15, 2017. At that time, Manfred confirmed that the Red Sox had violated MLB's rules against electronic sign stealing. Manfred fined defendant Red Sox an insignificant amount, but took no action against any of defendant Red Sox's players, employees or management involved in perpetrating or approving the impermissible electronic sign stealing scheme.

131. In a public statement issued on September 15, 2017, Manfred justified the minimal discipline on the grounds that Red Sox ownership and front office management had not known of the scheme, and that he had received "absolute assurances from the Red Sox that there will be no further violations of this kind." Manfred's public statement did not disclose the aspect of the Red Sox's scheme that involved the use of Red Sox players to serve as runners from the replay room to the dugout and also carefully avoided addressing the knowledge and involvement of the Red Sox's Field Manager in the impermissible scheme.

132. In his September 15, 2017 statement, Manfred also announced that MLB's investigation had determined that the New York Yankees had, during a prior season, "violated a rule governing the use of a dugout phone." According to Manfred's statement, no improper communications in violation of any MLB rules or regulations were involved (i.e., no communication of stolen signs occurred). Manfred fined the Yankees a minimal amount for this "technical" violation.

133. ███████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████



134.

135.     On January 2, 2020, Rosenthal and Drellich published a follow-up article in *The Athletic* containing information sourced to current and former Red Sox personnel that the Red Sox – who had hired Alex Cora, one of the architects of the Astros' trash can banging scheme, as

---

[105]

its Field Manager prior to the start of the 2018 season -- had impermissibly implemented a

renewed replay room scheme throughout the 2018 MLB regular season. [106]

136.    As MLB has now determined and publicly announced in April 2020, defendant

Red Sox did, in fact, resume its impermissible electronic sign stealing misconduct during the

2018 baseball season.[107]   At a minimum, during that season (and most likely during the 2019

season as well), the same Red Sox employee involved in the 2017 electronic sign stealing

misconduct repeated his impermissible conduct.   The employee viewed opposing catcher's sign

sequences in live video in the replay room and communicated the sign sequences to Red Sox

players for use by Red Sox runners on second base.[108]   While Manfred's April 2020 Decision

and Findings discussing the Red Sox's misconduct only names the one non-uniformed Red Sox

employee involved in the scheme, Red Sox players were necessarily involved in communicating

the sign information from the replay room to players in the dugout, in communicating the

information from the dugout to the Red Sox runner on second base, in communicating the

information to the hitter, and in receiving the information while at bat.   And it is improbable that

this could have taken place without the knowledge of the Red Sox Field Manager, Alex Cora, a

principal initiator and participant in the Astros' similar impermissible electronic sign stealing

schemes in 2017.

---

[106] Ken Rosenthal & Evan Drellich, *MLB's sign-stealing controversy broadens: Sources say the Red Sox used video replay room illegally in 2018,* THE ATHLETIC (Jan. 7, 2020), https://theathletic.com/1510673/2020/01/07/mlbs-sign-stealing-controversy-broadens-sources-say-the-red-sox-used-video-replay-room-illegally-in-2018/ (accessed Jan. 15, 2020).

[107]  Robert D. Manfred, Jr., *Decision and Findings of the Commissioner in the Red Sox Investigation*, MLB.COM (Apr. 22, 2020), https://img.mlbstatic.com/mlb-images/image/upload/mlb/scn5xwigcottcbte7siw.pdf (accessed May 4, 2020).

[108]  *Id.*

137.     The Red Sox's electronic sign stealing misconduct in 2017, 2018 and 2019 corrupted the performance statistics of Red Sox players and their opponents during those seasons, preventing the exercise of contestant skill and rendering the contests based on such performance statistics corrupted and unfair.

138.     Analyses have shown that the Red Sox's electronic sign stealing, like the Astros', was particularly effective in 2018 and caused Red Sox players to hit substantially better with runners on second base in 2018 than they did in 2017.  For example, analysis by Jake Mailhot of FanGraphs, a baseball statistics and analysis website, observed that Red Sox's Weighted On-Base Average[109] ("wOBA") with runners on second base jumped substantially in 2018 as compared to 2017 and far outperformed the MLB league average:[110]  In particular, Mailhot observed that the Red Sox excelled at hitting off-speed pitches when they had a runner on second base:

> It's clear that the Red Sox hit much better when there was a runner on second base. They simply crushed offspeed pitches and saw smaller benefits when facing breaking balls and fastballs. The obvious implication is that the team gained an advantage when a runner on second was able to relay the incoming pitch to the batter. When we compare their aggregate run values from 2017 to 2018, I estimate they gained a total cumulative value around five wins — the same estimated benefit the Astros saw with their sign-stealing scheme in 2017.[111]

---

[109] Weighted On-Base Average is "a rate statistic which attempts to credit a hitter for the value of each outcome (single, double, etc.) rather than treating all hits or times on base equally. wOBA is on the same scale as On-Base Percentage (OBP) and is a better representation of offensive value than batting average." Steve Slowinski, *Sabermetrics Library – wOBA*, FANGRAPHS (Feb. 15, 2010), https://library.fangraphs.com/offense/woba/  (accessed Feb. 12, 2020).

[110] Jake Mailhot, *How Much Did the Red Sox Benefit from Their Sign-Stealing Scheme?*, FANGRAPHS (Jan. 23, 2020), https://blogs.fangraphs.com/how-much-did-the-red-sox-benefit-from-their-sign-stealing-scheme/ (accessed Feb. 12, 2020).

[111] *Id.*

139.    The Red Sox not only engaged in impermissible electronic sign stealing that corrupted fantasy baseball statistics, but further issued numerous fraudulent statements that concealed from the public (including MLB fantasy baseball contestants) the Red Sox's misconduct and falsely attributed the Red Sox's hitting success to player ability and legitimate baseball factors.  These false statements – including false statements by Cora and Dave Dombrowski, team players and fraudulent promotions by the team itself – included the following:

a.      We're getting better. We're staying away from strikes on the edges. We're looking for pitches in the middle of the zone and putting good swings. If they're not there, we're taking their walks. . . .you know two big innings, one Sunday one today. . . .they found a way to grind out great at bats against a great pitcher." **Alex Cora on April 10, 2018 after defeating the New York Yankees 14-1**.[112]

b.      "Good at bats again. . . .it's instant offense. Mookie works a walk, Benny hits the wall, we score one and then Hanley, you should've seen his BP today that was impressive so we felt  very good about him and he put a good swing on it and from there it was just good at-bat after good at-bat. They're doing a good job staying in the zone and not expanding and putting good swings on pitches that they can drive." **Alex Cora on April 14, 2018 after defeating the Baltimore Orioles 10-3.[113]**

c.      "He's staying on pitches you can see on his takes. The way he is taking pitches tells you at a lot. We've been talking a lot lately about him staying in the zone and not chasing pitches. He was able to get that pitch in the air the other way. He's feeling good about himself, putting good at-bats, not expanding so those are all good signs for hitters. . . .it was all around a good offensive game for us." **Alex Cora on May 28, 2018 after defeating the Toronto Blue Jays 8-3**.[114]

d.      "Lineup-wise everybody's doing an outstanding job . . .like I said. . . its getting fun…it's a pretty good lineup right now from top to bottom,

[112] Alex Cora, *Cora on huge win over Yankees*, MLB.COM (Apr. 10, 2018), https://www.mlb.com/redsox/video/cora-on-huge-win-over-yankees-c1925599983 (accessed Feb. 14, 2020).

[113] Alex Cora, *Cora on Red Sox's 10-3 victory*, MLB.COM (Apr. 14, 2018),

[114] Alex Cora, *Alex Cora on Jackie Bradley Jr.'s catch: 'Woah'*, YouTube.com (May 28, 2018), https://www.youtube.com/watch?v=JucOElDyUoQ (accessed Feb. 14, 2020).

everybody is putting good at-bats. . . . the line kept moving and that's what its all about, from top to bottom just be relentless and that's what they've been doing the last few weeks." **Alex Cora on July 10, 2018 after defeating the Texas Rangers 8-4.**[115]

e.      "Jackie [Bradley] has been one of our best hitters the last month and a half . . . he's driving in runs he's hitting the ball solid, he's staying in the middle of the ballpark, if you see his contact, the quality of his at-bats, driving the ball, then you see the hitter that we see. . . .he's doing an outstanding job." **Alex Cora on July 28, 2018 after defeating the Minnesota Twins 10-4.**[116]

f.      "It was good, put the ball in play, a little more aggressive. . . .if you stay away from the edges of the strike zone and you get pitches in the middle of the plate and you square them off you're going to have good results and we've been doing that the whole season. . . .it seems like today they were ready to hit, they were looking for pitches in the middle of the zone and they did a good job." **Alex Cora on August 22, 2018 after defeating the Cleveland Indians 10-4.**[117]

g.      "It's almost overwhelming . . . .because you just never think that you'll be associated with a club that can do that. [To go] 119-57? Those numbers are mind-boggling. It's winning more than two-thirds of your games over the year, so, no, I don't think you can really grasp it, and I think it's a tribute to all these guys. You don't get to that point unless you're talented and you grind, you really work through things, you bounce back, you're resilient and you're tough. And that's this group." **Dave Dombrowski, Red Sox President of Baseball Operations, on October 28, 2018 after the Red Sox won the World Series.**[118]

---

[115] Alex Cora, *Cora on offense in win*, MLB.COM (July 10, 2018), https://www.mlb.com/video/cora-on-offense-in-win-c2256697083  (accessed Feb. 14, 2020).

[116] Alex Cora, *Cora discusses win over Twins*, MLB.COM (July 28, 2018), https://www.mlb.com/video/cora-discusses-win-over-twins-c2322233983 (accessed Feb. 14, 2020).

[117] Alex Cora, *Cora on offense after 10-4 win*, MLB.COM (Aug. 22, 2018), https://www.mlb.com/video/cora-on-offense-after-10-4-win-c2417205683 (accessed Feb. 14, 2020).

[118] Anthony Castrovince, *Team of this century? Sox win 4th title since '04*, MLB.COM (Oct. 28, 2018), https://www.mlb.com/redsox/news/red-sox-win-2018-world-series-title-c299876586  (accessed Feb. 14, 2020).

140.     As the above-mentioned quotes demonstrate, on an almost daily basis the Red Sox represented to the world that their success was due to, *inter alia*, their hard work approach to batting rather than their impermissible electronic sign stealing scheme.

**E.     The Astros', Red Sox's ▉▉▉▉▉▉ Electronic Sign Stealing Misconduct Compromised the Player Performance Statistics on which MLB DFS Contests Are Based and Prevented the Exercise of Contestant Skill.**

141.     The Astros', Red Sox's ▉▉▉▉▉ electronic sign stealing schemes discussed above compromised the player performance statistics on which the MLB fantasy baseball contests were based and prevented the exercise of contestant skill.  Corrupted statistical information pervaded the results of MLB fantasy baseball contests.  Untold numbers of hits, walks, runs, and wins were dishonestly obtained and awarded to Astros, Red Sox ▉▉▉▉▉ players that would not have taken place but for the players' impermissibly-gained advanced knowledge of pitches.   The Astros', Red Sox's, ▉▉▉▉▉ misconduct, combined with MLB's intentional failure to stop or disclose the misconduct, resulted in MLB fantasy contestants unknowingly taking part in corrupted and unfair competitions in which they could not exercise skill but were relegated to winning or losing on the basis of chance.

142.     In particular, the performance statistics on which the MLB fantasy baseball contests were based during the 2015, 2016, 2017, 2018 and 2019 seasons were corrupted in numerous ways, including but not limited to the following:

> a.     MLB fantasy baseball contestants who drafted pitchers for their fantasy lineup who were pitching against the Astros or the Red Sox were harmed when those pitchers performed poorly as a result of their electronic sign stealing misconduct;
>
> b.     MLB fantasy baseball contestants who participated in contests against opponents who selected Astros players or Red Sox players were harmed when the opponents' Astros or Red Sox players statistics were corruptly enhanced by their electronic sign stealing misconduct;

      c.      MLB fantasy baseball contestants were fraudulently induced to pick Astros or Red Sox players for their fantasy teams based on artificial statistics (and not to select pitchers who had fared poorly in games against the Astros and Red Sox) and were harmed when the Astros or Red Sox players did not perform as well as expected (or the unselected pitchers performed better) due to the hitters' lack of access to electronically stolen signs.

      d.      MLB fantasy baseball contestants overpaid when they selected Astros or Red Sox players for their fantasy teams based on artificial statistics resulting from their electronic sign stealing misconduct;

**G.**    **Plaintiffs and the Proposed Classes Were Unfairly and Deceptively Led to Believe that the MLB Fantasy Baseball Contests in Which They Participated Were Games of Skill.**

143.    Pursuant to the Conditions of Participation approved and required by the MLB Defendants to be provided to all participants in MLB fantasy baseball games, Plaintiffs and the members of the proposed Classes were expressly advised, in writing, that the contests were "contests of skill."

144.    Plaintiffs and the members of the proposed Classes were required, before being allowed to participate in the contests, to acknowledge and agree to the contests' Conditions of Participation, which were incorporated and applicable to every contest Plaintiffs and the members of the Classes paid to enter.  Absent such acknowledgement and approval, Plaintiffs and the Classes would not have been permitted to participate in the contests.

145.    All of the Plaintiffs and all of the members of the proposed Classes electronically acknowledged and agreed to the contests' Conditions of Participation before participating in any MLB fantasy baseball contests.

146.    The representation in the Conditions of Participation that the MLB fantasy baseball contests were contests of skill, which the MLB Defendants caused to be provided to all MLB fantasy contestants, was, during the ████████ 2017, 2018 and 2019 seasons, false.

147.    The MLB Defendants and the Astros and Red Sox were, at a minimum, aware during the 2017, 2018 and 2019 seasons that the representation in the Conditions of Participation that the MLB fantasy baseball contests were contests of skill, if ever true, was not true during those seasons.

148.    The representation that MLB fantasy baseball contests were contests of skill was material to each Plaintiff's and each Class member's decision to participate in such contests.  No Plaintiff, nor any of the proposed Class members, would have paid to participate in the contests if they knew that the player performance statistics upon which the contests depended were corrupted and that the contests were, as a result, not actually games of skill.

149.    Throughout the 2017, 2018 and 2019 baseball seasons, the MLB Defendants generated fantasy baseball information on the MLB television network, streaming service, and mobile applications that included, on a daily basis, expert recommendations of MLB players and even complete fantasy lineups for MLB fantasy contestants to use in selecting their fantasy teams.  MLB and its Clubs, including the Astros and the Red Sox, were aware that these daily player and lineup recommendations were, at a minimum, misleading, since they did not acknowledge or account for the ongoing electronic sign stealing that gave performance advantages to Astros and Red Sox players and performance disadvantages to opposing hitters and pitchers.  Defendants disseminated these player and lineup recommendations, as required by their marketing obligations pursuant to the MLB-DraftKings agreement, knowing the recommendations would mislead MLB fantasy contestants.

**H.    Plaintiff Kristopher R. Olson**

150.    Plaintiff Kristopher R. Olson was an active MLB fantasy baseball contest participant during the period at issue in this lawsuit.

151.    Plaintiff Olson was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

152.    In July 2015, Plaintiff Olson received and reviewed the MLB fantasy baseball contests' Conditions of Participation, which advised him the contests were contests of skill. Plaintiff Olson electronically acknowledged and agreed to the Conditions of Participation.

153.    Plaintiff Olson was aware that the MLB contests were offered at different levels of skill, depending upon the knowledge and experience of the contestant.  Plaintiff Olson initially played at the "Beginner" level, before graduating to the higher contest level.

154.    Plaintiff Olson relied on the representation in the MLB fantasy baseball contests' Conditions of Participation that the contests were conducted as games of skill in deciding to pay to participate in the contests.

155.    The fact that MLB fantasy baseball contests were games of skill was a material consideration to plaintiff Olson's decision to pay to participate in such contests.  He had no interest in participating, let alone paying to participate, in fantasy sports contests based on chance.  Plaintiff Olson has never bet on baseball and has no interest in doing so.  He would not have paid to participate in the MLB-branded fantasy contests if they were not games of skill.

156.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████

157. ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

158.    Manfred's September 2017 statement caused Plaintiff Olson to believe that electronic sign stealing would not tolerated by MLB, was not being perpetrated by other teams, and would not occur again.

159.    The Red Sox's complaint that the Astros were engaged in sign stealing misconduct during the October 2018 playoffs, Luhnow's (false) public statement denying the Red Sox's accusation, and Manfred's (false) public statement asserting that MLB had conducted a "thorough investigation" and exonerated the Astros were also widely reported in the Boston media.  Plaintiff Olson, who was closely following the Red Sox during that playoff series, was aware from television and newspaper reports of the Red Sox's complaint and Luhnow's and Manfred's statements in response.

160.    Luhnow's and Manfred's October 2018 statements caused Plaintiff Olson to believe that the Astros had not engaged in electronic sign stealing and that electronic sign stealing would not tolerated by MLB and was not being perpetrated.

161.    Plaintiff Olson was aware that electronic sign stealing was prohibited by MLB rules.

162.    Plaintiff Olson was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection

process and the subsequent player performance results that determine the contest winners. He was also aware that the effects of electronic sign stealing would be variable (depending, for example, on which games, which players and which at bats it affected) and could not, therefore, be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

163. Because electronic sign stealing corrupts both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners, the fact that one or more MLB Clubs was engaging in electronic sign stealing would have been material to Plaintiff Olson's decision to pay to participate in such contests.

164. Plaintiff Olson relied on ███████████████████████████ the Red Sox's "absolute assurance" in September 2017 that it would not engage in electronic sign stealing again, and Luhnow's and Manfred's statements in October 2018 in deciding to continue paying to participate in MLB fantasy baseball contests. Plaintiff Olson would not have continued to pay to participate in the contests if he knew that one or more teams was engaging in electronic sign stealing or if he learned that MLB was lying about its investigations of electronic sign stealing.

165. During the 2018 season, Plaintiff Olson paid for a subscription to MLB.TV in order to better participate in MLB fantasy contests and follow his fantasy players. Plaintiff Olson was aware of fantasy baseball programming by the MLB Defendants, including daily fantasy baseball player and lineup recommendations issued by the MLB Defendants. Plaintiff Olson received emails and other advertising and promotional materials about the MLB fantasy baseball contests directly from the MLB Parties.

166. Plaintiff Olson was aware during the Class Period of MLB's long-standing opposition to gambling on baseball, including Manfred's refusal in 2016 to reinstate Pete Rose

because of Rose's prior involvement with gambling.  Plaintiff Olson believed that MLB would not promote (or lend its name) to fantasy baseball contests if they were not games of skill and involved gambling.

167.    Plaintiff Olson was aware of MLB's long-standing and oft-repeated representations of its commitment to insuring the honesty and integrity of the game of baseball and, based on those representations, believed that MLB would not knowingly allow conduct by MLB member Clubs contrary to MLB's Official Rules and regulations or otherwise contrary to the integrity of the game of baseball.

168.    Plaintiff Olson relied on MLB's long-standing and oft-repeated opposition to gambling on baseball in deciding to pay to participate in the contests.

169.    Plaintiff Olson relied on MLB's long-standing and oft-repeated representations that it was committed to insuring the honesty and integrity of the game of baseball, including in regard to preventing electronic sign stealing, in deciding to pay to participate in the contests.

170.    Plaintiff Olson would not have participated in the MLB fantasy baseball contests had he known that the Houston Astros or the Boston Red Sox was engaging in the electronic sign stealing schemes described above or ▓▓▓▓▓▓▓ were engaging in electronic sign stealing.

171.    Plaintiff Olson would not have participated in the MLB fantasy baseball contests had he known that MLB was fraudulently concealing electronic sign stealing by its member Clubs.

172.    Plaintiff Olson would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the honesty of the player performance statistics on which the contests depended was compromised by MLB teams' and players' electronic sign stealing and that, as a result, the outcome of the contests would not be determined by skill.

173.     Plaintiff Olson paid and suffered the loss of MLB fantasy contest entry fees that he would not have paid had he known that the contests were not games of skill.

I.     **Plaintiff Christopher Lopez**

174.     Plaintiff Christopher Lopez was an active MLB fantasy baseball contest participant during the period at issue in this lawsuit.

175.     Plaintiff Lopez was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

176.     In September 2015, Plaintiff Lopez received and reviewed the MLB fantasy baseball contests' Conditions of Participation, which advised him the contests were contests of skill.  Plaintiff Lopez electronically acknowledged and agreed to the Conditions of Participation.

177.     Plaintiff Lopez relied on the representation in the MLB fantasy baseball contests' Conditions of Participation that the contests were conducted as games of skill in deciding to pay to participate in the contests.

178.     The fact that MLB fantasy baseball contests were games of skill was a material consideration to plaintiff Lopez's decision to pay to participate in such contests.  He had no interest in participating, let alone paying to participate, in fantasy sports contests based on chance.  Plaintiff Lopez has never bet on baseball and has no interest in doing so.  He would not have paid to participate in the MLB-branded fantasy contests if they were not games of skill.

179.     Plaintiff Lopez was aware during the Class Period of MLB's long-standing opposition to gambling on baseball and believed that MLB would not promote (or lend its name) to fantasy baseball contests if they if they were not games of skill and involved gambling.

180.     Plaintiff Lopez was aware of MLB's long-standing and oft-repeated representations of its commitment to insuring the honesty and integrity of the game of baseball

and, based on those representations, believed that MLB would not knowingly allow conduct by MLB member Clubs contrary to MLB's Official Rules and regulations or otherwise contrary to the integrity of the game of baseball.

181.    Plaintiff Lopez was aware that electronic sign stealing was prohibited by MLB rules.

182.    Plaintiff Lopez was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners.  He was also aware that the effects of electronic sign stealing would be variable (depending, for example, on which games, which players and which at bats it affected) and could not, therefore, be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

183.    Because electronic sign stealing corrupts both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners, the fact that one or more MLB Clubs was engaging in electronic sign stealing would have been material to plaintiff Lopez's decision to pay to participate in such contests.

184.    Plaintiff Lopez relied on the representation in the MLB fantasy baseball contests' Conditions of Participation that the contests were conducted as games of skill in deciding to pay to participate in the contests.

185.    Plaintiff Lopez relied on MLB's long-standing and oft-repeated opposition to gambling on baseball in deciding to pay to participate in the contests.

186.    Plaintiff Lopez relied on MLB's long-standing and oft-repeated representations that it was committed to insuring the honesty and integrity of the game of baseball, including in regard to preventing electronic sign stealing, in deciding to pay to participate in the contests.

187.    Plaintiff Lopez would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

188.    Plaintiff Lopez would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

189.    Plaintiff Lopez would not have participated in the MLB fantasy baseball contests during the Class Period had he known that MLB was fraudulently concealing electronic sign stealing by its member Clubs.

190.    Plaintiff Lopez would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the honesty of the player performance statistics on which the contests depended was compromised by MLB teams' and players' electronic sign stealing and that, as a result, the outcome of the contests would not be determined by skill.

191.    Plaintiff Lopez paid and suffered the loss of MLB fantasy contest entry fees that he would not have paid had he known that the contests were not games of skill.

**J.      Plaintiff Warren Barber**

192.    Plaintiff Warren Barber was an active DraftKings MLB DFS contest participant during the period at issue in this lawsuit.

193.    Plaintiff Barber was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

194.    Plaintiff Barber received and reviewed the MLB fantasy baseball contests' Conditions of Participation, which advised him the contests were contests of skill.  Plaintiff Lopez electronically acknowledged and agreed to the Conditions of Participation.

195.    The fact that MLB fantasy baseball contests were games of skill was a material consideration to Plaintiff Barber's decision to pay to participate in such contests.  He had no interest in participating, let alone paying to participate, in fantasy sports contests based on chance.

196.    Plaintiff Barber would not have paid to participate in the MLB-branded fantasy contests if he did not believe they were games of skill.

197.    Plaintiff Barber was aware during the Class Period of MLB's long-standing opposition to gambling on baseball and believed that MLB would not promote (or lend its name) to fantasy baseball contests if they were not games of skill but rather involved gambling.

198.    Plaintiff Barber was aware of MLB's long-standing and oft-repeated representations of its commitment to insuring the honesty and integrity of the game of baseball and, based on those representations, believed that MLB would not knowingly allow conduct by MLB member Clubs contrary to MLB's Official Rules and regulations or otherwise contrary to the integrity of the game of baseball.

199.    Plaintiff Barber was aware that electronic sign stealing was prohibited by MLB rules.

200.    Plaintiff Barber was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners.  He was also aware that the effects of electronic sign stealing would be variable (depending, for

example, on which games, which players and which at bats it affected) and could not, therefore, be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

201.    Because electronic sign stealing corrupts both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners, the fact that one or more MLB Clubs was engaging in electronic sign stealing would have been material to plaintiff Barber's decision to pay to participate in such contests.

202.    Plaintiff Barber relied on MLB's long-standing and oft-repeated opposition to gambling on baseball in deciding to pay to participate in the contests.

203.    Plaintiff Barber relied on MLB's long-standing and oft-repeated representations that it was committed to insuring the honesty and integrity of the game of baseball, including in regard to preventing electronic sign stealing, in deciding to pay to participate in the contests.

204.    Plaintiff Barber would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Houston Astros or Boston Red Sox or other Clubs engaged in the electronic sign stealing schemes described above.

205.    Plaintiff Barber would not have participated in the MLB fantasy baseball contests during the Class Period had he known that MLB was fraudulently concealing electronic sign stealing by its member Clubs.

206.    Plaintiff Barber would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the honesty of the player performance statistics on which the contests depended was compromised by MLB teams' and players' electronic sign stealing and that, as a result, the outcome of the contests would not be determined by skill.

207.     Plaintiff Barber paid and suffered the loss of MLB fantasy contest entry fees that he would not have paid had he known that the contests were not games of skill.

**K.     Plaintiff Christopher Clifford**

208.     Plaintiff Christopher Clifford paid entry fees for MLB fantasy baseball contests during the period at issue in this lawsuit.

209.     Plaintiff Clifford was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

210.     Plaintiff Clifford received and reviewed the MLB fantasy baseball contests' Conditions of Participation, which advised him the contests were contests of skill.  Plaintiff Clifford electronically acknowledged and agreed to the Conditions of Participation.

211.     Plaintiff Clifford relied on the representation in the MLB fantasy baseball contests' Conditions of Participation that the contests were conducted as games of skill in deciding to pay to participate in the contests.

212.     The fact that MLB fantasy baseball contests were games of skill was a material consideration to plaintiff Clifford's decision to pay to participate in such contests.  He had no interest in participating, let alone paying to participate, in fantasy sports contests based on chance.  He would not have paid to participate in the MLB-branded fantasy contests if they were not games of skill.

213.     Plaintiff Clifford was aware during the Class Period of MLB's long-standing opposition to gambling on baseball and believed that MLB would not promote (or lend its name) to fantasy baseball contests if they if they were not games of skill but rather involved gambling.

214.     Plaintiff Clifford was aware of MLB's long-standing and oft-repeated representations of its commitment to insuring the honesty and integrity of the game of baseball

and, based on those representations, believed that MLB would not knowingly allow conduct by MLB member Clubs contrary to MLB's Official Rules and regulations or otherwise contrary to the integrity of the game of baseball.

215.   Plaintiff Clifford was aware that electronic sign stealing was prohibited by MLB rules.

216.   Plaintiff Clifford was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners.  He was also aware that the effects of electronic sign stealing would be variable (depending, for example, on which games, which players and which at bats it affected) and could not, therefore, be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

217.   Because electronic sign stealing corrupts both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners, the fact that one or more MLB Clubs was engaging in electronic sign stealing would have been material to plaintiff Clifford's decision to pay to participate in such contests.

218.   Plaintiff Clifford relied on MLB's long-standing and oft-repeated opposition to gambling on baseball in deciding to pay to participate in the contests.

219.   Plaintiff Clifford relied on MLB's long-standing and oft-repeated representations that it was committed to insuring the honesty and integrity of the game of baseball, including in regard to preventing electronic sign stealing, in deciding to pay to participate in the contests.

220.    Plaintiff Clifford would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Houston Astros engaged in the electronic sign stealing schemes described above.

221.    Plaintiff Clifford would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Boston Red Sox engaged in the electronic sign stealing schemes described above.

222.    Plaintiff Clifford would not have participated in the MLB fantasy baseball contests during the Class Period had he known that MLB was fraudulently concealing electronic sign stealing by its member Clubs.

223.    Plaintiff Clifford would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the honesty of the player performance statistics on which the contests depended was compromised by MLB teams' and players' electronic sign stealing and that, as a result, the outcome of the contests would not be determined by skill.

224.    Plaintiff Clifford paid and suffered the loss of MLB fantasy contest entry fees that he would not have paid had he known that the contests were not games of skill.

**L.    Plaintiff Erik Liptak**

225.    Plaintiff Erik Liptak was an active MLB fantasy contest participant during the period at issue in this lawsuit. Plaintiff Clifford placed thousands of entries into MLB fantasy baseball contests during the Class Period.

226.    In April 2015, Plaintiff Liptak received the MLB fantasy baseball contests' Conditions of Participation, which represented that the contests were contests of skill.  Plaintiff Liptak electronically acknowledged and agreed to the Conditions of Participation.

227.    Plaintiff Liptak was, at all relevant times, aware that in order for fantasy sports competitions, including fantasy baseball, to be legal, they were required to be games of skill.

228.    The fact that MLB fantasy baseball contests were games of skill was a material consideration to plaintiff Liptak's decision to pay to participate in such contests.  He had no interest in participating, let alone paying to participate, in fantasy sports contests based on chance.

229.    Plaintiff Liptak would not have paid to participate in the MLB-branded fantasy contests if he did not believe they were games of skill.

230.    Plaintiff Liptak was aware during the Class Period of MLB's long-standing opposition to gambling on baseball and believed that MLB would not promote (or lend its name) to fantasy baseball contests if they were not games of skill and involved gambling.

231.    Plaintiff Liptak was aware of MLB's long-standing and oft-repeated representations of its commitment to insuring the honesty and integrity of the game of baseball and, based on those representations, believed that MLB would not knowingly allow conduct by MLB member Clubs contrary to MLB's Official Rules and regulations or otherwise contrary to the integrity of the game of baseball.

232.    Plaintiff Liptak was aware that electronic sign stealing was prohibited by MLB rules.

233.    Plaintiff Liptak was aware that if an MLB Club or Clubs were engaging in electronic sign stealing, that would corrupt both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners.  He was also aware that the effects of electronic sign stealing would be variable (depending, for example, on which games, which players and which at bats it affected) and could not, therefore,

be accurately factored into fantasy team player selection decisions, thus preventing the exercise of skill to win or lose a contest.

234.     Because electronic sign stealing corrupts both the initial MLB fantasy lineup player selection process and the subsequent player performance results that determine the contest winners, the fact that one or more MLB Clubs was engaging in electronic sign stealing would have been material to Plaintiff Liptak's decision to pay to participate in such contests.

235.     Plaintiff Liptak relied on MLB's long-standing and oft-repeated opposition to gambling on baseball in deciding to pay to participate in the contests.

236.     Plaintiff Liptak relied on MLB's long-standing and oft-repeated representations that it was committed to insuring the honesty and integrity of the game of baseball, including in regard to preventing electronic sign stealing, in deciding to pay to participate in the contests.

237.     Plaintiff Liptak would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the Houston Astros or Boston Red Sox or other Clubs engaged in the electronic sign stealing schemes described above.

238.     Plaintiff Liptak would not have participated in the MLB fantasy baseball contests during the Class Period had he known that MLB was fraudulently concealing electronic sign stealing by its member Clubs.

239.     Plaintiff Liptak would not have participated in the MLB fantasy baseball contests during the Class Period had he known that the honesty of the player performance statistics on which the contests depended was compromised by MLB teams' and players' electronic sign stealing and that, as a result, the outcome of the contests would not be determined by skill.

240.     Plaintiff Liptak paid and suffered the loss of MLB fantasy contest entry fees that he would not have paid had he known that the contests were not games of skill.