# Exhibit B-1
# [REDACTED]



## DRAFTKINGS ANNOUNCES EXCLUSIVE PARTNERSHIPS WITH 27 MLB TEAMS

Leading Daily Fantasy Sports Destination to Host
$4 Million Fantasy Baseball World Championship Event
in Las Vegas on August 15

BOSTON, MASS., July 31, 2015 – DraftKings, Inc., a leading daily fantasy sports destination, today announced exclusive partnerships with 27 Major League Baseball (MLB) teams, further establishing its dominant position in fantasy baseball. The team deals complement DraftKings' existing partnership with MLB as the league's "Official Daily Fantasy Game," through which the company offers co-branded MLB daily fantasy games and once-in-a-lifetime fan experiences, like throwing out the first pitch, throughout the season.

DraftKings' 2015 MLB contests culminate with the $4 Million Fantasy Baseball World Championship when 80 finalists compete in a live "sweat" contest for $4 Million in total prizes, including $1 Million for first place. The finale event will take place at Wynn Las Vegas on August 15 and each of the participants will win prizes during the contest that will feature all of the nine MLB games played that day. Fans can still qualify to win a spot at the Championship by entering any of the 9 remaining qualifiers on DraftKings.com.

"Baseball is one of the fastest-growing categories in DFS and our MLB partnerships ensure that we will continue to offer the sport's most engaging fantasy games and experiences," said Jason Robins, CEO of DraftKings. "The excitement and tremendous fan engagement surrounding our $4 Million Fantasy Baseball Championship is further proof of the value of our relationships with MLB and its teams."

As part of the MLB partnership, DraftKings users will benefit from exclusive content through the iPhone app, including the integration of MLB.com At Bat. The seamless integration allows Siri to send an alert when one of the DraftKings user's selected players is coming to bat. Users then simply tap the MLB.com At Bat logo on the alert and the MLB.com At Bat app will open to show a live look-in of the player's plate appearance.

DraftKings' baseball lineup of all 27 eligible MLB teams includes the reigning World Series Champion San Francisco Giants, New York Yankees, Boston Red Sox and New York Mets. Through these partnerships, DraftKings offers fans unique baseball contests and money-can't-buy experiences with their favorite teams.

**DraftKings MLB Team Partner List:**

Atlanta Braves                Baltimore Orioles                Boston Red Sox

| Chicago Cubs | Chicago White Sox | Cincinnati Reds |
| Cleveland Indians | Colorado Rockies | Detroit Tigers |
| Houston Astros | Kansas City Royals | Los Angeles Angels |
| Los Angeles Dodgers | Miami Marlins | Milwaukee Brewers |
| Minnesota Twins | New York Mets | New York Yankees |
| Oakland Athletics | Philadelphia Phillies | Pittsburgh Pirates |
| St. Louis Cardinals | San Diego Padres | San Francisco Giants |
| Tampa Bay Rays | Texas Rangers | Washington Nationals |

As the Official Daily Fantasy Game of Major League Baseball, DraftKings made its All-Star debut with numerous activations at the 2015 MLB All Star Game presented by T-Mobile. The company provided interactive experiences for fans to learn more about the game, meet legends, and enjoy green-screen activities. DraftKings also had a footprint on the concourse of the Great American Ball Park for All-Star Sunday, the Gillette Home Run Derby presented by Head & Shoulders and the 2015 MLB All-Star Game presented by T-Mobile.

**About DraftKings**
DraftKings, Inc. is a leading skill-based Daily Fantasy Sports (DFS) gaming destination for fans in North America to compete in single-day online games for cash and prizes across the largest variety of professional and collegiate sports. DraftKings is the exclusive DFS partner of Major League Baseball, the National Hockey League, NASCAR, Major League Soccer, and Ultimate Fighting Championship. Founded in 2012 by CEO Jason Robins, CRO Matt Kalish and COO Paul Liberman, DraftKings is headquartered in Boston, Mass.

Contact:
Sabrina Macias
DraftKings
(646) 565-6758
smacias@draftkings.com



## MEMORANDUM

| | |
|---|---|
| **To:** | Club Presidents |
| **cc:** | Commissioner Robert D. Manfred, Jr.<br>MLB Business and Media Board<br>Noah Garden<br>Kenny Gersh<br>Ed Weber |
| **From:** | Bob Bowman |
| **Date:** | April 1, 2015 |
| **Re:** | DraftKings Industry-Wide Advertising and Sponsorship Program |

We are pleased to inform you that we have extended and expanded our industry-wide exclusive licensing, advertising and sponsorship program (the "Program") with DraftKings through the end of the 2019 season.

As you may know, DraftKings is a leading provider of daily fantasy games, and has been our exclusive partner since 2013. Our new DraftKings Program will advance our industry's leadership position in a category which has exploded in popularity with our fans. Giving our fans, particularly our younger fans the opportunity to play fantasy baseball in a daily time frame, rather than the typical season-long activity, will surely help expand the reach of MLB.

At the national level, DraftKings will receive category exclusivity and marketing support for the DraftKings brand and sponsored games. At the club level, pursuant to the discussions we have had with each club, DraftKings will receive similar category exclusivity as well as certain media assets to assist in marketing the relevant daily games. As each of you knows, the five year Program totals no less than _____, consisting of both _____ in DraftKings (we received _____ in our first deal in 2013). Of that amount, _____ will be distributed to the clubs directly, with the remainder staying with BAM for a future distribution to all 30 clubs.

We have spoken directly to each eligible club (state and Canadian laws proscribe Seattle, Arizona and Toronto from directly participating) and so individual amounts and the promotional activities should be all set. That said, if you have any questions, please call either me or Noah Garden.

Many thanks to the Commissioner for his leadership on this issue, the newly formed Business and Media Board for their input and guidance, and particularly all of the clubs for their terrific support and assistance in making this an industry-wide effort.

We look forward to working with you on this endeavor. Thanks.

Bob

**HIGHLY CONFIDENTIAL**

REDACTED

REDACTED

REDACTED

## AMENDED AND RESTATED GAME LICENSE AND MARKETING RIGHTS AGREEMENT

This amended and restated agreement (the "**Agreement**"), effective as of March 31, 2015 (the "**Effective Date**"), amends and restates that certain Game License and Marketing Agreement, effective as of August 19, 2013 ("**Original Effective Date**"), as amended (the "**Original Agreement**"), and is made and entered into by and between MLB Advanced Media, L.P. ("**Licensor**" or "**MLBAM**"), a Delaware limited partnership, with its principal place of business at 75 Ninth Avenue, New York, NY 10011, on its own behalf and on behalf of Major League Baseball Properties, Inc. ("**MLBP**"), Major League Baseball Enterprises, Inc. ("**MLBE**") and The MLB Network, LLC ("**MLBN**"), and DraftKings, Inc. ("**Licensee**" or "**DraftKings**"), a Delaware corporation, with its principal place of business located at 125 Summer Street, Suite 510, Boston, MA 02110 (MLBAM and Licensee are each referred to herein as a "**Party**" and collectively as the "**Parties**"). The Parties hereby agree to amend and restate the terms and conditions of the Original Agreement as follows:

**I.**     **DEFINITIONS**. Defined terms are capitalized and defined in this Section I (Definitions) and elsewhere herein.

A.     "**Applicable Law**" shall mean all U.S. state and federal, and Canadian local, provincial and national, ordinances, regulations and laws applicable to the performance of the Parties under and/or the subject matter of this Agreement.

B.     "**Approval Committee**" shall mean a committee consisting of no fewer than two (2) representatives from each Party. For MLBAM, the most senior member of the Approval Committee shall be Kenny Gersh (or such other person employed by MLBAM in a business development executive capacity as designated by MLBAM and approved by Licensee, such approval not to be unreasonably withheld). For Licensee, the most senior member of the Approval Committee shall be Jason Robins. Approval Committee members other than the senior members listed herein shall be the initial and primary points of contact for issues that arise under this Agreement and the first point of contact for dispute resolution under this Agreement.

C.     "**Approved Fantasy Game**" shall mean any one or more of the skill-based fantasy games that has been (or that will be) developed by Licensee which meet certain conditions as specified in Section VII (Specific Terms Regarding Approved Fantasy Games) and which are expressly approved, such approval not to be unreasonably withheld, delayed, or conditioned, for marketing and promotion by the MLB Parties and Participating Clubs as an official fantasy game of Major League Baseball in accordance with and as further set forth in this Agreement.

D.     "**Bankruptcy Event**" shall mean the occurrence of any of the following with respect to a Party: (i) the insolvency of such Party; (ii) such Party forms or suffers formation of any committee of its creditors for the purpose of monitoring its financial affairs or enforcing such creditors' rights; (iii) any receiver, trustee or liquidator is appointed for all or a substantial part of the assets of such Party; (iv) such Party takes advantage of any applicable insolvency or like statute; (v) such Party makes any assignment for the benefit of creditors or an arrangement pursuant to any bankruptcy law; (vi) such Party files or has filed against it any petition under the bankruptcy or insolvency laws of any jurisdiction within which such Party is exercising any rights or fulfilling any obligations hereunder (which petition will not have been dismissed within thirty (30) days of the initial filing); or (vii) such Party appoints or suffers appointment of a receiver or trustee.

E.     "**Change in Control**" shall mean (i) the merger of a Party into or with another entity in a business combination transaction in which the stockholders of such Party immediately prior to the transaction cease to own after the transaction a majority of the issued and outstanding shares of voting capital stock of such Party; (ii) the consummation of a statutory merger or exchange of shares of a Party in a business combination transaction; (iii) the sale or transfer of all, or substantially all, of the capital stock or assets of a Party to a third party in a transaction to be accounted for as a business combination; or (iv) a change in control of the voting securities of a Party in a business combination (and not an equity financing) in which stockholders of such Party immediately prior to the transaction no longer enjoy the right and power to elect a majority of the directors of such Party after the transaction.

HIGHLY CONFIDENTIAL

MLB-Olson-00000442

F.  **"Club"** shall mean any MLB club.

G.  **"Club Marks"** shall mean all Marks owned, controlled, cleared for use by or on behalf of, or applied to be registered or registered by a Club, as and to the extent that the Club or another MLB Entity has the right to use or authorize third parties to use same.

H.  **"Collective Use"** shall mean the use of a Club Mark of each of the applicable Clubs, provided that each Club Mark is represented relatively equally, both in size and prominence. As examples, Collective Use shall be satisfied if: (i) in connection with a promotional campaign for an Approved Fantasy Game, each of the Participating Club Marks is used in relatively equal size and prominence; or (ii) the Club Marks are used within an Approved Fantasy Game over the course of a Season to represent the available MLB games for each day, even though not every Club plays a game on each day of the Season.

I.  **"Competitive Brand"**



J.  **"Compliance Event"** shall mean the occurrence of any of (i) a governmental or regulatory body enforcement action made against Licensee or any affiliate alleging any violation of Applicable Law as such Applicable Law applies to Licensee's (or such affiliate's) offerings of products or services within the Fantasy Games Category, (ii) enacted legislation (i.e., signed by an executive authority) rendering unlawful under Applicable Law any offerings of products or services within the Fantasy Games Category and/or (iii) a determination from any court, arbitrator or governmental or regulatory authority in the Licensed Territory finding that Licensee (or any affiliate) has violated Applicable Law with respect to Licensee's (or such affiliate's) offerings of products or services within the Fantasy Games Category.

K.  **"Confidential Information"** shall mean information disclosed by one Party to the other Party, including the terms and conditions of this Agreement, trade secrets, any information relating to product plans, designs, ideas, concepts, costs, prices, finances and financial information, business practices and policies, marketing practices and plans, customer analytics and information, customer acquisition strategies and plans, business opportunities, customer lists and customer information (including, in the case of Licensee as the disclosing Party, End User PI (as defined below)), information about personnel, research, development or know-how and any other technical or business information, the capabilities, technical descriptions and object code and source code relating to either Party's released or unreleased software products or services, and any other information not generally known to the public or received under circumstances reasonably interpreted as imposing an obligation of confidentiality and regardless of whether any such information is marked as "confidential," "proprietary," or with any other marking. "Confidential Information" shall not include any of such information which: (i) was publicly available at the time of disclosure by the disclosing Party; (ii) became publicly available after disclosure through no fault of the receiving Party; (iii) was known to the receiving Party prior to disclosure by the disclosing Party; or (iv) was rightfully acquired by the receiving Party after disclosure by the disclosing Party from a third party who was lawfully in possession of the information and was under no legal duty to the disclosing Party to maintain the confidentiality of the information.

HIGHLY CONFIDENTIAL

MLB-Olson-00000443

L.     **"Distribution Channel"** shall mean (i) those customary and traditional channels that Licensee generally uses to distribute fantasy games via Interactive Media and (ii) such other channels that are approved in writing by MLBAM for distribution of the Approved Fantasy Games, such approval not to be unreasonably withheld, delayed or conditioned.  For avoidance of doubt, the Licensee Website and any Licensee Application shall constitute Distribution Channels.

M.     **"End User"** shall mean any end user of a Licensee fantasy game.

N.     **"Exclusive Territory"** shall mean worldwide.

O.     **"Fantasy Games Category"** shall mean any fantasy sports game operated as a contest over the course of at least one (1) game (i.e., not a single in-game event) but less than an entire regular season or post-season series of such sport, whereby a participant enters a contest (either for free or by paying a fee) based on statistics of athletes from various teams competing in games occurring during such period of time.

P.     **"Fantasy Player Highlights"** shall mean those certain MLB game telecast highlight clips (selected in MLBAM's discretion) which shall be made available to Licensee via the MLBAM Media Player for viewing by End Users of Licensee's MLB fantasy games in accordance with, and as further set forth in, this Agreement.

Q.     **"Fantasy Tracker"** shall mean the fantasy tracker product contained in MLB.TV, which provides to then-currently logged-in End Users who are subscribers of MLB.TV, via the MLBAM Media Player, fantasy alerts pertaining to those MLB players on such End User's active fantasy team in accordance with, and as further set forth in, this Agreement.

R.     **"Integration(s)"** shall mean each of (i) the integration of the Off-Line assets granted to the Licensee in Section III.B of this Agreement; (ii) the integration of the Interactive Media assets granted to the Licensee in Section III.B of this Agreement; and (iii) the Jewel Events and hospitality rights and benefits granted under Section III.C of this Agreement.

S.     **"Interactive Media"** shall mean all forms of media now known or hereinafter discovered which are accessible via the Internet (as "Internet" is currently defined in the Communications Act of 1934, as amended) and/or any other networks commonly referred to as or a part of the Internet, as well as on any cellular network, mobile data network, or any similar data communication infrastructure now known or hereinafter developed.

T.     **"IP"** or **"Intellectual Property"** shall mean the Marks and all: (i) copyrights (including, without limitation, the right to reproduce, distribute copies of, display and perform the copyrighted work and to prepare derivative works), copyright registrations and applications, trademark rights (whether or not a Mark is registered), trademark registrations and applications, patent rights, patent applications and issuances, trade names, mask-work rights, trade secrets, moral rights, author's rights, privacy rights, publicity rights, algorithms, rights in packaging, goodwill and other proprietary rights and all renewals and extensions thereof; (ii) intangible legal rights or interests evidenced by or embodied in any idea, design, concept, technique, invention, discovery, enhancement or improvement, whether or not patentable, copyrightable, or trademarkable; and (iii) all modifications, derivatives and works otherwise incorporating of any of the foregoing.

U.     **"Jewel Event Marks"** shall mean all word Marks and logos for each Jewel Event.

V.     **"Jewel Events"** shall mean the All-Star Game exhibition (including all related activities and events, e.g., All-Star FanFest, All-Star Futures Game, All-Star Legends & Celebrity Softball Game, All-Star Workout Day, Home Run Derby, All-Star Game Red Carpet Show, etc.), and the Division Series, League Championship Series and the World Series games.  The term "Jewel Events" shall also include any other existing or future event, exhibition or other activity that an MLB Party characterizes as a "Jewel Event."

3

HIGHLY CONFIDENTIAL

W. "**Language**" shall mean the English language, as well as any other language with respect to which Licensee offers fantasy games in the Licensed Territory.

X. "**Licensed Properties**" shall mean the following MLB Proprietary Rights licensed hereunder by Licensor (on its own behalf and on behalf of the other MLB Parties, as applicable): the Club Marks, Jewel Event Marks, MLB Marks, Fantasy Player Highlights, Fantasy Tracker, MLB.com Gameday Links and MLB.TV Links.

Y. "**Licensed Territory**" shall mean the United States of America, and any subsequent area of the world which MLBAM agrees in writing to include upon the request of Licensee, which agreement shall not be unreasonably withheld nor conditioned upon MLBAM's receipt of additional financial consideration hereunder. For avoidance of doubt, the Licensed Territory shall not include Canada, unless and until MLBAM determines, in its sole discretion, that Applicable Law permits the offering of Approved Fantasy Games.

Z. "**Licensee Applications**" shall mean those software applications offered by Licensee, which are Licensee-branded and owned and/or controlled and developed for installation and download on a mobile device or other device capable of accessing content via Interactive Media.

AA. "**Licensee-Controlled Properties**" shall mean those Interactive Media locations offered by Licensee, which are Licensee-branded and owned and/or controlled, including, without limitation, the following: the Licensee Website; the Licensee Applications; and Licensee's social media presences (e.g., Facebook and Twitter pages, Snapchat presences, etc.).

BB. "**Licensee Marks**" shall mean shall mean the following Marks of Licensee: DRAFTKINGS (USPTO Registration # 4308819) and certain other Marks to be identified from time to time by Licensee.

CC. "**Licensee Materials**" shall mean all Licensee Proprietary Rights (including any Licensee Marks) and any other IP or other content or materials made available hereunder by Licensee for use in connection with the Approved Fantasy Games, the Licensee Primary Brand or otherwise pursuant to this Agreement.

DD. "**Licensee Primary Brand**" shall mean Licensee's primary Mark (currently DRAFTKINGS) when used on a standalone basis, without reference to any game, business activity or third-party element.

EE. "**Licensee Proprietary Rights**" shall mean all IP owned, controlled, first used, or applied for registration in or registered with a government authority by Licensee.

FF. "**Licensee Website**" shall mean the website currently available at http://www.draftkings.com, which is Licensee-branded, operated and owned and/or controlled.

GG. "**Marks**" shall mean all nicknames, slogans, emblems, logo types, insignia, designs, colors, artwork, coats of arms, trophies, uniforms, uniform designs, helmet designs, trademarks, trade names, service marks, trade dress, and rights in each of the above, mascots, and stadium and ballpark names and designs, and the commercial goodwill associated therewith, that at any time were or are owned, applied to be registered or registered, controlled, cleared for use by or on behalf of, or licensed by, a Party (and in the case of MLBAM, any applicable MLB Entity), whether existing as of the Effective Date or developed during the Term.

HH. "**MLB Entities**" shall mean MLBAM, the Office of the Commissioner of Baseball (the "**BOC**"), its Bureaus, Committees, Subcommittees and Councils, the Clubs, MLBP, MLBE & MLBN, each of their parent, subsidiary, affiliated or related entities, any entity which, now or in the future, controls, is controlled by, or is under common control with the Clubs or the BOC, and the owners, shareholders, general and limited partners, directors, officers, employees and agents of the foregoing entities.

HIGHLY CONFIDENTIAL

MLB-Olson-00000445

II. **"MLB Marks"** shall mean all Marks of any specific MLB Entity or specific MLB Entities, but excluding the Jewel Event Marks and the Club Marks.

JJ. **"MLB Parties"** shall mean each of the MLB Entities, but only to the extent of any such entity's baseball-related business and/or baseball-related products or services, and excluding each of the Clubs.

KK. **"MLB Proprietary Rights"** shall mean all IP owned, controlled, first used, or applied for in or registered with a government authority by an MLB Entity.

LL. **"MLB Rules"** shall mean any present or future generally applicable (and consistently applied) rules, regulations, policies, bulletins, or directives issued by an MLB Entity.

MM. **"MLBAM-Controlled Properties"** shall mean all MLB-focused properties owned, controlled and operated by or on behalf of MLBAM, including the following: the MLB.com portal, which shall include each of the Club-specific pages, all MLBAM consumer products (e.g., MLB.TV), as well as mobile versions thereof, and MLBAM downloadable applications such as MLB.com At Bat; and the MLB.com (including Club-specific) social media presences (e.g., Facebook pages and Twitter pages).

NN. **"MLBAM Materials"** shall mean all MLB Proprietary Rights and any other MLB Party IP licensed hereunder by MLBAM (on its own behalf and on behalf of the other MLB Parties) for use in connection with the Approved Fantasy Games or the Licensee Primary Brand, including any Licensed Property.

OO. **"MLBAM Media Player"** shall mean the MLBAM supplied and operated media player accessible via certain Interactive Media.

PP. **"MLB.com Gameday"** shall mean MLBAM's Gameday service as of the Effective Date.

QQ. **"MLB.com Gameday Links"** shall mean any link or links that when activated by an End User shall cause a redirect to MLB.com Gameday.

RR. **"MLB.TV"** shall mean MLBAM's MLB.TV service.

SS. **"MLB.TV Links"** shall mean any link or links that when activated by an End User shall cause a redirect to MLB.TV.

TT. **"Naming Rights Sponsor"** shall be defined as a sponsor that has a contractual arrangement with a Club directly (or indirectly through an MLB ballpark owner) that permits the sponsor to use its name as part of the name of that Club's ballpark.

UU. **"New MLB.TV Subscribers"** shall mean a new, first-time subscriber to MLB.TV who purchases a subscription as a direct result of Licensee's MLB.TV Links (i.e., after clicking an MLB.TV Link).

VV. **"Net Advertising Revenue"** shall mean all gross revenue actually collected by or on behalf of a Party in connection with Ad Sales, less any (i) applicable taxes, and (ii) third-party sales commissions and costs, if and to the extent substantiated and reasonably and actually incurred.

WW. **"Net MLB.TV Subscription Revenue"** shall mean the gross revenue actually collected by MLBAM from each first-time, non-recurring purchase of a subscription to MLB.TV by each New MLB.TV Subscriber, less any applicable taxes, charge-backs and/or refunds.

XX. **"Off-Line"** shall mean, for any particular activity, that the activity is conducted or completed other than via Interactive Media.

HIGHLY CONFIDENTIAL

YY.   "**Participating Club**" shall mean any Club that elects to provide Licensee with the licenses, exclusivities, and official designations set forth in Section III (Participating Clubs & Club Exclusivity) of **Exhibit A** and the marketing commitments set forth in Section IV (Participating Clubs) of **Exhibit B**; provided, however, that the Toronto Blue Jays shall not be a Participating Club, unless and until MLBAM shall determine otherwise.

ZZ.   "**Season**" shall mean each complete MLB season during the Term, starting with the first game of MLB spring training and concluding with the final game of the MLB post-season.

**II.     TERM.** The term of this Agreement shall begin on the Effective Date and, unless terminated earlier pursuant to the terms and conditions of this Agreement, continue in effect until the end of the 2019 Season (the "**Term**"). Each consecutive calendar year of the Term shall be referred to herein as "**Year 1**" (for 2015), "**Year 2**" (for 2016), "**Year 3**" (for 2017), "**Year 4**" (for 2018) and "**Year 5**" (for 2019), and each generally, as a "**Year**."

**III.     GRANTS OF RIGHTS & ASSUMPTION OF MARKETING COMMITMENTS.** Subject to the terms and conditions of this Agreement:

A.     MLBAM, on its own behalf and on behalf of each other MLB Party and Participating Club grants to Licensee the rights, exclusivities and designations set forth in **Exhibit A**.

B.     MLBAM shall advertise and market, and shall cause each other MLB Party and Participating Club to advertise and market, the Licensee Primary Brand and Approved Fantasy Games during each Year as further set forth in Section I (MLBAM), Section II (MLBN) and Section IV (Participating Clubs) of **Exhibit B**. Each Party shall appoint one (1) member of the Approval Committee to be that Party's primary point of contact (that Party's "**Primary Contact**") to oversee and implement the terms and conditions of this Agreement. Each Party's Primary Contact shall be a full-time employee of such Party. Each Party may change its Primary Contact by notice to the other Party (email notice to suffice). The Primary Contacts shall, on an ongoing basis, review and evaluate the marketing and promotion of the Approved Fantasy Games, and work to facilitate the successful implementation of this Agreement. In addition, the Parties shall mutually agree on a promotion and marketing plan for each subsequent Year of the Term by no later than April 1 of such Year, subject to agreement of Club-specific marketing plans with each Participating Club. Prior to any such subsequent Year of the Term, MLBAM and Licensee shall engage in good faith discussions to reasonably adjust the mix of media and marketing assets to be provided for the upcoming Season to optimize the success of this Agreement. By October 31st following the applicable Season, Licensee shall inform MLBAM of the lowest performing Integration of those set forth in Sections I, II or III of **Exhibit B** over the prior Season. MLBAM shall adjust 30% (or less, at Licensee's request) of the elements from the lowest performing Integration to either of the other two Integrations (as among those set forth in Sections I, II, and III of **Exhibit B**) as directed by the Licensee, subject to availability, and shall provide Licensee with an adjusted promotion and marketing plan by December 15 of the applicable Year. The Parties shall work collaboratively to adjust the mix of elements among the Integrations until the Parties agree on a final promotion and marketing plan. If the Parties cannot, acting reasonably and diligently, agree on a promotion and marketing plan, the Parties shall escalate the issue to the Approval Committee.

C.     MLBAM agrees to provide or to cause the provision of the Jewel Event sponsorship benefits set forth in Section III (Jewel Events) of **Exhibit B**.

**IV.     LICENSEE GRANT OF RIGHTS.** Subject to the terms and conditions of this Agreement, Licensee hereby grants to MLBAM the non-exclusive, non-transferable, royalty free, non-sublicenseable and limited right to use, display, reproduce and distribute the Licensee Marks as supplied by Licensee solely to perform MLBAM's obligations to advertise and market the Approved Fantasy Game and the Licensee Primary Brand.

**V.     SALES.** MLBAM shall, with the prior written approval of Licensee (not to be unreasonably withheld), have the exclusive right to sell all advertising, sponsorships and any other type of commercial announcement, however denominated (excluding pre-roll ads in the MLBAM Media Player made available hereunder, unless mutually agreed by

HIGHLY CONFIDENTIAL                                                                                          MLB-Olson-00000447

the Parties), against, in and/or relating to the display of any Licensee Mark and/or the Approved Fantasy Games on any MLBAM-Controlled Property ("**MLBAM Ad Sales on MLBAM-Controlled Properties**"). MLBAM shall, with the prior written approval of Licensee (not to be unreasonably withheld), have the non-exclusive right to sell all advertising, sponsorships and any other type of commercial announcement, however denominated, against, in and/or relating to the display of any Licensee Mark and/or the Approved Fantasy Games on any Licensee-Controlled Property ("**MLBAM Ad Sales on Licensee-Controlled Properties**" and together with MLBAM Ad Sales on MLBAM-Controlled Properties, "**MLBAM Ad Sales**"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ below. Licensee shall, with the prior written approval of MLBAM (not to be unreasonably withheld) and in each case subject to Section VI.A.A of **Exhibit D** (Prohibited Content) and MLBAM's then-current, generally applicable written advertising policies and restrictions provided to Licensee, have the non-exclusive right (i.e., subject to any MLBAM Ad Sales (and any third-party ad sales) on Licensee-Controlled Properties approved in writing by Licensee) to sell all advertising, sponsorships and any other type of commercial announcement, however denominated, against, in and/or relating to the display of any Licensed Properties on any Licensee-Controlled Property ("**Licensee Ad Sales Against Licensed Properties**" and, together with MLBAM Ad Sales, "**Ad Sales**"), subject to the revenue share provision set forth in Section IX.C.iii (Revenue Sharing) below.

**VI.     GENERAL LIMITATIONS.** All rights and licenses granted by MLBAM in this Agreement, except as expressly set forth herein: (a) shall be limited to the Licensed Territory and the Language; (b) shall not be encumbered, transferred, assigned, sublicensed or otherwise hypothecated; and (c) with respect to Club Marks and Participating Club Marks licensed hereunder, shall be limited to Collective Use. Licensee shall not permit the Licensed Properties and other MLBAM Materials from being distributed, displayed, performed or otherwise used in any location outside the Licensed Territory. Each Party shall target its marketing, promotion and other communications relating to the Approved Fantasy Game or any of Licensee's fantasy baseball contests only to End Users (i) inside the Licensed Territory; and (ii) outside any state in the Licensed Territory where such promotion is not permitted by Applicable Law. For greater certainty, neither Party shall target its marketing, promotional or other communications in connection with the Approved Fantasy Games and/or any of Licensee's fantasy baseball contests to Canada or Canadian End Users; provided, however, that each Party acknowledges and agrees that the other Party targets marketing, promotional or other communications to Canada or Canadian End Users other than in connection with the Approved Fantasy Games and/or Licensee's fantasy baseball contests ("**Separate Canadian Activities**") and that such Separate Canadian Activities do not constitute a breach of the foregoing.

**VII.    SPECIFIC TERMS REGARDING APPROVED FANTASY GAMES & COMPLIANCE.** Additional terms and conditions regarding the Approved Fantasy Games are set forth in **Exhibit C**.

**VIII.   LICENSEE'S FANTASY GAME & OTHER BUSINESS OPERATION OBLIGATIONS.**

   A.    In General.



   B.    Standards of Performance. Licensee shall perform the Game Obligations in accordance with its then-current specifications and standards and Applicable Law. Licensee shall use commercially reasonable efforts to ensure that the Approved Fantasy Games shall, on a reasonably continuous basis and in accordance with the standards set forth in the preceding sentence, be available to End Users, operate, and have maintenance, support and customer service and technical support in accordance with Licensee's then current maintenance, support and customer service and technical support offerings. MLBAM acknowledges and agrees that Licensee may remove any Approved Fantasy Game from public availability and use at any time and from time to time for emergency support or routine and scheduled maintenance and support or for any other reason in Licensee's sole discretion.

115357020 v11

HIGHLY CONFIDENTIAL                                                                 MLB-Olson-00000448