# Exhibit B-4
# [REDACTED]

In the event MLBAM gives written notice of an objection with respect to any violation of the foregoing, Licensee shall remedy the violation within twenty-four (24) hours following receipt of written notice. Any failure to comply with the foregoing shall be subject to the remedy set forth in Section XII.B of this **Exhibit D**. For purposes of clarity, the Parties acknowledge and agree that within the Licensee-Controlled Properties certain user-generated content not subject to the prior review or approval of Licensee may be published and may contain materials in violation of this Section. Publication of such user generated content in violation of this Section shall not be deemed a material breach provided that upon knowledge of the publication of such user generated Prohibited Content, Licensee removes that content as soon as practicable, but in no event later than twenty-four (24) hours following such knowledge.

B. <u>MLBAM's Prohibited Activities</u>. MLBAM agrees that it shall: (i) not make any reference or claim about Licensee or its products other than presenting current information that has been published by mutual agreement of the Parties or pre-approved in writing by Licensee; (ii) not use deceptive, misleading, illegal, or unethical practices in marketing or promoting the Approved Fantasy Games; (iii) keep Licensee informed as to any problems encountered with the Approved Fantasy Games; (iv) not make any representations or warranties with respect to the Approved Fantasy Games; (v) use only those marketing materials and promotional materials approved in advance and in writing by each of the Parties; and (vi) not solicit any End User or potential End User to cancel, not renew, or discontinue its use of any Approved Fantasy Game.

C. <u>Licensee's Prohibited Activities</u>. The only rights for giveaways, involving MLB-related games or events (including any of the assets provided to Licensee under this Agreement and including through the use of tickets thereto as prizes) conveyed by this Agreement to Licensee are those set forth in *Schedule 3 to Exhibit B*, and Licensee shall not engage in additional such giveaways without the prior written consent of MLBAM. Unless expressly permitted hereunder or authorized in advance in writing by MLBAM, Licensee shall not advertise, promote, or provide from any Interactive Media location owned or controlled by Licensee any of the following activities: (i) MLB game ticket resales not authorized by MLBAM; (ii) unauthorized use, infringement, or violation of any MLB Proprietary Right, including any MLB game telecast or excerpt thereof; (iii) presentation of a group of images from any MLB game, commonly referred to as a "photo gallery"; and (iv) presentation of accounts and descriptions of MLB games. Notwithstanding the foregoing, the Parties acknowledge and agree (to each such Party's knowledge) that the commercial activities of Licensee on the Licensee-Controlled Properties and the content contained therein as of the Effective Date shall not be Prohibited Content as described in this Section and the continued commercial activities of Licensee on the Licensee-Controlled Properties and the content described therein, substantially as offered as of the Effective Date, shall not constitute breach of this Agreement.

D. <u>Prohibited Business Activities</u>. Neither Party shall use any Intellectual Property licensed hereunder by the other Party in a manner that is competitive with any good or service offered by the applicable licensor. Each Party hereby represents and warrants that such Party is not engaged in and will continue to not engage in (during the Term) any Prohibited Business Activities. **"Prohibited Business Activities"** shall mean any activities or operations of a Party or its affiliates that involve: (i) unlawful gambling, including with the primary purpose of assisting an end user in betting on professional or amateur sporting events or accomplishments; or (ii) Prohibited Substances.

E. <u>No Spyware/Adware</u>. Neither Party shall knowingly use any spyware or adware in connection with this Agreement. Neither Party will knowingly distribute any commercial message, or authorize any third party to distribute any commercial message, by means of spyware or adware in connection with the Approved Fantasy Game.

F. <u>Non-Solicitation</u>. Neither Party shall directly solicit for employment or as an independent contractor any employee of the other Party without the other Party's prior written consent during the Term and for a period of one (1) year following expiration or termination of this Agreement; provided, however, that neither Party shall be in breach of this Section if any employee of one Party initiates contact with the other

115357020 v11

HIGHLY CONFIDENTIAL                                                                      MLB-Olson-00000495

Party about an employment or independent contractor opportunity as a result of advertising, general recruiting activities, participation in job fairs or other public dissemination about such opportunity.

## VIII. <u>PROPRIETARY RIGHTS; MARK GUIDELINES</u>.

A. <u>MLB Proprietary Rights</u>.   Licensee hereby acknowledges the proprietary nature of the MLB Proprietary Rights, and agrees that all right, title and interest in and to them shall belong exclusively to the applicable MLB Entities.  Licensee represents and warrants that, to its knowledge, it has not made any unauthorized use of any MLB Proprietary Right. MLBAM reserves all rights in the MLB Proprietary Rights not expressly granted to Licensee hereunder.  Licensee shall neither contest the validity or scope of the appropriate MLB Entities' rights in the MLB Proprietary Rights by virtue of having entered into this Agreement nor commit or permit any act or omission by it or any third party that may impair the appropriate MLB Entities' rights in them.

B. <u>Licensee Intellectual Property</u>.  MLBAM hereby acknowledges the proprietary nature of the Licensee Intellectual Property, and agrees that all right, title and interest in and to them shall belong exclusively to Licensee (or its licensors or other third party owners), and MLBAM and the MLB Entities shall have no rights in or to any Licensee Intellectual Property other than as specifically set forth in this Agreement. MLBAM shall not display any Licensee Intellectual Property other than in accordance with the provisions of this Agreement.  MLBAM acknowledges and agrees that the Approved Fantasy Games are a commercially valuable asset of Licensee, the development of which required the investment of substantial time, effort and cost by Licensee.  MLBAM further acknowledges and agrees that the Approved Fantasy Games contain trade secrets of Licensee and that they are Licensee's Confidential Information and are proprietary to Licensee.

C. <u>Inurement of Goodwill</u>. All goodwill resulting from the other Party's use of the granting Party's Marks will inure solely to the granting Party. Neither Party will, at any time during or after this Agreement, register, attempt to register, claim any interest in, contest the use of or otherwise take any action or inaction which could reasonably be expected to adversely affect the validity of any of the other Party's Marks (including any act or assistance to any act, which may infringe or lead to the infringement of any such Marks). Except as otherwise provided herein, the Parties shall not have the right to use any variation of the Marks of the other Party, or design any logo consisting of the Marks of the other Party, without the other Party's prior written approval, and upon such approval, such variations or logos shall become Marks hereunder governed by the terms hereof. Neither Party shall conjoin or use any of the Marks of the other Party with any other logo, word, symbol or design without the other Party's prior written approval, and neither Party shall use the Marks of the other Party in a manner that will genericize, dilute, tarnish, or otherwise damage the Marks or the goodwill associated therewith.

D. <u>Mark Guidelines</u>. In its use of the Marks of the granting Party, each Party will comply with any trademark usage guidelines of the granting Party that the granting Party may communicate in writing to the other Party from time to time.

i. With regard to the MLB Marks, Jewel Event Marks and Club Marks, such guidelines shall be the then-current MLB Style Guide, updated on a yearly basis, which will be provided by MLBAM to Licensee.

ii. With regard to MLBAM's use of Licensee Marks, Licensee shall indicate the appropriate trademark symbol (either "™" or "®") and a legend specifying that such Licensee Marks are trademarks of Licensee and will be in accordance with Licensee's then-current trademark usage policies as provided in writing from time-to-time.

## IX. <u>ASSIGNMENT</u>.   Except in connection with a Change in Control of a Party, neither Party may assign this Agreement without the prior written consent of the other Party, such consent not to be unreasonably withheld, conditioned or delayed; provided, however, that MLBAM may assign this Agreement upon a Change in Control or to any other MLB Entity.

46

115357020 v11

MLB-Olson-00000496



## XI.   END USER PI.

A.   Approved Fantasy Game Terms of Use and Privacy Policies; Ownership of End User PI.   End User PI shall remain the exclusive property of Licensee and MLBAM shall have no rights thereto. For purposes of clarity, the foregoing restriction shall not apply to any end user information acquired by MLBAM as a result of MLBAM's, any other MLB Party's or any Club's operations irrespective of whether such information is duplicative of End User PI.

B.   End User PI Security.   Licensee represents and warrants that it shall at all times: maintain physical, technical and administrative security measures, including recovery plans, that comply with Applicable Law, that are reasonably designed to ensure the integrity, security and confidentiality of End User PI, and that are designed to protect End User PI from unlawful, unwarranted, accidental, or unauthorized access, disclosure, modification, or destruction.

## XII.   DISPUTE RESOLUTION.

A.   Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled as follows:

   i.   The Party with a reasonable basis for dispute ("**Aggrieved Party**") shall provide written notice to the other Party ("**Other Party**") outlining the basis and details of the dispute, with specific reference to the applicable Section(s) of this Agreement ("**Dispute Notice**").

   ii.   Senior executives of both Parties must use best efforts to meet (whether by phone or in-person) within seven (7) days of the Other Party's receipt of the Dispute Notice ("**Escalation Period**") with a view to resolving, to the mutual satisfaction of both Parties, the matter(s) that is/are the subject of the Dispute Notice.

47

115357020 v11

HIGHLY CONFIDENTIAL

iii. If, at the conclusion of the Escalation Period, the relevant senior executives of each Party are unable to mutually agree on such resolution, then the Aggrieved Party shall refer the dispute to, and it shall be settled by arbitration administered by, the American Arbitration Association (the "**AAA**") in accordance with its Commercial Arbitration Rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The place of arbitration shall be New York County, New York state. Except as may be required by law, neither Party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both Parties. The arbitration shall be conducted by one (1) arbitrator in accordance with the AAA Rules for Expedited Procedures, which arbitrator shall be selected in accordance with the AAA Rules for Expedited Procedures, and which arbitrator shall have had at least twenty years' experience in general commercial transactions and contract disputes. In connection with any arbitration proceeding: (a) no arbitrator shall have been employed by either Party hereto; (b) the arbitrator shall be neutral and independent of the Parties to this Agreement; (c) no arbitrator shall be then-currently or previously affiliated with any Party's auditors (or attorneys); and (d) no arbitrator shall have a conflict of interest with (including, without limitation, any bias towards or against) either Party hereto. The award of the arbitrator shall be accompanied by a reasoned opinion.

iv. Either Party also may, without waiving any remedy under this Agreement, seek from any court of competent jurisdiction located in New York County, New York state, any interim or provisional relief that is necessary to protect the rights or property of that Party, pending the establishment of the arbitral tribunal. Each of the Parties consents to the jurisdiction and venue of any such court and waives any argument that any such court does not have jurisdiction over such Party or such dispute or that venue in any such forum is not appropriate or convenient.

B. In addition, in the event any of the following events occur during the Term:

i. Licensee fails to seek MLBAM's approval as required under Section II of **Exhibit C**, and MLBAM provides Licensee a Dispute Notice regarding MLBAM's objection to such change to the applicable Rules and Requirements,

ii. MLBAM provides Licensee a Dispute Notice regarding Licensee's breach of its covenant to comply with Applicable Law with respect to Licensee's Game Operations or its obligations under this Agreement under Section XIII.B (Compliance with Applicable Law) of this **Exhibit D**,

iii. MLBAM provides Licensee a Dispute Notice after Licensee fails to remedy within twenty-four (24) hours any MLBAM objection to Prohibited Content as required pursuant to Section VII.A (Prohibited Content) of this **Exhibit D**, or

iv. MLBAM provides Licensee a Dispute Notice pertaining to the existence of a Compliance Event,

Then, upon MLBAM's written request, Licensee shall immediately suspend its use of the Licensed Properties, and MLBAM, each MLB Party and each Participating Club shall have the right to suspend all marketing and promotion hereunder, until the matter has been resolved pursuant to the process set forth in Section XII.A above.

C. If any MLB Entity other than MLBAM takes any action (or fails to act) in a manner that would constitute a breach of this Agreement, such act and/or omission shall be deemed a breach of this Agreement by MLBAM. Notwithstanding any term to the contrary in this Agreement, Licensee covenants not to sue or take any other action against any MLB Entity other than MLBAM regarding any dispute arising out of or relating to this Agreement. In such action, discovery shall be limited to documents directly relevant to one or more of the issues. In no event shall Licensee be entitled to, nor shall Licensee seek, discovery (including, but not limited to, information requests/subpoenas/depositions) from the Office of the Commissioner of Baseball or its Bureaus, Committees, Subcommittees and Councils, or call

HIGHLY CONFIDENTIAL                                                                 MLB-Olson-00000498

as a witness, the Commissioner of Baseball or the owners of any Club, regarding any dispute arising out of or relating to this Agreement.

## XIII.  ADDITIONAL PROVISIONS.

A.  Notices. Any notices required or permitted to be given hereunder by either Party to the other shall be given in writing (i) by personal delivery; (ii) by a nationally recognized overnight delivery company; or (iii) by electronic or facsimile transmission, including PDF (with verification or confirmation of receipt or delivery); in each case, addressed to the Parties as follows (or to such other addresses as the Parties may request in writing by notice given pursuant to this Section):

| TO MLBAM: | And | TO LICENSEE: |
|---|---|---|
| MLB Advanced Media, L.P. | | DraftKings, Inc. |
| 75 Ninth Avenue | | 125 Summer Street |
| New York, New York 10011 | | Suite 510 |
| Attention: General Counsel | | Boston, Massachusetts 02110 |
| | | Attention: Chief Executive Officer |

Notices shall be deemed received on the earliest of personal delivery, or twenty-four (24) hours following deposit with an overnight delivery company.



C.  Survival. Sections IX.B (Equity), ███████████████████████████ XI (Fantasy Game Ownership) and XII (Other) of the body of this Agreement and Sections II (Payment Terms), IV (Confidential Information), V.A (Representations and Warranties of both Parties), V.E (Indemnification of MLBAM), V.F (Indemnification of Licensee), V.G (Indemnification Procedures), V.H (Reasonable Assistance), V.I (Limitation on Liability), VI.D (Licensee's Right of Refund), VI.E (Effect of Termination), VI.F (No Competition),VII.F (Non-Solicitation), VIII (Proprietary Rights; Mark Guidelines), X (Insurance), XII (Dispute Resolution) and XIII (Additional Provisions) of this **Exhibit D** (Standard Terms and Conditions) shall survive any termination, cancelation, or expiration of this Agreement. All defined terms shall survive for purposes of the interpretation of any of the foregoing provisions which survive.

D.  Governing Law.  The validity, construction and enforceability of this Agreement shall be governed by the laws of the State of New York.

E.  No Implied Waiver.  No failure or delay on the part of the Parties hereto to exercise any right, power, or privilege hereunder or under any instrument executed pursuant hereto shall operate as a waiver; nor shall any single or partial exercise or any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right, power, or privilege.  This Agreement shall not be modified or amended, and no provision of this Agreement may be waived, except in a writing executed by each of the Parties.  All rights and remedies granted herein shall be in addition to other rights and remedies to which the Parties may be entitled at law or in equity.

F.  Interpretation.  The Section headings contained herein are for convenience of reference and are not intended to define or limit the scope of any provision of this Agreement.  Unless otherwise noted, as used in this Agreement, the words "include" and "including" and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "but not limited to" or "without

49

HIGHLY CONFIDENTIAL

limitation." This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and shall become effective and binding upon the Parties as of the Effective Date at such time as all the signatories hereto have signed a counterpart of this Agreement. The determination that any provision of this Agreement is invalid or unenforceable shall not invalidate this Agreement, and the remainder of this Agreement shall be valid and enforceable to the fullest extent permitted by law. This Agreement, including **Exhibits A through E**, and all schedules attached thereto, constitutes the full and complete understanding of the Parties with respect to the subject matter hereof and replaces and supersedes all prior agreements, including the Original Agreement, and all other understandings and proposals by and between the Parties, whether written or oral.

G.  No Agency. Notwithstanding any term to the contrary in this Agreement, neither Party will make any claims, representations, or warranties on behalf of the other Party, and neither Party is authorized to do so by this Agreement. The relationship between the Parties will be that of independent contractors. Nothing contained herein is intended or will be construed to create or imply a partnership, joint venture, principal, or agent relationship or other joint relationship, and neither Party will have the right, power, or authority to bind or create any obligation, express or implied, on behalf of the other Party. Neither Party shall be liable, except as otherwise expressly provided in this Agreement, for any expenses, liabilities or other obligations incurred by the other Party.

H.  Exhibits. The following exhibits and schedules are attached hereto and incorporated herein:

- Exhibit A: MLB Party and Club Licenses, Exclusivities and Official Designations

- Exhibit B: MLB Party and Participating Club Marketing Commitments and Sponsorship Program

   - *Schedule 1 to Exhibit B: Digital and Television Integration Timing and Frequency Plan*

   - *Schedule 2 to Exhibit B:  Terrestrial Media Placement Plan*

   - *Schedule 3 to Exhibit B: Jewel Event Marketing Commitments & MLB Promotions*

- Exhibit C:  Approved Fantasy Games

- Exhibit C-1: Licensee Website's Terms of Use

- Exhibit C-2:  Licensee Website's Privacy Policy

- Exhibit C-3:  Licensee's 2015 MLB Regular Season Daily Salary Cap Style Game Rules and Eligibility Requirements

- Exhibit D:  Standard Terms and Conditions

- Exhibit E: Competitive Brands

115357020 v11

HIGHLY CONFIDENTIAL              MLB-Olson-00000500

**Exhibit E**



115357020 v11

HIGHLY CONFIDENTIAL

MLB-Olson-00000501

**THIRD AMENDMENT TO**
**AMENDED AND RESTATED GAME LICENSE**
**AND MARKETING RIGHTS AGREEMENT**

This Third Amendment to the Amended and Restated Game License and Marketing Rights Agreement (this "**Amendment**"), shall be effective as of April 13, 2017 (the "**Amendment Effective Date**") through March 31, 2018 (such time period, the "**2017 Amendment Term**"), and is made and entered into by and between MLB Advanced Media, L.P. ("**MLBAM**"), a Delaware limited partnership, with its principal place of business at 75 Ninth Avenue, New York, NY 10011, and DraftKings, Inc. ("**Licensee**"), a Delaware corporation, with its principal place of business located at 125 Summer Street, Suite 510, Boston, MA 02110, and shall modify the Amended and Restated Game License and Marketing Rights Agreement between the Parties, effective as of March 31, 2015, as amended as of March 15, 2016, and as of June 23, 2016, (the "**Agreement**"). Capitalized terms used herein without definition shall be given the meanings ascribed to such terms in the Agreement.

The Parties hereby agree to amend the Agreement as follows:

1.

2.

3.        shall be excluded from the definition of "**Competitive Brand**".

4.    The remaining balance of the Year 2 License Fee, equal to        payable pursuant to Section IX.A(ii) of the Agreement shall be paid by Licensee to MLBAM upon the dual execution of this Amendment.

5.    Reference to "Section II (MLBN)" in the first sentence of Section III.B. shall hereby be deleted in its entirety.

6.    Section IX.A(iii) of the Agreement shall hereby be deleted in its entirety and replaced with the following:

    iii.  Year 3 License Fee.        (the "**Year 3 License Fee**"), in the following installments:

        a.        on April 30, 2017;
        b.        on Aug 1, 2017;

7.    A new Section IX.B(ii) shall be added after Section IX.B(i) and shall read as follows:

    ii.  Additional Equity Grant. Licensee shall issue to MLBAM on the date of the Third Amendment an additional        in equity, pursuant to the terms of that certain Series E-1 Preferred Stock Purchase Agreement, dated as of March 1, 2017, as amended from time to time, including such amendment (all other necessary ancillary agreements related thereto) entered into by the Parties on the date of the Third Amendment. For purposes of this Agreement, "Third Amendment" means that certain Third Amendment to this Agreement, with an effective date of April 13, 2017, by and between MLB Advanced Media, L.P., a Delaware limited partnership, with its principal place of business at 75

MLB-Olson-00000502

Ninth Avenue, New York, NY 10011, and DraftKings, Inc., a Delaware corporation, with its principal place of business located at 125 Summer Street, Suite 510, Boston, MA 02110

8.

9. For the 2017 Amendment Term, subsection (iii) of Section II.C. of Exhibit A shall hereby be deleted in its entirety and replaced with the following:

> (iii) grant any official designation as an "official mini-fantasy game" or an "official daily fantasy game" or confusingly similar designation (e.g., relating to any fantasy game in the Fantasy Games Category) to any third party

10. For the 2017 Amendment Term, Section II.D. of Exhibit A shall not apply and replaced with the following for the 2017 Amendment Term:

> D. Designations. The term "**MLB Designation(s)**" shall mean (i) "An Official Partner of Major League Baseball;" (ii) in and relating to Approved Fantasy Games branding: "An Official Daily Fantasy Game of Major League Baseball;" and (iii) designations of similar import reasonably requested by Licensee and approved by Licensor (such approval not to be unreasonably withheld)

11. Section III.D. of Exhibit A shall not apply for the 2017 Amendment Term.

12. Subsection (ii) of Section V.B. of Exhibit A shall not apply for the 2017 Amendment Term.

13. Section II of Exhibit B shall not apply for the 2017 Amendment Term.

14. Section V.B. of Exhibit B shall not apply for the 2017 Amendment Term.

15. Section V.E. of Exhibit B shall not apply for the 2017 Amendment Term.

16. Schedule 1 to Exhibit B of the Agreement shall hereby be deleted in its entirety and replaced with Schedule 1 to be mutually agreed upon by the Parties and attached hereto no later than fifteen (15) days following the dual execution of this Amendment, such agreement to not be unreasonably withheld.

17. Schedule 2 to Exhibit B of the Agreement shall not apply for the 2017 Amendment Term.

18. Schedule 3 to Exhibit B of the Agreement shall hereby be deleted in its entirety and replaced with Schedule 3 to be mutually agreed upon by the Parties and attached hereto no later than fifteen (15) days following the dual execution of this Amendment, such agreement to not be unreasonably withheld.

19. Prior to December 31, 2017, MLBAM, in its sole discretion, shall elect to either (i) enter into an amendment to the Agreement that, among other terms to be mutually agreed upon by the parties, (a) extends Licensee's                    through the remainder of the term of the Agreement (which such Licensee
any affiliate of either, chosen by MLBAM in its sole discretion) and (b) reduces each of the Year 4 Licensee Fee and Year 5 Licensee Fee           of the applicable Licensee Fee; or (ii) allow this Amendment to expire at the end of the 2017 Amendment Term per the terms of this Amendment.    For

2

purposes of clarity, in the event MLBAM elects clause (ii) above, the terms of the Agreement shall continue to govern and this Amendment shall be null and void at the conclusion of the 2017 Amendment Term.

To the extent any terms herein conflict with the Agreement, the terms herein shall control.   Except as expressly set forth herein, the Parties agree that the Agreement shall not be otherwise modified or amended. Upon complete execution, the terms set forth herein shall be incorporated into the Agreement as though originally set forth therein for the duration of the 2017 Amendment Term and all references to the Agreement during the 2017 Amendment Term shall be understood to include this Amendment.

3

MLB-Olson-00000504

**DraftKings, Inc.:**

**MLB ADVANCED MEDIA, L.P.,**
**By its General Partner,**
**MLB Advanced Media, Inc.:**

DocuSigned by:

4C75EC34D656430...

Lana Ritaro Misch

SVP, General Counsel

4/13/2017 | 5:16:42 PM EDT

MLB-Olson-00000505

ACKNOWLEDGED AND AGREED TO BY:

**DraftKings, Inc.:**

**MLB ADVANCED MEDIA, L.P.,**
**By its General Partner,**
**MLB Advanced Media, Inc.:**

By: _Janet Holian_
AC18C5408E884B0

By: _____

Name: ___Janet Holian_____

Name: _____

Title: ___Chief Marketing Officer___

Title: _____

Date: ___4/13/2017_____

Date: _____

4

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** (this "*Agreement*") is made as of May 31, 2019 (the "*Effective Date*") by and among MLB Advanced Media, L.P. and Saugatuck River Ventures, LLC (each, a "*Seller*" and collectively, the "*Sellers*"), each of the entities and individuals set forth on the Schedule of Purchasers attached hereto as Exhibit A (each, a "*Purchaser*" and collectively, the "*Purchasers*") and, for purposes of Sections 1.02(a)(v), 4.03, 4.05, 5.01, 5.03 and 5.04 only, DraftKings Inc., a Delaware corporation (the "*Company*").

### RECITALS

**WHEREAS**, MLB Advanced Media, L.P. owns (i)          shares of common stock, par value          per share, of the Company (the "*Common Stock*"), and (ii)          shares of Series E-1 Preferred Stock, par value          per share, of the Company (the "*Series E-1 Preferred*") (such shares, the "*MLB Shares*");

**WHEREAS**, Saugatuck River Ventures, LLC holds a warrant for the purchase of up to          shares of Common Stock (the "*Warrant*") for an aggregate exercise price of          (the "*Exercise Price*") and desires to exercise all such shares (such exercise, the "*Warrant Exercise*") immediately prior to the Closing (such exercised shares, the "*SRV Shares*" and together with the MLB Shares, the "*Shares*").

**WHEREAS**, immediately following the Warrant Exercise, Sellers desire to sell the Shares to Purchasers, and Purchasers desire to purchase the Shares from Sellers, upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENT

In consideration of the respective representations, warranties, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

### The Stock Purchase

SECTION 1.01.The Stock Purchase.

SECTION 1.02.Closing; Delivery. The consummation of the transaction contemplated hereby shall occur on the Effective Date, or at such other time as the parties may mutually agree (the "*Closing*").

(a) On or prior to the Closing:

(i) Each Purchaser will deliver (1) to Sellers or their designees, by wire transfer to an account designated by Sellers, the amount(s) set forth opposite such Purchaser's name on Exhibit B, such that Sellers shall receive an aggregate amount equal to the Purchase Price less the Exercise Price (the "*Sellers Purchase Price*"), and (2) to the Company, by wire transfer to an account designated by the

203026446 v4

Company, the amount set forth opposite such Purchaser's name on Exhibit B, such that the Company shall receive an aggregate amount equal to the Exercise Price (the "***Company Purchase Price***").

(ii) Each Purchaser will deliver to the Company (1) an executed Adoption Agreement to the Voting Agreement (as defined below), in the form attached hereto as Exhibit C (the "***Adoption Agreement***"), and (2) an executed joinder agreement to the Company Agreements (defined below), in the form attached hereto as Exhibit D (the "***Joinder Agreement***");

(iii) Immediately prior to the Closing, Saugatuck River Ventures, LLC will deliver to the Company an exercise notice for the Warrant duly endorsed for the SRV Shares to effectuate the Warrant Exercise;

(iv) Each Seller will deliver to Purchasers a stock power duly endorsed for the total number of Shares to be sold to Purchasers hereunder in proper form for the transfer of the Shares to Purchasers hereunder, in the form attached as Exhibit E;

(v) Each Seller hereby irrevocably instructs the Company to, and the Company shall, upon (1) the written confirmation by such Seller or its designee of receipt of the Sellers Purchase Price (which may be by email to the Company), (2) confirmation by the Company of the Warrant Exercise and receipt of the Company Purchase Price, (3) receipt of the fully executed Agreement, Adoption Agreements, Joinder Agreements and stock powers by the Company and (4) compliance with Section 1.02(b) below: (A) cancel any stock certificates issued to Sellers representing the Shares and (B) issue to Purchasers stock certificates evidencing the Shares in Purchasers' names, in accordance with Exhibit B. The Company hereby acknowledges that the wire transfer made pursuant to Section 1.02(a)(i)(2) shall be deemed to have occurred on behalf of Saugatuck River Ventures, LLC concurrently with the Warrant Exercise; and

(vi) Each Seller will deliver to Purchasers a statement in accordance with the requirements of Treasury Regulation Section 1.1445-2(b)(2) that it is not a "foreign person" as defined in Section 1445(f)(3) of the Code.

(b) Prior to the Closing, each Seller will: (A) provide the notice specified in Section 2.12(c) of the Investor Rights Agreement (defined below) to the Company (with a copy to Purchasers); (B) notify the Company of the contemplated sale of the Shares in accordance with Section 2.12(c) of the Investor Rights Agreement; (C) deliver to the Company the stock certificates representing the Shares, if any, accompanied by one or more duly executed stock powers; and (D) execute and submit to the Company such other transfer documentation as may be reasonably required of the Sellers in connection with the sale of the Shares.

SECTION 1.03. Conditions Precedent to the Obligations of the Purchasers. The obligations of the Purchasers under this Agreement with respect to the Shares to be transferred at the Closing are subject to the fulfillment of each of the following conditions, unless waived by the Purchasers in writing, at or before the Closing:

(a) Representations and Warranties. The representations and warranties of the Sellers contained in this Agreement shall be true and correct as of the Closing.

(b) Performance of Agreements. The Sellers shall have performed and complied with all of their covenants and other obligations contained in this Agreement required to be performed or complied with at or before the Closing.

-2-

203026446 v4

(c) <u>Restrictions on Transfer</u>. The Sellers shall have complied in all respects with Section 2.12(c) of the Investor Rights Agreement and the Company's Bylaws (the "*Bylaws*"), unless otherwise waived in writing by the Company.

## ARTICLE II

### Representations and Warranties of Sellers

Each Seller hereby represents and warrants, severally and not jointly, to Purchasers and the Company as of the date hereof and as of the date of Closing as follows:

SECTION 2.01.<u>Authority; Noncontravention</u>. Seller has the legal capacity to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to comply with the provisions of this Agreement. The execution and delivery by the Seller of this Agreement and the performance by the Seller of its obligations hereunder have been duly authorized by all requisite action on the part of the Seller. This Agreement has been duly executed and delivered by Seller and, assuming the due authorization, execution and delivery by Purchasers, constitutes a valid and binding obligation of Seller enforceable against Seller in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting the enforcement of creditor's rights generally and (ii) general principles of equity. Subject to the consent of the Company as provided herein, the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and compliance by Seller with the provisions of this Agreement do not and will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under any provision of any contract, agreement, instrument, judgment, order or decree of any court or governmental agency to which Seller is a party or any of its properties or assets is subject or any law or regulation applicable to Seller, other than any such conflicts, violations, breaches, defaults, rights, losses, liens or entitlements that individually or in the aggregate could not reasonably be expected to impair in any material respect the ability of Seller to perform its obligations under this Agreement.

SECTION 2.02. <u>Title to Shares</u>. Immediately after the Warrant Exercise and prior to the Closing, Seller is the sole record and beneficial owner of, and holds and has good and valid title to, the Shares to be purchased by Purchasers from Seller hereunder, and the certificates representing the Shares, if any, are free and clear of any liens, pledges, options, voting agreements, trusts, restrictions of any nature (including vesting or repurchase rights of the Company) and any other encumbrances of any kind except as provided in the Certificate of Incorporation, as amended and/or restated (the "*Certificate*"), Bylaws or the Company Agreements (collectively, "*Claims*"). At the date of the Closing, Purchasers will acquire valid marketable title to the Shares, free and clear of any Claims, and will acquire all of Seller's right, title and interest in and to the Shares. Seller is not obligated to transfer the Shares to any other person or entity. Assuming the Purchasers receive no notice of any adverse claims to the Shares, upon consummation of the transfer of the Shares to the Purchasers in accordance with the terms hereof and the delivery of the certificates representing the Shares, each Purchaser shall be a "protected purchaser" within the meaning of Section 8- 303 of the Uniform Commercial Code as in effect in the State of New York.

SECTION 2.03. <u>Brokers; Fees and Expenses</u>. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller. Seller agrees to indemnify and hold Purchasers harmless from and against any claim or liability resulting from any party claiming any such commission or fee, if such claims shall be contrary to the foregoing statement.

-3-

203026446 v4

SECTION 2.04. Investment Decision. Seller has received, has had ample opportunity to review and has reviewed, a copy of this Agreement and such other documents and information as it has deemed appropriate to make its own analysis and decision to enter into this Agreement and to sell the Shares owned by Seller to Purchasers on the basis of such analysis. Seller is a sophisticated individual or entity familiar with transactions similar to those contemplated by this Agreement, has adequate information concerning the business and financial condition of the Company, has such knowledge and experience in business and financial matters, or has consulted with its own financial or legal advisors, to enable Seller to understand and evaluate this Agreement and form an investment decision with respect thereto. Seller understands and acknowledges that (a) neither the Company nor Purchasers (except as set forth in Article III below) makes any representations with respect to the transactions contemplated hereby or the Shares, including, without limitation, with respect to the current or future fair market value of such Shares and (b) none of the Company, Purchasers or their respective affiliates or agents has given Sellers any investment advice, opinion or other information on whether the sale of the Shares owned by Seller is prudent. Seller acknowledges that (i) the Purchasers and their respective affiliates or agents currently may have, and later may come into possession of, non-public information with respect to the Company that is not known to Seller and that may be material to a decision to sell the Shares, including, without limitation, information that Purchasers or their affiliates may have received from the Company on a confidential basis ("*Seller Excluded Information*") and (ii) Seller has determined to sell the Shares notwithstanding its lack of knowledge of the Seller Excluded Information. Seller hereby acknowledges that any future sale of shares of the Company's capital stock could be at a premium or a discount to the Purchase Price, and such sale could occur at any time or not at all. Except as set forth in Article III hereof, Seller hereby acknowledges that it has not relied on any representation or statement of Purchasers or the Company in making its investment decision in selling the Shares.

SECTION 2.05. Consents. Other than the Seller's delivery of the documents set forth in Sections 1.02(a)(iii), (a)(iv) and (b) hereof, the consent of the Company as provided herein and the re-registration of the Shares by the Company to the Purchasers, no approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any governmental authority or any other person or entity is required of the Seller in connection with the due execution and delivery by the Seller of this Agreement and the performance of the Seller's obligations hereunder.

SECTION 2.06. Litigation. There is no action, lawsuit, arbitration, claim or proceeding pending or, to the knowledge of the Seller, threatened, against the Seller that involves any of the transactions described in this Agreement or that could reasonably be expected to impede the consummation of such transactions.

SECTION 2.07. Securities Laws. The Seller has not offered to sell any portion of the Shares or any interest therein in a manner which would require the sale of the Shares to the Purchasers hereunder to be registered under the Securities Act (defined below) or any other applicable securities laws. Seller has not offered to sell the Shares by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Securities Act.

SECTION 2.08. Receipt of Information. The Seller or its affiliate is a stockholder of the Company and, in such capacity, has received, or has access to and has the ability to receive, the information with respect to the Company and the Shares provided by the Company to its stockholders.

203026446 v4

HIGHLY CONFIDENTIAL

MLB-Olson-00000510

ARTICLE III

Representations and Warranties of Purchasers

Each Purchaser represents and warrants, severally and not jointly, to Sellers and the Company as follows:

SECTION 3.01. Authority; Noncontravention. Purchaser has the requisite power and authority to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to comply with the provisions of this Agreement. The execution and delivery by the Purchaser of this Agreement and the performance by the Purchaser of its obligations hereunder have been duly authorized by all requisite action on the part of the Purchaser. This Agreement has been duly executed and delivered by Purchaser, and, assuming the legal capacity, due execution and delivery by Sellers, constitutes a valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting the enforcement of creditors' rights generally, and (ii) general principles of equity. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and compliance by Purchaser with the provisions of this Agreement do not and will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under any provision of any contract, agreement, judgment, instrument, order or decree of any court or governmental agency to which Purchaser is a party or any of its properties or assets is subject or any law or regulation applicable to Purchaser, other than any such conflicts, violations, breaches, defaults, rights, losses, liens or entitlements that individually or in the aggregate could not reasonably be expected to impair in any material respect the ability of Purchaser to perform its obligations under this Agreement.

SECTION 3.02. Brokers; Fees and Expenses. No broker, investment banker, financial advisor or other person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission, or the reimbursement of expenses, in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Purchaser. The Purchaser agrees to indemnify and hold the Sellers harmless from and against any claim or liability resulting from any party claiming any such commission or fee, if such claims shall be contrary to the foregoing statement.

SECTION 3.03. Investment Decision. Purchaser has received, has had ample opportunity to review and has reviewed, a copy of this Agreement and such other documents and information as it has deemed appropriate to make its own analysis and decision to enter into this Agreement and to purchase the Shares being purchased by Purchaser on the basis of such analysis. Purchaser is a sophisticated individual or entity familiar with transactions similar to those contemplated by this Agreement, has adequate information concerning the business and financial condition of the Company, has such knowledge and experience in business and financial matters, and/or has consulted with its own financial or legal advisors, to enable it to understand and evaluate this Agreement and form an investment decision with respect thereto. Purchaser understands and acknowledges that (a) neither the Company nor Sellers (except as set forth in Article II above) make any representations with respect to the transactions contemplated hereby or the Shares, including, without limitation, with respect to the current or future fair market value of such Shares and (b) none of the Company, Sellers or their respective affiliates or agents has given Purchaser any investment advice, opinion or other information on whether the purchase of the Shares is prudent. Purchaser acknowledges that (i) the Sellers and their respective affiliates or agents currently may have, and later may come into possession of, non-public information with respect to the Company that is not known to Purchaser and that may be material to a decision to purchase the Shares, including, without limitation, information that Sellers or their affiliates may have received from the Company on a confidential basis ("***Purchaser Excluded Information***") and (ii) Purchaser has determined to purchase the Shares notwithstanding its lack

-5-

HIGHLY CONFIDENTIAL                                                    MLB-Olson-00000511