# Exhibit B-6
# [REDACTED]

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED**, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
|------|-------------------------------------------|
| Redacted | |

Dated: May 31, 2019

### SAUGATUCK RIVER VENTURES, LLC

By _____
DocuSigned by:
Edward Weber, Jr.
DA4BA79290FE49E

Name ___Edward Weber, Jr._____

Title ___Vice President_____

MLB-Olson-00000552

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED**, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
|------|-------------------------------------------|
| Redacted | |

Dated: May 31, 2019

**SAUGATUCK RIVER VENTURES, LLC**

By  _Edward Weber, Jr._
—DA1BA73290FE49E...

Name  Edward Weber, Jr.

Title  Vice President

MLB-Olson-00000553

### ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED**, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
|------|-------------------------------------------|
| Redacted | |

Dated: May 31, 2019

### SAUGATUCK RIVER VENTURES, LLC

By _____
Edward Weber, Jr.

Name ___Edward Weber, Jr.___

Title ___Vice President___

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
|------|-------------------------------------------|
| Redacted | |

Dated: May 31, 2019

SAUGATUCK RIVER VENTURES, LLC

By _____
   *Edward Weber, Jr.*
   DA4BA73296FE49E...

Name    Edward Weber, Jr.

Title   Vice President

HIGHLY CONFIDENTIAL

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED**, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
| --- | --- |
| Redacted | |

Dated: May 31, 2019

**SAUGATUCK RIVER VENTURES, LLC**

By _____
    *Edward Weber, Jr.*
    BA4DA73293FE45E

Name _____
    Edward Weber, Jr.

Title _____
    Vice President

MLB-Olson-00000556

## ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED**, Saugatuck River Ventures, LLC ("*Assignor*"), hereby sells, assigns and transfers unto the following entity the shares of Common Stock of DraftKings Inc., a Delaware corporation (the "*Company*"), set forth below, standing in Assignor's name on the books of the Company and hereby irrevocably constitutes and appoints Cooley LLP attorney-in-fact to transfer said stock on the books of the Company, with the full power of substitution in the premises.

| Name | Number of Common Stock Shares Transferred |
|---|---|
| Redacted | |

Dated: May 31, 2019

**SAUGATUCK RIVER VENTURES, LLC**

**By** _Edward Weber, Jr._
BA4BA73290FE49E...

**Name** Edward Weber, Jr.

**Title** Vice President

HIGHLY CONFIDENTIAL

**This Warrant has not been registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any applicable state securities laws, and may not be sold or transferred unless such sale or transfer is in accordance with the registration requirements of the Securities Act and applicable laws, or some other exemption from the registration requirements of the Securities Act and applicable laws is available with respect thereto.**

## WARRANT FOR THE PURCHASE OF COMMON STOCK

**Warrant No. WCS-1**                              **Number of Shares:** ▮▮▮▮▮

### DRAFTKINGS, INC.

#### Void on or after November 1, 2019

1.     Issuance; Term of Warrant. This Warrant is issued to **Saugatuck River Ventures, LLC.,** a Delaware limited liability company ("*MLBAM*" or "*Saugatuck*" or the "*Holder*") by **DraftKings, Inc.,** a Delaware corporation (the "*Company*"). This warrant expires on October 31, 2019 (the "*Expiration Date*"), unless exercised by the Holder, in writing and following payment of the Exercise Price for cash, wire transfer or certified check, at any time prior to midnight, Eastern Daylight Time, on the day preceding Expiration Date. This Warrant is being issued pursuant to a certain Game License and Marketing Rights Agreement (the "*MLBAM License Agreement*") among the Company and MLB Advanced Media L.P. ("*MLBAM*"). Terms used herein but not defined herein shall have the meanings set forth in the MLBAM License Agreement.

2.     Exercise Price; Number of Shares; Vesting. Subject to the terms and conditions hereinafter set forth, the Holder, commencing on the date hereof, is entitled upon surrender of this Warrant with the subscription form annexed hereto, duly executed, at the principal office of the Company, or such other office as the Company shall notify the Holder of in writing, to purchase from the Company at an exercise price per share ▮▮▮▮ (the "*Exercise Price*") for ▮▮▮▮ shares of Common Stock of the Company (the "*Warrant Shares*" or "*Securities*").

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3.     Payment of Exercise Price. The Exercise Price may be paid (i) in cash or by check, (ii) by the surrender by the Holder to the Company of any promissory notes or other obligations issued by the Company to the Holder, with all such notes and obligations so surrendered being credited against the

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

D^K 4-1-13

HIGHLY CONFIDENTIAL

Exercise Price in an amount equal to the principal amount thereof plus accrued interest (or the fair value of the obligations) to the date of surrender, (iii) by any combination of the foregoing, or (iv) by the cashless exercise feature set forth below in Section 4.

4.



Where:

$X =$    the number of shares of Securities to be issued to the Holder pursuant to this Section;

$Y =$    the number of shares of Securities covered by this Warrant in respect of which the net issue election is made pursuant to this Section;

$A =$    the Fair Market Value of one share of Securities for which this Warrant is exercisable, as determined in good faith by the Board of Directors of the Company (the "*Board*"), as at the time the net issue election is made pursuant to this Section; and

$B =$    the Exercise Price in effect under this Warrant at the time the net issue election is made pursuant to this Section.

The Board shall promptly respond in writing to an inquiry by the Holder as to the fair market value of one share of Securities for which this Warrant is exercisable. "*Fair Market Value*" of the Company's Securities on any date means (i) if the Company's Common Stock is traded on a national securities exchange, the average (on that date) of the high and low prices of the Common Stock on the principal national securities exchange on which the Common Stock is traded, if the Common Stock is then traded on a national securities exchange; or (ii) the last reported sale price (on that date) of the Common Stock on the NASDAQ Global Market, if the Common Stock is not then traded on a national securities exchange; or (iii) the average of the closing bid and asked prices last quoted (on that date) by an established quotation service for over-the-counter securities, if the Common Stock is not reported on the NASDAQ Global Market; or (iv) if the Securities are not publicly traded, the fair market value of the Securities as determined by the Board in good faith after taking into consideration all factors which it reasonably deems appropriate, including, without limitation, recent sale and offer prices of the Securities for which this Warrant is then exercisable, in private transactions negotiated at arm's length, recent exercise prices for any options issued by the Company, revenues and operating earnings of the Company for the most recent twelve-month period, projected revenues and operating earnings of the Company for the next twelve-month period, discounted positive cash flow of the Company, the nature and timing of any product releases and product shipments, generation of significant orders, cash flow from operations, consummation of relationships with strategic partners, the book value of the Company's assets as recorded on the most recently prepared balance sheet of the Company, the price/earnings multiples of comparable publicly traded companies (and adjusted for any illiquidity associated with the Company's Common Stock), and appropriate consideration of the senior rights, preferences and privileges of classes of preferred stock outstanding, and other pertinent factors determined by the Board of Directors.

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

DK
9-1-15

HIGHLY CONFIDENTIAL                    MLB-Olson-00000563

- 3 -

5.      Exercise of Warrant.  This Warrant may be exercised in full or in part at any time or from time to time until the earlier of Expiration Date listed above by the Holder hereof by surrender of this Warrant and the subscription form annexed hereto (duly executed) by such Holder, to the Company at its principal office, accompanied by payment of the Exercise Price as set forth herein.  If this Warrant is exercised in part, the Holder shall be entitled to receive a new warrant, which shall be dated as of the date of this Warrant, covering the number of remaining Warrant Shares, as adjusted, in respect of which this Warrant shall not have been exercised.  As soon as practicable after the exercise of this Warrant in full or in part, and in any event within 30 days thereafter, the Company at its expense (including the payment by it of any applicable issue taxes) will cause to be issued in the name of and delivered to the Holder hereof, or as such Holder (upon payment by such Holder of any applicable transfer taxes) may direct, a certificate or certificates for the number of fully paid and nonassessable shares of Common Stock to which such Holder shall be entitled on such exercise, plus, in lieu of any fractional share to which such Holder would otherwise be entitled, cash equal to such fraction multiplied by the then current market value of one full share.

6.      Issuance Date.  The person or persons in whose name or names any certificate representing Warrant Shares is issued hereunder shall be deemed to have become the holder of record of the shares represented thereby as of the close of business on the date this Warrant is exercised with respect to such shares, whether or not the transfer books of the Company shall be closed.

7.      Reserved Shares; Valid Issuance.  The Company covenants that it will at all times from and after the date hereof reserve and keep available such number of its authorized shares of Common Stock free from all preemptive or similar rights therein, as will be sufficient to permit the exercise of this Warrant in full.  The Company further covenants that such shares as may be issued pursuant to such exercise and conversion will, upon issuance, be duly and validly issued, fully paid and nonassessable, and free from all taxes, liens and charges with respect to the issuance thereof.  The Company will at all times reserve and keep available, solely for issuance and delivery on the exercise of the Warrants, all shares of Common Stock from time to time issuable on the exercise of the Warrants.

8.      Subdivision or Combination of Common Stock.  If after the issue date of this Warrant the Company shall subdivide the Common Stock, by split-up or otherwise, or combine the Common Stock, or issue additional shares of Common Stock in payment of a stock dividend on the Common Stock, the number of shares issuable on the exercise of this Warrant shall forthwith be proportionately increased in the case of a subdivision or stock dividend, or proportionately decreased in the case of a combination, and the Exercise Price shall forthwith be proportionately decreased in the case of a subdivision or stock dividend, or proportionately increased in the case of a combination.

9.      Mergers and Reclassifications.  If after the Original Issue Date there shall be any reclassification, capital reorganization or change of the Common Stock (other than as a result of a subdivision, combination or stock dividend provided for in Section 8 hereof), or any consolidation of the Company with, or merger of the Company into, another corporation or other business organization (other than a consolidation or merger in which the Company is the continuing corporation and that does not result in any reclassification or change of the outstanding Common Stock), or any sale or conveyance to another corporation or other business organization of all or substantially all of the assets of the Company, then, as a condition of such reclassification, reorganization, change, consolidation, merger, sale or conveyance, lawful provisions shall be made, and duly executed documents evidencing the same from the Company or its successor shall be delivered to the Holder, so that the Holder shall thereafter have the right to purchase, at a total price not to exceed that payable upon the exercise of this Warrant in full, the kind and amount of shares of stock and other securities and property receivable upon such reclassification, reorganization, change, consolidation, merger, sale or conveyance by a holder of the

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

$\frac{DK}{9.1}.13$

MLB-Olson-00000564

number of shares of Common Stock that might have been purchased by the Holder immediately prior to such transaction (or, if there are no holders of Common Stock at such time, by a holder of the number of shares of Common Stock that might have been acquired by the Holder immediately prior to such transaction upon the exercise of this Warrant in full). In any such case appropriate provisions shall be made with respect to the rights and interest of the Holder to the end that the provisions hereof (including, without limitation, provisions for the adjustment of the Exercise Price and the number of shares issuable hereunder) shall thereafter be applicable in relation to any shares of stock or other securities and property thereafter deliverable upon exercise hereof.

10.     Fractional Shares. In no event shall any fractional share of Common Stock be issued upon any exercise of this Warrant. If, upon exercise of this Warrant as an entirety, the Holder would, except as provided in this Section, be entitled to receive a fractional share of Common Stock, then the Company shall, in its sole discretion, either (i) issue the next higher number of full shares of Common Stock, issuing a full share with respect to such fractional shares or (ii) pay to the Holder, in cash or by check, the cash value of such fractional share, based upon the fair market value of a share of Common Stock as determined in good faith by the Board as of the date of exercise.

11.     Amendment. The terms of this Warrant may be amended, extended, modified or waived only with the written consent of (i) the Company and (ii) MLBAM.

12.     Reservation of Stock; Taxes. The Company will reserve from its authorized and unissued shares of capital stock a sufficient number of shares to provide for the issuance of Warrant Shares upon the exercise of this Warrant. Issuance of this Warrant shall constitute full authority to the Company's officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Warrant Shares issuable upon the exercise of this Warrant. The Company covenants that all shares of Warrant Shares that may be issued upon the exercise of rights represented by this Warrant will, upon exercise, be fully paid and nonassessable and free from all taxes, liens and charges in respect of the issue (other than taxes in respect of any transfer occurring contemporaneously with such issue). The Company shall pay any and all United States federal, state and local taxes and other charges that may be payable in connection with the preparation, issuance and delivery of the certificates representing shares of Warrant Shares issued hereunder. Notwithstanding the foregoing, the Company shall not be responsible for the payment of any taxes on the income of capital gain of the Holder.

13.     Exercise of Warrant. This Warrant may be exercised in whole or in part by the Holder by the surrender of this Warrant, together with the Notice of Exercise in the forms attached hereto as Exhibit A, duly completed and executed at the principal office of the Company, accompanied by payment in full of the Exercise Price in cash, wire transfer or by certified check with respect to the shares of Warrant Shares being purchased. This Warrant shall be deemed to have been exercised immediately prior to the close of business on the date of its surrender for exercise as provided above, and the person entitled to receive the shares of Warrant Shares issuable upon such exercise shall be treated for all purposes as the holder of such shares of record as of the close of business on such date. As promptly as practicable after such date, the Company shall issue and deliver to the person or persons entitled to receive the same a certificate(s) for the number of full shares of Warrant Shares issuable upon such exercise, together with a replacement warrant in the event this Warrant is exercised for less than all of the Warrant Shares.

HIGHLY CONFIDENTIAL

MLB-Olson-00000565

14.    Warrant Register; Transfers, Etc.

a.    Register. The Company will maintain a register containing the names and addresses of the registered holders of the Warrants. The Holder may change its address as shown on the warrant register by written notice to the Company requesting such change. Any notice or written communication required or permitted to be given to the Holder may be given by first class mail, facsimile transmission, overnight courier service, or delivered to the Holder at its address as shown on the warrant register. Whenever the Exercise Price is adjusted as herein provided, the Company shall promptly deliver to the Holder a certificate setting forth the Exercise Price after such adjustment and setting forth a brief statement of the facts requiring such adjustment.

b.    Transfer Restrictions. Subject to compliance with applicable federal and state securities laws, this Warrant may be transferred by the Holder with respect to any or all of the Warrant Shares purchasable hereunder. Upon surrender of this Warrant to the Company, together with the assignment hereof properly endorsed, for transfer of this Warrant as an entirety by the Holder, the Company shall issue a new warrant of the same denomination to the assignee. Upon surrender of this Warrant to the Company, together with the assignment hereof properly endorsed, by the Holder for transfer with respect to a portion of the shares of Common Stock purchasable hereunder, the Company shall issue a new warrant to the assignee, in such denomination as shall be requested by the Holder hereof, and shall issue to such Holder a new warrant covering the number of shares in respect of which this Warrant shall not have been transferred.

c.    Lost or Mutilated Warrant. In case this Warrant shall be mutilated, lost, stolen or destroyed, the Company shall issue a new warrant of like tenor and denomination and deliver the same (i) in exchange and substitution for and upon surrender and cancellation of any mutilated Warrant, or (ii) in lieu of any Warrant lost, stolen or destroyed, upon receipt of evidence reasonably satisfactory to the Company of the loss, theft or destruction of such Warrant (including a reasonably detailed affidavit with respect to the circumstances of any loss, theft or destruction) and of indemnity reasonably satisfactory to the Company.

d.    Replacement Warrant. Subject to compliance with federal and applicable state securities laws, on surrender for exchange of any Warrant, properly endorsed, to the Company, the Company at its expense will issue and deliver to or on the order of the Holder thereof a new Warrant or Warrants of like tenor, in the name of such Holder or as such Holder (on payment by such Holder of any applicable transfer taxes) may direct, calling in the aggregate on the face or faces thereof for the number of shares of Common Stock called for on the face or faces of the Warrant or Warrants so surrendered.

15.    Market Stand Off on Public Offering. The Holder agrees that it will not, without the prior written consent of the managing underwriter and the Company, (a) during the period commencing on the date of the final prospectus relating to the Company's first underwritten public offering of its Common Stock (an "*IPO*") under the Securities Act, and ending on the date specified by the Company and the managing underwriter (such period not to exceed 180 days, which 180-day period may be extended upon the request of the managing underwriter and the Company, to the extent (and only to the extent) required by FINRA Rule 2711(f)(4) or NYSE Member Rule 472(f)(4), or any successor or similar rule or regulation, or any similar or successor provision or any applicable laws, for an additional period not exceeding 30 days if the Company issues or proposes to issue an earnings or other public release within 30 days of the expiration of the 180 day lock-up period): (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any Securities or other securities of the Company or any corporate successor to the Company held immediately prior to the

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

effectiveness of the registration statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any Securities or other securities of the Company or any corporate successor of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of the Securities or other securities, in cash or otherwise. The foregoing provisions of this Section 16 shall apply only to the Company's IPO and shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Holder if all officers and directors of the Company enter into similar agreements, unless the Holder waives the requirement with respect to any such officer or director. The underwriters in connection with the Company's IPO are intended third-party beneficiaries of this Section and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in the Company's IPO that are consistent with this Section or that are necessary to give further effect thereto. Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply to all shareholders subject to such agreements (pro rata based on the number of shares subject to such agreements). In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Securities of the Holder (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period. In connection with an IPO, the Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in connection with such registration that are consistent with this Section or that are necessary to give further effect thereto.

16.    Notices of Record Date. In the event of any taking by the Company of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend (other than a cash dividend) or other distribution, any right to subscribe for, purchase or otherwise acquire any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any proposed merger or consolidation of the Company with or into any other corporation, or any proposed sale, lease or conveyance of all or substantially all of the assets of the Company or any proposed liquidation, dissolution or winding up of the Company, the Company shall mail to the holder of the Warrant, at least ten (10) days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend, distribution or right, and the amount and character of such dividend, distribution or right.

17.    Miscellaneous. This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought. This Warrant shall be construed and enforced in accordance with and governed by the laws of the Commonwealth of Massachusetts. The headings in this Warrant are for purposes of reference only, and shall not limit or otherwise affect any of the terms hereof. This Warrant shall be binding upon the Company's successors and assigns and shall inure to the benefit of the Holder's successors, legal representatives and permitted assigns. This Warrant is being executed as an instrument under seal. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision. The Holder of this Warrant shall have no rights as a stockholder with respect to shares subject to this Warrant until such Holder has properly exercised this Warrant for such shares and paid the consideration required hereunder. If the last or appointed day for the taking of any action required or the expiration of any right granted herein shall be a Saturday or Sunday or a legal holiday in the Commonwealth of Massachusetts, then such action may be taken or right may be exercised on the next succeeding day which is not a Saturday or Sunday or such a legal holiday.

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

HIGHLY CONFIDENTIAL

MLB-Olson-00000567

DraftKings, Inc.

By: _____

Name:  Jason Robins
Title:  President & Chief Executive Officer

**Dated:  September 1, 2013**

HIGHLY CONFIDENTIAL

MLB-Olson-00000568

## Subscription – Exercise of Warrant Election

To:_____       Date:_____

    The undersigned hereby subscribes for _____ shares of _____ covered by this Warrant. The certificate(s) for such shares shall be issued in the name of the undersigned or as otherwise indicated below:

_____
Signature

_____
Name for Registration

_____
Mailing Address

## Assignment of Warrant

    For value received _____ hereby sells, assigns and transfers unto

_____
[Please print or typewrite name and address of Assignee]

_____

the within Warrant, and does hereby irrevocably constitute and appoint _____ its attorney to transfer the within Warrant on the books of the within named Company with full power of substitution on the premises.

Dated:_____       _____

Signed in the presence of: _____

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

**Exhibit A: Vesting of Warrants**

Terms used herein but not defined herein shall have the meanings set forth in the MLBAM License Agreement.

(a)     Vesting:



(b)     Termination of Initial Warrants Upon Certain Events: The Initial Warrants shall vest and become exercisable upon certain events of termination (depending on the Party initiating the termination) or upon a Change of Control of Licensee. In the event of a termination of this Agreement by Licensee on or prior to December 31, 2013, all Initial Warrants shall be forfeited, terminated and canceled. In the event of a termination of this Agreement by Licensee on or prior to December 31, 2013, but Licensee consummates a Change of Control on or prior to April 1, 2014, all of the Initial Warrants shall become vested and exercisable. In the event of a termination of this Agreement by MLBAM on or prior to October 31, 2014, all Initial Warrants shall be forfeited, terminated and canceled. In the event of a termination of this Agreement by MLBAM after October 31, 2014, the vested portion of the Initial Warrants up to the date of termination shall become exercisable and the remaining unvested portion of the Initial Warrants shall be forfeited, terminated and canceled. In the event of a termination of this Agreement by Licensee on or prior to December 31, 2014, all unvested Initial Warrants shall be forfeited, terminated and canceled. Notwithstanding the foregoing, in the event of a termination of this Agreement by Licensee on or prior to December 31, 2014, but Licensee consummates a Change of Control on or prior to April 1, 2015, all of the Initial Warrants shall become vested and exercisable; and if Licensee consummates a Change of Control after April 1, 2015, the vested portion of the Initial Warrants up to the date of termination shall become exercisable and the remaining unvested portion of the Initial Warrants shall be forfeited, terminated and canceled. In the event Licensee consummates a Change in Control at any time during the Term of this Agreement, the unvested portion of the Initial Warrants shall become vested and exercisable.

DraftKings, Inc.
MLBAM Warrant
126212 v1/BN

$P_{9,1,13}^{k}$

                                        MLB-Olson-00000570



CONFIDENTIAL

## AMENDMENT TO
## AMENDED AND RESTATED GAME LICENSE
## AND MARKETING RIGHTS AGREEMENT

This Amendment(this "**Amendment**"), effective as of June 23, 2016 (the "**Amendment Effective Date**") and is made and entered into by and between MLB Advanced Media, L.P. ("**MLBAM**"), a Delaware limited partnership, with its principal place of business at 75 Ninth Avenue, New York, NY 10011, and DraftKings, Inc. ("**Licensee**"), a Delaware corporation, with its principal place of business located at 125 Summer Street, Suite 510, Boston, MA 02110, and shall modify the Amended and Restated Game License and Marketing Rights Agreement between MLBAM and Licensee, effective as of March 31, 2015 (the "**Agreement**"). Each of MLBAM and Licensee hereby agree to amend the Agreement as follows:

1.      Capitalized terms used herein without definition shall be given the meanings ascribed to such terms in the Agreement.

2.      Section IX(C)(iii) of the Agreement shall be amended as follows by adding the following sentence to the end of the current provision: "Notwithstanding the foregoing, for the 2016 MLB season only, Licensee shall pay to MLBAM ▮▮▮▮▮▮▮▮▮▮▮▮ Net Advertising Revenue from any Licensee Ad Sales Against Licensed Properties for which MLBAM refers a third party to Licensee (a "**Referral**") and where such Referral and Licensee have fully executed an agreement for any advertising, sponsorships or any other type of commercial announcement (a "**Licensee Advertising Agreement**")." For purposes of clarity, MLBAM shall be credited with a Referral each time Licensee executes a Licensee Advertising Agreement with (x) any third party with whom MLBAM has a contractual relationship and (y) any third party that MLBAM informs Licensee it has referred to Licensee by providing sufficient documentation upon request from Licensee, unless, in the case of clause (y), Licensee has previously discussed entering into a Licensee Advertising Agreement with such third party prior to such notice from MLBAM.

3.      To the extent any terms herein conflict with the Agreement, the terms herein shall control. Except as expressly set forth herein, each of MLBAM and Licensee agree that the Agreement shall not be otherwise modified or amended. Upon complete execution, the terms set forth herein shall be incorporated into the Agreement as though originally set forth therein and all references to the Agreement shall be understood to include the Amendment.

ACKNOWLEDGED AND AGREED TO BY:

| **DraftKings, Inc.:** | **MLB ADVANCED MEDIA, L.P.,**<br>**By its General Partner,**<br>**MLB Advanced Media, Inc.:** |
|---|---|
| DocuSigned by:<br>*Janet Holian*<br>By: AC1AC5408FB84B0... | DocuSigned by:<br>*[signature]*<br>By: 4C75EC34D666430... |
| Name: Janet Holian | Name: Lara Pitaro Wisch |
| Title: Chief Marketing Officer | Title: SVP, General Counsel |
| Date: 7/8/2016 \| 6:23:41 AM PDT | Date: 7/14/2016 \| 11:04:17 AM EDT |

MLB-Olson-00002460

### AMENDMENT TO
### AMENDED AND RESTATED GAME LICENSE
### AND MARKETING RIGHTS AGREEMENT

This Amendment to the Amended and Restated Game License and Marketing Rights Agreement (the "**Amendment**"), effective as of March 15, 2016 (the "**Amendment Effective Date**"), is made and entered into by and between MLB Advanced Media, L.P. ("**MLBAM**"), a Delaware limited partnership, with its principal place of business at 75 Ninth Avenue, New York, NY 10011, and DraftKings, Inc. ("**Licensee**"), a Delaware corporation, with its principal place of business located at 125 Summer Street, Suite 510, Boston, MA 02110, and shall modify the Amended and Restated Game License and Marketing Rights Agreement between the Parties, effective as of March 31, 2015 (the "**Agreement**"). The Parties hereby agree to amend the Agreement as follows:

1.      Capitalized terms used herein without definition shall be given the meanings ascribed to such terms in the Agreement or that certain Note Purchase Agreement entered into as of December 23, 2015 by and among Licensee and those persons and entities named in Schedule I attached thereto (the "**Note Purchase Agreement**").

2.      The Year 2 License Fee payable pursuant to Section IX.A(ii) of the Agreement shall be payable by Licensee to MLBAM as follows:

      a.      ▮▮▮▮▮ in cash on or before March 15, 2016;

      b.      ▮▮▮▮▮ in cash on or before July 1, 2016; and

      c.      ▮▮▮▮▮ in cash (which is the balance of the Year 2 Licensee Fee required to be paid to MLBAM pursuant to the Agreement) on the Amendment Effective Date, on receipt of which MLBAM shall pay such amount to Licensee in exchange for a convertible promissory note in such amount dated as of the Amendment Effective Date, the form of which is attached hereto as Exhibit A (the "**Convertible Note**"). The Convertible Note shall be issued to MLBAM pursuant to, and MLBAM afforded the same rights and privileges available to all other Investors party to, the Note Purchase Agreement as of the Amendment Effective Date.

3.      In addition, Licensee shall pay to MLBAM an additional cash payment of ▮▮▮▮▮ (the "**Additional Payment**") upon the earlier of (i) the date after the Amendment Effective Date on which Licensee raises new cash in equity financing (not including financing related to the Note Purchase Agreement financing described herein) in excess of ▮▮▮▮▮ in the aggregate (e.g., in the next equity financing or series of financings) (a "**Qualifying Raise**") and (ii) December 31, 2016. Licensee shall (x) provide MLBAM with prompt written notice of any Qualifying Raise that occurs prior to December 31, 2016, but in no event later than thirty (30) days after such Qualifying Raise, and (y) make the Additional Payment upon the date of such notice or December 31, 2016, as applicable.

4.      To the extent any terms herein conflict with the Agreement, the terms herein shall control. Except as expressly set forth herein, the Parties agree that the Agreement shall not be otherwise modified or amended. Upon complete execution, the terms set forth herein shall be incorporated into the Agreement as though originally set forth therein and all references to the Agreement shall be understood to include the Amendment.

1

Execution Version

ACKNOWLEDGED AND AGREED TO BY:

**DraftKings, Inc.:**

By: _____

Name: ___JASON ROBINS___

Title: ___CEO___

Date: ___3/30/16___

**MLB ADVANCED MEDIA, L.P.,**
**By its General Partner,**
**MLB Advanced Media, Inc.:**

DocuSigned by:

By: _____
     4C75EC34D656430

Name: Lara Pitaro Wisch

Title: SVP, Business & Legal Affairs & General Counsel

Date: 3/26/2016 | 12:27:56 PM ET

2

**Major League Baseball**
**DraftKings Licensing Summary**

**Club Payment**
**Breakdown**

| | | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| BOS | 1 | | | | | |
| CHC | 2 | | | | | |
| LAD | 3 | | | | | |
| NYY | 4 | | | | | |
| SF | 5 | | | | | |
| HOU | 6 | | | | | |
| NYM | 7 | | | | | |
| ATL | 8 | | | | | |
| WAS | 9 | | | | | |
| DET | 10 | | | | | |
| PHI | 11 | | | | | |
| STL | 12 | | | | | |
| TEX | 13 | | | | | |
| LAA | 14 | | | | | |
| MIN | 15 | | | | | |
| BAL | 16 | | | | | |
| CIN | 17 | | | | | |
| CWS | 18 | | | | | |
| MIA | 19 | | | | | |
| SD | 20 | | | | | |
| CLE | 21 | | | | | |
| COL | 22 | | | | | |
| KC | 23 | | | | | |
| MIL | 24 | | | | | |
| OAK | 25 | | | | | |
| PIT | 26 | | | | | |
| TB | 27 | | | | | |
| **Total** | | | | | | |

 MLB-Olson-00002728

**Major League Baseball**
**DraftKings Summary**

|  | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|
| Gross Cash Payments | | | | | | |
| Club Payments | | | | | | |
| **Net Cash** | | | | | | |
| **Equity** | | | | | | |
| Net Equity | | | | | | |
| Interest on Promisory Note | | | | | | |
| Gain on Sale of Equity | | | | | | |
| **Total Equity** | | | | | | |
| **Total to MLB** | | | | | | |
| **Total to MLB & Clubs** | | | | | | |



*[a] MLBAM sold the company's equity position in May 2019 for*