UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTOPHER R. OLSON, CHRISTOPHER LOPEZ, WARREN BARBER, CHRISTOPHER CLIFFORD and ERIK LIPTAK,<br><br>Plaintiffs,<br><br>v.<br><br>MAJOR LEAGUE BASEBALL; MLB ADVANCED MEDIA, L.P.; HOUSTON ASTROS, LLC; and BOSTON RED SOX BASEBALL CLUB, LP,<br><br>Defendants. | 20 Civ. 632 (JSR) |

**MLB DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ALTER, AMEND OR VACATE JUDGMENT AND FOR LEAVE TO AMEND**

John L. Hardiman
Benjamin R. Walker
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB Advanced Media LP*

May 15, 2020

# TABLE OF CONTENTS


*Page*

**PRELIMINARY STATEMENT .......... 1**

**BACKGROUND .......... 4**

A. Procedural History .......... 4

B. The Court's Dismissal of the Amended Complaint .......... 5

**ARGUMENT .......... 7**

I. THERE IS NO BASIS TO SET ASIDE THE COURT'S JUDGMENT UNDER RULES 59 OR 60. .......... 7

II. PLAINTIFFS' "NEW EVIDENCE" DOES NOT JUSTIFY REOPENING THE JUDGMENT. .......... 10

A. Plaintiffs Still Cannot Allege Any Actionable Deception. .......... 10

1. The New Allegations in the PAC Do Not Remedy Plaintiffs' Failure to Allege Actionable Misrepresentations About Fantasy Baseball. .......... 11

2. The New Allegations in the PAC Do Not Remedy Plaintiffs' Failure to Allege Actionable Misrepresentations About Major League Baseball. .......... 13

B. MLBAM's Contracts With DraftKings Do Not Salvage Plaintiffs' Claims. .......... 19

C. Plaintiffs' Unjust Enrichment Claim Still Fails. .......... 24

**CONCLUSION .......... 25**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Axar Master Fund, Ltd.* v. *Bedford*,
2020 WL 1456482 (2d Cir. Mar. 23, 2020)....8

*Boxill* v. *Brooklyn College*,
2003 WL 21554498 (E.D.N.Y. July 10, 2003)....9

*Catskill Development, L.L.C.* v. *Park Place Entertainment Corp.*,
547 F.3d 115 (2d Cir. 2008)....12

*Chabner v. United of Omaha Life Ins. Co.*,
225 F.3d 1042 (9th Cir. 2000)....23

*Church & Dwight Co., Inc.* v. *Huey*,
961 S.W.2d 560 (Tex. Ct. App. 1997)....23

*City of Boston* v. *Purdue Pharma, LP, et al.*,
2020 WL 977056 (Mass. Super. Jan. 31, 2020)....23

*Coffey* v. *WCW & Air, Incorporated*,
2018 WL 4154256 (N.D. Fla. Aug. 30, 2018)....22

*Cortec Indus., Inc.* v. *Sum Holding, L.P.*,
949 F.2d 42 (2d Cir. 1991)....18

*Crisp Human Capital, Ltd.* v. *Authoria, Inc.*,
613 F. Supp. 2d 136 (D. Mass. 2009)....23

*U.S. ex rel. Daugherty* v. *Tiversa Holding Corp.*,
342 F. Supp. 3d 418 (S.D.N.Y. 2018)....16

*Doe I* v. *Wal-Mart Stores, Inc.*,
572 F.3d 677 (9th Cir. 2009)....25

*Flores* v. *Bank of Am., N.A.*,
2019 WL 2470923 (D. Colo. June 13, 2019)....25

*Friedman* v. *New York City Dep't of Educ.*,
2009 WL 37828 (S.D.N.Y. Jan. 5, 2009)....7

*Galstaldi* v. *Sunvest Communities USA, Ltd.*,
637 F. Supp. 2d 1045 (S.D. Fla. 2009)....23

*U.S. ex rel. Grubea* v. *Rosicki, Rosicki & Assocs., P.C.*,
319 F. Supp. 3d 747 (S.D.N.Y. 2018)....................7

*Hamm* v. *Mercedes-Benz USA, LLC*,
2019 WL4751911 (N.D. Cal. Sept. 30, 2019)....................23

*J.A.O. Acquisition Corp.* v. *Stavitsky*,
863 N.E.2d 585 (N.Y. 2007)....................20

*Janese* v. *Fay*,
692 F.3d 221 (2d Cir. 2012)....................8

*Johnson* v. *Askin Cap. Mgmt., L.P.*,
202 F.R.D. 112 (S.D.N.Y. 2001)....................9

*Karmilowicz* v. *Hartford Fin. Servs. Grp.*,
2011 WL 2936013 (S.D.N.Y. July 14, 2011)....................18

*Kopperl* v. *Bain*,
2016 WL 310719 (D. Conn. Jan. 26, 2016)....................9

*Lerner* v. *Fleet Bank, N.A.*,
459 F.3d 273 (2d Cir. 2006)....................18

*Linkage Corp.* v. *Trustees of Boston Univ.*,
679 N.E.2d 191 (Mass. 1997)....................23

*Loughridge* v. *Goodyear Tire and Rubber Co.*,
192 F. Supp. 2d 1175 (D. Colo. 2002)....................23

*In re Louisiana Crawfish Producers*,
852 F.3d 456 (5th Cir. 2017)....................9

*Mayer* v. *Belichik*,
605 F.3d 223 (3d Cir. 2010)....................16

*Mirkin* v. *XOOM Energy, LLC*,
931 F.3d 173 (2d Cir. 2019)....................8

*Nat'l Petrochemical Co. of Iran* v. *M/T Stolt Sheaf*,
930 F.2d 240 (2d Cir. 1991)....................8

*Nemaizer* v. *Baker*,
793 F.2d 58 (2d Cir. 1986)....................7

*In re Packaged Seafood Prods. Antitrust Litig.*,
242 F. Supp. 3d 1033 (S.D. Cal. 2017)....................23

*Pettiford* v. *City of Yonkers*,
2020 WL 1989419 (S.D.N.Y. Apr. 27, 2020)....9

*Pilot Corp. of Am.* v. *Fisher-Price Inc.*,
501 F. Supp. 2d 292 (D. Conn. 2007)....21

*In re Platinum-Beechwood Litig.*,
427 F. Supp. 2d 395 (S.D.N.Y. 2019)....18

*PNR, Inc. v. Beacon Property Mgt., Inc.*,
842 So.2d 773 (Fla. 2003)....23

*Prout* v. *Vladeck*,
319 F. Supp. 3d 741 (S.D.N.Y. 2018)....7

*Rodriguez* v. *British Airways PLC*,
2018 WL 501568 (E.D.N.Y. Jan. 19, 2018)....9

*Ryan* v. *Ryan*,
889 F.3d 499 (8th Cir. 2018)....10

*Sejin Precision Indus. Co.* v. *Citibank, N.A.*,
235 F. Supp. 3d 542 (S.D.N.Y. 2016)....18

*Shaoxing Daquin Import & Export Co., Ltd.* v. *Notations, Inc.*,
2020 WL 364567 (S.D.N.Y. Jan. 22, 2020)....7

*SiOnyx* v. *Hamamatsu Photonics K.K.*,
332 F. Supp. 3d 446 (D. Mass. 2018)....25

*State Farm Mutual Automobile Ins. Co.* v. *Medical Svc. Center of Fla., Inc.*,
2014 WL 11910630 (S.D. Fla. Sept. 15, 2014)....23

*In re Telexfree Secs. Litig.*,
389 F. Supp.3d 101 (D. Mass. 2019)....23

*United States* v. *Int'l Bhd. of Teamsters*,
247 F.3d 370 (2d Cir. 2001)....7, 10

*Williams* v. *Citigroup Inc.*,
659 F.3d 208 (2d Cir. 2011)....8, 10

**Statutes**

Uniform Internet Gambling Enforcement Act, 31 U.S.C. § 5362(1)(E)(ix)....12, 13, 21

**Other Authorities**

Fed. R. Civ. P. 9(b) ....5, 17, 18

Fed. R. Civ. P. 15(a) ....................8

Fed. R. Civ. P. 59(e) ....................1, 7, 8, 9

Fed. R. Civ. P. 60(b) ....................1, 7, 8, 9

Local Civil Rule 6.3 ....................7

Defendants Major League Baseball ("MLB") and MLB Advanced Media, L.P. ("MLBAM," and together with MLB, the "MLB Defendants") respectfully submit this memorandum of law in opposition to plaintiffs' motion to alter, amend or vacate judgment and for leave to amend.

## PRELIMINARY STATEMENT

At the heart of this Court's dismissal of this case was Plaintiffs' failure to allege in their amended complaint any actionable deception of Plaintiffs by Defendants or a sufficient connection between Plaintiffs' participation in fantasy baseball contests and any conduct by Defendants. Plaintiffs' current application and the proposed second amended complaint ("PAC") that accompanies it do not solve these problems because, as the Court observed in its April 3, 2020 opinion granting Defendants' motions to dismiss ("Opinion" or "Op."), the deficiencies in Plaintiffs' legal theories are insoluble. That the fantasy baseball hobby Plaintiffs have embraced relates to the playing of actual MLB games simply does not give Plaintiffs legal redress against MLB or its teams when they have a complaint as to how MLB games have been played.

As an initial matter, however, the Court need not even consider Plaintiffs' third bite at the apple because their motion has fatal procedural problems that, on their own, justify denial. Plaintiffs seek relief under Fed. R. Civ. P. 59(e) and 60(b) but remarkably claim that the onerous standards set forth in those rules are irrelevant. Indeed, Plaintiffs make no effort to satisfy the requirements of Rule 59(e) and give only passing attention to Rule 60(b), effectively conceding that their purported "newly discovered evidence" is not new at all but rather material produced in discovery before the motion to dismiss was decided (and in most cases before it was even argued).

If the Court does consider the merits of Plaintiffs' motion, the result should be the same. Even with the opportunity to cherry-pick from discovery, Plaintiffs still fail to allege sufficient false statements or reliance on such statements to support their misrepresentation claims,

or a sufficient connection between Defendants and Plaintiffs to support their nondisclosure, consumer protection or unjust enrichment claims.

In an effort to shore up their misrepresentation claims, Plaintiffs now cite provisions in the agreements between MLBAM and DraftKings to double down on their rejected argument that Defendants misrepresented DraftKings contests as "games of skill." But, as with Plaintiffs' insufficient prior allegations, nothing in those contracts (or any other statement alleged in the PAC) amounts to a commitment to prevent on-field rule violations from occurring for the benefit of fantasy baseball players. Rather, it is clear from the contracts that the use of the "game of skill" phrase reflected the parties' efforts to ensure that the fantasy contests themselves are conducted in a way that complies with federal law concerning internet gambling.

Plaintiffs also now complain that a September 2017 press release announcing discipline against the New York Yankees for violating a regulation regarding the use of dugout phones [REDACTED] Regardless, the Court was clear in its Opinion that, in addition to a false statement, Plaintiffs also need to plead plausible allegations of reliance and causation for their misrepresentation and consumer protection claims to survive. Plaintiffs do not and cannot allege that the press release assured them of the "integrity of major league baseball" (Op. at 16),

or even that electronic sign stealing was not occurring, because the *same* press release announced that the Red Sox *had* used electronic devices to convey decoded sign information.

The best Plaintiffs can do to articulate why [REDACTED] (Pl. Br. at 12.) But even crediting that implausible assertion, Plaintiff Olson alleges only that he continued to play "fantasy baseball" because Commissioner Manfred supposedly was untruthful in the September 2017 press release, not that he continued to play *DraftKings* fantasy baseball. (PAC ¶ 164.) The reason for the dissembling is that, according to his own transaction records, the last time Olson paid to play in a DraftKings fantasy baseball contest was in August 2017, a month *before* the press release. He could not have relied on the press release in continuing to play if he had already stopped playing.

In an effort to revive their consumer protection, fraud and unjust enrichment claims, Plaintiffs also attack the Court's holding that the dismissed complaint did not allege a sufficient connection between their DraftKings participation and Defendants. They contend that the Court minimized the business relationship between Defendants and DraftKings in concluding that it amounted only to Defendants allowing DraftKings "to use their marks and stadiums to advertise [DraftKings fantasy baseball] contests," and they proceed to spill considerable ink detailing the specific terms of the DraftKings-MLBAM contracts. (Pl. Br. at 3–7.) Plaintiffs' argument is not a fair depiction of the Court's Opinion, which accepted as true Plaintiffs' broad allegations that, among other things, Defendants and DraftKings have a "comprehensive league partnership" (Op. at 4) but nonetheless deemed Plaintiffs' claims insufficient as a matter of law. All the PAC allegations do is add cumulative detail. The Court's point, missed by Plaintiffs, is that the

relationship relevant for their claims is not the relationship between Defendants and DraftKings but the relationship (or more accurately, the lack of one) between Defendants and *Plaintiffs*. And in any event, Plaintiffs vastly overstate the terms of the contracts, which explicitly contradict Plaintiffs' assertions that Defendants "creat[ed] the product," "controlled" it, or were "substantially" involved "in virtually every aspect" of DraftKings' fantasy contests. (Pl. Br. at 4.) The contracts simply set out the criteria that MLBAM required DraftKings to meet if it wanted to use MLB trademarks for particular fantasy baseball contests.

For these and the other reasons explained below and in the Defendants' prior motions to dismiss, this case was properly dismissed with prejudice and should stay that way.

## BACKGROUND

### A. Procedural History

Plaintiff Kristopher Olson filed this action on January 23, 2020. (Dkt. No. 1.) On February 14, 2020, he filed an amended complaint (the "Amended Complaint," or "AC") adding four more plaintiffs and 370 paragraphs of new allegations spanning 87 additional pages. (Dkt. No. 20.) In the Amended Complaint, Plaintiffs asserted claims against Defendants for common-law fraud, negligence, violations of the consumer protection laws of Plaintiffs' home states (Massachusetts, California, Texas, Florida, and Colorado), among others, and unjust enrichment, all based on allegations that electronic sign stealing by the Astros, Red Sox, and other clubs during MLB games (in violation of MLB rules) had "corrupted" Plaintiffs' fantasy baseball games.

Defendants moved to dismiss the Amended Complaint on February 21, 2020. (Dkt. Nos. 27, 30, and 36.) Plaintiffs filed oppositions to the motions on March 6 (Dkt. Nos. 42, 44 & 45), and Defendants filed reply briefs on March 13 (Dkt. Nos. 47, 48 & 49). On March 20, the Court heard oral argument on Defendants' motions for nearly two hours. (Dkt. No. 57.)

Discovery proceeded while briefing on the motions, and this Court's consideration

of the motions, was ongoing. The MLB Defendants produced documents in response to Plaintiffs' discovery requests on March 12, 17, 19, and 25; the Astros produced documents on March 17 and 23; and the Red Sox produced documents on March 12, 19, and 30 and April 2.

### B. The Court's Dismissal of the Amended Complaint

On April 3, 2020, the Court granted the motions to dismiss in their entirety (Dkt. No. 55) and dismissed the Amended Complaint with prejudice, concluding that all of Plaintiffs' claims suffered from multiple deficiencies (without even reaching all asserted grounds).[1]

**Fraud.** With respect to Plaintiffs' theory that Defendants made affirmative misrepresentations, the Court held: (i) Plaintiffs failed to plausibly allege that the MLB Defendants had made any statements expressing a "commitment to safeguarding fantasy baseball from MLB rules violations," (ii) the MLB Defendants' alleged statements concerning "maintaining the integrity and honesty of the game of baseball" were not false, and (iii) alleged misrepresentations by the Astros and Red Sox were "largely speculations about the source of various players' or teams' success in a game, speculations not verifiable for their truth or falsity." (Op. at 10–12.) The Court concluded that a few of the alleged misrepresentations in the Amended Complaint were "plausibly" alleged to be false, but that Plaintiffs had not adequately alleged reliance on any of those statements with sufficient particularity under Rule 9(b). The Court also rejected Plaintiffs' "generalized" theory of reliance. (Op. at 12–16.) With respect to their claim of fraud by omission, the Court held that the Amended Complaint did not allege a transaction or other relationship between Defendants and Plaintiffs that could give rise to a duty of disclosure. (Op. at 16–21.)

[1] Thus, in the event that the Court grants Plaintiffs leave to file the PAC, Defendants reserve their rights to move to dismiss the PAC, including on grounds not specifically addressed herein. For example, Plaintiffs still fail to allege any cognizable harm. No Plaintiff alleges that he lost money on his DraftKings contests, or even how much he spent on DraftKings entry fees.

**Negligence.** The Court concluded that Plaintiffs' negligent misrepresentation claims "fail for essentially the same reasons that their fraud claims fail," including "because plaintiffs have failed to allege the existence of any duty to disclose owed them by defendants or reliance on defendants' affirmative representations." (Op. at 22.)

**Consumer Protection Claims.** The Court dismissed Plaintiffs' consumer protection claims on the ground that those claims, "like their fraud claims," were "not pled with enough specificity," because the Amended Complaint did not sufficiently allege "that the defendants' deceptive acts caused the plaintiffs harm" for the same reasons that it did not sufficiently allege that Plaintiffs relied on Defendants' alleged misrepresentations "such that these misrepresentations could have caused them to enter MLB DFS contests they otherwise would not have entered." (Op. at 25–26.) The Court also held that the consumer protection claims failed because "[t]he asserted connection between defendants and the allegedly harmful transactions plaintiffs entered into . . . is simply too attenuated to support liability here." (Op. at 26.)

**Unjust Enrichment.** The Court rejected Plaintiffs' unjust enrichment claims "because the plaintiffs have failed to plausibly allege that the defendants were enriched at the plaintiffs' expense" through DraftKings fees purportedly "shared" with Defendants, an "increase in the value" of Defendants' equity stake in DraftKings, or "increased fan involvement" attributable to Plaintiffs' DraftKings participation. (Op. at 30.)

Finally, the Court concluded that, "[w]hile a few of these deficiencies might conceivably be cured by giving plaintiffs another chance to amend their already amended complaint, most could not," and ordered the case dismissed with prejudice. (Op. 31.) The Clerk of the Court entered judgment on April 7. (Op. at 31; Dkt. No. 56.) This motion followed 28 days later, on May 5, asking the Court to reconsider its judgment based on discovery produced by

Defendants (and other previously available information) before the case was dismissed.

## ARGUMENT

### I. THERE IS NO BASIS TO SET ASIDE THE COURT'S JUDGMENT UNDER RULES 59 OR 60.

"Reconsideration of a court's previous order is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *U.S. ex rel. Grubea* v. *Rosicki, Rosicki & Assocs., P.C.*, 319 F. Supp. 3d 747, 750 (S.D.N.Y. 2018) (Rakoff, J.). Plaintiffs invoke Rules 59(e) and 60(b), both of which require "a showing of exceptional circumstances" to justify the "extraordinary" relief of reopening a final judgment. *Nemaizer* v. *Baker*, 793 F.2d 58, 61 (2d Cir. 1986).

"The standard for granting a motion for reconsideration under Rule 59(e) and Local Civil Rule 6.3 'is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shaoxing Daquin Import & Export Co., Ltd.* v. *Notations, Inc.*, 2020 WL 364567, at *1 (S.D.N.Y. Jan. 22, 2020) (Rakoff, J.) (quoting *Schrader* v. *CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). Rule 59(e) "motions that simply regurgitate the arguments that this Court previously rejected should be denied." *Prout* v. *Vladeck*, 319 F. Supp. 3d 741, 744 (S.D.N.Y. 2018) (Rakoff, J.).

Similarly, a post-judgment motion under Rule 60(b) based on new evidence requires an "onerous" showing. *United States* v. *Int'l Bhd. of Teamsters*, 247 F.3d 370, 392 (2d Cir. 2001). "[E]vidence in support of Rule 60(b) motions must be 'highly convincing'" to warrant relief. *Friedman* v. *New York City Dep't of Educ.*, 2009 WL 37828, at *1 (S.D.N.Y. Jan. 5, 2009) (Rakoff, J.)) (quoting *Kotlicky* v. *U.S. Fidelity & Guar. Co.*, 817 F.2d 6, 9 (2d Cir. 1987)).

Apparently recognizing their inability to satisfy these demanding standards,

Plaintiffs make little effort to do so. Instead, they make the absurd claim that "no analysis under Rule 59(e) or 60(b) is required" to evaluate their Rule 59(e) and Rule 60(b) motion merely because they also want to file an amended complaint. (Pl. Br. at 17.) Plaintiffs cite two Second Circuit cases—*Williams* v. *Citigroup Inc.*, 659 F.3d 208 (2d Cir. 2011) and *Mirkin* v. *XOOM Energy, LLC*, 931 F.3d 173 (2d Cir. 2019)—as ostensible support for this nonsensical proposition. Unsurprisingly, however, neither case holds that Rule 59(e) or Rule 60(b) is inapplicable to a Rule 59(e) and Rule 60(b) motion. To the contrary, in *Williams*, the court expressly recognized that "a party seeking to file an amended complaint postjudgment *must first* have the judgment vacated or set aside pursuant to Rules 59(e) or 60(b)," and that "to hold otherwise would enable the liberal amendment policy of Rule 15(a) to be employed in a way that is contrary to the philosophy favoring finality of judgments and the expeditious termination of litigation." 659 F.3d at 213 (emphasis added; quotation marks and alterations omitted).[2] Indeed, as the Second Circuit previously made clear, "[u]nless there is a valid basis to vacate the previously entered judgment, it would be contradictory to entertain a motion to amend the complaint." *Nat'l Petrochemical Co. of Iran* v. *M/T Stolt Sheaf*, 930 F.2d 240, 245 (2d Cir. 1991). Accordingly, "amendment of a complaint becomes significantly more difficult when a plaintiff waits . . . until after a judgment has been entered." *Janese* v. *Fay*, 692 F.3d 221, 229 (2d Cir. 2012); *see also, e.g.*, *Axar Master Fund, Ltd.* v. *Bedford*, 2020 WL 1456482, at *3 n.3 (2d Cir. Mar. 23, 2020) ("Because we conclude that the district court did not abuse its discretion in rejecting plaintiffs' motion . . . under Rule 59(e)

[2] The circumstances in *Williams* and *Mirkin* were also very different than here. Neither involved an attempt to reopen a judgment based on purportedly new evidence. In *Williams*, the Second Circuit reversed the district court's denial of a post-judgment motion as untimely simply because the plaintiff had failed to request leave to replead "in the first instance" (*i.e.*, prior to the dismissal order or entry of judgment). 659 F.3d at 214. *Mirkin* was a straightforward reversal of a dismissal decision on the merits. 931 F.3d at 177.

or Rule 60(b), we need not reach the merits of" proposed amended complaint).

As could be expected from Plaintiffs' refusal to acknowledge the relevance of the legal standards governing their motion, they fail miserably at satisfying them. Plaintiffs repeatedly express disappointment with the Court's Opinion and rehash arguments the Court already rejected (*see*, *e.g.*, Pl. Br. at 3–4, 7, 22, 24), without even trying to show how such carping meets the standard for reconsideration under Rule 59(e). Plaintiffs do make a half-hearted attempt to argue that their supposedly "newly discovered evidence" is sufficient under Rule 60(b). But "[e]vidence is not 'newly discovered' if it was in the moving party's possession prior to the entry of judgment." *Johnson* v. *Askin Cap. Mgmt., L.P.*, 202 F.R.D. 112, 114 (S.D.N.Y. 2001); *see also Boxill* v. *Brooklyn College*, 2003 WL 21554498, at *4 (E.D.N.Y. July 10, 2003) ("A Rule 60(b) motion is inappropriate when the moving party concedes that the evidence was discoverable before entry of judgment."). District courts in the Second Circuit consistently hold that information obtained in discovery before judgment—even if after briefing on a dispositive motion—cannot form the basis for post-judgment relief. *See*, *e.g.*, *Pettiford* v. *City of Yonkers*, 2020 WL 1989419, at *2 (S.D.N.Y. Apr. 27, 2020) (deposition taken after motion briefing but before judgment "is not newly discovered" because it was "available to Plaintiff prior to" court's decision); *Rodriguez* v. *British Airways PLC*, 2018 WL 501568, at *1, 2 (E.D.N.Y. Jan. 19, 2018) (discovery obtained "while defendants' motions for summary judgment were *sub judice*" not newly discovered); *Kopperl* v. *Bain*, 2016 WL 310719, at *4 (D. Conn. Jan. 26, 2016) ("[T]he standard applied. . . is whether the evidence was discovered prior to the ruling, not the completion of briefing").[3]

[3] The out-of-circuit cases Plaintiffs cite are distinguishable. In *In re Louisiana Crawfish Producers*, 852 F.3d 456, 467-68 (5th Cir. 2017), the court held that plaintiffs were justified in not bringing newly obtained discovery to the district court's attention because the district court entered judgment *before* "deadlines set forth in the case management order" to file dispositive motions.

Here, Plaintiffs had eight of the twelve "newly discovered" documents referenced in their motion—including the MLBAM-DraftKings agreement that is the crux of their PAC, which was produced on March 12—*before* the Court held oral argument on the motions to dismiss on March 20, and they received the remainder nine days before the Court's opinion (and thirteen days before judgment was entered). (*See* Declaration of John L. Hardiman, dated May 15, 2020 ("Hardiman Decl."), Exs. 1–5.) Thus, Plaintiffs indisputably had the discovery and could have brought it to the Court's attention before judgment if they truly believed it was material. Plaintiffs' delay in doing so is thus grounds for denying the motion.

## II. PLAINTIFFS' "NEW EVIDENCE" DOES NOT JUSTIFY REOPENING THE JUDGMENT.

Even if the evidence on which Plaintiffs' motion relies were properly characterized as "newly discovered," the Court still should not reopen its judgment or grant leave to file the PAC because the PAC fails to remedy the myriad fundamental deficiencies in Plaintiffs' claims that this Court correctly held warranted dismissal. *Teamsters*, 247 F.3d at 392 ("newly discovered evidence" justifies relief from judgment only where the evidence is "of such importance that it would probably have changed the outcome"); *Williams*, 659 F.3d at 214 ("leave to amend need not be granted" where "proposed amendment would be futile").

### A. Plaintiffs Still Cannot Allege Any Actionable Deception.

Plaintiffs argue that the PAC cures the defects in their common law fraud, negligent

---

Here, this Court alerted the parties at oral argument on Defendants' motion to dismiss that it would decide those motions, "worst case," by April 15 (Dkt. No. 57 at 57:7–9), so Plaintiffs could have, and should have, promptly alerted the Court to any purportedly material documents obtained in discovery. In *Ryan* v. *Ryan*, 889 F.3d 499, 509 (8th Cir. 2018), the court merely held that it would not "rule categorically" that evidence was not "newly discovered" where it "was first discovered after briefing *and submission* of those motions." (emphasis added.) Here, Plaintiffs had most of the documents in advance of argument (yet never mentioned them) and the rest while they knew the Court was considering the motions and would rule imminently.

misrepresentation and fraud-based consumer protection claims because it purportedly identifies specific misrepresentations by the MLB Defendants and alleges Plaintiffs' specific reliance on those misrepresentations. (Pl. Br. at 9-13.) Plaintiffs are wrong.

**1. The New Allegations in the PAC Do Not Remedy Plaintiffs' Failure to Allege Actionable Misrepresentations About Fantasy Baseball.**

The PAC expands on Plaintiffs' theory—belatedly emphasized in opposing Defendants' motions to dismiss—that the MLB Defendants falsely represented that DraftKings fantasy contests are "games of skill" when, according to Plaintiffs, undisclosed electronic sign stealing allegedly "distort[ed] the player statistics upon which the contests were based" and "prevent[ed] the exercise of skill to win or lose a contest." (Pl. Br. at 12–13; *see also id.* at 7–9.)

Plaintiffs argue that, in ruling on the motions to dismiss, "the Court did not appreciate the significance of plaintiffs' contentions concerning the 'game of skill' issue." (Pl. Br. at 7.) But as the Opinion reflects, the Court plainly understood, carefully considered, and rejected Plaintiffs' theory for a number of reasons. Most importantly, recognizing that Plaintiffs were conflating fantasy baseball with major league baseball, the Court concluded that a statement by MLB that it considered DraftKings fantasy contests to constitute games of skill did not amount to, and could not reasonably be relied on as, a representation that the MLB Defendants were "safeguarding fantasy baseball from MLB rules violations." (Op. at 10; *see also* Op. at 16.)

The PAC's new "game of skill" allegations fare no better. Plaintiffs simply make additional generalized assertions about Defendants' purported "aggressive marketing and promotion of MLB fantasy baseball contests as 'games of skill'" (*see, e.g.*, PAC ¶ 51) and point to additional public statements (not "newly discovered evidence") made by an attorney for DraftKings in 2015, at a legislative hearing, explaining "the variety of skills . . . [a] daily fantasy player must exercise" to succeed in a fantasy contest, none of which relate to knowing whether

players are breaking any league rules. (*Id.* ¶¶ 65–68.) Plaintiffs also reference purported "written representations to Plaintiffs that the MLB fantasy contests would be conducted as 'contests of skill'" taken from DraftKings' "Conditions of Participation," which DraftKings, not Defendants, conveyed to Plaintiffs, and to which Plaintiffs agreed when they first entered DraftKings contests (and thus also obviously had available prior to the judgment). (Pl. Br. at 7–10.)[4]

Plaintiffs still have not alleged, because they cannot, that the MLB Defendants ever committed to "safeguarding fantasy baseball from MLB rules violations" or "ensuring the integrity of major league baseball" for the benefit of DraftKings participants. (Op. at 10, 16.) Instead, what becomes clear upon review of the contracts is that the "game of skill" statements reflect a belief, and an effort to ensure, that the fantasy contests themselves are conducted in a manner that comports with the legal definition of "game of skill" in the Uniform Internet Gambling Enforcement Act ("UIGEA") and thus are not illegal gambling.[5] These statements have nothing to do with whether MLB clubs and players abide by on-field rules.

UIGEA defines "games of skill" as contests in which "winning outcomes reflect the relative knowledge of the participants and are determined predominantly by accumulated statistical results of the performance of individuals (athletes in the case of sports events) in multiple

[4] No Plaintiff avers that he was even aware when he agreed to these conditions that MLBAM had any right to review and approve them. (*See* PAC ¶¶ 143–228.) And the contract language makes clear that the conditions are generally applicable to fantasy contests on the DraftKings platform, not just baseball contests. (*See* Dkt. No. 64-4 at 24, 25 (conditions referred to as "*Licensee's Website's* Terms of Use and Privacy Policy") (emphasis added).)

[5] The alleged misstatements are not actionable for the additional reason that "statements of opinion generally cannot constitute fraud" when they are, as here, legal opinions "based on advice of counsel." *Catskill Development, L.L.C.* v. *Park Place Entertainment Corp.*, 547 F.3d 115, 134 (2d Cir. 2008); (*see* PAC ¶ 37 (alleging that "MLB's attorneys investigated and confirmed . . . that fantasy baseball contests operated as 'games of skill' were legal under federal and state law and did not constitute a form of gambling")).

real-world sporting . . . events." 31 U.S.C. § 5362(1)(E)(ix).[6] There can be no serious dispute that DraftKings daily fantasy contests meet this definition, even accepting all of Plaintiffs' allegations of undisclosed electronic sign stealing as true. Plaintiffs' theory is based on a flawed premise: that a fantasy baseball contest can only be a "game of skill" if the underlying MLB games are entirely free of undisclosed rule violations.[7] This argument has no basis in the statute or common sense. Many factors that can affect an MLB player's on-field performance may be unknown to fantasy contestants in advance—*e.g.*, injury, weather, umpiring, fan interference and the forms of sign stealing that are *not* prohibited under MLB rules. Under the statute, as long as fantasy contestants have access to the same information and the statistics correctly represent what actually happened on the field (which Plaintiffs do not dispute), then DraftKings contests reflect the "relative knowledge of the participants" and are determined by "accumulated statistic[s]," and thus can be considered a "game of skill" under UIGEA.

In sum, merely referring to DraftKings contests as "games of skill" does not transform Defendants into guarantors of perfect adherence to MLB rules on the field.

**2. The New Allegations in the PAC Do Not Remedy Plaintiffs' Failure to Allege Actionable Misrepresentations About Major League Baseball.**

The PAC also alleges a new purported misrepresentation by MLB regarding the outcome of its 2017 investigation into alleged rule violations by the Yankees. Specifically,

[6] The DraftKings "Conditions of Participation" similarly state that "DraftKings markets DFS as 'Contests of Skill.' . . . . [W]inners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules." (PAC ¶ 33.)

[7] Indeed, the PAC itself relies on a statistical study that Plaintiffs claim demonstrates that DraftKings fantasy baseball contests were "games of skill" during the 2016 season (PAC ¶ 71), [redacted] (*Id.* ¶ 83). Accordingly, the Court may disregard Plaintiffs' contradictory allegations that rule violations negate the "skill" in DraftKings fantasy contests. (Op. at 11 (citing *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995).)

Plaintiffs allege that, in a September 15, 2017 press release announcing the outcome of that investigation and a related investigation regarding the Red Sox, Commissioner Manfred communicated, in Plaintiffs' words, that "MLB had determined that the Yankees had misused a dugout telephone during an earlier season in 'technical' violation of MLB rules, but that the Yankees had not improperly communicated sign information in violation of any MLB Rule or Regulation," [redacted]

As the Court recognized in the Opinion, Plaintiffs are not above resorting to mischaracterization to attempt to manufacture a misrepresentation on which to base their claims,[8] and they have done so again. Contrary to Plaintiffs' claim, [redacted] The press release actually stated:

> In the course of our investigation . . . we learned that during an earlier championship season (prior to 2017) the Yankees had violated a rule governing the use of the dugout phone. No Club complained about the conduct in question at the time and, without prompting from another Club or my Office, the Yankees halted the conduct in question. Moreover, the substance of the communications that took place on the dugout phone was not a violation of any Rule or Regulation in and of itself. Rather, the violation occurred because the dugout phone technically cannot be used for such a communication.

(Hardiman Decl., Ex. 6.) [redacted]

[8] "Plaintiffs first allege that the defendants, through public statements by MLB Commissioner Manfred, repeatedly misrepresented that the defendants were committed to 'making sure that fantasy baseball wagering competitions were fair.' But these are the words of the complaint, not of Commissioner Manfred, and plaintiffs fail to allege actual statements by Manfred that plausibly support the existence of such a misrepresentation." (Op. at 9 (citation omitted).)

[redacted]

[redacted]

[9] In March 2018, MLB clarified that its regulations would be enforced against the use of replay room monitors to decode signs. (*See* PAC ¶ 76(d).) MLB later applied this interpretation in its investigation of the Astros 2017 and 2018 conduct, which also involved more advanced electronic sign-stealing activities, including immediate communication of signs to the batter (as opposed to waiting until a runner was on second base). *See* Robert D. Manfred, Jr., *Statement of the Commissioner*, Office of the Commissioner of Baseball (Jan. 13, 2020),https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty2717.pdf.



[redacted]

Moreover, even if the statement [redacted] could be construed as false, it plainly was not materially so. The press release focused primarily on sign-stealing violations by the Red Sox. [redacted] is facially implausible, [redacted] *See, e.g.*, *U.S. ex rel. Daugherty* v. *Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 429 (S.D.N.Y. 2018) (granting motion to dismiss because it was "implausible that the false statement . . . would have been material"). In addition, numerous press reports put Plaintiffs on notice that rule violations generally, and electronic sign stealing specifically, could occur. (*See, e.g.*, PAC ¶¶ 93 n.67, 98 n.70.) Indeed, all sports fans understand "that players often commit intentional rule infractions in order to obtain an advantage over the course of the game." *Mayer* v. *Belichik*, 605 F.3d 223, 236 (3d Cir. 2010).

The PAC also alleges, as did the AC, that Commissioner Manfred misrepresented in an October 2018 press release that MLB had conducted a "thorough investigation" into a specific allegation that an Astros employee had been photographing the Red Sox' dugout before a playoff game. (Pl. Br. at 11–12.) Plaintiffs argue that the statement must have been false because a "thorough investigation" would have turned up the conduct later uncovered in MLB's investigation of the Astros in 2019 and 2020. (*Id.*) Looking past Plaintiffs' selective quotation, however, read in context, it is clear that Commissioner Manfred was referring to having conducted a "thorough investigation" of one discrete alleged incident before a single game, which had nothing to do with the trash can banging scheme described in the AC and PAC. Indeed, MLB's later

investigation concluded that the Astros ceased their sign-stealing conduct at some point in the 2018 season and did not use electronic equipment to decode and communicate opposing teams' signs in the 2018 postseason, so it is no surprise that an investigation limited to a single 2018 postseason game did not expand into the broader investigation that was conducted in 2019 and 2020.[10]

Nonetheless, in the Opinion, the Court charitably concluded that Plaintiffs' allegation concerning the 2018 investigation was plausible, albeit "a stretch." (Op. at 13.) The Court still held that the alleged misrepresentation was not actionable, however, because Plaintiffs did not "allege that [they] 'saw, read, or otherwise noticed'" the October 2018 press release, much less that they reasonably relied on it in choosing to participate in DraftKings fantasy contests, and "thus completely fail[ed]" to allege reliance (for their fraud claims) or causation (for their consumer protection claims) with the particularity required by Rule 9(b). (Op. at 15, 25-26.)

The PAC does not adequately allege reliance or causation with respect to the October 2018 press release either. One of the five Plaintiffs, Plaintiff Olson, now claims that he relied on that press release. (*See* PAC ¶ 164; *see also id.* ¶¶ 174–240.) Notably, however, Olson evasively alleges only that he did so "in deciding to continue to pay to play to participate in *MLB fantasy baseball contests*," not DraftKings contests specifically, which is all that matters because Plaintiffs have alleged no conceivable basis to assert claims based on other contests. (*Id.* ¶ 164 (emphasis added).) The truth is that Plaintiff Olson *cannot* allege that he continued to pay to play in DraftKings games after the October 2018 press release because the records of his DraftKings transactions that he produced to Defendants in discovery show that he stopped playing paid

---

[10] *See* Robert D. Manfred, Jr., *Statement of the Commissioner*, Office of the Commissioner of Baseball (Jan. 13, 2020), https://img.mlbstatic.com/mlb-images/image/upload/mlb/cglrhmlrwwbkacty2717.pdf.

DraftKings fantasy baseball games in August 2017. (*See* Hardiman Decl., Ex. 7 at 17.)[11] The same is true for the September 2017 press release.

Moreover, even if the PAC adequately alleges that Plaintiff Olson relied on the October 2018 or September 2017 press releases, such reliance would have been objectively unreasonable as a matter of law for the same reasons that those statements were immaterial as a matter of law (*see supra* at 16). *See Sejin Precision Indus. Co.* v. *Citibank, N.A.*, 235 F. Supp. 3d 542, 555 (S.D.N.Y. 2016) (Rakoff, J.) (granting motion to dismiss where "plaintiffs' reliance on [the] alleged misrepresentations was clearly unreasonable").

Finally, even assuming *arguendo* that at least Plaintiff Olson has sufficiently pled a material misrepresentation on which he reasonably relied, his claims would still fail because he has not adequately alleged that Commissioner Manfred made either statement with the requisite scienter, a ground for dismissal that the Court did not need to reach in the Opinion. *See Lerner* v. *Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (under Rule 9(b) plaintiffs must "allege facts that give rise to a strong inference of fraudulent intent"). Plaintiffs have again failed to plead a

[11] The Court may properly consider Plaintiff Olson's records of his DraftKings history in assessing the futility of his PAC. The Court may consider an exhibit "at this motion to dismiss stage" where "plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint." *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 472 n.27 (S.D.N.Y. 2019) (Rakoff, J.) (quoting *Cortec Indus., Inc.* v. *Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also Cortec*, 949 F.2d at 44 ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on the motion."); *Karmilowicz* v. *Hartford Fin. Servs. Grp.*, 2011 WL 2936013, at *5 (S.D.N.Y. July 14, 2011) (documents "properly before the court" on a motion to dismiss although "none of them are attached to [the] complaint and none of their specific provisions are referenced in the allegations" because the complaint "refers to and relies upon" them). Here, Plaintiff Olson alleges that he "was an active MLB fantasy baseball contest participant during the period at issue in the lawsuit" (PAC ¶ 150) and must have consulted his own DraftKings transaction history in making that allegation.

single plausible allegation connecting Defendants' statements to their relationship with DraftKings sufficient to create a strong inference that Defendants intended to defraud DraftKings participants.

**B. MLBAM's Contracts With DraftKings Do Not Salvage Plaintiffs' Claims.**

Plaintiffs' Amended Complaint included extensive allegations about the relationship between MLBAM and DraftKings during the putative class period. Indeed, as Plaintiffs themselves point out in their motion, the Amended Complaint contained no less than 30 paragraphs of such allegations. (*See* Pl. Br. at 3–4). Plaintiffs contend that the Court somehow missed these 30 paragraphs, because the Opinion supposedly noted only that "'plaintiffs allege that the defendants allowed DraftKings to use their marks and stadiums to advertise [DraftKings] contests" (*id.* at 3), or that perhaps the Court credited an imagined mischaracterization of Plaintiffs' allegations by the MLB Defendants (*id.* at 19–20). The Court did no such thing. The Opinion expressly recounted, and accepted as true, Plaintiffs' allegations that MLBAM "acquired equity stakes in DraftKings 'sizeable enough to reap meaningful benefit from the rise of daily fantasy,'" and that "DraftKings and MLB entered into a '*comprehensive league partnership*' that provided for co-branding of MLB DFS baseball contests, allowed DraftKings to offer market-specific in-ballpark experiences, and gave DraftKings promotional rights, use of MLB league and team logos, the exclusive right to sign sponsorship deals with individual MLB member clubs, and a designation as MLB's 'Official Daily Fantasy Game.'" (Op. at 4 (quoting AC ¶ 36) (emphasis added).)

What the Court actually held is that Plaintiffs' allegations about Defendants' relationship with DraftKings did not establish a sufficient relationship between Defendants and *Plaintiffs* to give rise to any conceivable duty of disclosure or provide a basis for Plaintiffs' consumer protection claims. Based on a painstaking review of the applicable case law, the Opinion found Plaintiffs' inability to allege "the existence of any transaction—or any other comparable business relationship—between themselves and the defendants" or facts that "demonstrate[d] that

the defendants were substantial participants in the transaction between plaintiffs and DraftKings" fatal to their claims. (Op. at 18, 28.)

As the Court noted, to properly allege fraud by omission, a plaintiff "must demonstrate a relationship between the plaintiff and defendant that gives rise to a duty to disclose," or, at the very least, that the defendant had "a much closer relationship to the transaction than that alleged here," such as an architect who "'knew or should have known' that [a] subcontractor would rely on his plans" or "attorneys who were paid to recruit investors for a business" and knew "material facts about this business." (Op. at 16, 19.)[12] The Court dismissed Plaintiffs' negligent misrepresentation claim because of the same "fail[ure] to allege the existence of any duty to disclose owed them by defendants." (*Id.* at 22.) Indeed, the relationship requirement for a negligent misrepresentation claim is even more stringent than for a fraudulent omission claim. *See, e.g.*, *J.A.O. Acquisition Corp.* v. *Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007) (negligent misrepresentation claim requires "a special or privity-like relationship"). As for Plaintiffs' consumer protection claims, the Court expressed "deeper" "concerns" (beyond their inability to allege actionable deception) because "[t]he asserted connection between defendants and the allegedly harmful transaction plaintiffs entered into . . . is simply too attenuated to support liability." (*Id.* at 26.)

Despite adding numerous cumulative allegations about the relationship between MLBAM and DraftKings, purportedly drawn from the MLBAM-DraftKings contracts, the PAC does not remedy these fundamental deficiencies because Plaintiffs still say next to nothing about

[12] Of course, a relationship giving rise to a duty to disclose answers only part of the question. A plaintiff alleging a fraudulent omission must also plead and prove a failure to disclose a fact "'basic' to their decision to enter" a business transaction or a misleading partial disclosure. (Op. at 17 (discussing Section 551 of the Second Restatement of Torts).)

any relationship between Defendants and Plaintiffs or allege anything close to substantial participation by Defendants in DraftKings' customer transactions. Plaintiffs try to compensate for substance with rhetoric, claiming that certain provisions in the DraftKings contracts permitted MLBAM to exercise "control[]" over "every aspect of the commercial venture." (Pl. Br. at 20.) But the provisions at issue (*see* Dkt. No. 64-4 at 24; Dkt. No. 64-5 at 12) reflect nothing more than the common concern of all licensors as to how their trademarks and other proprietary material will be used. *See Pilot Corp. of Am.* v. *Fisher-Price Inc.*, 501 F. Supp. 2d 292, 300–01 (D. Conn. 2007) ("approval" rights are "intended to give the trademark owner the ability to police and protect its mark, so that the mark will not be used in a way that could tarnish it" and "[a]pproval rights . . . are not the same as ownership rights"). To the extent DraftKings wanted to use MLBAM proprietary material in conjunction with its fantasy baseball contests, those contests had to adhere to certain criteria; these were the "Approved Fantasy Contests" described in the contracts. (*See* Dkt. No. 64-3 at 8; Dkt. No. 64-4 at 24.) If DraftKings did not want to adhere to such criteria, it could still run fantasy baseball contests, just not with any MLBAM material. MLBAM's vigilance regarding the use of its intellectual property by DraftKings was, as Plaintiffs concede (*see* Pl. Br. at 5), heightened by concerns that DraftKings contests not cross the line into illegal gambling. Thus, certain provisions of the contracts aligned with provisions of the UIGEA. *Compare* 31 U.S.C. § 5362(1)(E)(ix)(I) and (1)(E)(ix)(II) *with* (Dkt. No. 64-4 at 24).[13] Also, the fact that each member of the putative classes received and was required to agree to a written representation from DraftKings (purportedly at MLBAM's insistence) that DraftKings fantasy games were "Contests

[13] Indeed, Plaintiffs argue that it would be "unfair and deceptive" if DraftKings games did not comply with UIGEA. (Pl. Br. at 7.) Thus, far from resurrecting Plaintiffs' consumer protection claims, the provisions of the MLBAM-DraftKings agreements that ensure compliance with UIGEA undermine those claims.

of Skill" (Pl. Br. at 5, 8), does not establish MLBAM's participation in DraftKings' transactions, but rather a mutual agreement between DraftKings and its customers that the contests are lawful—an agreement to which Defendants were not parties—and does not bring Defendants any closer to Plaintiffs than they were before. In sum, MLBAM's interest in monitoring the ways in which its valuable trademarks were used, and ensuring that they were used in connection with legal contests, does not equate to "control" any more than Plaintiffs' prior allegations about MLB's "comprehensive league partnership" agreement with DraftKings did. (AC ¶ 5.)[14]

MLBAM's establishment of the criteria by which DraftKings contests could use MLB trademarks also does not demonstrate, as the Court found necessary to sustain state consumer protection claims, that Defendants were "advertising [their] own product" or "otherwise made an express factual representation that gave rise to a duty," or that there was "some nexus between defendants and the transaction that allegedly caused the plaintiffs harm." (Op. at 20–21 & n5, 26.) The new cases cited in Plaintiffs' brief under the consumer protection statutes of their home states (*see* Pl. Br. at 21–22 & nn. 8, 9 & 10) do not change that but rather support principles already articulated in the Opinion: that liability without privity can be based on "the defendant's production of the good or service that was the basis of the transaction," or "the defendant's substantial participation in the transaction that caused the plaintiff harm." (Op. at 27.)

For example, in *Coffey* v. *WCW & Air, Incorporated*, 2018 WL 4154256 (N.D. Fla. Aug. 30, 2018), the court permitted Florida consumer claims to proceed against (i) the manufacturer of the water treatment system at issue, and (ii) parties who directly sold the systems

[14] In fact, if anything, the MLBAM-DraftKings contracts give the Court another reason to reject their claims. The contracts expressly disclaim that MLBAM and DraftKings were joint venture partners (Dkt. No. 64-6 at 7), the centerpiece of Plaintiffs' prior argument that Defendants owed duties to DraftKings participants (*see* Op. at 18).

to consumers. *Id.* at *1, *4–7. Similarly, in *Galstaldi* v. *Sunvest Communities USA, Ltd.*, 637 F. Supp. 2d 1045 (S.D. Fla. 2009), the defendants directly "participat[ed] in the FDUTPA violations" because (i) they had direct contact with consumers, "conduct[ing] tours of [the condominium] facility to prospective buyers" and directly selling units through their brokers and agents, and (ii) the defendants held themselves out as joint venturers with the condominium seller. *Id.* at 1050, 1056–57.[15] These cases do nothing to show that Defendants, who neither created nor sold fantasy games to Plaintiffs, may be liable under consumer protection laws. And re-styling their consumer protection claims around alleged "unfair conduct" (based on nearly identical allegations to their fraud-based deception claims) does not relieve Plaintiffs of their obligation to plead a close nexus between their DraftKings transactions and Defendants, as the cases they cite demonstrate.[16]

---

[15] *See also In re Telexfree Secs. Litig.*, 389 F. Supp.3d 101, 107 (D. Mass. 2019) (dismissing Massachusetts consumer protection claim against bank whose employee participated in pyramid scheme); *City of Boston* v. *Purdue Pharma, LP, et al.*, 2020 WL 977056, at *7 (Mass. Super. Jan. 31, 2020) ("the Distributor Defendants are involved in essentially all opioid transactions, having distributed them to the point where they are sold and dispensed as prescriptions," and therefore "a commercial transaction has been sufficiently alleged"); *Hamm* v. *Mercedes-Benz USA, LLC*, 2019 WL 4751911, at *4 (N.D. Cal. Sept. 30, 2019) ("under California law, a manufacturer has a duty to disclose a defect that poses an unreasonable safety risk even if that manufacturer did not have a transactional relationship with the vehicle owner"); *Loughridge* v. *Goodyear Tire and Rubber Co.*, 192 F. Supp. 2d 1175, 1185 (D. Colo. 2002) (manufacturer, in addition to "brand[ing] the [product] to imply certain characteristics that it allegedly knew were untrue," targeted both its marketing and its website "to the ultimate consumer"); *Church & Dwight Co., Inc.* v. *Huey*, 961 S.W.2d 560, 566 (Tex. Ct. App. 1997) (defendant manufactured product and plaintiff "sought and acquired" product, "based, in part, on the manufacturer's representations").

[16] *See Linkage Corp.* v. *Trs. of Boston Univ.*, 679 N.E.2d 191, 195 (Mass. 1997) (plaintiff company and defendant university were counterparties to multi-year agreement); *Chabner* v. *United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1044–45 (9th Cir. 2000) (life insurer liable under California statute to customer); *PNR, Inc.* v. *Beacon Property Mgt., Inc.*, 842 So.2d 773, 774 (Fla. 2003) ("business dispute" between commercial tenant and property manager); *Crisp Human Capital, Ltd.* v. *Authoria, Inc.*, 613 F. Supp. 2d 136, 138 (D. Mass. 2009) (dispute arising from parties' "Re-seller Agreement"); *State Farm Mutual Automobile Ins. Co.* v. *Medical Svc. Center of Fla., Inc.*, 2014 WL 11910630, at *1 (S.D. Fla. Sept. 15, 2014) (health care clinic "unlawfully obtain[ed] insurance payments from State Farm"); *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1055–56 (S.D. Cal. 2017) (antitrust claims alleged by purchasers against manufacturers and sellers of canned tuna).

In addition to the overblown allegations of "control" discussed above, Plaintiffs' arguments about several other terms of MLBAM's contracts with DraftKings suffer from obvious mischaracterizations or exaggerations, including:

- Plaintiffs' claim that MLBAM "participated in creating the product (MLB-branded fantasy baseball games)" (*see, e.g.*, Pl. Br. at 4–5) is directly contradicted by the agreement, which makes clear [redacted] (Dkt. No. 64-3 at 14 (emphasis added));

- Provisions that gave MLBAM a "contractual right of pre-approval" over the use of MLB trademarks in "DraftKings' advertising and marketing of the contests," do not give MLBAM *carte blanche* over all "content" in DraftKings' marketing (*compare* Pl. Br. at 4, *with* Dkt. No. 64-5 at 12);

- Commitments to "[u]ndertak[e] highly-specified marketing and promotion of the contests" [redacted] (*compare* Pl. Br. at 4, *with* Dkt. No. 64-4 at 12–23);

- The contract's dispute resolution and termination provisions permit *both parties* to terminate in the event of a material breach of contract (*compare* PAC ¶ 32, *with* Dkt. No. 64-5 at 18; Dkt. No. 64-6 at 4–5); and

- A purported requirement that MLBAM's programming include "expert recommendations of specific MLB players for inclusion in MLB fantasy contest lineups" and "recommended complete lineups of hitters and pitchers for selection in the contests" (*see* PAC ¶ 43) has no basis in the agreement. (Dkt. No. 64-3 at 8 through 64-6 at 8.)

None of these provisions, real or invented, transforms MLBAM from a licensor of trademarks and participant in marketing into a "substantial participant" in every DraftKings fantasy contest.

### C. Plaintiffs' Unjust Enrichment Claim Still Fails.

Plaintiffs also still have not alleged how Defendants were supposedly unjustly enriched "at [Plaintiffs'] expense." (Op. at 30.) Plaintiffs only allege generally that "[redacted] (PAC ¶¶ 451, 515, 578.) Only Plaintiff Olson alleges that he "paid for a subscription to MLB.TV in order to better participate in MLB

fantasy contests and follow his fantasy players" during the 2018 season (*id.* ¶ 165), but again, he did not then participate in DraftKings (*see supra* at 17–18). Moreover, that Plaintiffs received exactly what they paid for precludes a finding of unjust enrichment. *See, e.g.*, *Flores* v. *Bank of Am., N.A.*, 2019 WL 2470923, at *16 (D. Colo. June 13, 2019) (dismissing unjust enrichment claim where plaintiff "receiv[ed] services in exchange for money"). The PAC's allegations of how much Defendants "benefitted" from their DraftKings relationship still do not establish a benefit at *Plaintiffs'* expense. Furthermore, the PAC's allegations cannot change the fact that unjust enrichment is not recognized as an independent cause of action under California or Texas law. (*See, e.g.*, Dkt. No. 28 at 24.)

Plaintiffs' new allegations also do not solve the fundamental problem that, without a relationship between Plaintiffs and Defendants, there is no reason to apply a quasi-contract theory of liability. Unjust enrichment is, at its core, "an equitable stopgap for occasional inadequacies in contractual remedies at law." *SiOnyx* v. *Hamamatsu Photonics K.K.*, 332 F. Supp. 3d 446, 472 (D. Mass. 2018); *see also Doe I* v. *Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009) ("[t]he lack of any prior relationship between Plaintiffs and [defendant] precludes the application of an unjust enrichment theory"). That theory is plainly inapplicable here.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' motion should be denied.

Dated: May 15, 2020

Respectfully submitted,

*/s/ John L. Hardiman*
John L. Hardiman
Benjamin R. Walker
Hannah Lonky Fackler
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
facklerh@sullcrom.com

*Counsel for Major League Baseball and MLB Advanced Media LP*