**MANDATE**

N.Y.S.D. Case #
20-cv-0632(JSR)

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of March, two thousand twenty-two,

Before:      Debra Ann Livingston,
                  *Chief Judge,*
             Gerard E. Lynch,
             Joseph F. Bianco,
                  *Circuit Judges.*

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Apr 28 2022
```

**JUDGMENT**

Kristopher R. Olson, Christopher Clifford, Erik Liptak, Christopher Lopez, Warren Barber, individually and on behalf of all others similarly situated,

Docket Nos. 20-1831(L), 20-1841(XAP)

           Plaintiffs-Appellants-Cross-Appellees,

v.

Major League Baseball, MLB Advanced Media, L.P.,

           Defendants-Appellees-Cross-Appellants,

New York Yankees Partnership,

           Interested Party-Appellee-Cross-Appellant,

Boston Red Sox Baseball Club, L.P., Houston Astros, LLC,

           Defendants - Appellees.

The appeal and cross-appeal in the above captioned case from a judgment and unsealing order of the United States District Court for the Southern District of New York were heard on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the district court's dismissal of plaintiffs' first amended complaint without leave to amend and the district court's denial of plaintiffs' motion for reconsideration are AFFIRMED. The district court's unsealing order is also AFFIRMED.

For the Court:
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

**MANDATE ISSUED ON 04/28/2022**

20-1831(L)
*Olson v. Major League Baseball*

# United States Court of Appeals
## for the Second Circuit

_____

August Term 2020

(Submitted: December 14, 2020    Decided: March 21, 2022)

Nos. 20-1831-cv; 20-1841-cv

_____

KRISTOPHER R. OLSON, CHRISTOPHER CLIFFORD, ERIK LIPTAK,
CHRISTOPHER LOPEZ, WARREN BARBER, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellants-Cross-Appellees*,

— v. —

MAJOR LEAGUE BASEBALL, MLB ADVANCED MEDIA, L.P.,

*Defendants-Appellees-Cross-Appellants*,

NEW YORK YANKEES PARTNERSHIP,

*Interested Party-Appellee-Cross-Appellant*,

BOSTON RED SOX BASEBALL CLUB, L.P., HOUSTON ASTROS, LLC,

*Defendants-Appellees.*[*]

_____

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

Before:      LIVINGSTON, *Chief Judge*, LYNCH and BIANCO, *Circuit Judges*.

Plaintiffs-Appellants Kristopher R. Olson, Christopher Clifford, Erik Liptak, Christopher Lopez, and Warren Barber appeal from the judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*), granting the motion to dismiss all claims against Major League Baseball ("MLB") entities and two teams. Plaintiffs, a putative class of fantasy sports players, assert claims for fraudulent misrepresentations and omissions, negligent misrepresentations, violations of various state consumer protection laws, and unjust enrichment. The gravamen of the lawsuit is that plaintiffs, along with a potential class of thousands of other contestants, paid to compete in fantasy baseball contests operated by non-party DraftKings Inc. ("DraftKings"), wrongly believing that they were engaging in "games of skill" based upon a fair gauge of player performance, while defendants fraudulently concealed that the player statistics were purportedly unreliable because of rule violations in the form of electronic sign-stealing by certain MLB teams during the 2017–2019 baseball seasons. Plaintiffs further allege that MLB intentionally took no action to address these rule violations in order to protect its financial interest and investment in DraftKings.

We affirm the district court's dismissal of the First Amended Complaint and its denial of plaintiffs' motion for reconsideration. At its core, this action is nothing more than claims brought by disgruntled fantasy sports participants, unhappy with the effect that cheating in MLB games may have had on their level of success in fantasy sports contests. We hold that alleged misrepresentations or omissions by organizers and participants in major league sports about the competition itself—such as statements about performance, team strategy, or rules violations—do not give rise to plausible claims sounding in fraud or related legal theories brought by consumers of a fantasy sports competition who are utilizing a league's player statistics.

The MLB entities and the New York Yankees Partnership have filed a cross-appeal, challenging the district court's separate order, which concluded that a September 14, 2017 letter from the MLB Commissioner to the New York Yankees General Manager should be unsealed. This letter related to the results of an internal investigation, which plaintiffs allege contradicted a subsequent MLB press release on the same subject. In light of plaintiffs' attempted use of the letter in their proposed Second Amended Complaint and the district court's discussion

of the letter in explaining its decision to deny plaintiffs' request for leave to amend in their reconsideration motion, and because MLB disclosed a substantial portion of the substance of the letter in its press release about the investigation, we conclude that the district court did not abuse its discretion in unsealing the letter, subject to redacting the names of certain individuals.

Accordingly, we AFFIRM the district court's dismissal of plaintiffs' First Amended Compliant without leave to amend and the district court's denial of plaintiffs' motion for reconsideration.  We also AFFIRM the district court's unsealing order.

> DAVID S. GOLUB (Steven L. Bloch, *on the brief*), Silver Golub & Teitell LLP, Stamford, Connecticut; John D. Radice, Kenneth Pickle, Natasha Fernandez-Silber, April Lambert, Radice Law Firm, P.C., Princeton, New Jersey (*on the brief*), *for Plaintiffs-Appellants-Cross-Appellees*.
>
> JOHN L. HARDIMAN (Benjamin R. Walker, Hannah Lonky Fackler, *on the brief*), Sullivan & Cromwell LLP, New York, New York, *for Defendants-Appellees-Cross-Appellants*.
>
> RANDY L. LEVINE, New York Yankees Partnership, Bronx, New York; Jonathan D. Schiller, Thomas H. Sosnowski, Boies Schiller Flexner LLP, New York, New York (*on the brief*), *for Interested Party-Appellee-Cross-Appellant*.
>
> Katherine B. Forrest, Michael T. Reynolds, Lauren A. Moskowitz, Cravath, Swaine & Moore LLP, New

York, New York, *for Defendant-Appellee Boston Red Sox Baseball Club, L.P.*

HILARY L. PRESTON (Clifford Thau, Marisa Antos-Fallon, *on the brief*), Vinson & Elkins LLP, New York, New York; Michael C. Holmes, Vinson & Elkins LLP, Dallas, Texas (*on the brief*), *for Defendant-Appellee Houston Astros, LLC.*

_____

JOSEPH F. BIANCO, *Circuit Judge*:

Plaintiffs-Appellants Kristopher R. Olson, Christopher Clifford, Erik Liptak, Christopher Lopez, and Warren Barber appeal from the judgment of the United States District Court for the Southern District of New York (Rakoff, *J.*), granting the motion to dismiss all claims against Major League Baseball ("MLB") and MLB Advanced Media, L.P. ("MLBAM," and together with MLB, the "MLB Defendants"), as well as the Boston Red Sox Baseball Club, L.P. (the "Red Sox") and Houston Astros, LLC (the "Astros," and together with the Red Sox, the "Team Defendants").

Plaintiffs assert claims for fraudulent misrepresentations and omissions, negligent misrepresentations, violations of various state consumer protection laws, and unjust enrichment. The gravamen of the lawsuit is that plaintiffs, along

4

with a potential class of thousands of other contestants, paid to compete in fantasy baseball contests operated by non-party DraftKings Inc. ("DraftKings"), wrongly believing that they were engaging in "games of skill" based upon a fair gauge of player performance, while defendants fraudulently concealed that the player statistics were unreliable because of rule violations in the form of electronic sign-stealing by certain MLB teams during the 2017–2019 baseball seasons. Plaintiffs further allege that MLB intentionally took no action to address these rule violations in order to protect its reputation and financial interests, as well as its investment in DraftKings.

Defendants moved to dismiss all the claims in this action, and the district court granted that motion, dismissing the First Amended Complaint ("FAC") in its entirety without leave to amend. In a motion for reconsideration, plaintiffs moved to vacate the judgment and for leave to amend, attaching their proposed Second Amended Complaint ("SAC") to the motion, which purported to cure the deficiencies in the FAC by, *inter alia*, adding new allegations drawn from materials obtained during discovery. The district court denied the motion for reconsideration for substantially the same reasons it dismissed the FAC.

As part of its order denying plaintiffs' motion for reconsideration, the district court discussed a September 14, 2017 letter, referenced in the proposed SAC and filed under seal, which was sent by the Commissioner of the MLB to the General Manager of the New York Yankees Partnership (the "Yankees") and related to the results of an internal investigation by MLB. In a separate order, after application of the three-part analysis required by our precedent, the district court determined that the letter should be unsealed, but permitted the MLB Defendants and the Yankees to submit a redacted version to protect the identity of the individuals mentioned therein, and then stayed the unsealing order to allow the Yankees to appeal to this Court.

We affirm the district court's dismissal of the FAC and its denial of plaintiffs' motion for reconsideration. At its core, this action is nothing more than claims brought by disgruntled fantasy sports participants, unhappy with the effect that cheating in MLB games may have had on their level of success in fantasy sports contests. We hold that alleged misrepresentations or omissions by organizers and participants in major league sports about the competition itself—such as statements about performance, team strategy, or rules violations—do not give rise to plausible claims sounding in fraud or related legal theories brought by

consumers of a fantasy sports competition who are utilizing a league's player statistics.

More specifically, among other pleading defects, plaintiffs have not plausibly alleged, either in the FAC or the proposed SAC, actual or reasonable reliance upon the alleged fraudulent and negligent misrepresentations about player performance and electronic sign-stealing. Apart from actual reliance, no consumer of fantasy baseball competitions could plausibly allege that, in paying to participate in the competition, they reasonably relied upon these statements in believing that the sport of major league baseball was free from intentional violations of league rules by teams and/or individual players. Instead, any reasonable spectator or consumer of sports competitions—including participants in fantasy sports contests based upon such sporting events—is undoubtedly aware that cheating is, unfortunately, part of sports and is one of many unknown variables that can affect player performance and statistics on any given day, and over time.

The claims under the various state consumer protection laws fail for a similar reason—that is, the alleged statements by defendants about the integrity of their sport (including the electronic sign-stealing issue) do not rise to the level

of a deceptive or unfair practice that would plausibly mislead the reasonable consumer under these circumstances. In addition, with respect to the unjust enrichment claim, there is no plausible claim that any alleged benefit to MLB was unjust. Thus, the FAC was properly dismissed, and the motion for reconsideration was properly denied because the additional allegations in the proposed SAC do not cure these pleading defects, as the claims in this particular case are based on fundamentally-flawed legal theories.

We likewise affirm the district court's order unsealing the September 14, 2017 letter sent by the MLB Commissioner to the Yankees' General Manager about the results of an internal investigation, which plaintiffs allege contradicted a subsequent MLB press release on the same subject. In light of plaintiffs' attempted use of the letter in their proposed SAC and the district court's discussion of the letter in explaining its decision to deny them the leave to amend requested in their reconsideration motion, and because a substantial portion of the substance of the letter has already been disclosed in the press release about the investigation issued by MLB, we conclude that the district court did not abuse its discretion in unsealing the letter with redactions.

Accordingly, we AFFIRM the district court's dismissal of plaintiffs' FAC without leave to amend and the district court's denial of plaintiffs' motion for reconsideration. We also AFFIRM the district court's unsealing order.

## BACKGROUND

### I.    Factual Background[1]

DraftKings was founded in 2012 to operate daily and weekly fantasy sports contests—across multiple sports including baseball—through its website and mobile applications. Less than a year after DraftKings' founding, MLB, acting through and in a partnership or joint venture with MLBAM,[2] acquired an equity stake in DraftKings.

As part of the partnership, DraftKings offers daily fantasy sports baseball competitions ("MLB DFS") and requires "contestants to select a lineup of MLB players pursuant to a 'salary cap' draft." Joint App'x at 80. DraftKings

---

[1] The factual summary below is derived from the allegations in the FAC and the proposed SAC, which we must accept as true in reviewing a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] MLB is an unincorporated association consisting of thirty major league baseball clubs, including defendants Houston Astros and Boston Red Sox, and interested party New York Yankees Partnership (the "Yankees"). MLBAM is a limited partnership comprised of MLB's member clubs (or their affiliates). "MLBAM has responsibility for internet and interactive marketing for MLB, including MLB's relationship with DraftKings and promotion and marketing of DraftKings' fantasy baseball competitions on a nationwide basis." Joint App'x at 78.

participants accumulate fantasy points based on the performance of their "drafted" players in real life on the particular day or week covered by the contest; at the end of the contest, the total points accrued determines who wins a cash prize. As outlined in the FAC, MLB DFS, like other fantasy sports competitions offered by DraftKings, are defined as "games of skill," which are exempt from federal prohibitions on illegal gambling, pursuant to the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. § 5361, *et seq.* (2006). The DraftKings' "Terms of Use" include a "Conditions of Participation" provision, which states that "[W]inners are determined by the individuals who use their skill and knowledge of relevant sports information and fantasy sports rules to accumulate the most points according to the corresponding scoring rules." Joint App'x at 460. Participants pay DraftKings an entry fee to join a contest, a portion of which is kept by DraftKings and a portion of which funds the contests' prizes.

Plaintiffs Olson, Lopez, Barber, Clifford, and Liptak are residents of Massachusetts, California, Texas, Florida, and Colorado, respectively. Each plaintiff participated in these contests and alleged in the proposed SAC that he received and relied upon the MLB fantasy baseball contests' Conditions of Participation, which stated that the contests were conducted as games of skill, in

deciding to pay to participate in these contests. Joint App'x at 505, 509, 512, 514, 516–17.

In early 2015, MLB made a further investment in DraftKings, creating what MLB and DraftKings called "the most comprehensive league partnership in daily fantasy sports history." Joint App'x at 82 (internal quotation marks omitted). According to the FAC, the deal "provided for co-branding of DraftKings' DFS baseball contests, allowed DraftKings to offer market-specific in-ballpark experiences, and gave DraftKings promotional rights, use of MLB league and team logos, the exclusive right to sign sponsorship deals with individual MLB member clubs, and a designation as MLB's 'Official Daily Fantasy Game.'" Joint App'x at 82–83. In return, plaintiffs allege, the MLB Defendants "received a share of the multi-million dollar fees earned from fantasy baseball contestants, an increase in the value of its equity investment in DraftKings (which MLB redeemed in 2019), as well as substantial other financial benefits." Joint App'x at 72–73.

As part of that March 2015 deal, MLBAM, acting on behalf of MLB and its clubs and affiliates, and DraftKings signed a licensing and marketing agreement, setting out the conditions under which DraftKings could use MLB's proprietary material in its fantasy baseball competitions ("MLB-DraftKings Agreement"). The

terms of that agreement allegedly show that the MLB Defendants "were not simply [] investor[s] in DraftKings," but were "directly and substantially involved in every aspect of the commercial venture." Joint App'x at 458.

Shortly thereafter, and before July 2015, DraftKings announced individual partnerships with twenty-seven of MLB's member clubs, including the Astros and the Red Sox.[3] As part of the terms of these partnerships, DraftKings could create "market-specific in-ballpark experiences" and could "place advertisements inside the stadiums of their partner MLB member clubs." Joint App'x at 83. This business relationship between DraftKings and defendants allegedly continued into the relevant time period, which included the 2017–2019 baseball seasons.

Meanwhile, the issue regarding electronic sign-stealing was brewing in baseball. During baseball games, pitchers and catchers use a series of signals—called "signs"—to communicate the type of pitch being thrown, and the intended speed, movement, and location of the pitch. A batter who knows the type of pitch being thrown in advance is more likely to hit the ball successfully. Thus, keeping such signs secret is significant to a pitcher's success, and the disclosure to the batter of the content of the signs correspondingly affects his success.

---

[3] The Astros and the Red Sox deny that any separate individual contracts exist between them and DraftKings. Astros' Br. at 11; Red Sox's Br. at 4–5.

All of MLB's member clubs have entered into an operating agreement (the "MLB Constitution"), pursuant to which all teams agreed to be bound by rules and regulations "relating to games, ballparks . . . and other matters" set by MLB. Joint App'x at 85. MLB rules and regulations do not prohibit sign-stealing *per se*, but as of the start of the 2017 season, they did explicitly prohibit *electronic* sign-stealing. Joint App'x at 87 (stating that regulations barred "the use of electronic equipment or devices during games, providing that no such equipment 'may be used for the purpose of stealing signs or conveying information designed to give a Club an advantage'").

Throughout the 2017, 2018, and 2019 baseball seasons, officials and players of the Astros and the Red Sox (and possibly other MLB member clubs) allegedly violated MLB rules by engaging in electronic sign-stealing.[4] Although plaintiffs allege that these teams improved their batting performance significantly during the class period by engaging in this prohibited practice, the Team Defendants attributed their success to legitimate factors in various public statements made throughout this period.

---

[4] The FAC cites a news article reporting that Astros personnel believed that as many as eight teams may have been electronically stealing signs. Joint App'x at 109. The proposed SAC further alleges that electronic sign-stealing occurred as early as the 2015 baseball season.

Electronic sign-stealing was reported to MLB when the Yankees filed a complaint in 2017. MLB Commissioner Robert D. Manfred, Jr. then issued a public statement on September 15, 2017 (the "2017 Press Release") announcing that his office had "conducted a thorough investigation" of the allegation by the Yankees "that the Boston Red Sox violated certain Major League Baseball Regulations by using electronic equipment to aid in the deciphering of signs being given by the Yankees' catcher," and that he was "prepared to disclose the results of that investigation." Joint App'x at 295. The 2017 Press Release noted, "At the outset, it is important to understand that the attempt to decode signs being used by an opposing catcher is not a violation of any Major League Baseball Rule or Regulation." Joint App'x at 295. It further emphasized that "Major League Baseball Regulations do, however, prohibit the use of electronic equipment during games and state that no such equipment 'may be used for the purpose of stealing signs or conveying information designed to give a Club an advantage.'" Joint App'x at 295. Based on the investigation conducted by his office, Commissioner Manfred found that the Red Sox violated this regulation "by sending electronic communications from their video replay room to an athletic trainer in the dugout." Joint App'x at 295. He noted that he had "received absolute assurances from the

14

Red Sox that there will be no future violations of this type," and imposed a fine on the Red Sox of "an undisclosed amount."  Joint App'x at 295.  According to plaintiffs, that fine did not serve to deter the Red Sox, as the team is alleged to have resumed the practice the following season.

The 2017 Press Release further explained that, after the Yankees' complaint, "the Red Sox brought forward allegations that the Yankees had made improper use of the YES Network in an effort to decipher the Red Sox signs."  Joint App'x at 295.  It then described how the Commissioner's Office subsequently conducted an investigation into the Yankees' alleged conduct, and the results of that investigation:

> During that investigation, we found insufficient evidence to support the allegation that the Yankees had made inappropriate use of the YES Network to gain a competitive advantage.  In the course of our investigation, however, we learned that during an earlier championship season (prior to 2017) the Yankees had violated a rule governing the use of the dugout phone.  No Club complained about the conduct in question at the time and, without prompting from another Club or my Office, the Yankees halted the conduct in question.  Moreover, the substance of the communications that took place on the dugout phone was not a violation of any Rule or Regulation in and of itself.  Rather, the violation occurred because the dugout phone technically cannot be used for such a communication.  Based on the foregoing, I have decided to fine the Yankees a lesser undisclosed amount which in turn will be donated by my office to hurricane relief efforts in Florida.

Joint App'x at 296.

Allegations of electronic sign-stealing by the Astros did not become public until various news articles were published in November 2019. Shortly thereafter, Commissioner Manfred announced the commencement of a "really, really thorough" investigation into the alleged conduct by the Astros. Joint App'x at 96. On January 13, 2020, Commissioner Manfred announced in a press release that MLB had determined that the Astros engaged in electronic sign-stealing in the 2017 season and part of the 2018 season. Commissioner Manfred described how "the conduct of the Astros, and its senior baseball operations executives, merits significant discipline" because this behavior "caused fans, players, executives at other MLB Clubs, and members of the media to raise questions about the integrity of games in which the Astros participated." Press Release, Major League Baseball, Office of the Commissioner, MLB Completes Astros' Investigation (Jan. 13, 2020); *see* Joint App'x at 96 n.40 (citing press release). The press release contained many of the details regarding the findings of that investigation of the Astros, and also announced the imposition of disciplinary sanctions against the Astros and certain members of the Astros organization.

## II.    Procedural History

Ten days after the January 13, 2020 press release about the Astros, plaintiff Olson filed the initial class action complaint alleging:  (1) violations of state consumer protection statutes of nearly all fifty states against the MLB Defendants, (2) unjust enrichment against all defendants, (3) negligence against the MLB Defendants, and (4) violations of the Texas Deceptive Trade Practices and Consumer Protection Act ("TDTPA") against the Astros.  Plaintiff Olson also indicated an intent to file a cause of action alleging violations of the Massachusetts Consumer Protection Act ("MCPA") against the Red Sox.

On February 14, 2020, the FAC was filed, and plaintiff Olson was joined by new plaintiffs Lopez, Barber, Clifford, and Liptak.  The FAC added a claim for common law fraud against all defendants, provided more detailed allegations regarding particular violations of state consumer protection statutes in connection with the domiciles of plaintiffs, and now alleged negligence as a separate cause of action against the Team Defendants to supplement the prior negligence allegations against the MLB Defendants.  In sum, plaintiffs allege common law fraud, negligence, and unjust enrichment against all defendants; violations of the consumer protection statutes of plaintiffs' home states (and the "substantially

similar" consumer protection statutes of numerous other states) against the MLB Defendants; violations of the TDTPA against the Astros; and violations of the MCPA against the Red Sox.  Plaintiffs seek the certification of a nationwide class, and Massachusetts, California, Texas, Florida, and Colorado subclasses.

Plaintiffs' allegations center on defendants' purported concealment of the electronic sign-stealing scheme:  The FAC ties defendants' alleged concealment of the prohibited electronic sign-stealing—which purportedly corrupted the fairness of MLB DFS contests—to defendants' financial interest and investment in DraftKings.  The FAC alleges that defendants made various statements and omissions designed to conceal the electronic sign-stealing scheme in order to convince plaintiffs (and other MLB DFS contest participants) that the MLB DFS contests were "games of skill" grounded in fair and legitimate player performance statistics.  The ultimate aim of such deception was allegedly to induce plaintiffs and other DraftKings participants to play MLB DFS contests, which each plaintiff alleges he would not have done "had he known that the honesty of the player performance statistics on which his wagers were based and the results of his wagers were determined was compromised by MLB teams' and players' electronic sign stealing."  Joint App'x at 112–15.

18

On April 3, 2020, the district court dismissed the FAC in its entirety without leave to amend. *Olson v. Major League Baseball* ("*Olson I*"), 447 F. Supp. 3d 159, 173 (S.D.N.Y. 2020). Judgment was entered on April 7, 2020. On May 6, 2020, pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, plaintiffs sought reconsideration in the form of a motion to alter, amend, and vacate the judgment and for leave to amend, attaching their proposed SAC. According to plaintiffs, the proposed SAC cured the deficiencies in the FAC by, *inter alia*, adding new allegations drawn from materials obtained during discovery. On June 5, 2020, the district court denied the reconsideration motion in its entirety. *Olson v. Major League Baseball* ("*Olson II*"), 447 F. Supp. 3d 174, 182 (S.D.N.Y. 2020).

In *Olson II*, the district court discussed a letter, dated September 14, 2017, sent by Commissioner Manfred to the General Manager of the Yankees. *Id.* at 179. That letter, filed under seal, was referenced in the proposed SAC and was subject to a request for continued sealing by the MLB Defendants and third-party Yankees. *Id.* at 179 n.3.

In a subsequent order, the district court determined that the letter should be unsealed, but permitted the MLB Defendants and the Yankees to submit "a minimally redacted version of the letter to protect the identity of individuals

mentioned therein." *Olson v. Major League Baseball* ("*Olson III*"), 466 F. Supp. 3d 450, 456–57 (S.D.N.Y. 2020). The district court also stayed the unsealing to allow the Yankees to pursue an appeal in this Court. *Id.* at 457.

This appeal followed. Plaintiffs appeal the dismissal of the FAC, as well as the denial of the motion for reconsideration based on the proposed SAC. The MLB Defendants and the Yankees cross-appeal the district court's unsealing order.

## DISCUSSION

### I.  Plaintiffs' Appeal

### A.  The Standard of Review

We review the grant of a motion to dismiss *de novo*, accepting all factual allegations in the complaint as true and drawing all reasonable inferences in favor of the plaintiff. *City of Providence v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 48 (2d Cir. 2017).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Claims sounding in fraud must satisfy the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b). *See Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004). Under Rule 9(b)'s particularity requirement, the plaintiff must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Id.* at 187; *see also Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015).

The district court's denial of leave to amend is similarly reviewed *de novo* because the district court made an interpretation of law when it determined that any amendment, and specifically the proposed amendments in the SAC, would be futile. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Id.* In general, when evaluating whether a proposed amended complaint would state a claim, we consider "the proposed

amendment[s] . . . along with the remainder of the complaint." *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 323 n.3 (2d Cir. 2010).

Finally, we generally review the denial of a reconsideration motion under Federal Rules of Civil Procedure 59(e) and 60(b) for abuse of discretion. *See Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011) (per curiam) (Rule 60(b)); *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 150 (2d Cir. 2008) (Rule 59(e)). However, where (as here) the denial of reconsideration is based solely on futility grounds, we again conduct *de novo* review. *See, e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 92 (2d Cir. 2016).

For ease, we will review the allegations contained in both the FAC and the proposed SAC together. Moreover, the parties agree that the claims should be analyzed under the law of each plaintiff's home states and, unless otherwise noted, the elements for the respective claims under each state's law (Massachusetts, California, Texas, Florida, and Colorado) do not differ in a material manner.[5]

---

[5] In addition, to the extent we cite persuasive authority from other jurisdictions, such courts also were analyzing state law claims that are substantially similar to those at issue here.

## B.     Plaintiffs' Fraud and Negligent Misrepresentation Claims

Plaintiffs have alleged two types of affirmative misrepresentations sounding in fraud and negligent misrepresentation:   those regarding fantasy baseball and those regarding real-life major league baseball.

Common law fraud requires a (1) material misrepresentation or omission, (2) with knowledge of its falsity, (3) for the purpose of inducing an action by plaintiffs, (4) that was reasonably relied upon, and (5) that caused injury.  *See Small v. Fritz Cos., Inc.*, 65 P.3d 1255, 1258 (Cal. 2003); *Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013); *Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 913 (Mass. 2017); *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 47–48 (Tex. 1998).[6]  The elements of negligent misrepresentation are: (1) misrepresentation of a material fact, (2) without reasonable grounds for believing it to be true, (3) with the intent to induce another's reliance, (4) that was reasonably relied upon, and (5) that caused injury.  *See Fox v. Pollack*, 226 Cal. Rptr. 532, 537 (Cal. Ct. App. 1986); *Allen v. Steele*, 252 P.3d 476, 482 (Colo. 2011) (en banc);

---

[6]  Florida law does not include reasonable, or justifiable, reliance as a necessary element of a fraudulent misrepresentation claim (although it does require justifiable reliance for *negligent* misrepresentation claims); rather, only actual reliance is required.  *See Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010).

*Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc.*, 232 So. 3d 502, 505 (Fla. Dist. Ct. App. 2017); *Nota Constr. Corp. v. Keyes Assocs., Inc.*, 694 N.E.2d 401, 405 (Mass. App. Ct. 1998); *Willis v. Marshall*, 401 S.W.3d 689, 698 (Tex. App. 2013).[7]

a. Alleged Affirmative Misrepresentations about Fantasy Baseball

Plaintiffs allege that defendants made actionable misrepresentations related to fantasy baseball. In particular, plaintiffs point to a statement by Commissioner Manfred in October 2015 that he was "quite convinced [MLB DFS contests are] game[s] of skill, as defined by the federal statute." Joint App'x at 246, 462. In addition, plaintiffs rely upon a provision of the DraftKings Terms of Use characterizing the MLB DFS contests as "contests of skill," which plaintiffs assert can be attributed to defendants by virtue of their business arrangement with DraftKings. Joint App'x at 503. Plaintiffs assert that these were misrepresentations because electronic sign-stealing deprived fantasy baseball contestants of the ability to exercise their skill in selecting players and, instead, essentially converted the contests to being based on random chance.

In its thorough opinions, the district court found several pleading defects with respect to these alleged affirmative misrepresentations about fantasy

---

[7] As discussed *infra*, Massachusetts, Colorado, and Texas law also require additional elements.

baseball. With respect to the reference to "games of skill" in DraftKings' Terms of Use, the district court held that the language at issue referred to the skill and knowledge of the fantasy sports bettors (and were not about the fantasy baseball contests themselves) and, in any event, the SAC failed to plausibly allege how this statement by DraftKings constituted a statement by any defendant. *Olson II*, 447 F. Supp. 3d at 178. However, we need not address the nature of the alleged business arrangement between defendants and DraftKings because we conclude that, even assuming that each of these statements in the Terms of Use could be attributed to defendants, plaintiffs have failed to plausibly allege how such statements regarding fantasy baseball contests being "games of skill" or "contests of skill" are false even with the existence of electronic sign-stealing. *See McCall v. Pataki*, 232 F.3d 321, 323 (2d Cir. 2000) (holding that we are "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied" (citation omitted)). Moreover, any such statement regarding whether fantasy baseball is a "game of skill" or "contest of skill" is a non-actionable opinion.

The statements at issue merely reference the UIGEA, which differentiates permissible gaming activity from illegal gambling and defines permissible gaming

activity to include contests in which "winning outcomes reflect the relative knowledge and skill of the participants and are determined predominantly by accumulated statistical results of the performance of individuals . . . in multiple real-world sporting . . . events."  31 U.S.C. § 5362(1)(E)(ix)(II).  It is important to note that the "skill" referenced here is the ability of the fantasy baseball participants to select players, not the skill level of the real-life players themselves. Moreover, the existence of numerous variables in real-life baseball, including rules violations (whether intentional or unintentional), does not mean that MLB DFS contests do not involve the skill of the fantasy baseball participants.  The skill in participating in an MLB DFS contest lies not in any assurances of on-field performance, but rather in choosing a lineup based on considerations of the innumerable, widely-known variables that could impact player performance, such as weather, injuries, umpiring, cheating, and many more.  Indeed, one could even argue that factoring in potential cheating or rules violations that could occur during the game itself could implicate a degree of additional skill by MLB DFS contest participants.   Thus, any statements that can fairly be attributed to defendants about the fantasy baseball contests being "games of skill" or "contests

26

of skill" are not rendered plausibly false due to the existence of rules violations, including electronic sign-stealing.[8]

In any event, such statements are non-actionable because whether fantasy baseball is a "game of skill" or "contest of skill" is a statement of opinion, rather than a statement of fact. *See, e.g.*, *Cicone v. URS Corp.*, 227 Cal. Rptr. 887, 891–92 (Cal. Ct. App. 1986) ("[T]he representation must ordinarily be an affirmation of fact. A misrepresentation of law is ordinarily not actionable in the absence of a confidential relationship or other special circumstance. The theory is either that everyone is bound to know the law, or that a statement regarding the law is a mere opinion on which one may not rely." (citations omitted)); *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 153 (Colo. 2007) (en banc) ("[A] representation of law is a statement of opinion as to what the law permits or prohibits, and cannot support an action for fraud."); *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d

---

[8] Plaintiffs suggest that the meaning of the phrase "contest of skill" should not be tied to the statutory definition of a "game of skill" under the UIGEA, but should be analyzed using the "common sense meaning of the words" in that "contestants' skill, *inter alia*, in selecting players, managing the salary cap and choosing the contests in which to participate would substantially control whether they won or lost." Appellants' Reply Br. to MLB at 21. Even assuming that plaintiffs' definition were used for analyzing the alleged misrepresentations, the skill of contestants in selecting real-life players does not dissipate when there are rules violations. Contestants still have complete control over those player selections, which will dictate whether they win or lose, and must use their skills to account for any variables, known and unknown, that can affect player performance. Thus, none of the statements are plausibly false even under that definition.

168, 172 (Fla. Dist. Ct. App. 1994) ("A claim of fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact."); *Zimmerman v. Kent*, 575 N.E.2d 70, 75 (Mass. App. Ct. 1991) ("A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment."); *Fina Supply, Inc. v. Abilene Nat'l Bank*, 726 S.W.2d 537, 540 (Tex. 1987) (explaining "the general rule that misrepresentations involving a point of law or the legal effect of a document will not support an action for fraud").

Accordingly, plaintiffs have failed to state a plausible misrepresentation about fantasy baseball by defendants.

b. Alleged Affirmative Misrepresentations about Real-Life Baseball

Plaintiffs also plead numerous alleged misstatements against all defendants in relation to real-life major league baseball including, *inter alia*, the following: (1) Commissioner Manfred's repeated public statements reassuring the public about MLB's commitment to maintaining the integrity and honesty of baseball; (2) a statement from the 2017 Press Release by Commissioner Manfred which suggested that the Yankees had only engaged in a minor "technical" violation of the rules, as opposed to an electronic sign-stealing scheme as alleged by plaintiffs; (3) twelve

specific statements by Astros' players and managers, including denials that the Astros were involved in any electronic sign-stealing schemes; (4) the Team Defendants' agreement to be bound by the MLB Constitution and to follow MLB rules and regulations; and (5) repeated statements by the Red Sox attributing the team's success to player talent or other legitimate baseball factors instead of electronic sign-stealing.

Similar to the alleged misrepresentations about fantasy baseball contests being "games of skill," the district court found a number of pleading defects as to these alleged misrepresentations about real-life major league baseball. For instance, the district court held that plaintiffs failed to plausibly allege how Commissioner Manfred's public statements about maintaining the integrity of baseball, or statements by Astros and Red Sox players and officials about the sources of various players' or teams' successes in a game, were false. *Olson I*, 447 F. Supp. 3d at 166. In particular, with respect to Commissioner Manfred's statements about a commitment to the integrity of the game, the district court found that none of the statements were plausibly false because (1) plaintiffs' theory was "contradicted by the complaint's own description of various investigations and public disclosures that the MLB did in fact undertake," and (2) "[m]ore

importantly, even accepting as true plaintiffs' contention that defendants inadequately investigated player misconduct, such a fact is not inconsistent with a 'commitment' to integrity." *Id.* More generally, the district court concluded that plaintiffs "did not, and could not, allege the reliance necessary to support their fraud or negligent misrepresentation claims." *Olson II*, 447 F. Supp. 3d at 179. However, we need not address all of these various grounds for dismissal articulated by the district court because we find that dismissal is warranted on this portion of the fraud claims for the following two reasons.

First, with respect to alleged statements regarding the integrity of the game, we conclude that such generalized statements are not actionable as a matter of law. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (holding that "[i]t is well-established that general statements about . . . integrity" are "too general" to be material); *cf. MDVIP, Inc. v. Beber*, 222 So.3d 555, 561 (Fla. Dist. Ct. App. 2017) ("A promise to deliver an 'exceptional' product or service is a matter of opinion rather than fact, and constitutes non-actionable puffery."); *Fitzgerald v. Water Rock Outdoors, LLC*, 536 S.W.3d 112, 118 (Tex. App. 2017) (holding that statements that a company "is a high quality custom homebuilder with years of experience, is hardworking and honest, and employs

top-quality subcontractors . . . were not material misstatements but were merely 'puffing' or opinion and, as such, cannot constitute actionable fraud").

Moreover, as to the more specific alleged misrepresentations, including those related to player/team performance and electronic sign-stealing, we conclude that any fraud claims based upon such alleged misrepresentations also cannot survive a motion to dismiss because they each share the same fundamental flaw, which the district court also identified—that is, plaintiffs failed to plausibly allege the requisite element of reliance.

As noted above, with the exception of Florida law, which requires only actual reliance, a claim of fraud under the laws of plaintiffs' respective home states requires a showing of "actual and justifiable reliance." *Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 74 (Tex. App. 2011); *see also OCM Principal Opportunities Fund, L.P. v. CIBC World Mkts. Corp.*, 68 Cal. Rptr. 3d 828, 855–56 (Cal. Ct. App. 2007). "It is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." *Engalla v. Permanente Med. Grp., Inc.*, 938 P.2d 903, 919

(Cal. 1997) (quoting Restatement (Second) of Torts § 546 cmt. b (Am. L. Inst. 1977));

*accord STE Fin. Corp. v. Popkin*, No. 9118, 1991 WL 285754, at *4 (Mass. App. Ct.

Dec. 23, 1991). "[A] presumption, or at least an inference, of reliance arises

wherever there is a showing that a misrepresentation was material." *Engalla*, 938

P.2d at 919. However, conclusory allegations—vague awareness or reliance—

cannot support a claim for fraud and therefore warrant dismissal of such a claim

even at the motion to dismiss stage. *See Mirkin v. Wasserman*, 858 P.2d 568, 570

(Cal. 1993) ("In attempting to plead actual reliance, which is an element of th[e]

torts [of deceit and negligent misrepresentation], plaintiffs alleged in conclusory

fashion that they had purchased Maxicare securities '*in reliance upon* said

misrepresentations.' Defendants demurred on the ground that the allegation of

reliance was insufficient. . . . [T]he court sustained the demurrers with leave to

amend." (internal citations omitted) (emphasis added)); *see generally Ashland Inc.*

*v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (affirming dismissal of

fraud claims because "even accepting as true all of the facts alleged in the

[operative complaint], appellants' Section 10(b) claim fails due to their inability to

plead reasonable reliance on the alleged misrepresentations").

As set forth below, even under the liberal pleading standard of Rule 8, plaintiffs failed to plausibly plead actual or reasonable reliance as to any of the alleged specific misrepresentations regarding team/player performance or electronic sign-stealing. Thus, the fraud claims were properly dismissed.[9]

With respect to actual reliance, the district court correctly noted that the FAC contained no allegation that plaintiffs "saw, read, or otherwise noticed" any of the actionable misrepresentations. *Olson I*, 447 F. Supp. 3d at 167 (quoting *In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 217 (S.D.N.Y. 2019)). Plaintiffs try to cure this pleading defect, as it related to the specific statements regarding electronic sign-stealing, by adding an allegation in the proposed SAC that Olson relied upon Commissioner Manfred's statement quoted in the 2017 Press Release as well as Commissioner Manfred's October 2018 public statement. Plaintiffs, however, were forced to withdraw Olson's allegation that he relied on the September 2017

---

[9] The parties dispute whether the stricter particularity requirement of Rule 9(b) applies to the reliance element for common law fraud claims. We have never addressed that precise issue. *See SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173, 177 n.4 (2d Cir. 2016) ("Because the complaint fails to meet the *Twombly* pleading standard, we do not consider whether the stricter pleading requirements of Federal Rule of Civil Procedure 9(b) apply to the reliance element of [plaintiff's] common law fraud claims."). However, we need not reach that issue here because we conclude that plaintiffs have failed to plausibly plead reliance for the fraud claims under the *Twombly* standard pursuant to Rule 8.

and October 2018 alleged misstatements because he had stopped playing MLB DFS contests in August 2017. Since no other named plaintiff is alleged to have relied upon those statements specifically, plaintiffs have failed to sufficiently plead actual reliance upon them.

Similarly, as to the alleged misrepresentations made by the Team Defendants about performance or electronic sign-stealing, plaintiffs did not allege, in either their FAC or their proposed SAC, that any of the named plaintiffs actually saw, read, or heard the alleged misstatements made by the members of the Astros or Red Sox, and thus failed to adequately plead reliance. *See, e.g.*, *Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 738–39 (D. Mass. 1995) (under Massachusetts law, dismissing claims of fraud and negligent misrepresentation for failure to plead actual reliance).

Even assuming, *arguendo*, that plaintiffs adequately alleged that they relied upon specific statements regarding player/team performance or electronic sign-stealing by Commissioner Manfred or the Team Defendants, plaintiffs also failed to plausibly allege that any reliance on those statements, in playing MLB DFS contests, was reasonable. "Besides actual reliance, [a] plaintiff must also show 'justifiable' reliance, i.e., circumstances were such to make it *reasonable* for plaintiff

34

to accept defendant's statements without an independent inquiry or investigation." *Wilhelm v. Pray, Price, Williams & Russell*, 231 Cal. Rptr. 355, 358 (Cal. Ct. App. 1986). Although reasonableness of reliance is generally a question for the jury, courts may resolve this issue as a question of law where no reasonable person could believe the type of misstatement alleged. *See All. Mortg. Co. v. Rothwell*, 900 P.2d 601, 609 (Cal. 1995) (en banc) ("[W]hether a party's reliance was justified may be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." (citation omitted)).

Here, plaintiffs assert a right not just to rely upon the assertion that the MLB DFS contests would be determined in accordance with actual performance metrics, but also to rely upon those metrics being made in compliance with MLB rules and regulations. However, plaintiffs could not plausibly rely upon the type of misstatements alleged in this case to reasonably conclude that their participation in MLB DFS contests through the use of real-life player statistics would not be impacted by rules violations like electronic sign-stealing.

Our holding today is consistent with the conclusion of numerous other courts around the nation that have found that fraud and related claims brought by disappointed sports fans—whether about poor performance or rule violations—

35

cannot survive a motion to dismiss. *See, e.g.*, *In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.* ("*Pacquiao*"), 942 F.3d 1160, 1171–72 (9th Cir. 2019) (collecting cases); *Mayer* v. *Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *Bowers v. Fédération Internationale de l'Automobile*, 489 F.3d 316, 322, 325 (7th Cir. 2007); *Oliver v. Houston Astros, LLC*, No. 220-cv-00283, 2020 WL 1430382, at *3 (D. Nev. Mar. 23, 2020), *aff'd*, 2020 WL 2128656 (D. Nev. May 5, 2020); *Le Mon v. Nat'l Football League*, 277 So. 3d 1166, 1168 (La. 2019); *Castillo v. Tyson*, 701 N.Y.S.2d 423, 423 (N.Y. App. Div. 2000).

Although many of these cases addressed the limits of the contractual rights of ticketholders, several of these decisions dismissed fraud-related claims. They also more broadly rejected the ability of disappointed ticketholders to bring such claims based on alleged cheating or some other alleged deficiency in the competition itself, because any alleged reliance would be unreasonable as a matter of law. *See, e.g.*, *Pacquiao*, 942 F.3d at 1170 n.7; *Mayer*, 605 F.3d at 234–36; *Bowers*, 489 F.3d at 324; *Castillo*, 701 N.Y.S.2d at 423.

For example, in *Mayer*, a season ticketholder brought a lawsuit against the National Football League and the New England Patriots football team alleging, among other things, common law and statutory fraud claims arising out of the

team's purported practice of surreptitiously videotaping the signals of opposing

teams—often referred to as "Spygate." 605 F.3d at 225, 228. The Third Circuit held

that, under New Jersey law, the season ticketholder suffered no cognizable injury

to a legally protected right or interest. *Id.* at 236. In particular, after reviewing the

"overwhelming weight of the case law" supporting that decision, the Third Circuit

explained:

> [W]e do recognize that [plaintiff] alleged that he was the victim, not
> of mere poor performance by a team or its players, but of a team's
> ongoing acts of dishonesty or cheating in violation of the express rules
> of the game. Nevertheless, there are any number of often complicated
> rules and standards applicable to a variety of sports, including
> professional football. It appears uncontested that players often
> commit intentional rule infractions in order to obtain an advantage
> over the course of the game. For instance, a football player may
> purposefully commit pass interference or a "delay of game." Such
> infractions, if not called by the referees, may even change the outcome
> of the game itself. There are also rules governing the off-field conduct
> of the football team, such as salary "caps" and the prohibition against
> "tampering" with the employer-employee relationships between
> another team and its players and coaches. [Plaintiff] further does not
> appear to contest the fact that a team is evidently permitted by the
> rules to engage in a wide variety of arguably "dishonest" conduct to
> uncover an opponent's signals. For example, a team is apparently free
> to take advantage of the knowledge that a newly hired player or coach
> takes with him after leaving his former team, and it may even have
> personnel on the sidelines who try to pick up the opposing team's
> signals with the assistance of lip-reading, binoculars, note-taking, and
> other devices. In addition, even [plaintiff] acknowledged in his
> amended complaint that "[t]eams are allowed to have a limited
> number of their own videographers on the sideline during the game."

*Id*. (citation omitted). The court emphasized that, "[a]t least in this specific context, it is not the role of judges and juries to be second-guessing the decision taken by a professional sports league purportedly enforcing its *own* rules." *Id*. at 237; *see also Ryan v. Nat'l Football League, Inc.*, No. 19-CV-1811, 2019 WL 3430259, at *5 (E.D. La. July 30, 2019) (finding that the NFL Constitution and Official Playing Rules were adopted for the benefit of the member clubs of the NFL and not intended to be relied upon by plaintiffs—fans—and that reliance on the same was not reasonable or justified).

In *Pacquiao*, the Ninth Circuit likewise affirmed the dismissal of claims for, *inter alia*, common law and statutory fraud brought by ticketholders to the 2015 boxing match between Emmanuel "Manny" Pacquiao and Floyd Mayweather, Jr. 942 F.3d at 1164. In particular, plaintiffs claimed that defendants (including the fight organizers and promoters) knew that Pacquiao was injured and concealed that injury, that plaintiffs would not have purchased tickets if they had known that Pacquiao was "damaged goods," and that the fight was a "magnificent con." *Id*. In holding that there was no cognizable claim, the Ninth Circuit explained that "although boxing fans—like all sports fans—can reasonably expect a regulation match, they also reasonably anticipate a measure of unpredictability that makes

spectator sports exciting." *Id*. at 1169. Thus, "[w]hatever subjective expectations Plaintiffs had before the match did not negate the very real possibility that the match would not, for one reason or another, live up to those expectations." *Id*. at 1170.

Similarly, in *Bowers*, the Seventh Circuit addressed claims brought by spectators to a Formula One race who sued because twenty cars were scheduled to race, but fourteen cars withdrew after it was discovered that they had a dangerous tire problem. 489 F.3d at 319. Among the claims brought by the plaintiff ticketholders was a promissory estoppel claim, in which they asserted that they relied upon the advertising and promotional material that indicated twenty cars would drive in the race. *Id*. at 324. In rejecting this claim (along with the other claims), the Seventh Circuit concluded that "no reasonable promoter or racing fan would have regarded a race's 'advertising and promotion' concerning the number of cars scheduled to roll as a promise upon which someone could reasonably rely." *Id*. The court further explained:

> [S]ports fans had to understand that numerous events could prevent a full complement of twenty cars from racing at a particular location on a particular day—dangerous track conditions, a driver's sudden illness, an accident in shipping a car to the track, any number of things, including the possibility that, for some reason, a driver might refuse to race. If the plaintiffs indeed went to Indianapolis only

> because they took the defendants' advertising as a reliable promise
> that twenty drivers, no fewer, would compete, they acted
> unreasonably.

*Id.*; *see also Le Mon*, 277 So.3d at 1169 (holding that "plaintiffs—ticket holders who attended the NFL Championship games—have no right to recover damages for fraud and deceptive trade practices allegedly committed by the NFL and its officials during the game"); *Castillo*, 701 N.Y.S.2d at 423 (affirming dismissal of claims brought by pay-per-view fans for, among other things, fraud and negligent misrepresentation seeking a refund for fight in which boxer was disqualified for biting his opponent's ear).

We recognize that plaintiffs are not suing as ticketholders or pay-per-view fans, but rather as participants in a fantasy sports contest that uses real-game statistics. However, the analysis of these cases, especially as it relates to reasonable expectations regarding the competition itself, applies with equal—if not greater—force here because, as acknowledged at oral argument, plaintiffs are an additional step removed from the baseball game itself when compared to paying ticketholders or viewers. *See also Oliver*, 2020 WL 1430382, at *3–4 (dismissing RICO and unjust enrichment claims brought by plaintiff who lost sports bets that the Los Angeles Dodgers would win the 2017 and 2018 World Series and who had

argued that he was the victim of fraud because the Astros and the Red Sox had engaged in sign-stealing). In other words, just as a ticketholder should have no reasonable expectation that he or she will see a game that is free of poor performance or rule violations, a fantasy sports participant similarly should have no such expectation in utilizing the statistics from that game. *See also id*. at *2 ("In the hyper-competitive world of professional sports, where hard-working athletes are heroes to children and adults alike, it is no secret that athletes will sometimes disappoint their fans by acting unethically to gain a perceived edge.").

Over the years, baseball has had to address many forms of cheating—such as spit balls, steroids, cork bats, and the list goes on and on—that are part of not only baseball, but every sport. In fact, as the Third Circuit noted, many forms of "arguably 'dishonest' conduct" in professional football are not prohibited by the rules at all. *Mayer*, 605 F.3d at 236. More specifically, here, non-electronic sign-stealing, which could also affect statistics, is not even new or outlawed; only *electronic* sign-stealing is. Put another way, it is highly implausible that fantasy baseball participants could reasonably rely upon a purported lack of electronic sign-stealing in participating in the DraftKings' contest, when non-electronic sign-stealing is not even prohibited by MLB rules.

41

In sum, given the lack of plausible allegations of actual or reasonable reliance (even when the proposed SAC is considered), we conclude that the district court properly dismissed the fraud and negligent misrepresentation claims based on the alleged affirmative misrepresentations.

### c. Alleged Misrepresentation by Omission

Plaintiffs also assert a misrepresentation by omission theory based on the premise that plaintiffs would not have entered into the MLB DFS contests if defendants had not concealed the sign-stealing schemes and the corrupting of the statistics on which the MLB DFS contests were based. The district court found that plaintiffs failed to identify any duty owed to them by defendants. We agree.

Fraud by omission, at its core, requires a showing (1) that plaintiff and defendant have a relationship giving rise to a duty to disclose, and (2) that the concealed information is material. *See Wood v. Motorola Mobility, Inc.*, No. C-11-04409, 2012 WL 892166, at *8–9 (N.D. Cal. Mar. 14, 2012); *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383–84 (Colo. App. 1990); *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. Dist. Ct. App. 1994); *accord Buffalo-Water 1, LLC v. Fid. Real Estate Co., LLC*, 111 N.E.3d 266, 277 (Mass. 2018); *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Under Restatement Second of Torts Section 551(2):

> [o]ne party to a business transaction is under a duty to
> exercise reasonable care to disclose to the other before the
> transaction is consummated, (a) matters known to him
> that the other is entitled to know because of a fiduciary
> or other similar relation of trust and confidence between
> them; and (b) matters known to him that he knows to be
> necessary to prevent his partial or ambiguous statement
> of the facts from being misleading; and (c) subsequently
> acquired information that he knows will make untrue or
> misleading a previous representation that when made
> was true or believed to be so; and (d) the falsity of a
> representation not made with the expectation that it
> would be acted upon, if he subsequently learns that the
> other is about to act in reliance upon it in a transaction
> with him; and (e) facts basic to the transaction, if he
> knows that the other is about to enter into it under a
> mistake as to them, and that the other, because of the
> relationship between them, the customs of the trade or
> other objective circumstances, would reasonably expect
> a disclosure of those facts.

Restatement (Second) of Torts § 551(2) (Am. L. Inst. 1977).[10]   According to

plaintiffs, defendants had a duty to disclose to prevent prior partial or ambiguous

statements from being misleading and a duty to disclose to provide updates when

---

[10]  The Supreme Court of Texas has never adopted the general duty to disclose facts in a
commercial setting under Section 551 of the Second Restatement of Torts.  *Bradford*, 48
S.W.3d at 755.   "A duty to disclose arises only out of a confidential or fiduciary
relationship."  *Beverick v. Koch Power, Inc.*, 186 S.W.3d 145, 153 (Tex. Ct. App. 2005).
Despite plaintiffs' contention that the MLB-DraftKings Agreement created a relationship
giving rise to a duty to disclose, no such fiduciary relationship is alleged to exist between
the Astros and plaintiffs.  In any event, as discussed *infra*, plaintiffs' claim fails even if the
broader standard under Section 551(2) is applied.   Thus, in our analysis, we assume,
*arguendo*, that the Section 551(2) standard applies to fraudulent non-disclosure claims
brought in each plaintiff's home state.

they subsequently acquired information rendering a prior representation untrue or misleading under Section 551(2) of the Second Restatement of Torts.

The parties dispute whether the relationship between them here meets the threshold requirement of Section 551(2) of the Second Restatement of Torts. That provision applies only "to parties that have entered into business transactions." *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1274 (10th Cir. 2019) (interpreting Colorado law and affirming that § 551(2) did not apply because there was no contract, employment, or other relationship giving rise to a duty to disclose); *accord Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 151 (2d Cir. 1993). Defendants argue, as the district court concluded, that Section 551(2) does not apply to defendants because they were not party to the MLB DFS transaction between plaintiffs and DraftKings. Plaintiffs contend that the district court erred in its conclusion because "courts in plaintiffs' home states have made clear that § 551(2) does not require 'privity' between parties, and that parties who are indirectly involved in a transaction are nonetheless subject to § 551(2)." Appellants' Br. at 57.

However, we need not reach this question because, even assuming, *arguendo*, the parties were "part[ies] to a business transaction" under the meaning of Section 551(2), the omitted facts at issue are not basic to the transaction and,

thus, no duty to disclose arises under Section 551(2).  As stated in comment j to

§ 551(2)(e):

> A basic fact is a fact that is assumed by the parties as a
> basis for the transaction itself.  It is a fact that goes to the
> basis, or essence, of the transaction, and is an important
> part of the substance of what is bargained for or dealt
> with.  Other facts may serve as important and persuasive
> inducements to enter into the transaction, but not go to
> its essence.  These facts may be material, but they are not
> basic.

Restatement (Second) of Torts § 551(2)(e) cmt. j (Am. L. Inst. 1977).  Basic facts go

beyond "those that are simply material."  *Wolf v. Prudential-Bache Secs., Inc.*, 672

N.E.2d 10, 12 (Mass. App. Ct. 1996) (finding no duty to disclose).  Instead, cases

where that rule has been found applicable have been "those in which the

advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of

the community, and is so extreme and unfair, as to amount to a form of swindling,

in which the plaintiff is led by appearances into a bargain that is a trap, of whose

essence and substance he is unaware."  Restatement (Second) of Torts § 551(2)(e)

cmt. l (Am. L. Inst. 1977).

No facts have been alleged here that would give rise to a plausible duty to

disclose under this standard.  Plaintiffs argue that "the integrity of MLB's player

performance statistics—the principal basis for success or failure in the [MLB DFS]

contests—was 'basic' to plaintiffs' decisions to pay entry fees to participate in those contests, and the corruption of those statistics was, therefore, also 'basic.'" Appellants' Br. at 56 (quoting Restatement (Second) of Torts § 551(2)(e) cmt. j (Am. L. Inst. 1977)).  Thus, plaintiffs seek to create a broad and all-encompassing duty that, in essence, would require defendants to disclose as a "basic fact" *anything* that could affect the integrity of MLB players' performance statistics.  Such an expansive interpretation of the duty to disclose in this context, which is unsupported by any case authority, would open the courthouse doors to a wide range of claims that would require courts to draw unmanageable lines between types of undisclosed facts.  Disappointed ticketholders, sports bettors, and others financially impacted (directly or indirectly) by the outcome of sporting events could sue over every type of undisclosed fact about teams and players, which plaintiffs could argue would have altered their decision to pay money in connection with the event.

In *Mayer*, the Third Circuit noted the endless litigation that could result from requiring a duty to disclose in these situations and rejected such a requirement:

> [T]here appear to be no real standards or criteria that a legal decision-maker may use to determine when a particular rule violation gives rise to an actionable claim or should instead be accepted as a usual and expected part of the game.  At the very least, a ruling in favor of

> [plaintiff] could lead to other disappointed fans filing lawsuits
> because of "a blown call" that apparently caused their team to lose or
> any number of allegedly improper acts committed by teams, coaches,
> players, referees and umpires, and others. This Court refuses to
> countenance a course of action that would only further burden
> already limited judicial resources and force professional sports
> organizations and related individuals to expend money, time, and
> resources to defend against such litigation.

605 F.3d at 237; *see also Pacquiao*, 942 F.3d at 1171 ("Plaintiffs' theory would require

all professional athletes to affirmatively disclose *any* injury—no matter how

minor—or risk a slew of lawsuits from disappointed fans. Such a result would

fundamentally alter the nature of competitive sports: Opponents would

undoubtedly use such information to their strategic advantage, resulting in fewer

games and matches won through fair play, and gone would be the days of athletes

publicly declaring their strength and readiness for fear of a lawsuit alleging that

fans were misled.").

We similarly reject plaintiffs' broad interpretation of a duty to disclose

under the circumstances of this case. The fact that all MLB DFS contestants had

access to player statistics was "basic" to the transaction, but the actions of the real-

life players and coaches were not. Put differently, MLB DFS contestants did not

bargain for statistics that were unaffected by real-life variables, including rules

violations; to the contrary, as discussed in the context of reasonable reliance, it is

47

"basic" to MLB DFS contests, and entirely foreseeable, that real-game statistics would be affected by such variables.  And, in any event, there is no indication that the statistics were inaccurate, because they properly reflected the events that took place on the field.[11]  Therefore, no duty to disclose such violations exists in this particular context, and the fraud by omission claim was properly dismissed.

In reaching this decision, we emphasize that our analysis is limited to alleged misrepresentations and omissions by participants related to the athletic competition itself, including topics such as performance, game strategy, and compliance with the rules.  We recognize that plausible fraud claims may exist in other cases with respect to statements or omissions unrelated to the core athletic competition, such as the financial health of a league/team or innumerable other business-related matters that are part of the sports industry, and our holding in no way addresses such claims.  *See, e.g.*, *Charpentier v. L.A. Rams Football Co.*, 89 Cal. Rptr. 2d 115, 117–19, 122–24 (Cal. Ct. App. 1999) (holding that season-ticket holder

---

[11]  In other words, the contestants are applying their skill in determining which players to select on a given day based on the players' actual past performance, and the contestants' success will be judged by the players' actual performance during the period covered by the fantasy contest.  The effect of player cheating on that contest is no different than any one of a number of unpublicized variables that could affect a player's performance, such as whether the player slept poorly the night before, is distracted by worries about a child's illness, or has a superstitious reaction to something that occurred on the way to the ballpark that saps his confidence.

stated a cause of action for fraud and deceit based upon alleged misrepresentations by Los Angeles Rams about their lack of intention to relocate the team and the absence of discussions with other cities); *Beder v. Cleveland Browns, Inc.*, 717 N.E.2d 716, 718–19, 722–23 (Ohio Ct. App. 1998) (holding that disputed issue of fact precluded summary judgment on fraudulent inducement claim brought by season ticketholders against Cleveland Browns related to alleged misrepresentation about team's intention to relocate to another city); *Skalbania v. Simmons*, 443 N.E.2d 352, 353, 359 (Ind. Ct. App. 1982) (holding that class action was properly certified where season ticketholders alleged that hockey team misrepresented its financial ability to finish the season in order to increase season-ticket sales, and then ceased operation after only 13 of 40 scheduled home games had been played); *see also In re Pacquiao-Mayweather Boxing Match Pay-Per-View Litig.*, No. 2:15-ml-02639, 2017 WL 6520608, at *9 (C.D. Cal. Aug. 25, 2017) ("If a sports team makes a misrepresentation concerning its business strategy or financial health, for instance, and fans detrimentally rely on that misrepresentation, the fans may have a valid claim against the team, just as they would in any other non-sports context. The only claims to be barred under the Court's framework are those based on a narrow set of misrepresentations or

49

omissions that cut to the core of athletic competition."), *aff'd*, 942 F.3d 1160 (9th

Cir. 2019).[12]

## C.   Plaintiffs' Consumer Protection Claims

Plaintiffs also assert claims for deceptive and unfair trade practices under

their home state consumer fraud statutes.  In particular, the FAC alleges that

defendants actively marketed and promoted the MLB DFS contests—inducing

consumers to participate in such contests—and that defendants concealed that the

statistics plaintiffs purportedly relied upon were "unreliable."  Although the

district court found dismissal warranted due to a failure to satisfy the heightened

pleading requirement of Rule 9(b), the district court independently dismissed the

claims because plaintiffs failed "to identify a sufficient nexus between the

transaction that allegedly harmed them and the defendants to support a consumer

protection claim."  *Olson I*, 447 F. Supp. 3d at 171.

On appeal, plaintiffs contend that the district court "failed to acknowledge

repeated allegations in the Complaint that defendants were not merely 'a passive

---

[12]  Similarly, we have no occasion here to consider the legal viability of a hypothetical claim that a league, team official, or others associated with a sport refrained from addressing instances of cheating for the purpose of participating in a fantasy contest based on inside knowledge that certain players were violating the rules to enhance their performance.

investor,' that they 'actively' and 'aggressively' marketed the contests, engaging in 'promotion, marketing and participation in inducing members of the public to engage' in the [MLB DFS] transactions."  Appellants' Br. at 36 (citations and emphasis omitted).  Defendants counter that "[t]he common theme in all of the cases Plaintiffs cite is that liability under state consumer protection statutes will not lie unless the defendant had a direct hand in the allegedly unfair or deceptive transaction," which defendants contend is absent here.  MLB Defs.' Br. at 54–55.  However, we may affirm on any ground supported by the record, *see In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 157 (2d Cir. 2015), *as amended* (Dec. 17, 2015), *aff'd on other grounds sub nom. Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386 (2018), and hold that, even if that requisite nexus is met, plaintiffs have failed to adequately allege an unfair or deceptive practice that can survive a motion to dismiss.

To state a claim under the consumer protection statutes of plaintiffs' home states,[13] plaintiffs must allege (1) a cognizable injury (2) caused by (3) an unfair or

---

[13]  California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; California Consumer Legal Remedies Act, CAL. CIV. CODE § 1750 *et seq.*; Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. ANN. § 6-1-101 *et seq.*; Florida Deceptive and Unfair Trade Practices Act, FLA. STAT. ANN. § 501.201 *et seq.*; MCPA, MASS. GEN. LAWS ch. 93A § 2 *et seq.*; TDTPA, TEX. BUS. & COM. CODE ANN. § 17.41 *et seq.*  Like the cited California, Colorado, Florida, and Massachusetts laws, the Federal Trade Commission

deceptive act or practice. *See Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 793 (9th Cir. 2012) (applying California law); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 146–47 (Colo. 2003) (en banc); *Marti v. Schreiber/Cohen, LLC*, 454 F. Supp. 3d 122, 127 (D. Mass. 2020) (applying Massachusetts law), *appeal dismissed*, No. 20-1518, 2020 WL 6877926 (1st Cir. June 18, 2020); *TLO S. Farms, Inc. v. Heartland Farms, Inc.*, 282 So.3d 145, 148 (Fla. Dist. Ct. App. 2019); *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). "The determination of whether certain conduct is unfair or deceptive is a question of fact, but whether that conduct rises to the level of a . . . violation [of a consumer protection statute] is a question of law." *Fed. Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 34 (1st Cir. 2007); *Cheslow v. Ghiradelli Chocolate Co.*, 445 F. Supp. 3d 8, 16 (N.D. Cal. 2020) (noting that "a court may determine, as a matter of law, that the alleged violations of [state consumer protection statutes] are simply not plausible" (citation omitted)); *accord Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368–69 (S.D. Fla. 2003).

We conclude that the alleged conduct here does not plausibly rise to the level of a deceptive or unfair practice. "[C]onduct is deceptive or misleading if it

---

Act proscribes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a).

52

is 'likely to deceive a reasonable consumer.'" *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 850 (N.D. Cal. 2018) (quoting *Williams v. Gerber Prods.*, 552 F.3d 934, 938 (9th Cir. 2008)); *accord Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 479–80 (Tex. 1995) (finding an act false, misleading, or deceptive if "it has the capacity to deceive an ignorant, unthinking, or credulous person" (internal quotation marks and citation omitted)); *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) ("[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." (internal quotation marks and citation omitted)). That test requires a probability "that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Lavie v. Procter & Gamble Co.*, 129 Cal. Rptr. 2d 486, 495 (Cal. Ct. App. 2003); *see also Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (explaining the standard under Florida law to "require[] a showing of *probable*, *not possible*, deception that is likely to cause injury to a reasonable relying consumer." (internal quotation marks and citation omitted) (emphasis added)).[14]

---

[14] Colorado has a heightened standard: "To be a deceptive trade practice under the CCPA, a false or misleading statement must be made with knowledge of its untruth, or

Plaintiffs allege that defendants acted deceptively by advertising the MLB DFS contests despite knowing that such contests were not "contests of skill" and that there were electronic sign-stealing schemes, and then making numerous alleged misrepresentations. As discussed *supra* in connection with the other claims, no reasonable consumer, not even an "ignorant, unthinking, or credulous person," *Boys Club of Greater Dallas*, 907 S.W.2d at 480, could believe that there would be no rules violations in MLB baseball games notwithstanding any statements by participants to the contrary. *See Oliver*, 2020 WL 1430382 at *2 ("In the hyper-competitive world of professional sports, where hard-working athletes are heroes to children and adults alike, it is no secret that athletes will sometimes disappoint their fans by acting unethically to gain a perceived edge.").

Plaintiffs emphasize that MLB DFS contests are "statistics-based competition[s]" and thus, can be fair only if the underlying "player performance statistics" are reliable. Appellants' Reply to MLB at 5. However, there is no allegation that the statistics utilized by plaintiffs in the MLB DFS baseball contests

---

recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008) (internal quotation marks and citation omitted). Since plaintiffs' claims fail under the lower standards promulgated by other states' courts, they similarly fail under Colorado's heightened standard.

did not accurately reflect the real-world baseball statistics of the MLB players based on their actual performances on the field during the games. To the extent that plaintiffs assert that such statistics are "unreliable" because they include the impact of unknown real-world variables (including rules violations), such variables reflect the reality of sports competition, and their existence does not render the sports competition—or a fantasy sports contest based upon that competition—deceptive or unfair. *See also Oliver*, 2020 WL 1430382, at *4 ("The Astros and Red Sox could have won the World Series for any number of reasons unconnected to the asserted pattern of fraud. The fact that a team may engage in the fraudulent use of technology to steal hand signals does not guarantee that the signal-stealing team will win. [Plaintiff] could have lost his bets for many reasons.").

Plaintiffs have failed to cite to a single case, in any jurisdiction, where a court has allowed a claim to proceed under a state consumer fraud statute based upon an alleged inadequacy in performance by participants in a sports competition or an undisclosed rule violation, or statements by participants related to such matters. That is no accident. When it comes to sports competitions, the one thing that a spectator or consumer can expect is the unexpected. As the Ninth Circuit

aptly explained in *Pacquiao*, "[i]n a typical consumer-protection case, consumers form beliefs about what they can expect by relying on public representations regarding the features of the good or service at issue." 942 F.3d at 1170. However, "[t]hese principles do not apply with equal force to claims brought by fans in the sports context" because the "'human drama of athletic competition' distinguishes this case from the garden-variety consumer protection cases." *Id*. (footnote and citation omitted). We agree, and the fact that plaintiffs are not spectators, but fantasy sports participants, does not dictate a different result *vis-à-vis* claims against the sports leagues and teams.

In short, the alleged misrepresentations and omissions at issue here do not support a plausible deceptive or unfair practice under any of the applicable consumer protection statutes. Thus, we affirm the district court's dismissal of all of plaintiffs' consumer protection claims.

### D.    Plaintiffs' Unjust Enrichment Claims

Finally, we conclude that the district court properly dismissed plaintiffs' unjust enrichment claims because plaintiffs have failed to plausibly allege that the benefit to defendants was unjust.[15]

---

[15]  As a threshold matter, MLB argues that there is no independent cause of action for unjust enrichment under either California or Texas law, and that Massachusetts and

To succeed on their claims of unjust enrichment, an equitable remedy, plaintiffs must demonstrate that defendants benefited at the expense of plaintiffs and the benefit was unjust. *See Scott v. Scott*, 428 P.3d 626, 636 (Colo. App. 2018); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So.3d 689, 693–94 (Fla. Dist. Ct. App. 2018); *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013); *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App. 2013).

Here, for similar reasons described with respect to the other claims, plaintiffs have failed to adequately plead that the alleged benefit to defendants was unjust. *See Hall v. Humana Hosp. Daytona Beach*, 686 So.2d 653, 656 (Fla. Dist. Ct. App. 1996) ("[T]he more modern action for unjust enrichment is an equitable remedy requiring proof that money had been paid due to fraud, misrepresentation, imposition, duress, undue influence, mistake, or as a result of some other grounds appropriate for intervention by a court of equity." (citation omitted)).

---

Florida law bar an unjust enrichment claim where a plaintiff has an adequate (albeit deficient) legal claim. However, we need not address these arguments because, assuming the existence of such a cause of action in each of these states, plaintiffs have failed to plead a plausible claim. Similarly, we need not address the other pleading defects argued by defendants.

In the instant case, plaintiffs received the benefit of their bargain since they participated in the MLB DFS contests. Potential losses are a known possibility when deciding to participate in MLB DFS contests, and plaintiffs cannot now claim that they were unaware of that possibility, or the possibility that they may not know all variables, that *might* affect their lineups and player statistics, including rules violations by teams and/or players. *See also Oliver*, 2020 WL 1430382, at *4 (holding that plaintiff who lost bets with a Las Vegas casino and through a sports betting app could not bring unjust enrichment claim against the Astros or the Red Sox related to electronic sign-stealing). Moreover, it is also conceivable that, since the nature of MLB DFS is a competition based on individual players, rather than teams, plaintiffs may have even benefitted due to electronic sign-stealing if they had drafted certain players. Accordingly, the unjust enrichment claims were properly dismissed.

*     *     *

In sum, we affirm the district court's dismissal of the claims in the FAC, as well as the denial of the motion for reconsideration, because plaintiffs failed to state any plausible claims in the FAC and the additional allegations in the

58

proposed SAC failed to cure (and could not cure) the pleading deficiencies contained within the flawed legal theories asserted by plaintiffs.

## II.     The Cross-Appeal

In the cross-appeal, the MLB Defendants and the Yankees (a non-party) challenge the district court's decision to unseal a September 2017 letter from MLB to the Yankees (the "Yankees Letter"), regarding the results of an internal investigation by MLB.  Plaintiffs filed the Yankees Letter under seal with their motion for reconsideration, and it was referenced in the district court's Memorandum Order denying that motion.

When reviewing a district court's order to seal or unseal a document, "we examine the court's factual findings for clear error, its legal determinations *de novo*, and its ultimate decision to seal or unseal for abuse of discretion."  *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016).  Cross-appellants argue that the district court misapplied the applicable law and abused its discretion in ordering the letter to be unsealed.  We disagree.

### A.     Common Law Right of Access to Judicial Documents

"Judicial documents are subject at common law to a potent and fundamental presumptive right of public access that predates even the U.S. Constitution."

59

*Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020). As we have explained, "[t]he presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice." *United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1048 (2d Cir. 1995).

However, "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access." *United States v. Amodeo* ("*Amodeo I*"), 44 F.3d 141, 145 (2d Cir. 1995). Instead, for a court filing to be classified as a "judicial document," it "must be relevant to the performance of the judicial function and useful in the judicial process." *Id*. Therefore, as a threshold question, the court "determines whether the record at issue is a 'judicial document'—a document to which the presumption of public access attaches." *Mirlis*, 952 F.3d at 59.

If a court determines the record at issue is a "judicial document," a determination that thereby attaches the common law presumption of public access to that record, it must next determine the particular weight of that presumption of access for the record at issue. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119

60

(2d Cir. 2006).  At this step, "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  *Amodeo II*, 71 F.3d at 1049.

Finally, once the weight of the presumption has been assessed, the court is required to "balance competing considerations against it."  *Id*. at 1050.  Those competing considerations may include, among others, "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure."  *Mirlis*, 952 F.3d at 59 (quoting *Amodeo II*, 71 F.3d at 1050).  After conducting this balancing, the court may deny public disclosure of the record if the factors counseling against public access outweigh the presumption of access afforded to that record.  *Id.*  Moreover, the presumption of access "requires a court to make specific, rigorous findings before sealing the document or otherwise denying public access."  *Newsday LLC v. County of Nassau*, 730 F.3d 156, 167 n.15 (2d Cir. 2013).

## B.    Analysis

Applying the requisite three-part test, the district court held that the Yankees Letter is a "judicial document," as to which there is a "very strong"

presumption in favor of public access, and that the competing privacy considerations identified by the MLB Defendants and the Yankees did not outweigh the presumption of public access afforded to that document. *Olson III*, 466 F. Supp. 3d at 454–57. Therefore, the district court concluded that the Yankees Letter should be unsealed, with minimal redactions to protect the identity of individuals mentioned therein. *Id.* at 456. Having carefully reviewed the legal challenges raised by cross-appellants to the district court's determinations under our precedent, we find those challenges unpersuasive and conclude that the district court did not abuse its discretion in ordering the unsealing of the Yankees Letter.

   a.   <u>Judicial Document</u>

The threshold question is whether the Yankees Letter is a "judicial document." As noted above, even though the ultimate decision to unseal is reviewed for abuse of discretion, this threshold determination is a question of law that is reviewed *de novo*. *United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 134 (2d Cir. 2017).

Cross-appellants argue that the "mere fact that a sealed document was 'submitted to the court for consideration' by one party is *not* sufficient to create a

presumption of public access to the document." Yankees' Br. at 25 (quoting *Trump v. Deutsche Bank AG*, 940 F.3d 146, 152 (2d Cir. 2019)). Although that is certainly an accurate statement of the law, it is not the mere filing of the Yankees Letter that makes it a judicial document in this case. Instead, the Yankees Letter was explicitly referred to, and quoted, in plaintiffs' proposed SAC (under seal) and was one of the key grounds asserted for the reconsideration motion seeking an opportunity to amend the dismissed pleading. In particular, plaintiffs argued that the Yankees Letter contradicted Commissioner Manfred's statements in the 2017 Press Release regarding an internal investigation by MLB and, thus, could provide a basis for a plausible fraud claim. Moreover, the Yankees Letter was directly addressed by the district court in its denial of the reconsideration motion. *Olson II*, 447 F. Supp. 3d at 179. Therefore, the Yankees Letter is undoubtedly a "judicial document" entitled to the presumption of public access.

The primary argument advanced by cross-appellants is that the Yankees Letter cannot be a judicial document because the district court ruled, after reviewing the letter, that the content of the document was immaterial to any plausible fraud claim. However, we have emphasized that a document filed with the court is a judicial document "if it would reasonably have the *tendency* to

influence a district court's ruling on a motion or in the exercise of its supervisory powers, without regard to which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019). Thus, the fact that the district court ultimately found the content of the Yankees Letter to be immaterial under the law does not undermine its classification as a judicial document.

Cross-appellants suggest that the analysis should be different here because the district court had already ruled in granting the motion to dismiss that any alleged misrepresentations about the integrity of real-life major league baseball (rather than fantasy baseball) were irrelevant to the claims. Therefore, cross-appellants contend that the additional allegations about the Yankees Letter were based on the same flawed legal theory that the district court had already rejected and was doomed to fail regardless of the specific content of the sealed document.

That contention, however, overlooks the fact that reconsideration motions, by their very nature, seek to have the court re-assess its prior analysis. Under cross-appellants' proposed approach, unsuccessful reconsideration motions would not be designated as "judicial documents" simply because they may appear to be futile in the wake of the court's prior ruling. That is not the law. The

classification of such motions (and exhibits to such motions) as "judicial documents" is not contingent upon their likelihood of success. Moreover, as we have explained, even if a court finds some piece of evidence irrelevant to its consideration of a particular motion or to the lawsuit itself, access to such materials assists the public in evaluating the merits of the court's decision:

> [E]rroneous judicial decision-making with respect to . . . evidentiary and discovery matters can cause substantial harm. Such materials are therefore of value "to those monitoring the federal courts." Thus, all documents submitted in connection with, and relevant to, such judicial decision-making are subject to at least some presumption of public access.

*Brown*, 929 F.3d at 50 (footnotes omitted) (quoting *Amodeo II*, 71 F.3d at 1049). Because the Yankees Letter was submitted in the motion for reconsideration in connection with plaintiffs' proposed SAC and was explicitly considered and rejected by the district court in its Memorandum Order, we conclude that the Yankees Letter was "relevant to the performance of the judicial function and useful in the judicial process," *Lugosch*, 435 F.3d at 119 (quoting *Amodeo I*, 44 F.3d at 145), and, therefore, the district court properly classified it is a "judicial document."

      b.     <u>The Presumption of Public Access</u>

Because the Yankees Letter is a judicial document, a presumption of public interest attaches. *Bernstein*, 814 F.3d at 141. Under our three-part analysis, the next

step for the court is to determine the strength of the presumption that should attach to the particular document at issue. *Lugosch*, 435 F. 3d at 119.

The presumption of public access exists along a continuum. The strongest presumption attaches where the documents "determin[e] litigants' substantive rights," *Amodeo II*, 71 F.3d at 1049, and is weaker where the "documents play only a negligible role in the performance of Article III duties," *id.* at 1050. *See also Bernstein*, 814 F.3d at 142 (finding that the presumption is "at its zenith" where documents "directly affect an adjudication, or are used to determine litigants' substantive legal rights," and is at its weakest where a document is neither used by the court nor "presented to the court to invoke its powers or affect its decisions" (internal quotation marks and citation omitted)). Thus, a strong presumption attaches to materials filed in connection with dispositive motions, such as a motion to dismiss or a summary judgment motion. *See Brown*, 929 F.3d at 50. Moreover, where the documents at issue "are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal." *Amodeo II*, 71 F.3d at 1050. In contrast, "[d]ocuments that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the

presumption's reach, and stand on a different footing than . . . a motion filed by a party seeking action by the court, or, indeed, than any other document which is presented to the court to invoke its powers or affect its decisions." *Id.* (internal quotation marks, alteration, and citations omitted).

The district court found that the Yankees Letter "represents the kind of document to which the strongest presumption of access applies." *Olson III*, 466 F. Supp. 3d at 455. We find no error in the weight accorded to the presumption by the district court. As the district court noted, the Yankees Letter was a core component of plaintiffs' motion for reconsideration, as plaintiffs argued that the additional allegations in the proposed SAC related to that letter (and its purported contradiction with the 2017 Press Release) required such reconsideration. In addition, the district court's denial of the reconsideration motion was a dispositive adjudication of the parties' substantive legal rights.

Cross-appellants again contend that the district court's ultimate determination, in the denial of the reconsideration motion, that the content of the letter was immaterial to plaintiffs' claims substantially weakens the presumption in this case. We disagree. As the district court explained in the Memorandum Order, "[t]he Court was plainly discussing the materiality of representations in the

2017 Press Release as a matter of law, not the materiality of the Yankees Letter to the Court's decisionmaking process." *Olson III*, 466 F. Supp. 3d at 455. Thus, in terms of the decisionmaking process, the district court characterized the Yankees Letter as "integral to the Court's reasoning in this case." *Id.* Under these circumstances, the presumption of access remains strong. Moreover, the strength of that presumption is bolstered by the fact that, as discussed above, the public will be able to better understand and assess the district court's ruling with more complete knowledge of the document that was referenced in their proposed SAC and that was a cornerstone of plaintiffs' reconsideration motion.

The Yankees caution that "[t]he district court's Unsealing Order, if left to stand, provides a roadmap for a plaintiff who brings meritless litigation to, after the case is dismissed, circumvent a protective order and harm a non-party by simply filing a meritless motion for reconsideration and attaching the sealed document to that motion." Yankees' Br. at 25–26 (emphasis omitted). We addressed a similar concern in *Amodeo II* and stated that "we believe motive generally to be irrelevant to defining the weight accorded the presumption of access" at step two of the analysis. 71 F.3d at 1050. Instead, considerations of "personal motives, such as an individual vendetta or a quest for competitive

economic advantage . . . are best weighed as part of an assertion by a person or firm of a right of privacy based on an anticipated injury as a result of disclosure." *Id*. Thus, such considerations will be part of the final step of the analysis to which we now turn.

    c.      <u>Privacy Interests</u>

After assessing the weight of the presumption, the court must balance the privacy interests of the cross-appellants supporting the non-disclosure of the document with the presumption of public access. *Id*. Here, after careful consideration of the competing considerations, the district court concluded that "[t]he privacy interests of MLB and the Yankees . . . are modest at best, and not nearly strong enough to overcome the robust presumption of access that attaches to the Yankees Letter." *Olson III*, 466 F. Supp. 3d at 455. We discern no basis to disturb the district court's discretionary balancing of these factors.

As an initial matter, the Yankees argue that, as a non-party, the team has a heightened interest in privacy. To be sure, we have recognized that "[t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation." *In re Application of Newsday, Inc.*, 895 F.2d 74, 79–80 (2d Cir. 1990) (citation omitted). Here, although the Yankees are not named as a defendant, their

third-party status should be placed in context.  More specifically, the Yankees are members of MLB (a named defendant in this case) and, through that membership, they allow the Commissioner, as part of the MLB Constitution, to, among other things, investigate any alleged practices that are "not in the best interests of the national game of Baseball" and to make decisions regarding what actions are appropriate following such investigations.  Joint App'x at 217.  The Yankees do not contend that there are limitations to the Commissioner's authority to make public the results, in whole or in part, of an internal investigation.  Thus, to the extent that the privacy rights of the Yankees are affected by the decisions of MLB and its Commissioner regarding the handling of the results of the investigation (including public disclosures), the Yankees are not equivalent to a third party who is unassociated with MLB.  *Cf. Byrne v. Yale Univ., Inc.*, No. 3:17-CV-1104 (VLB), 2020 WL 1820761, at *3 (D. Conn. Apr. 10, 2020) (concluding sealing of confidential internal investigation materials warranted where the incidents and individuals referenced were far removed from the district court's decision).  We recognize, however, that the privacy of interests of the Yankees, even given their membership in MLB, must be given careful consideration along with similar privacy interests asserted by MLB itself.

With respect to those privacy interests, cross-appellants emphasize that results of an internal investigation are traditionally private and prepared with an expectation of confidentiality. *See Amodeo II*, 71 F.3d at 1051 ("[C]ourts should . . . consider the degree to which the subject matter is traditionally considered private rather than public."). Moreover, they argue that the public disclosure of the Yankees letter reflecting the results of the internal investigation would "chill the cooperation and candor that is essential to the conduct of thorough and fair internal investigations in MLB and other sports and industries." Yankees' Br. at 33. The Yankees further contend that the team will suffer "significant and irreparable reputational harm" if the document is released to the public. Yankees' Br. at 36.

Each of these considerations the Yankees and MLB invoke for continuing to seal the Yankees Letter, however, overlooks a fact that is critical to the balancing—namely, that MLB voluntarily disclosed major portions of the content and pertinent conclusions of the internal investigation, as summarized in the Yankees Letter, to the public in the 2017 Press Release. In particular, the 2017 Press Release (issued one day after the Yankees Letter was privately sent to the Yankees) explained that: (1) the Red Sox violated MLB rules through the use of an electronic

device to decode signs; (2) there was insufficient evidence that the Yankees had made improper use of the YES Network to decode signs; and (3) the Yankees violated MLB rules through their use of a dugout phone. Thus, the district court did not err in concluding that the privacy interests of both MLB and the Yankees were greatly diminished because the content of the Yankees Letter, to a substantial extent, had already been made public by MLB. *Olson III*, 466 F. Supp. 3d at 456. In fact, given the public nature of the disclosure, the diminished value of the Yankees' privacy interest under such circumstances would not change even if the Yankees had no relationship to MLB. In addition, any argument regarding the chilling effect on future MLB internal investigations was substantially undermined not only by the public disclosure of the results of the investigation detailed in the Yankees Letter, but also by MLB's decision to issue similar press releases regarding other internal investigations into alleged sign-stealing schemes in September 2017 (Red Sox), January 2020 (Astros), and April 2020 (Red Sox). Joint App'x at 482–84, 495–98.

Moreover, it is important to note that the Yankees primarily contend they will suffer "significant and irreparable reputational harm" not because of the actual substance of the Yankees Letter, but rather because its content would be

distorted. Yankees' Br. at 18. The Yankees argue that the harm from the unsealing of the Yankees Letter will arise because its content "would be distorted to falsely and unfairly generate the confusing scenario that the Yankees had somehow violated MLB's sign stealing rules, when in fact the Yankees did not." Yankees' Br. at 36. That argument, however, carries little weight. Disclosure of the document will allow the public to independently assess MLB's conclusion regarding the internal investigation (as articulated to the Yankees), and the Yankees are fully capable of disseminating their own views regarding the actual content of the Yankees Letter. In short, any purported distortions regarding the content of the Yankees Letter can be remedied by the widespread availability of the actual content of this judicial document to the public, and the corresponding ability of MLB and the Yankees to publicly comment on it.

We also need to address the claims regarding plaintiffs' motivation. More specifically, the MLB Defendants accuse plaintiffs of trying to circumvent the stipulated confidentiality order that protected the Yankees Letter in discovery for "perceived shock value, or to cause potential embarrassment," MLB Defs.' Reply Br. at 12, and the Yankees echo this accusation, Yankees' Reply Br. at 2–5, 20. As noted above, improper motives in any attempt to use and/or unseal a judicial

document can be considered by the court during the step-three balancing. However, as the district court noted, cross-appellants "offer[ed] no evidence of plaintiffs' bad faith beyond speculation," *Olson III*, 466 F. Supp. 3d at 456, and, on appeal, cross-appellants have similarly failed to point to any evidence in the record that would support disturbing the district court's finding of the lack of bad faith by plaintiffs as it relates to the use of the Yankees Letter in their motion or in their support for its unsealing.

Finally, we note that the district court took particular care to address the privacy interests of certain individuals mentioned in the Yankees Letter (and not the 2017 Press Release), whose identities were not critical to the public's ability to understand the Yankees Letter's content and its relationship to plaintiffs' claims, as well as to assess the district court's ruling. Specifically, the district court held that the identification of these individuals could be redacted from the publicly-filed version of the Yankees Letter. *Id.* at 456. That approach was consistent with our guidance that, in conducting this balancing and exercising its discretion, a district court should consider its ability to use redactions that do not unduly interfere with the public's right to access judicial documents in order to address privacy concerns. *See Amodeo II*, 71 F.3d at 1047–48, 1052–53; *accord Newsday, Inc.,*

895 F.2d at 80 (affirming order releasing search warrant affidavit and noting that "[t]he record shows that the district court was aware of the privacy interests at stake, and redacted references to innocent third parties").

In sum, where the presumption of public access is at its strongest, as it is here with respect to the Yankees Letter, the presumption can be overcome only by countervailing considerations in "extraordinary circumstances." *Amodeo II*, 71 F.3d at 1048. The district court did not abuse its discretion in concluding that the privacy interests of cross-appellants, as well as the related countervailing considerations against unsealing, were insufficient to overcome the strong presumption in favor of public access in this case, and thus, the unsealing of the Yankees Letter with redactions was warranted.

### III.   CONCLUSION

For the reasons set forth above, we AFFIRM the district court's dismissal of plaintiffs' FAC without leave to amend and the district court's denial of plaintiffs' motion for reconsideration. We also AFFIRM the district court's unsealing order.